IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CLIFFORD OWENSBY | ) | CASE NO. |
| c/o James R. Willis, Esq. | ) | |
| 75 Erieview Plaza, Ste. 108 | ) | |
| Cleveland, OH 44114 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | (JURY DEMAND ENDORSED) |
| -vs- | ) | |
| | ) | |
| CITY OF DAYTON | ) | |
| c/o Law Department | ) | |
| 101 W. Third Street | ) | |
| Dayton, Ohio 45402 | ) | |
| | ) | |
| WAYNE M. HAMMOCK | ) | |
| Dayton Police Department | ) | |
| 335 W. Third Street | ) | |
| Dayton, Ohio 45402 | ) | |
| | ) | |
| VINCENT J. CARTER | ) | |
| Dayton Police Department | ) | |
| 335 W. Third Street | ) | |
| Dayton, Ohio 45402 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Clifford Owensby, by and through his attorney, hereby submits this Complaint, and alleges the following:

**INTRODUCTION**

1. This is a civil rights action seeking justice for the shocking use of unnecessary police force and unlawful arrest of a paraplegic man whom the defendant Officers Wayne M. Hammock and Vincent J. Carter (collectively, "Officers") rashly and viciously attacked after failing to credit

and recognize his professed disability and misinterpreting his non-threatening attempts to de-escalate the encounter as challenges to police authority.

This egregious ordeal began with what should have been a simple traffic stop. Mr. Owensby was driving a vehicle with windows tinted in excess of the legal opacity, a non-arrestable minor misdemeanor offense. Indeed, these defendant Officers literally ordered Mr. Owensby out of his vehicle. This despite lacking the requisite reasonable suspicion that a crime had occurred beyond the non-arrestable offenses associated with the traffic stop. This order was made in hopes of conducting an illegal "free air" dog sniff, indeed despite the fact no canine was present on the scene. Despite repeatedly informing them of his physical disability that made Mr. Owensby incapable of stepping out of the vehicle, defendant Officers Hammock and Carter, with the help of canine officer Jeremy Stewart once he arrived, literally yanked Mr. Owensby out of the vehicle by his dreadlocked hair, causing significant and lasting injury.

It is undeniably pellucid, indeed to the highest possible degree, that under the Fourth Amendment, the actions of those who are judged thereby (which for sure would include the defendant Officers) are required to obey the law even as they enforce it. And with that being so, not unlike the rest of us, law enforcement officers can be held accountable when their conduct toward any individual crosses a line. This is particularly so when the evidence shows, as it does here, that police officers are ill-prepared to accommodate disabled persons who are unable to follow Commands due to their disabilities. For sure, this is especially so when the reasons for the Commands are not based on anything rational; officer safety, escape, or destruction of evidence.

Here, it may be helpful to simply note that, when fully developed, the facts will show the conduct of these defendant Officers was scandalous, arbitrary and capricious. Likewise, it was resultant from an egregious intent that had been artificially generated. The defendant Officers'

2

underlying motivations to search Mr. Owensby's vehicle were prefaced upon Mr. Owensby's "history." In our judgment, having acted on their ulterior motivations as these Officers did cannot possibly defended - - indeed, in law, logic, or commonsense.

As such, Mr. Owensby seeks compensation for physical and emotional harm, pain and suffering, permanent scarring, and economic damages, as well as punitive sanctions against the individual officers to punish and deter the blatant abuse of authority and violation of right evident here.

## JURISDICTION AND VENUE

2. Mr. Owensby's claims are brought pursuant to 42 U.S.C. §1983, the United States Constitution, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq*., as amended, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §701, *et seq*.

3. This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. §§1331 and 1343.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the Southern District of Ohio.

5. Jurisdiction supporting the Mr. Owensby's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988.

## PARTIES

6. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

7. Plaintiff, Clifford Owensby, was at all times relevant to this Complaint, a resident of Montgomery County in the State of Ohio and physically disabled (paraplegic) within the meaning of the Americans with Disabilities Act.

8. Defendant Wayne M. Hammock was at all times relevant to this Complaint employed as a police officer for the City of Dayton located in Montgomery County, Ohio. Defendant Hammock was acting under color of law in his capacity as a police officer at the time of the incident.

9. Defendant Vincent J. Carter was at all times relevant to this Complaint employed as a police officer for the City of Dayton located in Montgomery County, Ohio. Defendant Carter was acting under color of law in his capacity as a police officer at the time of the incident.

10. Defendant City of Dayton, Ohio is an Ohio municipality, established under the laws of Ohio. Defendant City of Dayton is responsible for the policies, practices, supervision, training, and final decision-making of the Dayton Police Department and its officers. Defendant City of Dayton was at all times relevant to this Complaint the employer of Defendants Hammock and Carter, and ultimately controlled the supervision and oversight of its department, police officers, and the faulty police department policies and training employed and/or relied upon at the time of the incident.

## BACKGROUND FACTS

11. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

12. Mr. Owensby is a paraplegic. He routinely uses a wheelchair to move about; as well as a specialized hand accelerator and brakes to operate his vehicle. Mr. Owensby indisputably suffers from a physical impairment that substantially limits his ability to perform several major life activities. Mr. Owensby often requires the assistance of others familiar with the care of paralyzed individuals to assist him in everyday tasks including, but not limited to, transfers needed when moving between his wheelchair and his vehicle.

13. On September 30, 2021, Mr. Owensby was running errands in his car and travelling to

return the cable boxes retrieved from the residents of one of his rental properties to Spectrum.

14. At approximately 11:50AM, Mr. Owensby picked up the cable boxes.

15. Defendant Officers Wayne M. Hammock and Vincent J. Carter had supposedly been watching Mr. Owensby pick up the cable boxes in what the defendant Officers might refer to as a high crime area.

16. At approximately 12:29PM Defendants Hammock and Carter pulled Mr. Owensby over less than seven hundred feet from his home for driving a vehicle with windows tinted in excess of the legal opacity.

17. Operating a vehicle with windows tinted in excess of the legal opacity is a non-arrestable minor misdemeanor offense in violation of Ohio Revised Code §4511.81(C), punishable by a maximum fine of One-Hundred and Fifty Dollars ($150.00).

18. Immediately after noticing the flashing overhead lights of the marked Dayton Police Department cruiser behind him, Mr. Owensby pulled over.

19. Defendant Carter approached Mr. Owensby's driver's side window and asked for his driver's license while Defendant Hammock approached the passenger's side.

20. Defendant Officers returned to the police cruiser; Defendant Carter proceeded to run Mr. Owensby's license through the Law Enforcement Automated Data System (LEADS), and Defendant Hammock called for a canine unit and retrieved a window tint meter.

21. Notably, the LEADS check revealed no active warrants and that Mr. Owensby's driver's license was valid.

22. While Defendant Carter continued writing the traffic citation, Defendant Hammock approached Mr. Owensby's passenger side to measure the vehicle's window tint percentage.

23. Defendant Hammock determined the window's visible light transmission to be Twenty

Percent (20%).

24. Defendant Hammock remarked that the three-year-old child in the back seat was not in a car-seat before returning to his cruiser - - this fact, we concede.

25. Failing to restrain the child in a proper car seat, is a non-arrestable minor misdemeanor in violation of Ohio Revised Code §4511.81, punishable by a maximum fine of Seventy-Fifty Dollars ($75.00).

26. Defendant Hamock advised Defendant Carter of the alleged violation to be added to the ticket.

27. While Defendant Carter finished writing the ticket, Defendant Hammock returned to Mr. Owensby's driver's side window and instructed him to turn off the vehicle - - this was done for reasons that were not expressed.

28. Mr. Owensby, of course, readily complied.

29. Defendant Hammock then ordered Mr. Owensby to unbuckle his seatbelt and step out of the car.

30. Mr. Owensby specifically, and indeed unequivocally, informed Defendant Hammock that he could not step out of the vehicle **due to being a paraplegic**. This revelation, he emphasized.

31. Defendant Hammock asked how Mr. Owensby got in the car.

32. Mr. Owensby advised that he had help getting in the vehicle from a family member. Defendant Hammock then abruptly opened Mr. Owensby's door and "I'm going to help you get out," which evidenced the officer's indifference to Mr. Owensby's handicaps despite the lack of any basis grounded in law, logic, commonsense, or human compassion.

33. Granted, it is a fact that Mr. Owensby told Defendant Hammock not to touch him, which admonition was not merely ignored as the facts will show.

6

34. Defendant Hammock then arrogantly and dogmatically stated: "I'm asking you, but I'm telling you so it's not an option."

35. When Mr. Owensby asked what the problem was, Defendant Hammock said, "the problem is that **because of your history**, I am going to have a dog go free air around the car and you have to be out of the car to do that." This Command was made in accordance with defendant City of Dayton's policy that requires all individuals be removed from a vehicle prior to a dog conducting a free air sniff around the vehicle.

36. Given the *mens rea* exposed by the above quoted, it follows: the critical inquiry here asks whether Mr. Owensby's history supplied the requisite probable cause necessary to arrest and to search as was done.

37. Still, it happened that Mr. Owensby once again respectfully advised that he could not step out of the car.

38. Defendant Hammock's response was to declare, "I am going to assist you getting out of the car."

39. Mr. Owensby again told Defendant Hammock not to touch him and even called a family member to come bear witness to the events that were transpiring.

40. Before the arrival of the canine officer, Defendant Carter, having finished writing the traffic ticket, joined Defendant Hammock at Mr. Owensby's driver's side window and, too, instructed Mr. Owensby to get out of the car.

41. Defendant Hammock reached into the car through the window to unbuckle Mr. Owensby's seatbelt without any resistance, thereby unstrapping him. Defendant Hammock again demanded Mr. Owensby to step out of the car.

42. Mr. Owensby again repeated, "I'm a paraplegic, sir. I can't step out of the car."

43. Defendant Hammock's response was to exclaim to Mr. Owensby that he got into the car so he should get out of the car to avoid being pulled out.

44. Mr. Owensby asked Defendant Hammock "can you call your 'white shirt' (*i.e.*, a supervisor), please?"

45. Defendant Hammock, in the wake of Mr. Owensby's request, became increasingly agitated and outraged. This caused him to officiously yell, "I'm going to pull you out and then I'll call a white shirt because you're getting out of the car! That's not an option!"

46. After becoming even more aggressive and abusive: Defendant Hammock said, "you're getting out of this car so you can cooperate and get out of the car, or I will drag you out of the car! Do you see your two options here?"

47. Mr. Owensby's response to this outrageous conduct as to calmly tell Defendant Hammock that he has rights and would like a white shirt to be called. This most assuredly was a request he had a right to make – in our judgment.

48. Officer Hammock declared, "I will after I'm done."

49. Defendant Hammock immediately grabbed one of Mr. Owensby's forearms with both hands while Defendant Carter grabbed the other forearm. And, in the wake thereof, they imposed their will on Mr. Owensby.

50. Mr. Owensby started yelling, "what are you doing bro? I'm a paraplegic I'm trying to tell you I got help getting in the car! Y'all could f--king hurt me!" We deem his responses to be pleas for help that were callously ignored.

51. Ignoring Mr. Owensby's concerns, the facts will show, Defendants Carter and Hammock forcefully yanked and tugged at Mr. Owensby's arms. Our contention, here, is these acts were atrocious, brutal, painful, and illegal.

52. Next it happened that in an attempt to keep himself from being thrown to the ground, Mr. Owensby grabbed his steering wheel. Clearly this was a futile effort to survive the illegal onslaught on his well-being.

53. The canine handler, Officer Jeremy Stewart, who had by that time only just arrived, noticed the struggle and helped pry Mr. Owensby's fingers from the wheel. This seemed to be an effort to lessen apparent agony and the ferocity of his tormentors.

54. Simultaneously, Defendant Carter pulled Mr. Owensby's other arm with both hands while Defendant Hammock grabbed a handful of Mr. Owensby's hair.

55. Defendant Carter suddenly released Mr. Owensby's arm allowing Defendant Hammock, with Mr. Owensby's hair in one hand and the base of his skull in the other hand, to literally drag Mr. Owensby out of the car by his head, letting Mr. Owensby's back slam against the pavement.

56. Defendant Hammock dragged Mr. Owensby several feet before letting him go. The force of Mr. Owensby's body hitting the ground was so great that his shoes literally popped off of his feet.

57. Mr. Owensby then cried out in pain and agony, indeed while pleading to the gathering crowd for help.

58. Once Mr. Owensby was literally rolled on his back and while his arms were being restrained by Defendant Hammock, Defendant Carter announced, "there's something [a weapon] right here," before running his hand over Mr. Owensby's crotch, only to realize his suspicion was Mr. Owensby's penis, a fact the officers joked about later.

59. Mr. Owensby was repeatedly instructed to "stop" even as he cried out, "you're hurting me." All this was done by him to no avail.

60. Defendant Hammock's response was to Command Mr. Owensby to stop yelling and

writhing in pain while pinned on his side against the ground. This clearly was done to evidence he was in command of this situation - - as was truly the case.

61. To further restrict Mr. Owensby's movement, Defendant Hammock rested his weight on his knee placed on Mr. Owensby's rib cage while using his hand to restrain Mr. Owensby's neck.

62. Simultaneously, Defendant Carter restrained both of Mr. Owensby's arms. Mr. Owensby again shouted, "I'm a paraplegic" to which Defendant Hammock responded, "then stop! You're making this worse than it needs to be!"

63. Mr. Owensby's response to all this was that he repeatedly told the officers that he was a paraplegic and had given them everything they asked for. And Mr. Owensby again asked for the officers to call a white shirt.

64. Defendant Hammock's response was to repeatedly instruct him, "cooperate! You're not cooperating!"

65. Defendant Hammock removed his weight from Mr. Owensby's body leaving Defendant Carter to rest his weight on his knee placed on Mr. Owensby's hip with Mr. Owensby's left arm pinned against the ground and his right arm restrained by Defendant Carter's hand.

66. With Mr. Owensby pinned against the ground and not moving, Defendant Hammock again grabbed a handful of Mr. Owensby's hair in one hand and Mr. Owensby's left arm with his other hand and dragged Mr. Owensby several more feet across the ground, flipping him onto his stomach.

67. Defendant Carter then dug his knee directly into Mr. Owensby's lower-back while grabbing one arm. Defendant Hammock forcibly grabbed the other arm to handcuff Mr. Owensby.

68. Throughout this the entire ordeal, Mr. Owensby continuously advised the defendant

Officers that they were hurting him, what was being done to him was unjust, and he was a paraplegic. Mr. Owensby also pleaded for help throughout the encounter.

69. Yet, with his sweatpants around his ankles and no shoes on his feet, Mr. Owensby was hauled to a police cruiser, his paralyzed legs dragging across the pavement in their wake.

70. To be sure, the facts here will show that instead of replacing Mr. Owensby's shoes on his feet, Defendant Hammock threw them into Mr. Owensby's vehicle through an open window.

71. Once at the cruiser, Defendant Carter propped Mr. Owensby into the backseat, with Defendant Hammock yanking him from the other side to situate him in the car, despite Mr. Owensby's cries that the officers were hurting him. These pleas, of course, were ignored.

72. Defendant Hammock said, "I told you it was not an option."

73. Once the arrest of Mr. Owensby had been consummated, a thorough search of Mr. Owensby's vehicle was conducted. For sure, it will be said this search was lawful. This despite the officers' constant remarks that guns and/or drugs must have been in the car. For sure nothing illegal was located. Of course, the monies were seized by these officers for reasons other than safekeeping, It remains in the possession of the culprits.

74. Here, too, it is a fact that when it became apparent to Defendant Hammock that the seizure of the money may not occur, he asked, "Why aren't they seizing the money now with his history and making him show proof?"

75. Defendant Hammock was told, as proof of the expertise of these officers, that a Prosecutor (some time in the future, at his convenience) would make that decision once the amount of currency was ascertained.

76. Sergeant Alex Magill, the supervisor called to the scene, approached Defendants Carter

and Hammock as they were counted the seized Currency. It was by then on the hood of one of the police cruisers with Officer Stewart observing. And, of course, the money was seized despite the lack of probable cause to do so - - which renders the seizure itself a constitutional violation, indeed of the Fourth Amendment and Takings Clause of the Fifth Amendment.

77. Defendant Hammock explained that Mr. Owensby would not get out of the car, so he yanked Mr. Owensby out of the car.

78. At some point in conversation with these officers, Sgt. Magill asked if Mr. Owensby was going to jail and, if so, for what.

79. Officer Hammock's response was that Mr. Owensby was going to jail for "obstruction" - - a misdemeanor of the second degree in violation of Ohio Revised Code §2921.31.

80. Sgt. Magill asked if there was any "dope" in the car to which Defendant Hammock responded, "no. . . but we gotta do something with the money."

81. Once Sgt. Magill walked away, Officer Stewart remarked quietly, but audible enough to be recorded, "I don't know why you beat that poor man up."

82. Defendant Carter who, unlike Defendant Hammock had not already muted his bodycam, immediately muted his bodycam in the wake of Officer Stewart's comment.

83. Contemporaneously, with the search of the vehicle and the counting of the money, Sgt. Magill initiated a discussion with Mr. Owensby in the back of the police cruiser.

84. Through tears, Mr. Owensby told Sgt. Magill what happened and explained that he had requested a supervisor because he wanted the situation de-escalated since the officers were aggressive. Mr. Owensby explained he is a paraplegic and that he had help getting in the vehicle. Mr. Owensby expressed that was afraid that the officers would hurt him if the defendant Officers removed him from the vehicle incorrectly.

85. In response, Sgt. Magill defended his officers' conduct. In doing so, he explained to Mr. Owensby was to indicate, in so many words, that a supervisor cannot just drop everything to help and that the Supreme Court authorized what had been done to him.

86. Sgt. Magill further remarked that the officers will not stop **an investigation** simply because a supervisor is requested and that, if someone does not go along with the program, that is a crime.

87. It was then, and again, that Mr. Owensby explained that he had not wanted to get hurt and that he is a paraplegic; thus, he could not run away or do anything else to abscond.

88. Sgt. Magill told Mr. Owensby that he should have asked for help so the officers could accommodate.

89. Mr. Owensby said the only help he knew to ask for was a supervisor to de-escalate the encounter.

90. Sgt. Magill informed Mr. Owensby that even if the officers pulled him out by his hair, it was because he was not complying.

91. In frustration, Mr. Owensby banged his head against the headrest several times and started sobbing, "why?"

92. Sgt. Magill said, "you're making a scene for no reason."

93. After having left Mr. Owensby alone in the cruiser for a while, Sgt. Magill asked Mr. Owensby if he was in any pain.

94. Mr. Owensby told Sgt. Magill that he felt pain in his legs.

95. Sgt. Magill said, "but you can't feel your legs."

96. Mr. Owensby reiterated that he felt pain in his legs and wanted to go to the hospital to make certain he was okay.

97. Sgt. Magill asked where specifically Mr. Owensby was hurt, but, by the supervisor's

standards, Mr. Owensby could not articulate his pain specifically enough.

98. Thus, Sgt. Magill decided that Mr. Owensby did not need to go to the hospital since he did not see any injuries and no specific allegations of injuries were reported. Of course, that was not true. Still, Mr. Owensby was left alone in the vehicle once more.

99. A short time later, Mr. Owensby specifically asked an unknown officer to advise Sgt. McGill that his lower back **also** hurt.

100. Still, it happened that over twenty minutes after having expressed feeling pain in his lower back, Mr. Owensby was then examined for injuries and photographs were taken.

101. Ultimately, it was decided that Mr. Owensby should go to the hospital and thus, he was transported by Defendants Hammock and Carter and Officer Stewart.

102. Upon his arrival at the hospital, medical personally observed an injury on Mr. Owensby's lower back near his buttocks where a once closed bedsore had ruptured. Several scrapes and bruises on Mr. Owensby's body were also observed. A bandage was placed over the open bedsore wound and Mr. Owensby was released.

103. Upon his discharge, the defendant Officers transported Mr. Owensby to the Montgomery County Jail.

104. The Record will show that the Jail refused to accept Mr. Owensby, this for reasons that could not be any clearer. In the wake of that indication, Mr. Owensby was told that he needed to make his own arrangements to get home. As a result, Mr. Owensby was picked up by a family member.

105. Prior to leaving the Jail, Mr. Owensby received paperwork related to the approximately $22,450.00 in U.S. Currency seized as well as a ticket for the Tint and Child Restraint traffic violations.

106.  To date, Mr. Owensby has not been charged with any offenses other than the minor

misdemeanor offenses referenced above. Specifically, Mr. Owensby was never charged with

Obstructing Official Business, the charge cited by Defendant Hammock as the basis for Mr.

Owensby's arrest.

### CLAIM I:
### 42 U.S.C. 1983 – Excessive Force
### (Against Defendants Wayne M. Hammock and Vincent J. Carter)

107.  Plaintiff  hereby incorporates all other preceding paragraphs of this Complaint as if set

forth herein.

108.  Defendants Hammock and Carter intentionally and knowingly applied unnecessary,

unreasonable, and excessive force against Mr. Owensby by grabbing him by his arms, yanking

him by his hair, forcefully throwing him to the ground, pinning him down with their knees in his

back, dragging him across the pavement, and haphazardly hauling him into the vehicle without

any regard to his lack of ability to walk, balance and sit up.

109.  At the various times Defendants used force, Mr. Owensby never posed any serious

threat to the officers or anyone else. Mr. Owensby was visibly unarmed and, at all times, at the

mercy of these assailants.

110.  At all times relevant, including when Defendant Hammock used force, the truth will

show Mr. Hammock realized and was aware that he had encountered Mr. Owensby on a prior

traffic stop that occurred on February 26, 2020. Then, it also happened that Defendant Hammock

sought to have Mr. Owensby (suffering from paraplegia then, too) exit his vehicle. On this prior

occasion, a supervisor was called and arrived at the scene of the stop prior to Mr. Owensby

exiting his vehicle. Notably, the supervisor overruled Defendant Hammock and not only allowed

Mr. Owensby to remain in his vehicle, but also immediately let Mr. Owensby continue on his way without any further delay.

111.  At the time the defendant Officers used force, they failed to utilize lesser means of force to de-escalate, reasonably communicate with, and/or control the situation, despite Mr. Owensby's obvious disability and defendant Officers having plenty of time and opportunity to do so.

112.  Defendants (on the occasion here involved), to be sure, did maintain the use of inordinate force on Mr. Owensby. This despite his exclamations that he was a paraplegic, and the officers were hurting him.

113.  Even postured by these insuperable facts, if the defendant Officers were justified in stopping, detaining, arresting, or otherwise using some level of force during the encounter (which we insist was unjustified), the quantum of force used went far beyond that which could be considered reasonably justifiable under the circumstances.

114.  To be sure then, we are contending the use of force by Defendants under these circumstances was objectively unreasonable. It was also cruel and unusual punishment they inflicted on Mr. Owensby. This despite any right to due process.

115.  The actions as described herein of Defendants while acting under color of state law also deprived Mr. Owensby of the rights, privileges, and liberties secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment of the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. §1983.

116.  As a direct and proximate result of the acts, omissions, and violations alleged above,

Mr. Owensby suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

## CLAIM II:
### 42 U.S.C. §1983 – Unlawful Arrest and Detention
### (Against Defendants Wayne M. Hammock and Vincent J. Carter)

117.   Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

118.   Defendants Hammock and Carter attempted to stop Mr. Owensby for a traffic infraction, a civil offense, and not a crime.

119.   Defendants had no information suggesting that Mr. Owensby had recently committed, or was about to commit, a crime when Defendants detained and/or seized him.

120.   Defendants had no information suggesting that Mr. Owensby had any active warrants requiring his arrest.

121.   Defendants also received information from LEADS that Mr. Owensby's license and insurance were valid.

122.   Indeed, Defendants advised Mr. Owensby that (in their opinion) it was because of his stale criminal history that they he was being ordered to step out of the car.

123.   Nonetheless, Defendants forcefully detained and arrested Mr. Owensby and placed him in handcuffs, restricting his liberty, and took him to jail.

124.   Defendants Hammock and Carter each personally participated in the arrest of Mr. Owensby.

125.   It should also be noted, Mr. Owensby made absolutely no movement that could reasonably be construed as violent, resistive, obstructive, or involving any use, or threat, of force.

126. The total extent of his protestations of being removed from the vehicle was his insistence that a supervisor be summoned due to his fear of being injured by the defendant Officers on the scene.

127. Give the defendant Officers, who were at the scene of this debacle, completely lacked information that could have enabled any of them to have reasonably suspected that a crime had been committed of any type is magnified by their apparent disregard for his pleas made in agony.

128. The intentional and/or reckless conduct of Defendants, acting under color of state law, deprived Mr. Owensby of the rights, privileges, liberties, and immunities, secured by the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. §1983, including the unlawful detention and arrest, and which caused Mr. Owensby's loss of liberty, physical injury, and emotional/dignitary harms.

129. As a direct and proximate result of the acts, omissions, and violations alleged above, Mr. Owensby suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses

**CLAIM III:**
**42 U.S.C. §1983 – Municipality Liability**
**(Against Defendant City of Dayton)**

130. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

131. The City of Dayton at all times relevant has maintained a policy, custom, or practice that has been the cause, indeed the moving force, behind the violation of citizens' rights. Specifically, this policy, custom, or practice involves:

a. The unlawful removal of citizens from their vehicles prior to conducting a free-air dog sniff, in the absence of reasonable suspicion or concern for officer safety, particularly when a canine officer has not arrived on the scene.

132.    The above-described policy, custom, or practice was the direct and proximate cause of Defendants Hammock and Carter violating Mr. Owensby's Fourth, Fifth, Eighth, and Fourteenth Amendment rights, enforceable through 42 U.S.C. §1983.

133.    As a direct and proximate result of the acts, omissions, and violations alleged above, Mr. Owensby suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses

### CLAIM IV:
**Discrimination and/or Failure to Accommodate Pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 et seq.**
**(Against Defendant City of Dayton)**

134.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

135.    At all times relevant, herein, Mr. Owensby was a disabled person within the meaning of the American with Disabilities Act. He suffers from paraplegia.

136.    Defendants Hammock and Carter knew or should have that Mr. Owensby was a paraplegic at various times during the encounter.

137.    Defendants Hammock and Carter did not receive adequate training to recognize that Mr. Owensby was a paraplegic and/or ignored Mr. Owensby's attempts at a reasonable accommodation.

138.    Ultimately, it seems the Defendants Hammock and Carter must have misinterpreted

Mr. Owensby's repeated references to his disability as being some sort of an obstruction of their official business.

139. The only accommodation offered to Mr. Owensby was Defendant Hammock "helping" Mr. Owensby out of the vehicle. However, Mr. Owensby's wheelchair was not in his vehicle and Defendants Hammock and Carter did not have a wheelchair to place Mr. Owensby in once he was removed. Thus, Defendant's Hammock and Carter would have had to carry or drag Mr. Owensby "somewhere."

140. Simply put, Defendants Hammock and Carter had no plan in place to ensure Mr. Owensby's safety once he was removed from the vehicle thereby making their Command patently unreasonable.

141. Because of Mr. Owensby's disability, and behavior relating to that disability, he was treated in disparate manner. In particular, he was singled out by Defendants Hammock and Carter for disparate treatment when they should have recognized Mr. Owensby was attempting to protect himself from being injured.

142. Defendants Hammock and Carter treated Mr. Owensby with contempt, disdain, and indignity instead of attempting to reasonably to de-escalate or understand Mr. Owensby's disability and/or Mr. Owensby's limitations.

143. When responding to Mr. Owensby's behavior, Defendants Hammock and Carter did not employ appropriate and proportional tactics, such as the use of non-threatening communication, de-escalation, simple soft hands techniques or restraint, but instead responded with aggression and overwhelming and unnecessary force without providing reasonable opportunity for Mr. Owensby to comply.

144. Defendants continued using inappropriate and escalating force even after Mr.

Owensby communicated that he was paraplegic.

145.    Mr. Owensby was humiliated, degraded, discriminated against and excluded from the benefits and services of the Dayton and/or its police department, including by (1) denying him assistance relating to his disability and the means to locomote; (2) denying him reasonable accommodations including sending an officer to retrieve his wheelchair from his house less than 700 feet away, requesting an officer bring a wheelchair to the scene, explaining medical training and experience that equipped the defendant Officers to safely remove Mr. Owensby from the vehicle and a plan for safely accommodating Mr. Owensby once out of the vehicle, or call a supervisor before force was applied and/or escalated against him; (3) not using non-threatening communication, or simple soft hands techniques or restraint before and/or instead of resorting to forceful, aggressive, and/or retaliatory force used against Mr. Owensby.

146.    Cruelly, despite knowing he as a paraplegic, Defendants alleged that Mr. Owensby "obstructed official business" despite knowing that he could not possibly comply with any alleged commands, or otherwise have intended to obstruct justice.

147.    Defendant City of Dayton and its agents' employees were required by relevant provision of the ADA to treat Mr. Owensby with reasonable care concerning his disability and the provision of benefits and services offered by the City/police department, to provide reasonable accommodations so that Mr. Owensby could meaningfully participate in the programs, services, and benefits of the City, and to implement sufficient policies, practices, procedures, and training sufficient to effectuate the mandate of the ADA to ensure that persons who suffer from disabilities were not discriminated against and relegated to second-class citizen status, particularly in such minor circumstances as a traffic stop. Instead, Mr. Owensby's disability and associate behaviors,

as expressed in the episode identified above, were met with contempt, disregard, and overwhelming and unnecessary uses of force that caused serious injury.

148. Defendant City of Dayton, as a public entity, and its agents and employees, ignored Mr. Owensby's obvious needs and treated him with contempt in circumstances that are likely demonstrative of much larger systematic problems, including lack of training on encounters and communications with paraplegic persons, and which undoubtedly contributed to the harms identified above.

149. As such, Defendant City of Dayton has willfully disregarded its duties under the ADA and has knowingly allowed unlawful policies and practices to persist related to the provision of services, programs and activities to individuals with disabilities, and specifically with respect to the use of force against individuals with disabilities.

150. Despite the long-standing and clear (and unambiguous) provisions of the ADA, it seems Defendant City of Dayton continues to enforce policies and practices that discriminate against Mr. Owensby and other persons with disabilities; therefore, an actual controversy exists between the parties entitled Mr. Owensby to declaratory relief pursuant to 28 U.S.C. §2201.

151. Without the declaratory and injunctive relief requested herein, Mr. Owensby, who resides in the City of Dayton are, to be sure, likely to encounter the same discriminatory policies and actual practices.

152. Without the declaratory and injunctive relief requested herein, Defendant City of Dayton and its agents will continue to discriminate against Mr. Owensby on the basis of disability in violation of the ADA and its implementing regulations.

153. As a direct and proximate result of the acts, omissions, and violations alleged above,

Mr. Owensby suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

### CLAIM V:
### Violations of Section 540 of the Rehabilitation Act of 1973
### (Against Defendant City of Dayton)

154.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

155.    The Defendant City of Dayton has denied Mr. Owensby access to programs, benefits, and services provided to individuals who come into contact with officers from Dayton, and for which he was qualified to participate, solely on the basis of his disabilities, thereby violating Section 504.

156.    Specifically, and without limitation, Dayton discriminated against Mr. Owensby by:

    b.  Ratifying and condoning the unnecessary use of force against a severely disabled individual who posed no threat to himself or others;

    c.  Maintaining a use of force policy which, in practice, does not accommodate individuals with disabilities or permit modifications as necessary to protect individuals with disabilities who pose no threat to law enforcement officers, the public, or themselves;

    d.  Failing to adequately train officers of Dayton regarding the rights of individuals with disabilities with respect to the appropriate use of force; and

    e.  Failing to adequately supervise officers of Dayton regarding interactions with individuals with disabilities with respect to the appropriate use of force.

157.    Despite the clear provisions of Section 504, Defendant City of Dayton persisted in

imposing policies and actual practices which discriminate against Mr. Owensby and other persons with severe disability who come into contact with law enforcement officers.

158.    As a direct and proximate result of the acts, omissions, and violations alleged above, Mr. Owensby suffered damages, injuries, pain and suffering, emotional distress, impairment in quality of life, past and future economic losses, including loss of earnings and loss of capacity, reasonable and necessary medical, and other expenses.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, and following:

a.  Declaratory and injunctive relief;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress, impairment of quality of life, reasonable and necessary medical and other expenses;

d.  Punitive damages;

e.  Issuance of an Order mandating appropriate equitable relief, including, without limitation, changes to the policies, procedures, and actual practices of Dayton relative to individuals with disabilities;

f.  Pre- and post-judgement interest at the highest lawful rate;

g.  Costs, expert witness fees, and reasonable attorney fees, as allowed by statute or as otherwise allowed by law; and

h.  For any other and further relief that this Court shall deem just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: December 29, 2021

Respectfully submitted,

/s/ James R. Willis

| | |
|---|---|
| CLARISSA A. SMITH, ESQ. (0095891) | JAMES R. WILLIS, ESQ. (0032463) |
| 1220 W. Sixth Street, Ste. 308 | 75 Erieview Plaza, Ste. 108 |
| Cleveland, OH 44113 | Cleveland, OH 44114 |
| P. 216-523-1100 | P. 216-523-1100 |
| F. 216-274-9915 | F. 216-274-9915 |
| Email: clarissa.a.smithesq@gmail.com | Email: jrwillis-barrister@sbcglobal.net |

***Of Counsel***        ***Attorney for Plaintiff Clifford Owensby***