Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  CIVIL DIVISION

4                    *   *   *

5  CLIFFORD OWENSBY,

6        Plaintiff,

7        vs.          CASE NO. 3:21-cv-00343-MJN-CHG

8  CITY OF DAYTON, et al.,

9        Defendants.

10                   *   *   *

11          Deposition of VINCENT CARTER, Defendant

12  herein, called by the Plaintiff for

13  cross-examination pursuant to the Rules of Civil

14  Procedure, taken before me, Kathy S. Wysong, a

15  Notary Public in and for the State of Ohio, at the

16  City Law Department, 101 West Third Street,

17  Dayton, Ohio, on Thursday, November 10, 2022, at

18  9:34 a.m.

19                   *   *   *

20

21

22

23

24

25

Page 2

1             EXAMINATION CONDUCTED      PAGE

2    BY MR. CHRISTIAN:.....................     4

3

4                EXHIBITS MARKED

5    (Plaintiff's Exhibit 1, Ticket No.

6    1995990, was marked for purposes of

7    identification.)......................   28

8    (Plaintiff's Exhibit 2, findings on

9    Professional Standards Bureau

10   Investigation, was marked for

11   purposes of identification.)..........   84

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3           Christian Law, P.C.
 4      By:  Riley Christian
             Attorney at Law
 5           4602 21st Street
             P.O. Box 1648
 6           Long Island City, New York  11101
             929-816-3011
 7           rchristian@rchristianlaw.com
 8           and
 9      By:  Clarissa A. Smith
             Attorney at Law
10           1220 West Sixth Street
             Suite 308
11           Cleveland, Ohio  44113
             216-523-1100
12           clarissa.a.smithesq@gmail.com
13      On behalf of the Defendants:
14           City of Dayton
15      By:  Leonard J. Bazelak
             Adam Laugle
16           Attorneys at Law
             101 West Third Street
17           P.O. Box 22
             Dayton, Ohio  45401
18           937-333-4100
             leonard.bazelak@daytonohio.gov
19           adam.laugle@daytonohio.gov
20   ALSO PRESENT:
21           Clifford Owensby
22                     *   *   *
23
24
25
```

1                    VINCENT CARTER
2    of lawful age, Defendant herein, having been first
3    duly cautioned and sworn, as hereinafter
4    certified, was examined and said as follows:
5                    CROSS-EXAMINATION
6    BY MR. CHRISTIAN:
7            Q.   Please state your name for the
8    record.
9            A.   Vincent Carter.
10           Q.   I'm Riley Christian.  I'm here
11   representing the plaintiff, Clifford Owensby.
12   I'll be asking you some questions today.  Have you
13   done any depositions before?
14           A.   I have not.
15           Q.   Okay.  The questions that I will be
16   asking you will be under oath.  Do you understand?
17           A.   I understand.
18           Q.   You understand that you will be --
19   you're sworn to tell the truth?
20           A.   Yes.
21           Q.   Okay.  Now, we have a nice court
22   reporter here who will be attempting to transcribe
23   everything that we say here today so it's
24   important that we don't talk at the same time.
25   It's also very important that you say all your

1  answers verbally.  Don't shake your head because
2  she can't get that down, and please no uh-huhs or
3  huh-uhs because we also can't get that either.  Do
4  you understand?
5         A.   I understand.
6         Q.   Okay.  If there's a question that you
7  don't understand, just let me know and I will do
8  my best to rephrase.  Okay?
9         A.   All right.
10        Q.   If you need a break, just let me
11  know.  The only thing that I ask is that if
12  there's a pending question, you answer the
13  question before you take your break.
14        A.   All right.
15        Q.   Okay?
16        A.   Yes.
17        Q.   Have you had any alcohol in the past
18  twenty-four hours?
19        A.   No.
20        Q.   Have you taken any drugs or
21  medication within the last twenty-four hours?
22        A.   No.
23        Q.   Is there any other reason that you
24  would not be able to give full, complete, and
25  truthful answers today?

```
                                             Page 6

 1           A.    No.

 2           Q.    What's your current address?

 3           A.    335 West Third Street, Dayton, Ohio.

 4           Q.    Have you lived anywhere else this

 5   year?

 6           A.    No.

 7           Q.    How long have you been at this

 8   address?

 9           A.    Seven years.

10           Q.    What's your current age?

11           A.    My age you said?

12           Q.    Yes.

13           A.    Thirty-three.

14           Q.    And when's your birthday?

15           A.    October 13th of '89.

16           Q.    What's your social security number?

17                 MR. BAZELAK:  Objection.  You don't

18   have to answer that.  That's personal identifying

19   information.  He doesn't have to answer.

20                 MR. CHRISTIAN:  We can just put the

21   last four on the record, keep the rest off.

22                 MR. BAZELAK:  I mean, it's clear that

23   any personal identifying information he doesn't

24   have to answer so --

25                 MR. CHRISTIAN:  Okay.
```

Page 7

1              MR. BAZELAK:  -- there's no purpose

2    in putting any numbers.

3              MR. CHRISTIAN:  All right.  Just note

4    my objection for the record, please.

5    BY MR. CHRISTIAN:

6        Q.   Where were you born?

7        A.   Austin, Texas.

8        Q.   How long were you in Austin, Texas?

9        A.   Six, seven years.  I'm not really

10   sure.  I moved at a young age.

11       Q.   When did you come to Ohio?

12       A.   Eleven -- ten, eleven, twelve, on and

13   off.  Whatever age you are in fourth grade.

14       Q.   Where were you directly prior to

15   coming to Ohio?

16       A.   Like what state?

17       Q.   Yes, what state?  Sorry.

18       A.   I actually lived in Indiana for a

19   short period of time before Ohio.

20       Q.   What is a short period of time?

21       A.   The time frame between Texas and,

22   Ohio, so age six to ten, twelve.

23       Q.   So anywhere from the age between six

24   and twelve you were in Indiana?  I'm sorry.

25       A.   Yes.

Page 8

1          Q.   What city?

2          A.   Fort Wayne.

3          Q.   Had you lived anywhere else?

4          A.   No.

5          Q.   Okay.  Have you ever been charged

6    with a crime?

7          A.   Charged with a crime?

8          Q.   Yes.

9          A.   No.

10         Q.   Are you married?

11         A.   Yes.

12         Q.   When did you get married?

13         A.   June of 2016.

14         Q.   What's your spouse's name?

15              MR. BAZELAK:  Object.  Again, any

16   family names or personal identifying information

17   not discoverable under the statute.

18              MR. CHRISTIAN:  Can we note my

19   objection for the record?

20   BY MR. CHRISTIAN:

21         Q.   Do you have any children?

22              MR. BAZELAK:  You can answer that.

23              THE WITNESS:  Yes.

24   BY MR. CHRISTIAN:

25         Q.   Okay.  What are their names?

1              MR. BAZELAK:  Objection.  Don't

2  answer.

3              MR. CHRISTIAN:  Note my objection,

4  please.

5  BY MR. CHRISTIAN:

6        Q.   How old are your children?

7              MR. BAZELAK:  You can answer.

8              THE WITNESS:  Twelve and four.

9  BY MR. CHRISTIAN:

10        Q.   Twelve and four?

11        A.   Yep.

12        Q.   So you have two children?

13        A.   Yes.

14        Q.   Sorry.  What do you currently do for

15  work?

16        A.   I work for the City of Dayton Police

17  Department.

18        Q.   How long have you worked there?

19        A.   It will be seven years in April.

20        Q.   What's your job title?

21        A.   Patrol officer.

22        Q.   What's your job description as a

23  patrol officer?

24        A.   Right now it's just respond to calls,

25  patrol the neighborhoods of east Dayton.  I don't

Page 10

1    know, I --

2            Q.    When you say respond to calls, you

3    mean what exactly?

4            A.    Calls of service.  People call the

5    police in need of a problem or issues going on or

6    whatever else assistance that police may provide.

7            Q.    So when they call, you go and show up

8    on scene?

9            A.    Correct.

10           Q.    What's your current schedule?

11           A.    9:00 p.m. to 7:00 a.m.  I'm on third

12   shift or midnights.

13           Q.    I'm sorry, can you repeat that?

14           A.    I'm on midnights, like the midnight

15   schedule.

16           Q.    Okay.

17                 MR. CHRISTIAN:  Can you read his

18   first answer back?

19                 (Record read.)

20   BY MR. CHRISTIAN:

21           Q.    Did you have these same hours on

22   September 30th of 2021?

23           A.    I did not.

24           Q.    What were your hours on that day?

25           A.    At that time I was part of a

Page 11

1    proactive unit, our hours varied throughout the

2    week.

3            Q.   You were part of what unit?

4            A.   A proactive unit.  It's called the

5    west pod patrol community problem response team.

6                 MR. CHRISTIAN:  Can you repeat that

7    back?

8                 THE WITNESS:  West pod -- west patrol

9    community problem response team.

10   BY MR. CHRISTIAN:

11           Q.   And so you are a part of a different

12   unit now?

13           A.   I am just back on the road.  I am not

14   on a unit at all now, just patrol officer.

15           Q.   What's the difference between the

16   two?

17           A.   When I was part of the community

18   problem response team, our sole focus was to find

19   locations or get locations and get drugs and guns

20   off the street.

21           Q.   Did you have to go -- undergo any

22   training for your job?

23           A.   For which one?  Like just the police

24   officer in general?

25           Q.   Just to be a police officer in

```
                                          Page 12
 1   general.
 2            A.    Yes.   You do six months in the Dayton
 3   Police Academy.
 4            Q.    Can you describe the type of
 5   training?
 6            A.    Basically learn how to be a police
 7   officer.  You start with, like, the Ohio Revised
 8   Code, you do defensive tactics, you do firearms
 9   training, you do driving training.  Just basically
10   six months to learn how to be somewhat -- or how
11   to be a police officer.
12            Q.    Okay.  Did you have to undergo any
13   additional training to be a part of that proactive
14   unit?
15            A.    The proactive unit?
16            Q.    Yes.
17            A.    No, that was all based on my work
18   done as a patrol officer.
19            Q.    Have you ever received a formal
20   complaint about your conduct as a police officer?
21            A.    What do you mean as a formal
22   complaint?
23            Q.    Has anyone ever written a --
24   withdraw.
25                  Has anyone that you've encountered
```

Page 13

```
 1   throughout the course of your job filed a
 2   complaint with the Dayton Police Department in
 3   regard to your conduct?
 4           A.   I don't know of any actual filed
 5   complaints.
 6           Q.   Okay.  Any non-filed complaints that
 7   you're aware of?
 8           A.   I mean, throughout being a police
 9   officer people call in and complain about you, to
10   speak to a supervisor, but that's -- I've never --
11               MR. BAZELAK:  I assume you're talking
12   about other than this incident, right?
13               MR. CHRISTIAN:  Yeah, I am.
14               MR. BAZELAK:  Obviously, right?
15               MR. CHRISTIAN:  No, obviously.  Yep.
16   Uh-huh.
17   BY MR. CHRISTIAN:
18           Q.   If there are complaints about you,
19   are you made aware?
20           A.   Are the officers made aware?
21           Q.   Yes, the officers made aware.
22           A.   Yes.  Your supervisor will contact
23   you.
24           Q.   Is an investigation conducted?
25           A.   Yes, I believe so, unless -- it
```

1  depends on what type of complaint it is, but you

2  would have to ask a supervisor because that's

3  above what patrol officers do.  If there's a

4  complaint, that goes to the supervisor level and

5  above.  That's out of my control.  I don't know

6  what they do.

7          Q.   Okay.  Have you ever been

8  investigated for a complaint?

9          A.   No, besides, I guess, this one that

10  we're referring to, I have not.

11          Q.   This one counts.  So okay.  And

12  how -- withdrawn.

13          What was the outcome of the

14  investigation in regards to this matter?

15          A.   What are you referring to?

16          Q.   Well, you just stated that outside of

17  this one, you've never had an investigation done

18  on you so that means you -- in this instance there

19  has been an investigation done on you, correct?

20          A.   Correct.

21          Q.   Okay.  So what was the outcome of the

22  investigation?

23          A.   I got a training memo.

24          Q.   You got a training memo.  And what

25  did the training memo say?

Page 15

1           A.    What did it say?

2           Q.    Yes.

3           A.    I don't recall.

4           Q.    Was there any disciplinary action?

5           A.    For this outcome?

6           Q.    Yes.

7           A.    No.

8           Q.    Are there any records kept of the

9      complaints that are made against you?

10          A.    I have no idea.

11          Q.    Other than the current matter, have

12     you ever been named as a party to a lawsuit?

13          A.    No.

14          Q.    What was your job prior to joining

15     the police department?

16          A.    I was a corrections officer in

17     Hamilton County Justice Center, which is

18     Cincinnati.

19          Q.    Hamilton County?

20          A.    Yes.

21          Q.    How long did you have that job?

22          A.    I think it was almost a year.

23          Q.    Why did you leave?

24          A.    To come to Dayton.  To come to Dayton

25     as a police officer.

1          Q.   Do you remember what year you were

2    there?

3          A.   '14 to '15.  I started the police

4    academy in 2015.

5          Q.   What's your highest level of

6    education?

7          A.   Some college.

8          Q.   Some college.  Like a year or two?

9          A.   I did like four but never graduated.

10          Q.   Like four years?

11          A.   Yes.

12          Q.   What college?

13          A.   I started at Sinclair Community

14    College and then I went to Wright State for one

15    quarter and then Cincinnati for three years.

16          Q.   What year were you at Sinclair?

17          A.   2010 to, like, 2012.

18          Q.   And just for clarity, Sinclair is in

19    Ohio?

20          A.   Sinclair, yeah, it's right across the

21    street, Sinclair Community College in Dayton.

22          Q.   Got you.  What year were you at

23    Wright State?

24          A.   I just remember it was the fall so

25    sometime before Cincinnati.

Page 17

1          Q.    When you say sometime, like
2    approximately how much time?
3          A.    I was only there for one quarter so
4    just a couple months I was there.
5          Q.    Why did you leave so quickly?
6          A.    I didn't like it.
7          Q.    And what year were you at Cincinnati,
8    what years?
9          A.    I believe I already stated that.  It
10   was like 2010 to 2012.
11         Q.    Wait.  So then when were you at
12   Sinclair?  Sorry, maybe I --
13         A.    Sinclair, right when I graduated,
14   after high school, so it was like 2008.
15         Q.    Oh, okay, 2008.  Were you ever
16   suspended from any of these colleges?
17         A.    Suspended?
18         Q.    Yes.
19         A.    No.
20         Q.    Were you ever expelled from any of
21   these colleges?
22         A.    No.
23         Q.    When did you first learn of this
24   deposition?
25         A.    When did I first learn about it?

1          Q.    Uh-huh.

2          A.    I believe when I received an e-mail.

3          Q.    And when was that?

4          A.    I don't recall.  I'd have to check my

5    e-mail.

6          Q.    What did you do to prepare for the

7    deposition today?

8          A.    Just met with the City attorneys.

9          Q.    Did you review any documents?

10         A.    Just the PSB documents, what was said

11   in the interview of that.

12         Q.    Other than your attorney, did you

13   speak with anyone else in preparation for this

14   deposition?

15         A.    No.

16         Q.    Prior to September 30th, 2021, did

17   you know Clifford Owensby?

18         A.    I did not.

19         Q.    Were you working on September 30th,

20   2021?

21         A.    Yes.

22         Q.    What were you doing that day?

23         A.    That day I came in early because that

24   week we actually worked later in the hours because

25   we were doing gun reduction initiatives that week.

Page 19

1    Just came in early that day.

2            Q.    When you say early, what time did you

3    come in?

4            A.    I don't know, probably 10:00 or

5    11:00.

6            Q.    A.m.?

7            A.    Yes.

8            MR. CHRISTIAN:  Can you read his last

9    answer back?

10           (Record read.)

11           MR. CHRISTIAN:  Before that.  Sorry.

12   I asked him what he was doing that day.

13           (Record read.)

14   BY MR. CHRISTIAN:

15           Q.    What does gun reduction initiatives

16   consist of?

17           A.    Combat violent crimes in the city of

18   Dayton.  You identify individuals who are wanted

19   for violent crimes or whatnot.

20           Q.    How do you identify them?

21           A.    The detectives do and they -- because

22   we work closely with the detectives in these

23   initiatives.  They come out for these as well.

24           Q.    I'm sorry, can you repeat that?

25           A.    So detectives would do the case work

1   on these individuals who are wanted for these
2   crimes --
3           Q.    Uh-huh.
4           A.    -- participate in these initiatives
5   as well to help us find these individuals who are
6   wanted.
7           Q.    Okay.  So are these initiatives done,
8   like, on the street?  How do they work?
9           A.    They're done on the street.
10          Q.    And when you went on the street to do
11  your initiative, did you have a partner?
12          A.    I did.
13          Q.    Who was your partner?
14          A.    Officer Wayne Hammock.
15          Q.    How long has he been your partner?
16          A.    We -- two and a half years.
17          Q.    Now, do you always work with Officer
18  Hammock or do you interchange partners on
19  different days?
20          A.    Depends.  At the time I wasn't on
21  SWAT, Officer Hammock was.  When he had SWAT
22  training, I would ride with other people.  Because
23  that unit I was on at that time consisted of,
24  like, eleven or twelve of us so while Officer
25  Hammock was my primary officer -- or partner,

Page 21

1    sometimes I would ride with other people in our

2    unit.

3          Q.    Okay.  Now, was Officer Hammock

4    working with you all day?

5          A.    Are you referring to the September?

6          Q.    Yes, sir, I am, September 30th.

7          A.    Yes, he was.

8          Q.    When did you first encounter Clifford

9    Owensby on September 30th?

10         A.    When we initiated a traffic stop.

11         Q.    Were you aware that his car was on

12   the road prior to you initiating the traffic stop?

13         A.    I was.

14         Q.    How?

15         A.    I was contacted by a drug detective

16   at the time stating a location they had been

17   watching that was consistent with drug sales.  I

18   was contacted by him.  He said the car, a white

19   Audi, was sitting on the street running outside

20   the building, people were coming and going from

21   his vehicle, which is consistent of potentially

22   buying or selling narcotics.

23         Q.    Did you believe Mr. Owensby had

24   narcotics in his vehicle prior to making the

25   traffic stop?

Page 22

1          A.    Yes, due to what the detective
2    described to me.
3          Q.    Prior to stopping him, were you under
4    any suspicion that he may be traveling with any
5    weapons?
6          A.    Well, drug houses -- drugs go
7    consistent with guns and guns go with drugs, so if
8    I thought there was narcotics, I have a high
9    probability to believe he has -- he's armed with a
10   weapon at that time as well.
11         Q.    What do you mean guns go with drugs?
12         A.    Most people don't sell drugs without
13   a gun.  Most people who have guns on them, they
14   usually have drugs too.  It goes hand in hand.
15         Q.    And this is based on your experience
16   as an officer?
17         A.    Correct.
18         Q.    Can you describe how the traffic stop
19   occurred with Mr. Owensby?
20         A.    What do you mean describe it?
21   Like --
22         Q.    How did it happen?
23         A.    Well, the detective said the vehicle
24   was moving, had dark window tint.  Got in the area
25   and conducted a traffic stop for dark window tint.

Page 23

1          Q.    Immediately prior to stopping
2    Mr. Owensby's vehicle while you were still in your
3    vehicle -- is it correct to call it a patrol car?
4          A.    Yeah.  Cruiser, patrol car, whatever
5    you want.
6          Q.    Okay.  Patrol car, we'll say that.
7          A.    All right.
8          Q.    While you were still in your patrol
9    car, did you have a conversation with -- well,
10   first, was Officer Hammock in the patrol car with
11   you?
12         A.    Yes.
13         Q.    And did you have a conversation with
14   Officer Hammock about Mr. Owensby?
15         A.    I didn't know who Mr. Owensby was
16   prior to the traffic stop.
17         Q.    Did you have a conversation with
18   Officer Hammock about the person that was
19   described to you in this white Audi outside of a
20   known drug house or --
21         A.    I don't recall any conversations
22   prior.
23         Q.    How did you get Mr. Owensby's
24   attention to make the stop?
25         A.    Activated our overhead lights.

1        Q.    And did Mr. Owensby stop his vehicle?

2        A.    He did.

3        Q.    After he stopped his vehicle did you

4    approach the vehicle?

5        A.    I did.

6        Q.    Which side?

7        A.    Driver's side.

8        Q.    When you approached the driver's side

9    of the vehicle, what did you do?

10        A.    Explained to Mr. Owensby who I was

11    and the reason for the traffic stop.

12        Q.    Which was the window tint you said,

13    right?

14        A.    Correct.

15        Q.    Did you ask him for his license and

16    registration?

17        A.    Yes.

18        Q.    Did he give it to you?

19        A.    He gave me his license, yes.

20        Q.    While you were at his driver's side

21    window, did you notice any adaptive driving

22    equipment?

23        A.    Eventually.

24        Q.    What did you say when you noticed it?

25        A.    I don't recall saying anything about

Page 25

1    it.  I believe Mr. Owensby advised me that he was
2    a paraplegic at some point in the traffic stop.
3           Q.   What's your understanding of
4    paraplegic?
5           A.   That they have partially or full loss
6    of lower extremities.
7           Q.   Did you notice anyone else in the
8    vehicle?
9           A.   I did not.
10          Q.   After he gave you his license what
11   did you do?
12          A.   I went back to the cruiser and ran
13   his information through our LEADS.
14          Q.   And LEADS is what exactly?
15          A.   Just law enforcement, like, database
16   for individuals, see if they're valid or not, see
17   what -- pretty much their record.
18          Q.   Okay.  And what -- what came up on
19   Mr. Owensby's record?
20          A.   While running Mr. Owensby's
21   information, the Dayton Police Department has
22   field interview cards, it tells you all the
23   interaction that Dayton Police Department had with
24   Mr. Owensby and/or arrests, Mr. Owensby had
25   numerous contacts with the Dayton Police

Department with guns and drugs and he was charged with weapons under disability as well.

Q. While you're still at Mr. Owensby's driver's side initially, you made initial contact, did there come a point when Officer Hammock also approached the vehicle?

A. Officer Hammock approached the vehicle probably at the same time as me. We -- you don't always -- if you have a partner, you don't approach the vehicle alone. The initial stop I should say.

Q. Did he say anything when he approached, Officer Hammock?

A. I don't recall.

Q. After you took Mr. Owensby's license back to your vehicle, you ran the check in your LEADS system, did you write Mr. Owensby a ticket?

A. Eventually.

Q. Eventually. Did you do anything other than the LEADS and write a ticket?

A. I advised Officer Hammock of Mr. Owensby's prior past, and at some point, I believe early on, Officer Hammock requested a K-9 officer to our traffic stop.

Q. Do you know when Officer Hammock

1  ordered the K-9 unit to the traffic stop?

2          A.    I do not.

3          Q.    What traffic infractions was the

4  ticket for?

5          A.    Obviously the window tint.

6          Q.    Okay.

7          A.    And then I was advised that there was

8  a small child in the back seat who didn't have a

9  proper restraint device.

10         Q.    Didn't have a proper what device?

11 I'm sorry.

12         A.    Like a restraint.  Like a child seat.

13         Q.    As you were writing the ticket, was

14 Mr. -- excuse me -- was Officer Hammock in the

15 vehicle with you?

16         A.    No.

17         Q.    I'm going to show you a document,

18 what appears to be the traffic ticket from the day

19 of the traffic stop.  Do you recognize this

20 ticket?

21         A.    I do.

22         Q.    What is -- what's this ticket?  Could

23 you explain it to me?

24         A.    What would you like to know?

25         Q.    What's on it?  I know you mentioned

Page 28

1   the infractions, but could you point out where you

2   listed the infractions?  I'm sorry.

3          A.   The infractions would be under, like,

4   the middle of the ticket under other offenses

5   where it says window tint and then child

6   restraint.

7          Q.   Okay.

8          A.   And there would be an ORC to the

9   right of it.

10          Q.   And is that your signature at the

11   bottom?

12          A.   It is.

13          Q.   Is this dated September 30th, 2021?

14          A.   Yep.  Yes.

15          Q.   And is the name on it Clifford

16   Owensby?

17          A.   That's correct.

18          MR. CHRISTIAN:  I would like to mark

19   this for identification as Plaintiff's Exhibit 1.

20          (Plaintiff's Exhibit 1, Ticket No.

21   1995990, was marked for purposes of

22   identification.)

23   BY MR. CHRISTIAN:

24          Q.   Now, after you finished writing this

25   ticket, did you get out of your vehicle and

1  re-approach Mr. Owensby's car?

2        A.   What do you mean finish writing it?

3  I didn't finish writing it at the traffic stop.

4        Q.   Can you take me through your process

5  of drafting a traffic ticket?

6        A.   To, like, fill it out?

7        Q.   Yeah, to fill it out.  What do you

8  do?

9        A.   Well, you pull up his information and

10  you just fill -- pretty much you write it in pen

11  and fill out the boxes pretty much.

12        Q.   That's all?  What's the last thing

13  that you do?

14        A.   The last thing is you date it and you

15  sign it at the bottom when it was served, you put

16  your PDA, which is pretty much your badge number,

17  and then you fill out the back of it, but that's

18  not on here.  The back of it just has like owner

19  of the vehicle, stuff like that.

20        Q.   Okay.  And you said that you didn't

21  finish it during the traffic stop, so when did you

22  finish it?

23        A.   I don't recall the actual time I

24  finished it.

25        Q.   Prior to -- withdrawn.

1            During the traffic stop, what parts

2    of this ticket did you fill out?

3            A.   I don't recall when I stopped to help

4    Officer Hammock.

5            Q.   Did you write your signature on it

6    before you went to go help Officer Hammock?

7            A.   I don't recall.

8            Q.   Did you put the date on it?

9            A.   I don't recall.

10           Q.   Did you put the infractions on it?

11           A.   I don't recall.

12           Q.   Did you write his name on it?

13           A.   I definitely wrote his name on it.

14           Q.   Okay.  How long does it typically

15   take you to complete a traffic ticket?

16           A.   It just depends on the traffic

17   infractions and the compliance of the driver, but

18   anywhere from ten, fifteen minutes.

19           Q.   What do you mean the compliance of

20   the driver?

21           A.   Just the way they go about things.

22   If they want to argue about the reason they're

23   stopped or not.  I mean, it just depends on the

24   driver's attitude.  If they're going to argue

25   about why they're stopped, that obviously takes

Page 31

1  time away from me going back to start the traffic
2  ticket.
3  　　　　　Q.　So after you have this argument and
4  then you actually do get back into your vehicle,
5  how long does it take then after the argument is
6  over to typically complete the ticket?
7  　　　　　MR. BAZELAK:　Objection as to form.
8  Go ahead.
9  　　　　　THE WITNESS:　Like I said, it could
10  go anywhere from ten to fifteen minutes.　Ten
11  being fast, fifteen being longer.
12  BY MR. CHRISTIAN:
13  　　　　　Q.　So there's no difference in time from
14  if you have -- withdrawn.
15  　　　　　If I remember correctly, you stated
16  that Officer Hammock requested a K-9 unit?
17  　　　　　A.　Yes.
18  　　　　　Q.　What's your understanding about the
19  Dayton Police Department protocol for conducting a
20  free air sniff?
21  　　　　　A.　What's the protocol?
22  　　　　　Q.　Yes.
23  　　　　　A.　There isn't really one.　You can call
24  for a K-9 any time you want.
25  　　　　　Q.　After you got out of your vehicle to

1   assist Officer Hammock, which side did you -- of

2   Mr. Owensby's vehicle did you approach?

3            A.   Be the driver's side.

4            Q.   Where was Officer Hammock?

5            A.   I believe he was at the driver's

6   side.

7            Q.   When you approached, was Officer

8   Hammock speaking to Mr. Owensby?

9            A.   I don't recall at that time.

10           Q.   Did you hear Officer Hammock say

11  anything to Mr. Owensby when you approached?

12           A.   I don't recall.

13           Q.   Do you recall Officer Hammock telling

14  Mr. Owensby that he had to step out of the car?

15           A.   I know both Officer Hammock and I

16  both informed Mr. Owensby he would have to get out

17  of the car somehow, yes.

18           Q.   When you say get out of the car

19  somehow, what do you mean?

20           A.   Well, Officer Hammock and I were

21  speaking with Mr. Owensby trying to have him

22  explain to us a safe way to help Mr. Owensby out

23  of the vehicle.

24           Q.   And what did Mr. Owensby say in

25  response?

Page 33

 1            A.    That he was not getting out of the

 2     vehicle.

 3            Q.    Did he say why?

 4            A.    Did he say why he wasn't?

 5            Q.    Yes.

 6            A.    Because he was a paraplegic.

 7            Q.    You stated that you wanted to assist

 8     Mr. Owensby out of the car safely; is that

 9     correct?

10            A.    That's correct.

11            Q.    Was there a wheelchair provided to

12     help him get out of the car?

13            A.    Well, Mr. Owensby instructed us that

14     he got in the vehicle some way but he had no

15     devices with him to get in and out of the vehicle

16     so I felt the need to come back and help Officer

17     Hammock.  Two police officers helping Mr. Owensby

18     was more safe than just one.  I also believe that

19     Mr. Owensby could have instructed us how to safely

20     remove him from the vehicle, which he never did

21     provide us.

22            Q.    Okay.  So in that did you provide him

23     a wheelchair?

24            A.    We don't carry wheelchairs with us.

25            Q.    Did you make a call for a wheelchair?

Page 34

```
 1          A.   We don't make calls for wheelchairs.
 2          Q.   Do you make calls to assist anyone
 3    with a disability?
 4          A.   We do but --
 5          MR. BAZELAK:  Objection.  Form.  Go
 6    ahead if you understand the question.
 7          THE WITNESS:  Can you just reask the
 8    question again?
 9          MR. CHRISTIAN:  Can you reask the
10    question, please?
11          (Record read.)
12          MR. CHRISTIAN:  I'll rephrase.
13    BY MR. CHRISTIAN:
14          Q.   Do you make calls to assist anyone
15    who is unable to ambulate?
16          A.   Do I personally?  No, but -- because
17    usually when -- people already call the medics if
18    they need help with moving anyway so they would
19    already be there.
20          Q.   When you say people, who's people
21    that already call the medics?
22          A.   People who need help with whatever
23    disabilities or issues they've got going on at
24    that time.
25          Q.   So you mean like the person with the
```

Page 35

1    issue makes the phone call?

2            A.   They usually call fire first because

3    they need help being transported somehow.

4            Q.   Okay.  And in those situations that

5    are unusual, do officers make that call?

6            A.   I believe they can.

7            Q.   Okay.  Why didn't you?

8            A.   Because at that time the K-9 was

9    already on scene.  We gave Mr. Owensby multiple

10   opportunities to let us help him out of the car.

11   We even let him make phone calls to friends and

12   family to come get him out of the car, which he

13   failed to do so.  He just wanted more people to

14   show up to record us.  He was being actively

15   passive-aggressive, noncompliant, didn't listen to

16   any of our commands.

17            I've dealt with people who were

18   paraplegic the night before who had a device with

19   him.  We safely also removed that individual from

20   the car and sat him on the ground, which I

21   wholeheartedly believe that we were going to do

22   with Mr. Owensby if he would just comply.

23            Q.   Let's take a step back for a second.

24   You mentioned that the K-9 officer was on the

25   scene.  When did he arrive?

Page 36

1        A.   Like time?

2        Q.   When were you first made aware that

3   he was present on the scene?

4        A.   As I was writing up the citation for

5   Mr. Owensby.

6        Q.   So you were in your vehicle?

7        A.   When the K-9 arrived?

8        Q.   Yes.

9        A.   Yes.

10        Q.   And where was the K-9 unit when you

11   were in the vehicle?

12        A.   I'm pretty sure he parked on Ferguson

13   Street.

14        Q.   So was he parked on Ferguson Street

15   when you initially saw him while you were in the

16   vehicle?

17        A.   I could see the K-9 officer from my

18   vehicle, yes.

19        Q.   Was he in his vehicle?

20        A.   I mean, he drove it, so yes.

21        Q.   So you could see him in his vehicle?

22        A.   At that time -- what are you trying

23   to ask though?  Like, was he in his vehicle at one

24   time?  Yes, he was.

25        Q.   I'm asking you when you initially

Page 37

1    stated that he arrived on scene --

2            A.    Yes.

3            Q.    -- was he in his vehicle?

4            A.    He was getting out of his vehicle.

5            Q.    He was getting out of his vehicle.

6    And how far away was his vehicle from

7    Mr. Owensby's vehicle, approximately, would you

8    say?

9            A.    I don't know.  Ten, fifteen feet.

10           Q.    Why was Mr. Owensby being asked to be

11   removed from his vehicle?

12           A.    Because it's our policy to remove

13   occupants from the vehicle when a K-9 arrives.

14           Q.    When you first noticed that the K-9

15   officer was on scene, where was Officer Hammock?

16           A.    I believe he was still at the car

17   with Owensby.

18           Q.    While you were in your vehicle, could

19   you see Officer Hammock speaking with

20   Mr. Owensby -- withdrawn.  I'll rephrase.

21               When you first noticed the K-9

22   officer, could you also see Officer Hammock

23   speaking with Mr. Owensby?

24           A.    I don't recall if he was or not.

25           Q.    When Mr. Owensby stated he couldn't

Page 38

1    step out of the car because he was paraplegic, did

2    you say anything in response to that?

3              A.   At the beginning?

4              Q.   Well, just in response to his

5    statement that he couldn't get out because he was

6    a paraplegic.  Did you say anything at any point?

7              A.   I believe I didn't, but I'm pretty

8    sure he got in the car somehow, which he did tell

9    us that someone did help him get in the vehicle at

10   some point in time at the traffic stop.

11             Q.   Do you recall having any situation

12   like prior with someone that was a paraplegic?

13             A.   I do.

14             Q.   And was that person removed from the

15   car?

16             A.   He was.

17             Q.   Was any assistance provided?

18             A.   I believe officers on scene helped

19   escort -- helped lift him from his vehicle and

20   onto a curb.

21             Q.   Did the person the night before

22   mention anything about their safety in regard to

23   getting out of the car?

24             A.   I don't know because I wasn't the

25   contact officer on that actual traffic stop.

Page 39

1          Q.   Did you speak to the person -- the
2    driver the day before at all?
3          A.   I don't know what we said.  I did
4    speak to him.  I don't recall what I actually
5    said, but I did take him to jail as well so -- I
6    mean, I spoke to him as we went to jail.
7          Q.   Do you know if Officer Hammock said
8    anything in response to Mr. Owensby stating that
9    he couldn't get out of the car because he was
10   paraplegic?
11         A.   I don't recall what Officer Hammock
12   said.
13         Q.   Did there come a time when
14   Mr. Owensby asked for a white shirt to come to the
15   scene?
16         A.   Yes.
17         Q.   What's your understanding of what a
18   white shirt is?
19         A.   A supervisor.
20         Q.   Was a supervisor provided upon
21   request?
22         A.   Eventually.
23         Q.   What's the policy for -- withdrawn.
24              When a white shirt is requested, do
25   the patrol officers on scene call -- make a call

Page 40

1    for the white shirt?

2           A.    It depends on their situation, yes.

3           Q.    What does that mean, it depends on

4    the situation?

5           A.    Our situation was a little different.

6    Officer Hammock and I were in the door frame of

7    Mr. Owensby's car, which is a danger zone.

8    Obviously the night before, the individual that

9    was paraplegic was sitting on a pistol.  Through

10   the information that was provided to Officer

11   Hammock and I by the detective, we truly believed

12   there was potential for a firearm in the vehicle

13   and/or drugs.  I didn't feel the need -- I told

14   Mr. Owensby that we'd call a supervisor, but at

15   that time we weren't calling one as we were

16   actively trying to assist Mr. Owensby out of the

17   car.

18          Q.    Okay.  So you believe that because a

19   paraplegic man had a firearm on him when you

20   pulled him over the day before, Mr. Owensby also

21   had a firearm on him?

22          MR. BAZELAK:  Objection.  You can

23   answer, but he gave several other reasons, but go

24   ahead.

25          THE WITNESS:  Like I stated, I -- the

Page 41

1   traffic stop the night before, yes, the individual

2   had a firearm.  And like I said, Mr. Owensby was

3   sitting in front of a drug house and he had weapon

4   history, like I stated before.  I had reason to

5   believe that there was a potential for a firearm

6   within somewhere in that vehicle.

7   BY MR. CHRISTIAN:

8          Q.    Did you ever find a firearm?

9          A.    I did not.

10         Q.    Drugs?

11         A.    Nope.

12         Q.    Is a white shirt or supervisor

13  supposed to be contacted upon request?

14         A.    Eventually, yes.

15         Q.    Eventually.  Like within how much

16  time?

17         A.    There is no time frame.  Every call

18  is different.

19         Q.    So then when do you call a white

20  shirt?

21         A.    Well, like I explained to

22  Mr. Owensby, once he was out of the vehicle, a

23  white shirt would be requested to speak with him

24  about whatever issues or complaints he had with

25  the officers at the time.

Page 42

1       Q.   Okay.  And why once he was out of the
2  vehicle?
3       A.   Because we -- like I said, the
4  potential for the firearm.  I'm not going to --
5  with him unknown and actively being
6  passive-aggressive toward us, refusing to let us
7  help him out of the car, I'm not going to sit
8  there and sit with him at the door frame and call
9  a white shirt and just stand there when the
10  dangers are unknown.  He hasn't been patted down
11  or -- he was leaving a drug house, weapons could
12  be in the car.  There's no -- once he's safely
13  secured on the curb, a white shirt would have been
14  more than welcome to come out and speak with
15  Mr. Owensby about all his issues he had.
16       Q.   How was he being passive-aggressive,
17  Mr. Owensby?
18       A.   Refusing to allow us -- refusing to
19  give us any type of way to help him out of the
20  vehicle, grabbing ahold of the steering wheel,
21  screaming, calling people to come.  Pretty much
22  doing anything to not get out of the vehicle.
23       Q.   Could it have been that he grabbed
24  the steering wheel so that he wouldn't get hurt
25  upon being pulled out?

```
                                              Page 43
 1              MR. BAZELAK:  Objection.  Form.  You
 2    can answer.
 3              THE WITNESS:  Okay.  Mr. Owensby was
 4    grabbing the steering wheel because he didn't want
 5    to get out of the vehicle.  My intentions were
 6    never to hurt Mr. Owensby.
 7    BY MR. CHRISTIAN:
 8         Q.   Okay.  Let's go back a little bit.
 9    So when you approached the vehicle, Officer
10    Hammock was already at the vehicle.  You stated
11    that you didn't -- that you don't recall the
12    confron -- excuse me, the conversation that was
13    taking place between Mr. Owensby and Officer
14    Hammock at that time, correct?
15         A.   Correct.
16         Q.   So since you don't recall the
17    conversation, did you just see then Officer
18    Hammock reach and grab Mr. Owensby to pull him out
19    of the car?
20         A.   I don't know when that actually
21    happened.  I just remember when the door was open
22    and Mr. Owensby failing to provide us a way to get
23    him out of the vehicle, that's when I believe
24    Officer Hammock reached in and unbuckled his seat
25    belt.
```

Page 44

```
1           Q.   So you don't know why Officer Hammock

2    was reaching in and trying to pull Mr. Owensby out

3    of the vehicle?

4                MR. BAZELAK:   Objection.

5                THE WITNESS:   You'd have to ask

6    Officer Hammock.

7    BY MR. CHRISTIAN:

8           Q.   When Officer Hammock reached in to

9    grab Mr. Owensby out of the vehicle, did you see

10   what part of Mr. Owensby's body that he grabbed?

11          A.   No.

12          Q.   When you went to assist Officer

13   Hammock, what part of Mr. Owensby's body, if any,

14   did you grab?

15          A.   When we went to -- I was assisting

16   Officer Hammock, I believe I -- I don't recall

17   which wrist, but I know I grabbed one of his

18   wrists.

19          Q.   Is there a procedure for taking an

20   individual out of their vehicle when they're --

21   when they, in your -- withdrawn.

22               Is there a procedure to removing an

23   individual from their vehicle when a person is

24   deemed to be noncompliant?

25               MR. BAZELAK:   Objection as to form,
```

Page 45

1  but you can answer.

2              THE WITNESS:  There's no procedure.

3  Every traffic stop is different.  It's just based

4  on -- you go by how much resistance they're

5  providing.

6  BY MR. CHRISTIAN:

7       Q.   Did you believe it would take more

8  than one person to get Officer -- excuse me, to

9  get Mr. Owensby out of the vehicle?

10       A.   Do I believe there's one?  No, but I

11  want to provide the best care to Mr. Owensby so I

12  thought two was better than one.

13       Q.   So you believe that good care --

14              MR. CHRISTIAN:  Off the record for a

15  second.  I'm just pausing.

16              (Mr. Owensby exited the room.)

17              MR. CHRISTIAN:  Back on.

18  BY MR. CHRISTIAN:

19       Q.   So you believe that good care is to

20  assist -- sorry.

21       A.   You're all right.

22       Q.   -- Officer Hammock in yanking

23  Mr. Owensby out of the vehicle?

24              MR. BAZELAK:  Objection.  Go ahead,

25  you can answer that, but objection.

Page 46

1               THE WITNESS:  The care that I wanted

2    to provide for Owensby was to safely remove

3    Mr. Owensby the best way we could out of the

4    vehicle.  Mr. Owensby resisted multiple times,

5    resisted all commands, never gave us an

6    opportunity or came up with a valid way to get him

7    out of the vehicle, so at that time there's

8    already two of us out there so we both escorted

9    Mr. Owensby out of the car.

10   BY MR. CHRISTIAN:

11        Q.   Prior to September 30th, 2021, had

12   you undergone any type of training to accommodate

13   individuals who couldn't ambulate to help them be

14   removed from their vehicles?

15        A.   Just training dealing with people

16   inside of a vehicle?

17        Q.   So you had no training dealing with

18   individuals with ambulating?

19             MR. BAZELAK:  I think he had asked

20   you a question to clarify it, right?

21             THE WITNESS:  Yes, I just want a

22   clarification.

23   BY MR. CHRISTIAN:

24        Q.   Oh.  You were asking --

25             MR. BAZELAK:  Yeah.

Page 47

1              MR. CHRISTIAN:  Can you repeat the

2    question?

3              THE WITNESS:  I want, like, is this

4    training just for individuals in vehicles or just,

5    like, people in --

6    BY MR. CHRISTIAN:

7         Q.    Individuals in vehicles.

8         A.    Training with that, no, just people

9    who -- but I have on-the-job training for seven

10   years.  I've worked in the entire city, west

11   Dayton, east Dayton, and downtown Dayton.  I deal

12   with individuals every single day.  The best

13   training you receive is just talking to people and

14   allowing them to explain how to help them.

15        Q.    And did Mr. Owensby explain how you

16   could help him?

17        A.    He never did, no.

18        Q.    So in general, have you undergone any

19   training dealing with individuals who are unable

20   to ambulate?

21        A.    Like I said, on-the-job training.

22        Q.    So no formal training?

23             MR. BAZELAK:  Objection.

24             THE WITNESS:  We watch -- there's a

25   video on Power DMS which is just like police --

Page 48

```
 1   they send videos out every once in a while, but I
 2   don't recall watching it.
 3   BY MR. CHRISTIAN:
 4           Q.   So there is a potential training
 5   video, you just don't remember watching it?
 6           A.   Correct.
 7           Q.   Do you think if you had watched it,
 8   it could have helped you in this situation?
 9                MR. BAZELAK:  Objection.
10                THE WITNESS:  No.
11   BY MR. CHRISTIAN:
12           Q.   You said no?
13           A.   No.
14           Q.   Why not?
15           A.   Like I stated multiple times,
16   Mr. Owensby was resisting to get out of the
17   vehicle.  At no time did he provide any way of
18   getting out of the car.  He made that very clear,
19   he was not getting out of the car so --
20                MR. BAZELAK:  Good time to take a
21   break maybe?  Your client, I don't know if you
22   want to check on him, and it's probably a good
23   time to take a five-minute break.
24                (Pause in proceedings.)
25                MR. CHRISTIAN:  Can you read back the
```

Page 49

1    last question?

2                (Record read.)

3    BY MR. BAZELAK:

4         Q.   When -- I want to go back for a

5    second.  When you were inside of the vehicle,

6    inside of the police vehicle, and you stated that

7    you saw that the K-9 officer was on scene, what

8    does on scene mean?  Can you describe it?

9         A.   On scene, he's there.  Like, I can

10   see him.  He's going to deploy his dog at this

11   time because that's the whole reason he's there.

12   He is there on our traffic stop now.

13        Q.   So if you can see him from any

14   vantage point, does that mean he's on scene?

15        A.   Yes.

16        Q.   If you could see him in any distance

17   away, does that mean he's on scene?

18        A.   I would say so.

19        Q.   So if he's a hundred feet away, is he

20   on scene?

21        A.   If I could see him pulling up, I

22   would say he's on the scene.

23        Q.   Okay.  No matter the distance?

24        A.   No.

25        Q.   When you were inside the vehicle

1  writing the ticket, could you hear anything on the
2  outside, any conversations taking place between
3  Officer Hammock and Mr. Owensby?
4          A.   No.
5          Q.   Okay.  Were your windows up?
6          A.   Honestly, I don't recall.
7          Q.   Okay.  Correct me if I'm wrong.  Did
8  you state that -- earlier did you state that the
9  K-9 had arrived and had been removed from the
10  vehicle?
11          A.   The K-9 arrived on scene?
12          Q.   Yes.
13          A.   Yeah.
14          Q.   While you were in your vehicle?
15          A.   Yeah, he arrived -- I was in my car
16  when he arrived on scene.
17          Q.   Okay.  What does arrived mean?
18          A.   He's at our traffic stop now.
19          Q.   Other than Officer Hammock, was there
20  anyone else that helped remove Mr. Owensby from
21  his vehicle?
22          A.   No, it was just Officer Hammock and I
23  removed him from his vehicle, and then Officer
24  Letlow and I escorted Mr. Owensby back to my
25  cruiser -- or our cruiser I should say.

Page 51

```
 1            Q.   Who is Officer Letlow?
 2            A.   He was a patrol officer out west.
 3   He's since then retired.
 4            Q.   So who was the officer who brought
 5   the K-9?
 6            A.   Officer Jim Stewart.
 7            Q.   Did Officer Stewart help remove
 8   Mr. Owensby from the vehicle?
 9            A.   He did not.
10            Q.   What was Officer Stewart doing?
11            A.   I don't know.  I don't recall.
12            Q.   More specifically I mean what was he
13   doing while you and Officer Hammock were removing
14   Mr. Owensby from the vehicle?
15            MR. BAZELAK:   Objection.  Asked and
16   answered.  Go ahead.
17            THE WITNESS:   Go?
18            MR. BAZELAK:   Go ahead.
19            THE WITNESS:   Like I said, I
20   honestly -- I just know he was on the passenger
21   side of the vehicle.  I don't know what he was
22   actually doing, no.
23   BY MR. CHRISTIAN:
24            Q.   Did you all successfully remove him
25   from the car?
```

Page 52

1          A.    Eventually, yes.

2          Q.    You said that the best teacher in

3    regard to how to remove individuals who are unable

4    to ambulate from their vehicle is asking

5    questions; is that correct?

6          A.    Correct.

7          Q.    Did you ask Mr. Owensby what

8    accommodations he needed?

9          A.    We did.  We asked him how he got in

10   his vehicle, which he states someone helped him.

11   We asked him how to help him out of his vehicle,

12   which he provided us no reasonable way to help him

13   out, therefore, he did not wish to at any time get

14   out of the vehicle.

15         Q.    Did Officer Hammock ask what

16   accommodations he needed?

17         A.    I believe so.  I just don't know what

18   he said though.  I believe he asked Mr. Owensby

19   how -- or what accommodations that you're

20   referring to or how to get out of the vehicle.

21         Q.    What makes you believe that Officer

22   Hammock asked what were his accommodations?

23              MR. BAZELAK:  Objection.  Go ahead,

24   you can answer.

25              THE WITNESS:  I believe at one time

```
 1   Officer Hammock asked Mr. Owensby how he got in
 2   the vehicle.  So then I'm pretty sure Officer
 3   Hammock asked him how can we successfully remove
 4   him from the vehicle, which he did not provide.
 5   BY MR. CHRISTIAN:
 6       Q.   Like, did you hear this?  You said
 7   you believe so, so did you hear it?
 8       A.   He eventually told me this.
 9       Q.   When did he tell you?
10       A.   I don't recall.
11       Q.   Was it during the incident?
12       A.   During what incident?  During what
13   time though?  I don't recall.
14       Q.   Well -- do you recall if he told you
15   once you -- withdrawn.
16            If Mr. Owensby had agreed to be
17   removed from the vehicle, what was the plan for
18   removing him safely?
19       A.   If Mr. Owensby agreed to be removed
20   from the vehicle, the plan would have been for
21   Mr. Owensby to provide us the best way for him to
22   be removed from the vehicle like he did later in
23   the night, which I successfully removed him from
24   the cruiser and into his girlfriend's car with his
25   instructions safely.  So there is a way to do it,
```

1  he just failed to provide it prior.

2          Q.   How did Mr. Owensby -- withdrawn.

3               So you're saying that Mr. Owensby

4  didn't tell you how he got into the vehicle?

5          A.   He did not tell me, no.

6          Q.   Do you know if he told Officer

7  Hammock?

8          A.   I believe he told him something.  I

9  just don't know what that was.

10         Q.   Why do you believe so?

11         A.   Because they had a conversation.

12 Officer Hammock eventually told me that Owensby

13 told him that he was helped in the car because he

14 had had no devices with him, which in my training

15 and experience, every person I've dealt with

16 with -- who were paraplegic always had some type

17 of device in their car with them to provide them a

18 safe way to get out of car, which Owensby did not

19 have.

20         Q.   So since Mr. Owensby stated that he

21 didn't have his device with him, if Mr. Owensby

22 had stated he needed a wheelchair, would you have

23 provided it to assist him to get out?

24              MR. BAZELAK:  Objection.  Asked and

25 answered.  Go ahead.

Page 55

1               THE WITNESS:  If Mr. Owensby had a

2      wheelchair with him, we would have got the

3      wheelchair for him.  We also gave Mr. Owensby an

4      opportunity to make a phone call for a device,

5      which he did not do.  So obviously a wheelchair

6      was not what Mr. Owensby wanted.

7      BY MR. CHRISTIAN:

8           Q.   No, not if he had it with him because

9      he stated that he didn't have a device, correct?

10          A.   Yes.

11          Q.   So in the interest of Mr. Owensby's

12     safety, if he said the accommodation I need to be

13     safely removed from my vehicle is a wheelchair,

14     would it have been provided?

15              MR. BAZELAK:  Objection.  He didn't

16     say that, but go ahead.

17              THE WITNESS:  Officers do not carry

18     wheelchairs with them in their cruisers, but the

19     fact that Mr. Owensby did not have a wheelchair

20     with him, he just left a drug house, potential for

21     a gun in the vehicle, at that time the only safe

22     way to do it was to have Mr. Owensby tell us how

23     to get safely removed from the vehicle with both

24     officers at hand, which Mr. Owensby failed to do

25     so.

Page 56

1    BY MR. CHRISTIAN:

2         Q.   Other than asking the driver of the

3    vehicle what the safe way is to remove them from

4    the vehicle, is there any other policy in place to

5    provide a safe way to remove the driver from the

6    vehicle?

7              MR. BAZELAK:  Objection.  Go ahead.

8              MR. CHRISTIAN:  As to what?

9              MR. BAZELAK:  Policy.  The word

10   policy.  He never said it was like a formal

11   policy, but go ahead.

12             THE WITNESS:  There necessarily isn't

13   a policy.  It's based on the individual's

14   aggressive behavior, you use that much -- there's

15   no policy of how to get people out of the vehicle.

16   It's based on the actions of the driver.  So

17   Mr. Owensby was resisting so we used the least

18   amount of escorting him out of the vehicle as we

19   could.

20             MR. CHRISTIAN:  Can you repeat the

21   last part of his answer?

22             (Record read.)

23   BY MR. CHRISTIAN:

24        Q.   There is no policy in place to --

25   that describes how to safely remove an individual

Page 57

1   from the vehicle?

2          A.    No.

3          Q.    Once you began assisting Officer

4   Hammock pull Mr. Owensby out of the car, were you

5   concerned for Mr. Owensby's safety?

6          A.    Well, I'm always concerned for

7   everyone's safety, but at the same time the

8   unknown of the potential firearm on his vehicle --

9   or on his person, the safety was my partner and I

10  at that time.

11         Q.    Where was Mr. Owensby's hands when

12  you began to assist Officer Hammock pull him out

13  of the vehicle?

14         A.    On the steering wheel.

15         Q.    Did you see any weapons?

16         A.    As we were trying to escort him out

17  of the car?

18         Q.    Yes.

19         A.    Not in plain view, no.

20         Q.    Did you see him trying to reach for

21  anything that may have looked like a weapon?

22         A.    As that began, no, but his hands did

23  not actually stay on the steering wheel the

24  duration of us trying to assist him out of the car

25  though, so his hands were moving.

1          Q.   At any point did you see him reaching

2     for something that may have been a weapon?

3          A.   I don't recall at that time.  The

4     whole point was to get him out of the car.

5          Q.   Once you got him out of the car, did

6     you handcuff him?

7          A.   Eventually, yes.

8          Q.   Can you describe how his body hit the

9     ground once you got him out of the vehicle -- or

10    as you were pulling him out of the vehicle?

11         A.   I believe he just went straight to

12    his back.

13         Q.   Do you remember his shoes flying off?

14         A.   I don't, no.

15         Q.   Were you made aware after that his

16    shoes flew off after he hit the ground?

17         A.   That his shoes flew off?  No, I was

18    never made aware that his shoes flew off during

19    the escort out of the car.

20         Q.   Is it part of your practice to grab a

21    driver by his hair or head in order to remove him

22    from a vehicle?

23         A.   Can you reask that?  I didn't really

24    understand what you're asking.

25              MR. CHRISTIAN:  Can you repeat it

Page 59

1    back?

2                    (Record read.)

3                    MR. BAZELAK:  Are you talking

4    about -- objection to the form.  Go ahead.  You

5    can answer.

6                    THE WITNESS:  So are you -- is it

7    part of our practice, like, within the Dayton

8    Police Department?

9    BY MR. CHRISTIAN:

10            Q.    Yeah, we'll start there.

11            A.    I don't know if it's part of a

12   practice, but it's not against any policies or

13   procedures.  It's just a form of pain compliance.

14            Q.    What is the policy and procedure?

15            A.    For what?

16            Q.    Well, you just mentioned -- you said

17   it's not part of any policy or procedure so I'm

18   assuming that there is one.

19            A.    No, it's not against any.

20            Q.    Okay.  Have you seen the pulling of

21   the hair technique done before?

22            A.    Have I personally witnessed it?

23            Q.    Yes.

24            A.    I've seen it done in the past, yes.

25            Q.    How often?

1          A.    I can't recall.  We have hundreds of

2     officers on the Dayton Police Department.

3          Q.    Once, twice, five times?

4          A.    I don't recall.

5          Q.    Were you concerned for Mr. Owensby's

6     safety as you were handcuffing him?

7          A.    Like I stated before, I'm always

8     concerned about individual's I come in contact

9     with safety, but at the same time he's been

10    resisting this entire traffic stop getting out of

11    the vehicle.  We haven't patted him down for any

12    potential weapons yet so at that time I wanted him

13    handcuffed so we could pat him down for any

14    potential weapons.

15          Q.    Were you concerned for his safety

16    after you handcuffed him?

17          A.    Once he was secured and handcuffed

18    and he had no weapons on him, yes, we -- obviously

19    he's part of our traffic stop, safety is priority.

20          Q.    Did you eventually place Mr. Owensby

21    into your patrol car?

22          A.    Officer Letlow and I did, yes.

23          Q.    What was the plan to -- after he was

24    handcuffed, what was the plan to safely take

25    Mr. Owensby and place him in the patrol car?

Page 61

1          A.    Officer Letlow and I picked him up as

2   high as we could off the ground and walked him to

3   the back of our car.

4          Q.    How did you pick him up?

5          A.    He grabbed one arm, I grabbed the

6   other.

7          Q.    And then what?

8          A.    He was placed in the back of our

9   cruiser.

10         Q.    How was he transported?

11         A.    To where?

12         Q.    To the back of your cruiser.

13         A.    By picking him up.

14         Q.    Just by the arms?

15         A.    Well, I mean, I believe we both

16  had -- since he was handcuffed, I had one of my

17  arms behind him through the back of his arm and

18  then around his, like, torso, and I believe Letlow

19  did the same and we picked him up.

20         Q.    And did you at any point -- well,

21  withdrawn.

22             When transporting him to the patrol

23  car, did anyone pick up his legs?

24         A.    No.

25         Q.    What were his legs doing?

1          A.    I don't know.

2          Q.    Were they being dragged across the

3    ground as you were taking him from being

4    handcuffed over to your patrol car?

5          A.    I don't know, because like I said,

6    Officer Letlow and I picked him up as high as we

7    could so that potential would not be there, but I

8    don't know if they were or not.

9          Q.    Was there any concern for what would

10   happen to his legs?

11         A.    At that time I don't know.

12         Q.    You don't recall if there was any

13   concern for the safety of his legs?

14         A.    I don't --

15               MR. BAZELAK:  Objection.  Go ahead.

16               THE WITNESS:  I don't recall because

17   at that time he's under arrest and he just

18   resisted arrest, and at -- at that time the safety

19   of Mr. Owensby's legs are not relevant, like, on

20   top of my head.  He needs to be secured in the

21   back of our car.

22               MR. CHRISTIAN:  Go off the record for

23   just a second.

24               (Pause in proceedings.)

25               (Mr. Owensby entered the room.)

Page 63

1              MR. CHRISTIAN:  Can you read back the

2     last answer, please?

3              (Record read.)

4     BY MR. CHRISTIAN:

5         Q.   So you weren't concerned with the

6     safety of Mr. Owensby's legs after he was

7     handcuffed?

8              MR. BAZELAK:  Objection.  Answer it

9     again.

10              THE WITNESS:  Like I said, his safety

11     was always a priority of ours and I've answered

12     multiple times, but, yes, his safety of his legs

13     were a priority but at the same time the priority

14     was getting him secured in the back of our car.

15     BY MR. CHRISTIAN:

16         Q.   When you all got to the patrol car

17     with Mr. Owensby, how did you get him into the

18     patrol car?

19         A.   We just sat him in there, I believe.

20         Q.   Can you describe it?

21         A.   Just -- I believe we just placed --

22     picked him up and placed him in the car, the seats

23     in the back.

24         Q.   Picked him up how?

25         A.   How we were escorting him back there.

Page 64

1          Q.   So by his arms, one of you have one

2     arm and the other.  Did you lift him up high

3     enough?  I'm trying to just paint a picture.

4          A.   I guess.  I don't recall the actual

5     how we did it.  I just know we placed him in

6     there.  He sat down on the bench safely.  I would

7     have to recall to the video.

8          Q.   Did you see the video?

9          A.   I haven't watched it in a long time.

10         Q.   So you've seen it but you haven't

11    watched it in a while?

12         A.   Correct.

13         Q.   I want to go back a little bit.

14    Prior to making the stop, the detective who

15    contacted you in regard to Mr. Owensby, did that

16    detective instruct you to pull Mr. Owensby over?

17         A.   Well, yes.

18         Q.   Did he instruct you to pull him over

19    for his dark window tint?

20         A.   He told us about the dark window

21    tint, yes.

22         Q.   So did he tell you to pull him over

23    for his dark window tint?

24         A.   That would be the reason why for the

25    stop, yes, is the dark window tint.  It's a

Page 65

1   violation.

2          Q.    Now, you said you were working with a

3   gun reduction initiative, correct?

4          A.    That day?

5          Q.    Yes.

6          A.    Later that night, yes; not during the

7   time of our interaction with Mr. Owensby, no.

8          Q.    So you were just operating as a

9   patrol officer at the time?

10         A.    Yes, but we work closely with

11  detectives during the day as well.

12         Q.    Okay.

13         A.    So to better your answer, I did not

14  take calls of service when I was on that old unit

15  of the community problem response team.

16         Q.    And so the detective was part of this

17  gun reduction initiative?

18         A.    That night?  No, he was just out

19  working that day.

20         Q.    How many times a week did you do the

21  gun reduction initiatives?

22         A.    When I was part of that unit, it was

23  three times a week.

24         Q.    Does it last the entire day?

25         A.    It depends -- it depends how long we

Page 66

1  have air support.

2          Q.    And what is air support?

3          A.    It is an airplane or helicopter that

4  flies over -- over Dayton, that way if a car flees

5  or occupant flees, that we can lock on and

6  instruct responding officers and detectives to the

7  area or the route the car or occupant is -- or

8  individual is running.

9          Q.    How did the detectives notify you of

10 the vehicle at the drug location?

11         A.    He called me.

12         Q.    On your cell phone?

13         A.    Yeah.

14         Q.    Personal cell phone or provided?

15         A.    Personal cell phone.

16         Q.    Why is that property in which

17 Mr. Owensby's vehicle was outside of considered a

18 drug house?

19         A.    I don't know, you'd have to ask the

20 detectives.

21         Q.    When you were in the process of

22 handcuffing Mr. Owensby after he was removed from

23 the vehicle, did you have to position your body on

24 Mr. Owensby in order to handcuff him?

25         A.    In the back?  I don't believe I put

Page 67

1    my body on him at all.

2           Q.   So who handcuffed him?

3           A.   So what?

4           Q.   Who handcuffed him?

5           A.   I believe -- I don't recall, but I

6    know -- I think we all took part in it, me,

7    Officer Letlow, and Officer Hammock.

8           Q.   So then what did you do in order to

9    handcuff him?

10          A.   I held one of his wrists and placed a

11   cuff on it.

12          Q.   What about Officer Hammock?

13          A.   I don't know.

14          Q.   Officer Letlow?

15          A.   I don't recall.

16          Q.   Now, you mentioned that you were

17   concerned for the officers' safety earlier,

18   correct?

19          A.   Correct.

20          Q.   Could you have searched Mr. Owensby

21   while he was inside of his vehicle?

22          A.   No.

23          Q.   Why not?

24          A.   Officer safety.  I'm not going to

25   reach inside of an unknown vehicle and start

Page 68

1  patting him down for potential weapons.  He could

2  reach for my weapon, he could reach for his

3  weapon.  It's not safe.

4            Q.    Was Mr. Owensby arrested?

5            A.    He was.

6            Q.    Why?

7            A.    For obstruction and resisting arrest.

8            Q.    Do you know if he was ever charged

9  with the offenses he was cited for?

10           A.    For the traffic citation or are you

11 talking about the ones I just --

12           Q.    The ones that you just said.

13           A.    I don't know.

14           Q.    What is your understanding of --

15 well, withdrawn.

16                 Does the Dayton Police Department

17 have a policy on the amount of force they use to

18 remove individuals from their vehicle when they're

19 deemed to be noncompliant?

20           A.    There is a policy.  It's not

21 necessarily deemed toward people inside vehicles

22 though.

23           Q.    What's the policy?

24           A.    The policy -- the actual -- actual, I

25 can't even say it right, amount of force used

Page 69

1   necessary to use when individuals are actively or
2   reactively resisting arrest, so pretty much the
3   amount of force necessary to gain compliance of an
4   individual.
5          Q.   Do you believe that the amount of
6   force used in this instance was necessary?
7          A.   Yes.
8          Q.   Why?
9          A.   The amount of force used was -- it
10  wasn't really force, it was just physical -- using
11  physical technique, just pulling -- or escorting
12  him out of the vehicle is the only way to get him
13  out of the vehicle was to pull him out.  No other
14  type of force was used or Taser or asp or
15  anything.
16         Q.   Is pulling him out considered force?
17              MR. BAZELAK:  Objection.  Under what
18  circumstances?  Are you talking about the use of
19  force policy?  It's just -- objection to the form,
20  but go ahead and answer it if you can.
21              THE WITNESS:  You said is pulling out
22  force?
23  BY MR. CHRISTIAN:
24         Q.   Yeah.  You said in this instance what
25  happened wasn't really forced, it was just, you

Page 70

1  know, pulling and using physical techniques.
2          A.   What was -- so what was your question
3  again?
4          Q.   Is pulling not considered force?
5          A.   I guess it would be a little bit of
6  force because we have to physically get him out of
7  the vehicle.
8          Q.   When Mr. Owensby was still in his
9  vehicle prior to being pulled out, did you believe
10  that he would flee the scene?
11          A.   Did I believe he would?  I don't
12  know.
13          Q.   So was fleeing -- so was Mr. Owensby
14  potentially fleeing the scene -- withdrawn.
15              So was Mr. Owensby potentially
16  fleeing the scene not a factor in -- withdrawn.
17              When Mr. Owensby was removed from the
18  vehicle and he was on the ground and prior to
19  being handcuffed, did you perceive him as a
20  threat?
21          A.   When he was on -- outside of the car
22  and on the ground before I handcuffed him?
23          Q.   Yes.
24          A.   Like I stated before already, the
25  potential for him having a weapon on him was still

Page 71

1   great, so yes, he was still a threat at that time.

2           Q.   Was a white shirt called after he was

3   handcuffed?

4           A.   Yes.

5           Q.   Was it after he was already placed

6   into the patrol car?

7           A.   I don't recall when he was actually

8   called, but he was -- a sergeant was called, yes.

9           Q.   Who was the sergeant?

10          A.   That responded?

11          Q.   Yes.

12          A.   Sergeant Alexander Magill.

13          Q.   Did you speak to Sergeant Magill?

14          A.   We all did, yes.

15          Q.   When did you speak with him?

16          A.   When he arrived to our traffic stop.

17          Q.   When did he arrive?

18          A.   I don't know an exact time.

19          Q.   Are you aware that Mr. Owensby's

20  pants were down as you were dragging him to the

21  vehicle?

22          A.   I was not.

23               MR. BAZELAK:  Objection.  Go ahead.

24               THE WITNESS:  I was not.

25  BY MR. CHRISTIAN:

Page 72

1          Q.   Other than the other officers and

2    Mr. Owensby, was there anyone else on scene?

3          A.   As in the police department?

4          Q.   I'm sorry?

5          A.   As in like, what, police officers?

6          Q.   Anyone, police officers, pedestrians.

7          A.   There were multiple pedestrians

8    throughout standing on West Grand.

9          Q.   Did you speak with any pedestrians?

10         A.   I did not.

11         Q.   Did you know who they were?

12         A.   I did not.

13         Q.   Did you hear them say anything?

14         A.   Some were screaming, but I don't know

15   what they were screaming.  Just yelling at the

16   police officers on scene.

17         Q.   Did you search Mr. Owensby's vehicle?

18         A.   I did.

19         Q.   What did you find?

20         A.   Just he had a bag of money, a little

21   over twenty-two grand, on the driver's side

22   floorboard.

23         Q.   Did you confiscate it?

24         A.   First -- eventually, yes, but first

25   Officer Stewart had his dog -- the money was

Page 73

1    placed in an envelope with three other envelopes

2    and the dog successfully alerted on the money --

3    the envelope with the money in it.

4            Q.    Why did you confiscate it, the money?

5            A.    Because the K-9 alerted on it for

6    potential use in narcotics.  It was a K-9, it was

7    a drug dog.

8            Q.    Did the dog -- did the K-9 alert to

9    any drugs in the car?

10           A.    The K-9 alerted on the car, that was

11   the reason for the search.  That's why Mr. Owensby

12   was being under arrest.

13           Q.    And no drugs were found, correct?

14           A.    Correct.

15           Q.    After no drugs were found, did

16   Mr. Owensby get his money back?

17           A.    I believe he did not.

18           Q.    Do you know why?

19           A.    Well, pending investigation I guess.

20           Q.    And no weapons were found, correct?

21           A.    That's correct.

22           Q.    Were you surprised that you didn't

23   find any drugs or weapons?

24           A.    Was I surprised?

25           Q.    Yes.

Page 74

1          A.   I don't know.  Yes, just the way he

2    was acting throughout the duration of the traffic

3    stop.

4          Q.   How was he acting?

5               MR. BAZELAK:  Objection.  Asked and

6    answered.

7               THE WITNESS:  The way he was acting,

8    I mean, he was resisting arrest, refused to get

9    out of the car, refused to make any attempt for

10   officers to help him out of the car, made phone

11   calls to individuals to come up to his traffic

12   stop to videotape, didn't make any necessary means

13   to have some kind of device to help him out of the

14   car.  At no time did Mr. Owensby ever want to get

15   out of the car

16   BY MR. CHRISTIAN:

17        Q.   Do you believe individuals who don't

18   want to get out of their car when asked have drugs

19   or weapons in the car?

20        A.   Yes, due to my training and

21   experiences of making numerous traffic stops on

22   individuals who refused to get out of the car and

23   in doing so usually are hiding or have weapons in

24   the car or hiding narcotics in the car or on their

25   person.

1        Q.   So once Mr. Owensby stated that he
2    wasn't going to get out of the car, you believed
3    that he had drugs or weapons in the car?
4        A.   Yes.
5        Q.   And that's why you wanted to get
6    Mr. Owensby out of the car to conduct the search?
7        A.   To get Mr. Owensby out of the car
8    because the K-9 arrived.  But based on everything
9    prior to leading to the traffic stop, leaving a
10   drug house, seeing people go and come from his
11   vehicle, refusing to get out of the vehicle, there
12   was high probability, we all believed there was
13   drugs or a gun in the car.
14       Q.   Did you ever give Mr. Owensby his
15   traffic ticket?
16       A.   He got it at some point throughout
17   the duration of him and I's interaction.
18       Q.   Did you give it to him?
19       A.   He got it, yes.
20       Q.   How?
21       A.   I don't recall how he got it, but he
22   got it.
23       Q.   Did you see him get it?
24       A.   I don't recall.  I just know he had
25   his traffic ticket eventually.

Page 76

1          Q.    How do you know?

2          A.    How do I know?  Because I know he got

3    it.

4          Q.    Based on what?

5          A.    Because Officer Hammock or I gave him

6    his traffic ticket prior to him leaving with his

7    girlfriend later that night.

8          Q.    So Officer Hammock gave him the

9    ticket?

10         A.    I don't know.  I said officers did.

11   I don't know which officer gave it to him, but I

12   know for a fact he got his traffic ticket

13   eventually.  Yeah.

14         Q.    So you didn't see him get it, you

15   didn't see any officer give it to him, you don't

16   know which officer gave it to him, but he got it?

17         A.    He did because eventually at one

18   point it was in his property bag at the jail so he

19   got his traffic ticket.  His copy of the traffic

20   ticket was in his property bag at the time he was

21   going to jail.

22         Q.    Did you see anybody hand it to him to

23   know that he actually got it?

24         A.    It was in his property so it doesn't

25   matter.

1          Q.   Could it just have been -- could it
2     just have been placed in his property bag?
3          A.   Just placed it in there?  It was his
4     property because it's his ticket.
5          Q.   So if you write him a ticket and you
6     place Mr. Owensby in the back of the patrol car
7     and you place his ticket in his property bag, that
8     means he got it?
9          A.   Yes, because he's under arrest and
10     all his property is going to the jail because he
11     is told he is getting a ticket, he was told he got
12     a ticket, so his ticket is now in his property
13     which is in a bag that goes to the jail with all
14     his other belongings.
15          Q.   At what point did you see the ticket
16     in the property bag?
17          A.   When I walked -- when we were in the
18     jail, sally port, and then we handed it to the CO
19     staff, it was in the property bag.
20          Q.   So you didn't see it placed in the
21     property bag?
22          A.   It was placed in there by Officer
23     Hammock or I, yes, it was.
24          Q.   By Officer Hammock or you?
25          A.   Correct.  One of us put his ticket in

Page 78

1   his property bag, like I've said.

2           Q.    You were in your patrol car writing

3   Officer Hammock's ticket --

4           A.    What are you asking?

5           Q.    I haven't asked the question yet?

6               MR. BAZELAK:  Just let him finish.

7               THE WITNESS:  Oh.

8   BY MR. CHRISTIAN:

9           Q.    You were in your patrol car writing

10  Officer Hammock's ticket.  After you got out of

11  the patrol car, did you ever write on the ticket

12  again?

13          A.    So it's not Officer Hammock's ticket,

14  it's both of our ticket.

15          Q.    I'm sorry?

16          A.    Mr. Owensby?

17          Q.    Yeah.  I misspoke.  After you were

18  writing Mr. Owensby's ticket in your patrol car,

19  once you got out to assist Officer Hammock, did

20  there come a time where you went back and wrote on

21  the ticket then?

22          A.    Correct, so I could finish it.

23          Q.    And when was that?

24               MR. BAZELAK:  Objection.  Asked and

25  answered.  Go ahead.

Page 79

1              THE WITNESS:  I don't recall the time

2    frame, but it was completed, obviously, by looking

3    at it, it was completed at some point prior to him

4    going to the jail.

5    BY MR. CHRISTIAN:

6              Q.    Do you know what you wrote on it?

7              A.    To finish it?

8              Q.    To finish it.

9              A.    I do not.

10             Q.    Is there a policy for using your body

11   camera during a traffic stop?

12             A.    You have to activate it, yes.  Or it

13   actually activates on its own when you hit your

14   lights.

15             Q.    And how long does it have to be on?

16             A.    During the duration of our

17   interaction with Mr. Owensby, so the traffic stop

18   or eventually the jail or whatnot.

19             Q.    At any point did you turn the audio

20   off to your body camera?

21             A.    I did mute my body camera at one

22   point in time.

23             Q.    Why?

24             A.    At that time Mr. Owensby was secured

25   in our back seat and Officer Hammock and I were

Page 80

```
 1    having conversations not related to the incident
 2    so I felt -- I didn't see the need for it to catch
 3    us talking.
 4              MR. CHRISTIAN:  Can you repeat his
 5    answer for me?
 6              (Record read.)
 7    BY MR. CHRISTIAN:
 8         Q.   You muting the audio to your body
 9    camera, is that in accordance with the Dayton
10    Police Department policy?
11         A.   At that time you were allowed to mute
12    your body cam when having private conversations or
13    talking to an unmarked detective about the case or
14    whatnot, yes.
15         Q.   You were investigated as a result of
16    your consult during this incident, right?
17         A.   Yes.
18         Q.   And was there an investigation done
19    regarding you muting your audio?
20         A.   There was.
21         Q.   Do you know the results of that
22    investigation?
23         A.   I got a training memo.
24         Q.   What did that training memo say?
25         A.   As I stated earlier, I don't recall
```

Page 81

1   the verbiage of it, but it was in the body cam

2   policy.

3           Q.   Do you recall whether the

4   investigation -- whether the results of the

5   investigation stated that you were justified in

6   muting your body camera?

7           A.   I --

8               MR. BAZELAK:  Objection.  Do you have

9   the training memo?  If you want to show it to him.

10  He said he can't recall the verbiage.

11              MR. CHRISTIAN:  Okay.  One second.

12  Off the record.

13              (Pause in proceedings.)

14  BY MR. CHRISTIAN:

15          Q.   Mr. Carter, I have in my hand the

16  findings of the Profession Standards Bureau

17  Investigation of you and Officer Hammock in regard

18  to this matter.

19          A.   Okay.

20              MR. CHRISTIAN:  Counsel.

21              MR. BAZELAK:  Thank you.

22              MR. CHRISTIAN:  No problem.

23              (Mr. Owensby exited the room.)

24  BY MR. CHRISTIAN:

25          Q.   Have you seen this document before?

Page 82

1           A.    I don't believe so.

2           Q.    On the first page it says to Kamran

3   Afzal, spelled K-A-M-R-A-N, last name A-F-Z-A-L,

4   underneath it says director and chief of police.

5   Are you aware of who that is?

6           A.    Yeah, it's our chief.

7           Q.    Underneath it says from, Lieutenant

8   Eric R. Sheldon.  That's Eric with a C.

9   Underneath it says Professional Standards Bureau.

10  Are you aware of who the Professional Standards

11  Bureau are?

12          A.    Yep.

13          Q.    This is a twenty-seven page document.

14  Can you turn to page twenty-five for me?

15          A.    Yep.

16          Q.    On the -- in the last paragraph of

17  page twenty-five beginning with at the time, can

18  you read that for me, please?

19          A.    At the time of this incident, the

20  proper usage of BWC's was governed by Executive

21  Order 10-2021 body worn cameras, parentheses,

22  04/21, Section F, outlines when personnel may stop

23  or mute a recording.  It states:  Keep going?

24          Q.    Yes.

25          A.    Personnel shall not stop or mute a

Page 83

1   recording during a public encounter or assigned

2   CFS, except for the following:  Personnel may stop

3   and/or mute:  While conferring with undercover

4   personnel from investigative units, confidential

5   informants, or federal personnel/agents.  However,

6   personnel shall unmute prior to continuing or

7   taking any law enforcement action; personal relief

8   or break.  Personnel may momentarily mute only:

9   Conversations that involve police and/or case

10  tactics or strategy; personnel -- personal

11  emergency matters of a sensitive nature, i.e.,

12  family emergency, medical emergency, catastrophic

13  event.

14          With supervisors' approval, personnel

15  may mute when officers' duties are unlikely to

16  lead to information relevant to a case, i.e.,

17  directing traffic, preserving a crime scene.  The

18  BWC audio shall be reactivated immediately if the

19  circumstances change, or any police action is to

20  be taken.

21          Q.   Can you read that last sentence for

22  me, please, on page twenty-six?

23          A.   Based on Executive Order 10-2021,

24  Officer Carter's and Officer Hammock's muting of

25  his BWC during this incident was not justified.

Page 84

1  Therefore, a violation of Executive Order 10-2021
2  is sustained.
3        Q.   Do you know what BWC stands for?
4        A.   Body worn camera.
5        Q.   Thank you.  I would like this, the
6  findings on Professional Standards Bureau
7  Investigation as Plaintiff's Exhibit 2?
8             (Plaintiff's Exhibit 2, findings on
9  Professional Standards Bureau Investigation, was
10  marked for purposes of identification.)
11            MR. CHRISTIAN:  Do you want one,
12  Counselor?
13            MR. BAZELAK:  No, I'm good.  I'll
14  just write it down.
15            MR. CHRISTIAN:  No problem.
16  BY MR. CHRISTIAN:
17        Q.   After reviewing this document do you
18  believe that you were justified in muting your
19  audio during this incident?
20        A.   Well --
21            MR. BAZELAK:  Objection.  Go ahead.
22            THE WITNESS:  Well, the department
23  didn't find me justified, so therefore, no.
24  BY MR. CHRISTIAN:
25        Q.   Did you believe the investigation

Page 85

1   was -- withdrawn.

2              Was Mr. Owensby taken to the

3   hospital?

4        A.    Yes.

5        Q.    When was he taken?

6        A.    After he -- I believe he spoke with

7   Sergeant Magill and the money was counted.

8        Q.    After who spoke with Sergeant Magill?

9        A.    Clifford Owensby.

10       Q.    Did you see Mr. Owensby talking to

11  Sergeant Magill?

12       A.    I seen them, yes.

13       Q.    Do you know what they discussed?

14       A.    I do not.

15       Q.    Who took Mr. Owensby to the hospital?

16       A.    Officer Hammock and I did.

17       Q.    When you arrived at the hospital, was

18  any assistance provided to Mr. Owensby in getting

19  him out of the patrol car?

20       A.    Yep.  Yes.  We got him a wheelchair.

21  We uncuffed him and we asked Mr. Owensby how to

22  best assist him out of the cruiser into the

23  wheelchair, and he explained to us how to assist

24  him and we successfully got him in the wheelchair

25  and then wheeled him into the hospital.

Page 86

1          Q.   Who provided the wheelchair?

2          A.   Grandview has them at the hospital.

3    Grandview is a hospital.

4          Q.   Grandview Hospital is where he went?

5          A.   Yes.

6          Q.   How far was Grandview Hospital from

7    the scene?

8          A.   Less than two miles.  It's right down

9    the street on West Grand.  The actual entrance to

10   the hospital is on West Grand -- or it would be

11   east.

12         Q.   So how much time is that,

13   approximately?  Five minutes?

14         A.   If that, yeah.

15         Q.   Did you speak with anyone at the

16   hospital?

17         A.   Just when you take individuals into

18   the hospital, you just state the reason why you're

19   bringing them to the hospital, and then they

20   usually do all the talking because they ask

21   personal questions to the people coming to the

22   hospital.

23         Q.   Do you remember what they said?

24         A.   The hospital staff?

25         Q.   Yes, the hospital staff.

```
                                                  Page 87
 1            A.   No, usually they just ask for
 2    birthday, sosh, and why are you here today.
 3            Q.   Did you hear Mr. Owensby speak with
 4    the hospital staff?
 5            A.   Yeah, he spoke with them.  Yes.
 6            Q.   Do you know what he said?
 7            A.   No, I do not.
 8            MR. CHRISTIAN:  Off the record.
 9            (Pause in proceedings.)
10    BY MR. CHRISTIAN:
11            Q.   Back up a little bit.  When you and
12    Officer Hammock were removing Mr. Owensby from his
13    vehicle, do you remember him stating if he was in
14    any pain?
15            A.   I don't recall him saying anything
16    about pain being removed from the vehicle.
17            Q.   Do you remember him stating whether
18    he was in pain while you were attempting to
19    handcuff him?
20            A.   Honestly I don't recall.
21            Q.   Do you remember Mr. Owensby stating
22    if he was in pain when you were placing him into
23    your patrol car?
24            A.   No.  At that time he wasn't talking
25    at all, saying anything.
```

Page 88

1          Q.   Did Mr. Owensby state that he was in

2     pain while he was at the hospital?

3          A.   I don't recall.  I sat outside his

4     room the entire time so if he stated any type of

5     pain, it would have been to the medical staff.

6          Q.   Where was Mr. Owensby taken after his

7     hospital visit?

8          A.   Montgomery County Jail.

9          Q.   What happened when he got to

10    Montgomery County Jail?

11         A.   Myself and a couple corrections

12    officers, again, they got a wheelchair for him.

13    We helped him into the wheelchair and the

14    wheelchair went inside the jail.

15         Q.   Did he state that he was in any pain

16    while in the jail?

17         A.   Not that I recall, no.

18         Q.   Did you leave him at the jail then?

19         A.   No.  He was actually refused by the

20    jail's medical staff.

21         Q.   Why was he refused?

22         A.   That I do not know.  The medical

23    staff made that determination.

24         Q.   Did you receive any documentation

25    from the medical staff?

Page 89

1           A.   From being refused or from the
2   hospital?
3           Q.   From being refused.
4           A.   From the jail staff?
5           Q.   Yes.
6           A.   They don't give us reasons why or,
7   like, documentation saying this is why.
8           Q.   Did you receive any documentation
9   from the hospital?
10          A.   Yes, we received three forms of
11  documentation for Mr. Owensby; one goes to the
12  supervisor, one goes to Mr. Owensby, and one goes
13  to the jail staff on all the medical staff -- or
14  medical treatment he received at the hospital for
15  his records, the police records, and the jail
16  records.
17               MR. CHRISTIAN:  Can you restate his
18  answer for me, please?
19               (Record read.)
20  BY MR. CHRISTIAN:
21          Q.   Did you review the documents you
22  received?
23          A.   From the medical staff?
24          Q.   From the medical staff.
25          A.   I did not review them, no.

1      Q.   Do you know if Officer Hammock
2  reviewed it?
3      A.   I don't know.
4      Q.   Going back a bit again, when you
5  stated that you reviewed the field interview card
6  for Mr. Owensby, you stated that it showed that he
7  had numerous contacts with the police department
8  for guns and drugs; is that correct?
9      A.   Correct.
10     Q.   What would you define as numerous?
11     A.   More than one.
12     Q.   Is it more than two?
13     A.   He had a lot of field interview cards
14  on there with interaction with the police.  It
15  holds up to five or six on the computer.
16     Q.   So you saw up to five or six or does
17  it just hold up to five or six?
18     A.   It holds the most recent five, I
19  think, five or six.  I don't -- some people don't
20  have that many, but it holds the most recent,
21  like, date timewise.
22     Q.   Do you remember if he had five or
23  six?
24     A.   I -- he had numerous.  Like I said, I
25  don't know the exact number.

Page 91

1          Q.   Did the K-9 unit arrive on scene

2    prior to Officer Hammock going to the driver's

3    side of Mr. Owensby's vehicle?

4          A.   I don't recall the time frame between

5    Officer Hammock going to the driver's side or the

6    K-9 arriving.

7          Q.   You stated that you were working on

8    duty the day prior to the incident with

9    Mr. Owensby, correct?

10         A.   Correct.

11         Q.   Do you know what time your work shift

12   ended?

13         A.   The night before?

14         Q.   The night before.

15         A.   I don't, but obviously it was late.

16   I don't know the exact time.  I'd have to log on

17   the computer and actually see what time I logged

18   off that night.

19         Q.   What would you describe late as,

20   o'clock?

21         A.   No.  The night before I believe the

22   incident happened around, like, 10:00 or

23   o'clock at night so it would be like 2:00 or

24   o'clock in the morning.

25         Q.   What was your job on September 30th,

Page 92

1    2021?

2         A.    My job?  I was assigned to the

3    community problem response team.  The job title

4    was to get guns and drugs off the street

5    essentially.

6         Q.    And how do you do that?

7         A.    We work closely with unmarked

8    detectives.  We make traffic stops.  We -- subject

9    stops, talking to people.

10        Q.    Did you have any assigned duties that

11   day?

12        A.    As in like what?

13        Q.    Like, was there something more

14   specifically that you were told to do that day

15   instead of any, like, general getting guns off the

16   street?  Were you assigned to a specific area to,

17   you know, go crack down on --

18        A.    So that's not, like, really something

19   we were, like, assigned to do.  Pretty much we

20   just patrol the entire west Dayton corridor

21   anywhere to get guns and drugs off the street.  So

22   it's not really one specific spot unless, like,

23   detectives -- or like a crime stoppers complaint

24   comes and tells you about an area or whatnot or

25   like a pattern alert where they have multiple,

1   like, shootings or whatnot in this area.  But, no,

2   that day we were just helping a detective.

3           Q.   So you were just driving around that

4   day?

5           A.   Well, prior to that we were not

6   driving.  We were in our office.  But we were

7   driving to that location where Mr. Owensby was,

8   yes.

9           Q.   So you were in the office when you

10  received the call from the detective?

11          A.   Correct.

12          Q.   Would you have gone around to patrol

13  the streets that day if you had not gotten the

14  call from the detective?

15          A.   Yes, eventually.

16          Q.   What area of Dayton did the west

17  patrol service?

18          A.   West of the river.  So -- I don't

19  really know how to explain it other than -- west

20  of the Miami -- what is it, Great Miami River?

21          Q.   So everything west?

22          A.   Yeah.  That way (indicating).

23          Q.   Oh.  (Indicating.)

24          A.   Yep.  Got you.

25          Q.   Sorry, I'm not from Ohio.  Why did

Page 94

1    you leave this patrol and go back to being a

2    patrol officer?

3            A.   They got rid of the unit due to the

4    reorg of the new police chief.

5                 MR. CHRISTIAN:  Can you read that

6    back?

7                 (Record read.)

8                 THE WITNESS:  Reorganization.  Sorry.

9    BY MR. CHRISTIAN:

10           Q.   Earlier you testified that you

11   received training memos but you don't remember it;

12   is that correct?

13           A.   Training memos for what?  This?

14           Q.   I'm sorry?

15           A.   You asked me about training memos for

16   this one (indicating)?

17           Q.   For -- is that the investigation

18   you're pointing to?

19           A.   Yeah, you said -- you're talking

20   about a training memo.  Earlier I testified I had

21   a training memo for this.

22           Q.   Yeah.  Did you read the memo?

23           A.   Did I what?

24           Q.   Did you read the memo?

25           A.   Did I read the memo?

Page 95

```
 1          Q.   Yes.
 2          A.   When I received it, yes.
 3          Q.   Why didn't you graduate?
 4          A.   College?
 5          Q.   Yeah.
 6          A.   School wasn't for me.
 7          Q.   What do you mean?
 8          A.   It just -- I didn't enjoy going to
 9   class every day.
10          Q.   Were you ever accused of any
11   misconduct while in college?
12          A.   No.
13          Q.   Earlier you stated that you came in
14   early on September 30th, correct?
15          A.   Uh-huh.
16          Q.   If you're not coming in --
17          MR. BAZELAK:  Yes?
18          THE WITNESS:  Yes.  I'm sorry.
19   BY MR. CHRISTIAN:
20          Q.   If you're not coming in early, what's
21   the normal time you come in?
22          A.   For that day it would have been I
23   believe 2:00 p.m.
24          Q.   Are there any occasions where white
25   shirts or supervisors are requested and then
```

Page 96

1    they're called and then they overrule any

2    decisions of their subordinate officers?

3          A.    No.

4          Q.    Have you ever called your supervisor

5    to arrive on scene upon request?

6          A.    Have I ever called a supervisor?

7          Q.    Yeah, to come to the scene.

8          A.    Are you talking Owensby or just in

9    general?

10         Q.    Just in general.

11         A.    Oh, yeah.

12         Q.    How often do you say you have to call

13   your supervisor?

14         A.    Not often.

15         Q.    When you do, do you call because it's

16   requested or do you do it on your own?

17         A.    Because it's requested.

18         Q.    How quickly do you typically call

19   your supervisor after it's requested?

20         A.    Like I've stated earlier, it just

21   depends on the situation of the call, the nature

22   of the call, the person.  Each interaction with

23   the public and individuals are not the same.

24         Q.    When Mr. Owensby was being pulled

25   from the vehicle, did anyone attempt to ensure his

Page 97

1   back didn't hit the ground?

2           A.   Not that I know of, no.

3           Q.   At all times during the stop were you

4   able to see Mr. Owensby's hands?

5           A.   At all times?

6           Q.   Yes.

7           A.   I don't recall at all times if he put

8   his hands down or not.

9           Q.   But you were able to see his hands

10  when you were moving -- when you were removing him

11  from his car?

12          A.   The one I had ahold of, yes.

13          Q.   You couldn't see the other?

14          A.   There's two of us in the door frame,

15  it was kind of hard to see a whole lot.

16          Q.   So you couldn't see because Officer

17  Hammock was there?

18          A.   Officer Hammock and I were both in

19  the door frame with Mr. Owensby.  I only saw what

20  I could see.  I told you what I saw.

21          Q.   When police officers encounter a

22  citizen, whose job would you say it is to ensure

23  the safety of the citizen?

24               MR. BAZELAK:  Objection.  You can

25  answer.

1          THE WITNESS:  Whose job it is to

2    ensure the safety of an individual that calls?

3    BY MR. CHRISTIAN:

4          Q.   Yes.  Is it -- would it be the

5    citizen's job to ensure their safety or would it

6    be the officer's job or --

7          A.   It just depends on the call.  Like,

8    if they just want to call and there's no safety

9    issue, I guess there would be no job for anyone.

10   But if they're calling because they need help and

11   they need to be potentially saved, it would be the

12   police officer's.

13         Q.   Back to the ticket just briefly.

14   Now, I understand that you said that you're not

15   sure if you had signed the ticket when you were in

16   your patrol car; is that correct?

17         A.   Correct.

18         Q.   But generally, if you had signed the

19   ticket, would it have been completed?

20         A.   When I signed the ticket, that means

21   the ticket is completed, yes.

22         Q.   How much do you weigh?

23         A.   How much do I weigh?  Two thirty.

24         Q.   How much did you weigh in September

25   of 2021?

Page 99

1          A.   My weight fluctuates between two

2     twenty and two thirty.

3               MR. CHRISTIAN:  Go off the record for

4     a second.

5               (Pause in proceedings.)

6     BY MR. CHRISTIAN:

7          Q.   Do you recall counting the money that

8     you confiscated on the hood of Mr. Owensby's

9     vehicle?

10         A.   Counting Owensby's money on the hood?

11         Q.   Yes.

12         A.   Yes.

13         Q.   Do you recall Officer Hammock asking

14    you why you beat that poor man up while you were

15    counting money?

16         A.   I do.

17         Q.   What did he mean by that?

18              MR. BAZELAK:  Objection.

19    BY MR. CHRISTIAN:

20         Q.   What do you believe he meant by that?

21              MR. BAZELAK:  Objection.  You can

22    answer.

23              THE WITNESS:  I believe at the time

24    he just made an insensitive joke, but I don't -- I

25    don't know what he meant by it.

Page 100

1    BY MR. CHRISTIAN:

2          Q.    Did you think it was funny?

3          A.    No.

4                MR. CHRISTIAN:  I'm just going to

5    reserve my right to recall and I have no further

6    questions.

7                MR. BAZELAK:  All right.  We'll read.

8                (Thereupon, the deposition was

9    concluded at 1:39 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 101

1  STATE OF OHIO          )

2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3                I, Kathy S. Wysong, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6                DO HEREBY CERTIFY that the

7  above-named VINCENT CARTER, was by me first duly

8  sworn to testify the truth, the whole truth and

9  nothing but the truth.

10                Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14                I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25

Page 102

1          IN WITNESS WHEREOF, I have hereunto set

2     my hand and seal of office at Dayton, Ohio, on

3     this 21st day of November, 2022.

4                    *Kathy S. Wysong*

5                    _____

6

              KATHY S. WYSONG, RPR

7             NOTARY PUBLIC, STATE OF OHIO

              My commission expires 12-25-2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                      Page 103

 1                        Veritext Legal Solutions
                             1100 Superior Ave
 2                               Suite 1820
                            Cleveland, Ohio 44114
 3                          Phone: 216-523-1313
 4
      November 29, 2022
 5
      To: Leonard J. Bazelak
 6
      Case Name: Owensby, Clifford v. The City Of Dayton Et Al.
 7
      Veritext Reference Number: 5511220
 8
      Witness:  Vincent Carter        Deposition Date:  11/10/2022
 9
10    Dear Sir/Madam:
11
      The deposition transcript taken in the above-referenced
12
      matter, with the reading and signing having not been
13
      expressly waived, has been completed and is available
14
      for review and signature.  Please call our office to
15
      make arrangements for a convenient location to
16
      accomplish this or if you prefer a certified transcript
17
      can be purchased.
18
19    If the errata is not returned within thirty days of your
20    receipt of this letter, the reading and signing will be
21    deemed waived.
22
23    Sincerely,
24    Production Department
25
      NO NOTARY REQUIRED IN CA
```

Page 104

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 5511220
 3        CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
          DATE OF DEPOSITION: 11/10/2022
 4        WITNESS' NAME: Vincent Carter
 5            In accordance with the Rules of Civil
          Procedure, I have read the entire transcript of
 6        my testimony or it has been read to me.
 7            I have made no changes to the testimony
          as transcribed by the court reporter.
 8
          _____        _____
 9        Date                    Vincent Carter
10            Sworn to and subscribed before me, a
          Notary Public in and for the State and County,
11        the referenced witness did personally appear
          and acknowledge that:
12
              They have read the transcript;
13            They signed the foregoing Sworn
                  Statement; and
14            Their execution of this Statement is of
                  their free act and deed.
15
              I have affixed my name and official seal
16
          this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

Page 105

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5511220
 3      CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
        DATE OF DEPOSITION: 11/10/2022
 4      WITNESS' NAME: Vincent Carter
 5         In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7         I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9         I request that these changes be entered
        as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____
        Date                    Vincent Carter
14
           Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22      this _____ day of_____, 20_____.
23             _____
               Notary Public
24
               _____
25             Commission Expiration Date
```

Page 106

```
1                          ERRATA SHEET
                  VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 11/10/2022
3        PAGE/LINE(S) /        CHANGE         /REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19
         _____        _____
20       Date                     Vincent Carter
21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22       DAY OF _____, 20_____ .
23                        _____
                          Notary Public
24
                          _____
25                        Commission Expiration Date
```

**[00343 - ahead]**  Page 1

| 0 |
|---|
| **00343** 1:7 |
| **04/21** 82:22 |

| 1 |
|---|
| **1** 2:5 28:19,20 |
| **10** 1:17 |
| **10-2021** 82:21 |
| 83:23 84:1 |
| **101** 1:16 3:16 |
| **10:00** 19:4 91:22 |
| **11/10/2022** |
| 103:8 104:3 |
| 105:3 106:2 |
| **1100** 103:1 |
| **11101** 3:6 |
| **11:00** 19:5 |
| **12-25-2023** |
| 102:7 |
| **1220** 3:10 |
| **13th** 6:15 |
| **14** 16:3 |
| **15** 16:3 |
| **1648** 3:5 |
| **1820** 103:2 |
| **1995990** 2:6 |
| 28:21 |
| **1:39** 100:9 |

| 2 |
|---|
| **2** 2:8 84:7,8 |
| **20** 104:16 105:22 |
| 106:22 |
| **2008** 17:14,15 |
| **2010** 16:17 17:10 |
| **2012** 16:17 17:10 |
| **2015** 16:4 |
| **2016** 8:13 |

**2021** 10:22 18:16
18:20 28:13
46:11 92:1
98:25
**2022** 1:17 102:3
103:4
**216-523-1100**
3:11
**216-523-1313**
103:3
**21st** 3:5 102:3
**22** 3:17
**22255** 102:5
**28** 2:7 101:19
**29** 103:4
**2:00** 91:23 95:23

| 3 |
|---|
| **308** 3:10 |
| **30th** 10:22 18:16 |
| 18:19 21:6,9 |
| 28:13 46:11 |
| 91:25 95:14 |
| **335** 6:3 |
| **3:21** 1:7 |

| 4 |
|---|
| **4** 2:2 |
| **44113** 3:11 |
| **44114** 103:2 |
| **45401** 3:17 |
| **4602** 3:5 |

| 5 |
|---|
| **5511220** 103:7 |
| 104:2 105:2 |

| 7 |
|---|
| **7:00** 10:11 |

| 8 |
|---|
| **84** 2:11 |
| **89** 6:15 |

| 9 |
|---|
| **9** 26:23 27:1 |
| 31:16,24 35:8,24 |
| 36:7,10,17 37:13 |
| 37:14,21 49:7 |
| 50:9,11 51:5 |
| 73:5,6,8,10 75:8 |
| 91:1,6 |
| **929-816-3011** |
| 3:6 |
| **937-333-4100** |
| 3:18 |
| **9:00** 10:11 |
| **9:34** 1:18 |

| a |
|---|
| **a.m.** 1:18 10:11 |
| 19:6 |
| **able** 5:24 97:4,9 |
| **academy** 12:3 |
| 16:4 |
| **accommodate** |
| 46:12 |
| **accommodation** |
| 55:12 |
| **accommodatio...** |
| 52:8,16,19,22 |
| **accomplish** |
| 103:16 |
| **accused** 95:10 |
| **acknowledge** |
| 104:11 105:16 |
| **act** 104:14 |
| 105:20 |

**acting** 74:2,4,7
**action** 15:4 83:7
83:19 101:16
**actions** 56:16
**activate** 79:12
**activated** 23:25
**activates** 79:13
**actively** 35:14
40:16 42:5 69:1
**actual** 13:4
29:23 38:25
64:4 68:24,24
86:9
**adam** 3:15
**adam.laugle**
3:19
**adaptive** 24:21
**additional** 12:13
**address** 6:2,8
**advised** 25:1
26:21 27:7
**affiliated** 101:18
**affixed** 104:15
105:21
**afzal** 82:3
**age** 4:2 6:10,11
7:10,13,22,23
**agents** 83:5
**aggressive** 35:15
42:6,16 56:14
**agreed** 53:16,19
**ahead** 31:8 34:6
40:24 45:24
51:16,18 52:23
54:25 55:16
56:7,11 59:4
62:15 69:20
71:23 78:25

84:21
**ahold** 42:20
97:12
**air** 31:20 66:1,2
**airplane** 66:3
**al** 1:8 103:6
104:3 105:3
**alcohol** 5:17
**alert** 73:8 92:25
**alerted** 73:2,5,10
**alexander** 71:12
**allow** 42:18
**allowed** 80:11
**allowing** 47:14
**ambulate** 34:15
46:13 47:20
52:4
**ambulating**
46:18
**amount** 56:18
68:17,25 69:3,5
69:9
**answer** 5:12
6:18,19,24 8:22
9:2,7 10:18 19:9
40:23 43:2 45:1
45:25 52:24
56:21 59:5 63:2
63:8 65:13
69:20 80:5
89:18 97:25
99:22
**answered** 51:16
54:25 63:11
74:6 78:25
**answers** 5:1,25
**anybody** 76:22

**anyway** 34:18
**appear** 104:11
105:15
**appearances** 3:1
**appears** 27:18
**appended**
105:11,18
**approach** 24:4
26:10 29:1 32:2
**approached** 24:8
26:6,7,13 32:7
32:11 43:9
**approval** 83:14
**approximately**
17:2 37:7 86:13
**april** 9:19
**area** 22:24 66:7
92:16,24 93:1,16
**argue** 30:22,24
**argument** 31:3,5
**arm** 61:5,17 64:2
**armed** 22:9
**arms** 61:14,17
64:1
**arrangements**
103:15
**arrest** 62:17,18
68:7 69:2 73:12
74:8 77:9
**arrested** 68:4
**arrests** 25:24
**arrive** 35:25
71:17 91:1 96:5
**arrived** 36:7
37:1 50:9,11,15
50:16,17 71:16
75:8 85:17

**arrives** 37:13
**arriving** 91:6
**asked** 19:12
37:10 39:14
46:19 51:15
52:9,11,18,22
53:1,3 54:24
74:5,18 78:5,24
85:21 94:15
**asking** 4:12,16
36:25 46:24
52:4 56:2 58:24
78:4 99:13
**asp** 69:14
**assigned** 83:1
92:2,10,16,19
**assignment**
104:2 105:2
106:2
**assist** 32:1 33:7
34:2,14 40:16
44:12 45:20
54:23 57:12,24
78:19 85:22,23
**assistance** 10:6
38:17 85:18
**assisting** 44:15
57:3
**assume** 13:11
**assuming** 59:18
**attached** 105:7
**attempt** 74:9
96:25
**attempting** 4:22
87:18
**attention** 23:24
**attitude** 30:24

**attorney** 3:4,9
18:12 101:15
**attorneys** 3:16
18:8
**audi** 21:19 23:19
**audio** 79:19 80:8
80:19 83:18
84:19
**austin** 7:7,8
**authorize** 105:11
**available** 103:13
**ave** 103:1
**aware** 13:7,19
13:20,21 21:11
36:2 58:15,18
71:19 82:5,10

**b**

**back** 10:18 11:7
11:13 19:9
25:12 26:16
27:8 29:17,18
31:1,4 33:16
35:23 43:8
45:17 48:25
49:4 50:24
58:12 59:1 61:3
61:8,12,17 62:21
63:1,14,23,25
64:13 66:25
73:16 77:6
78:20 79:25
87:11 90:4 94:1
94:6 97:1 98:13
**badge** 29:16
**bag** 72:20 76:18
76:20 77:2,7,13
77:16,19,21 78:1

**based** 12:17
22:15 45:3
56:13,16 75:8
76:4 83:23
**basically** 12:6,9
**bazelak** 3:15
6:17,22 7:1 8:15
8:22 9:1,7 13:11
13:14 31:7 34:5
40:22 43:1 44:4
44:25 45:24
46:19,25 47:23
48:9,20 49:3
51:15,18 52:23
54:24 55:15
56:7,9 59:3
62:15 63:8
69:17 71:23
74:5 78:6,24
81:8,21 84:13,21
95:17 97:24
99:18,21 100:7
103:5
**beat** 99:14
**began** 57:3,12,22
**beginning** 38:3
82:17
**behalf** 3:2,13
**behavior** 56:14
**believe** 13:25
17:9 18:2 21:23
22:9 25:1 26:23
32:5 33:18 35:6
35:21 37:16
38:7,18 40:18
41:5 43:23
44:16 45:7,10,13
45:19 52:17,18

52:21,25 53:7
54:8,10 58:11
61:15,18 63:19
63:21 66:25
67:5 69:5 70:9
70:11 73:17
74:17 82:1
84:18,25 85:6
91:21 95:23
99:20,23
**believed** 40:11
75:2,12
**belongings**
77:14
**belt** 43:25
**bench** 64:6
**best** 5:8 45:11
46:3 47:12 52:2
53:21 85:22
**better** 45:12
65:13
**birthday** 6:14
87:2
**bit** 43:8 64:13
70:5 87:11 90:4
**body** 44:10,13
58:8 66:23 67:1
79:10,20,21 80:8
80:12 81:1,6
82:21 84:4
**born** 7:6
**bottom** 28:11
29:15
**box** 3:5,17
**boxes** 29:11
**break** 5:10,13
48:21,23 83:8

**briefly** 98:13
**bringing** 86:19
**brought** 51:4
**building** 21:20
**bureau** 2:9
81:16 82:9,11
84:6,9
**buying** 21:22
**bwc** 83:18,25
84:3
**bwc's** 82:20

**c**

**c** 82:8
**ca** 103:25
**call** 10:4,7 13:9
23:3 31:23
33:25 34:17,21
35:1,2,5 39:25
39:25 40:14
41:17,19 42:8
55:4 93:10,14
96:12,15,18,21
96:22 98:7,8
103:14
**called** 1:12 11:4
66:11 71:2,8,8
96:1,4,6
**calling** 40:15
42:21 98:10
**calls** 9:24 10:2,4
34:1,2,14 35:11
65:14 74:11
98:2
**cam** 80:12 81:1
**camera** 79:11,20
79:21 80:9 81:6
84:4

**cameras** 82:21
**car** 21:11,18
23:3,4,6,9,10
29:1 32:14,17,18
33:8,12 35:10,12
35:20 37:16
38:1,8,15,23
39:9 40:7,17
42:7,12 43:19
46:9 48:18,19
50:15 51:25
53:24 54:13,17
54:18 57:4,17,24
58:4,5,19 60:21
60:25 61:3,23
62:4,21 63:14,16
63:18,22 66:4,7
70:21 71:6 73:9
73:10 74:9,10,14
74:15,18,19,22
74:24,24 75:2,3
75:6,7,13 77:6
78:2,9,11,18
85:19 87:23
97:11 98:16
**card** 90:5
**cards** 25:22
90:13
**care** 45:11,13,19
46:1
**carry** 33:24
55:17
**carter** 1:11 4:1,9
81:15 101:7
103:8 104:4,9
105:4,13 106:20
**carter's** 83:24

[case - confidential]

**case** 1:7 19:25
80:13 83:9,16
103:6 104:3
105:3
**catastrophic**
83:12
**catch** 80:2
**cautioned** 4:3
**cell** 66:12,14,15
**center** 15:17
**certificate** 101:2
105:11
**certification**
104:1 105:1
**certified** 4:4
103:16
**certify** 101:6,14
**cfs** 83:2
**change** 83:19
105:8 106:3
**changes** 104:7
105:7,9
**charged** 8:5,7
26:1 68:8
**check** 18:4 26:16
48:22
**chg** 1:7
**chief** 82:4,6 94:4
**child** 27:8,12
28:5
**children** 8:21
9:6,12
**christian** 2:2 3:3
3:4 4:6,10 6:20
6:25 7:3,5 8:18
8:20,24 9:3,5,9
10:17,20 11:6,10
13:13,15,17 19:8

19:11,14 28:18
28:23 31:12
34:9,12,13 41:7
43:7 44:7 45:6
45:14,17,18
46:10,23 47:1,6
48:3,11,25 51:23
53:5 55:7 56:1,8
56:20,23 58:25
59:9 62:22 63:1
63:4,15 69:23
71:25 74:16
78:8 79:5 80:4,7
81:11,14,20,22
81:24 84:11,15
84:16,24 87:8,10
89:17,20 94:5,9
95:19 98:3 99:3
99:6,19 100:1,4
**cincinnati** 15:18
16:15,25 17:7
**circumstances**
69:18 83:19
**citation** 36:4
68:10
**cited** 68:9
**citizen** 97:22,23
**citizen's** 98:5
**city** 1:8,16 3:6
3:14 8:1 9:16
18:8 19:17
47:10 103:6
104:3 105:3
**civil** 1:3,13
101:19 104:5
105:5
**clarification**
46:22

**clarify** 46:20
**clarissa** 3:9
**clarissa.a.smit...**
3:12
**clarity** 16:18
**class** 95:9
**clear** 6:22 48:18
**cleveland** 3:11
103:2
**client** 48:21
**clifford** 1:5 3:21
4:11 18:17 21:8
28:15 85:9
103:6 104:3
105:3
**closely** 19:22
65:10 92:7
**code** 12:8
**college** 16:7,8,12
16:14,21 95:4,11
**colleges** 17:16,21
**combat** 19:17
**come** 7:11 15:24
15:24 19:3,23
26:5 33:16
35:12 39:13,14
42:14,21 60:8
74:11 75:10
78:20 95:21
96:7
**comes** 92:24
**coming** 7:15
21:20 86:21
95:16,20
**commands**
35:16 46:5
**commission**
102:7 104:19

105:25 106:25
**commissioned**
101:5
**community** 11:5
11:9,17 16:13,21
65:15 92:3
**complain** 13:9
**complaint** 12:20
12:22 13:2 14:1
14:4,8 92:23
**complaints** 13:5
13:6,18 15:9
41:24
**complete** 5:24
30:15 31:6
**completed** 79:2
79:3 98:19,21
103:13
**compliance**
30:17,19 59:13
69:3
**comply** 35:22
**computer** 90:15
91:17
**concern** 62:9,13
**concerned** 57:5
57:6 60:5,8,15
63:5 67:17
**concluded** 100:9
**conduct** 12:20
13:3 75:6
**conducted** 2:1
13:24 22:25
**conducting**
31:19
**conferring** 83:3
**confidential** 83:4

[confiscate - depends]                                         Page 5

**confiscate** 72:23
  73:4
**confiscated** 99:8
**confron** 43:12
**considered**
  66:17 69:16
  70:4
**consist** 19:16
**consisted** 20:23
**consistent** 21:17
  21:21 22:7
**consult** 80:16
**contact** 13:22
  26:4 38:25 60:8
**contacted** 21:15
  21:18 41:13
  64:15
**contacts** 25:25
  90:7
**continuing** 83:6
**contract** 101:18
**control** 14:5
**convenient**
  103:15
**conversation**
  23:9,13,17 43:12
  43:17 54:11
**conversations**
  23:21 50:2 80:1
  80:12 83:9
**copy** 76:19
**correct** 10:9
  14:19,20 22:17
  23:3 24:14
  28:17 33:9,10
  43:14,15 48:6
  50:7 52:5,6 55:9
  64:12 65:3

67:18,19 73:13
  73:14,20,21
  77:25 78:22
  90:8,9 91:9,10
  93:11 94:12
  95:14 98:16,17
**corrections**
  15:16 88:11
  105:17
**correctly** 31:15
**corridor** 92:20
**counsel** 81:20
**counselor** 84:12
**counted** 85:7
**counting** 99:7,10
  99:15
**counts** 14:11
**county** 15:17,19
  88:8,10 101:2
  104:10 105:15
**couple** 17:4
  88:11
**course** 13:1
**court** 1:1 4:21
  101:17 104:7
**crack** 92:17
**crime** 8:6,7
  83:17 92:23
**crimes** 19:17,19
  20:2
**cross** 1:13 4:5
**cruiser** 23:4
  25:12 50:25,25
  53:24 61:9,12
  85:22
**cruisers** 55:18
**cuff** 67:11

**curb** 38:20 42:13
**current** 6:2,10
  10:10 15:11
**currently** 9:14
**cv** 1:7

**d**

**d** 101:19
**danger** 40:7
**dangers** 42:10
**dark** 22:24,25
  64:19,20,23,25
**database** 25:15
**date** 29:14 30:8
  90:21 103:8
  104:3,9,19 105:3
  105:13,25
  106:20,25
**dated** 28:13
**day** 10:24 18:22
  18:23 19:1,12
  21:4 27:18 39:2
  40:20 47:12
  65:4,11,19,24
  91:8 92:11,14
  93:2,4,13 95:9
  95:22 102:3
  104:16 105:22
  106:22
**days** 20:19
  103:19
**dayton** 1:8,17
  3:14,17 6:3 9:16
  9:25 12:2 13:2
  15:24,24 16:21
  19:18 25:21,23
  25:25 31:19
  47:11,11,11 59:7

60:2 66:4 68:16
  80:9 92:20
  93:16 102:2
  103:6 104:3
  105:3
**daytonohio.gov**
  3:18,19
**deal** 47:11
**dealing** 46:15,17
  47:19
**dealt** 35:17
  54:15
**dear** 103:10
**decisions** 96:2
**deed** 104:14
  105:20
**deemed** 44:24
  68:19,21 103:21
**defendant** 1:11
  4:2
**defendants** 1:9
  3:13
**defensive** 12:8
**define** 90:10
**defined** 101:18
**definitely** 30:13
**department** 1:16
  9:17 13:2 15:15
  25:21,23 26:1
  31:19 59:8 60:2
  68:16 72:3
  80:10 84:22
  90:7 103:24
**depends** 14:1
  20:20 30:16,23
  40:2,3 65:25,25
  96:21 98:7

**[deploy - essentially]**

**deploy** 49:10
**deposition** 1:11
  17:24 18:7,14
  100:8 103:8,11
  104:1,3 105:1,3
**depositions** 4:13
**describe** 12:4
  22:18,20 49:8
  58:8 63:20
  91:19
**described** 22:2
  23:19
**describes** 56:25
**description** 9:22
**detective** 21:15
  22:1,23 40:11
  64:14,16 65:16
  80:13 93:2,10,14
**detectives** 19:21
  19:22,25 65:11
  66:6,9,20 92:8
  92:23
**determination**
  88:23
**device** 27:9,10
  35:18 54:17,21
  55:4,9 74:13
**devices** 33:15
  54:14
**difference** 11:15
  31:13
**different** 11:11
  20:19 40:5
  41:18 45:3
**directing** 83:17
**directly** 7:14
**director** 82:4

**disabilities**
  34:23
**disability** 26:2
  34:3
**disciplinary**
  15:4
**discoverable**
  8:17
**discussed** 85:13
**distance** 49:16
  49:23
**district** 1:1,2
**division** 1:3
**dms** 47:25
**document** 27:17
  81:25 82:13
  84:17
**documentation**
  88:24 89:7,8,11
**documents** 18:9
  18:10 89:21
**dog** 49:10 72:25
  73:2,7,8
**doing** 18:22,25
  19:12 42:22
  51:10,13,22
  61:25 74:23
**door** 40:6 42:8
  43:21 97:14,19
**downtown** 47:11
**drafting** 29:5
**dragged** 62:2
**dragging** 71:20
**driver** 30:17,20
  39:2 56:2,5,16
  58:21
**driver's** 24:7,8
  24:20 26:4

  30:24 32:3,5
  72:21 91:2,5
**driving** 12:9
  24:21 93:3,6,7
**drove** 36:20
**drug** 21:15,17
  22:6 23:20 41:3
  42:11 55:20
  66:10,18 73:7
  75:10
**drugs** 5:20 11:19
  22:6,7,11,12,14
  26:1 40:13
  41:10 73:9,13,15
  73:23 74:18
  75:3,13 90:8
  92:4,21
**due** 22:1 74:20
  94:3
**duly** 4:3 101:4,7
**duration** 57:24
  74:2 75:17
  79:16
**duties** 83:15
  92:10
**duty** 91:8

**e**

**e** 18:2,5
**earlier** 50:8
  67:17 80:25
  94:10,20 95:13
  96:20
**early** 18:23 19:1
  19:2 26:23
  95:14,20
**east** 9:25 47:11
  86:11

**education** 16:6
**either** 5:3 101:15
**eleven** 7:12,12
  20:24
**emergency**
  83:11,12,12
**encounter** 21:8
  83:1 97:21
**encountered**
  12:25
**ended** 91:12
**enforcement**
  25:15 83:7
**enjoy** 95:8
**ensure** 96:25
  97:22 98:2,5
**entered** 62:25
  105:9
**entire** 47:10
  60:10 65:24
  88:4 92:20
  104:5 105:5
**entrance** 86:9
**envelope** 73:1,3
**envelopes** 73:1
**equipment** 24:22
**eric** 82:8,8
**errata** 103:19
  105:7,10,18
  106:1
**escort** 38:19
  57:16 58:19
**escorted** 46:8
  50:24
**escorting** 56:18
  63:25 69:11
**essentially** 92:5

**et** 1:8 103:6
104:3 105:3
**event** 83:13
101:16
**eventually** 24:23
26:18,19 39:22
41:14,15 52:1
53:8 54:12 58:7
60:20 72:24
75:25 76:13,17
79:18 93:15
**everyone's** 57:7
**exact** 71:18
90:25 91:16
**exactly** 10:3
25:14
**examination**
1:13 2:1 4:5
**examined** 4:4
**excuse** 27:14
43:12 45:8
**executed** 105:10
**execution** 104:14
105:19
**executive** 82:20
83:23 84:1
**exhibit** 2:5,8
28:19,20 84:7,8
**exhibits** 2:4
**exited** 45:16
81:23
**expelled** 17:20
**experience** 22:15
54:15
**experiences**
74:21
**expiration**
104:19 105:25

106:25
**expires** 102:7
**explain** 27:23
32:22 47:14,15
93:19
**explained** 24:10
41:21 85:23
**expressly** 103:13
**extremities** 25:6

**f**

**f** 82:3,22
**fact** 55:19 76:12
**factor** 70:16
**failed** 35:13 54:1
55:24
**failing** 43:22
**fall** 16:24
**family** 8:16
35:12 83:12
**far** 37:6 86:6
**fast** 31:11
**federal** 83:5
**feel** 40:13
**feet** 37:9 49:19
**felt** 33:16 80:2
**ferguson** 36:12
36:14
**field** 25:22 90:5
90:13
**fifteen** 30:18
31:10,11 37:9
**filed** 13:1,4,6
**fill** 29:6,7,10,11
29:17 30:2
**find** 11:18 20:5
41:8 72:19
73:23 84:23

**findings** 2:8
81:16 84:6,8
**finish** 29:2,3,21
29:22 78:6,22
79:7,8
**finished** 28:24
29:24
**fire** 35:2
**firearm** 40:12,19
40:21 41:2,5,8
42:4 57:8
**firearms** 12:8
**firm** 101:17
**first** 4:2 10:18
17:23,25 21:8
23:10 35:2 36:2
37:14,21 72:24
72:24 82:2
101:7
**five** 48:23 60:3
82:14,17 86:13
90:15,16,17,18
90:19,22
**flee** 70:10
**fleeing** 70:13,14
70:16
**flees** 66:4,5
**flew** 58:16,17,18
**flies** 66:4
**floorboard**
72:22
**fluctuates** 99:1
**flying** 58:13
**focus** 11:18
**following** 83:2
**follows** 4:4
**force** 68:17,25
69:3,6,9,10,14

69:16,19,22 70:4
70:6
**forced** 69:25
**foregoing**
104:13 105:18
**form** 31:7 34:5
43:1 44:25 59:4
59:13 69:19
**formal** 12:19,21
47:22 56:10
**forms** 89:10
**fort** 8:2
**found** 73:13,15
73:20
**four** 5:18,21
6:21 9:8,10 16:9
16:10
**fourth** 7:13
**frame** 7:21 40:6
41:17 42:8 79:2
91:4 97:14,19
**free** 31:20
104:14 105:20
**friends** 35:11
**front** 41:3
**full** 5:24 25:5
**funny** 100:2
**further** 100:5
101:14

**g**

**gain** 69:3
**general** 11:24
12:1 47:18
92:15 96:9,10
**generally** 98:18
**getting** 33:1 37:4
37:5 38:23

**[getting - holds]**

48:18,19 60:10
63:14 77:11
85:18 92:15
**girlfriend** 76:7
**girlfriend's**
53:24
**give** 5:24 24:18
42:19 75:14,18
76:15 89:6
**gmail.com** 3:12
**go** 10:7 11:21
22:6,7,11 30:6
30:21 31:8,10
34:5 40:23 43:8
45:4,24 49:4
51:16,17,18
52:23 54:25
55:16 56:7,11
59:4 62:15,22
64:13 69:20
71:23 75:10
78:25 84:21
92:17 94:1 99:3
**goes** 14:4 22:14
77:13 89:11,12
89:12
**going** 10:5 21:20
27:17 30:24
31:1 34:23
35:21 42:4,7
49:10 67:24
75:2 76:21
77:10 79:4
82:23 90:4 91:2
91:5 95:8 100:4
**good** 45:13,19
48:20,22 84:13

**gotten** 93:13
**governed** 82:20
**grab** 43:18 44:9
44:14 58:20
**grabbed** 42:23
44:10,17 61:5,5
**grabbing** 42:20
43:4
**grade** 7:13
**graduate** 95:3
**graduated** 16:9
17:13
**grand** 72:8,21
86:9,10
**grandview** 86:2
86:3,4,6
**great** 71:1 93:20
**ground** 35:20
58:9,16 61:2
62:3 70:18,22
97:1
**guess** 14:9 64:4
70:5 73:19 98:9
**gun** 18:25 19:15
22:13 55:21
65:3,17,21 75:13
**guns** 11:19 22:7
22:7,11,13 26:1
90:8 92:4,15,21

**h**

**hair** 58:21 59:21
**half** 20:16
**hamilton** 15:17
15:19
**hammock** 20:14
20:18,21,25 21:3
23:10,14,18 26:5

26:7,13,21,23,25
27:14 30:4,6
31:16 32:1,4,8
32:10,13,15,20
33:17 37:15,19
37:22 39:7,11
40:6,11 43:10,14
43:18,24 44:1,6
44:8,13,16 45:22
50:3,19,22 51:13
52:15,22 53:1,3
54:7,12 57:4,12
67:7,12 76:5,8
77:23,24 78:19
79:25 81:17
85:16 87:12
90:1 91:2,5
97:17,18 99:13
**hammock's** 78:3
78:10,13 83:24
**hand** 22:14,14
55:24 76:22
81:15 102:2
**handcuff** 58:6
66:24 67:9
87:19
**handcuffed**
60:13,16,17,24
61:16 62:4 63:7
67:2,4 70:19,22
71:3
**handcuffing**
60:6 66:22
**handed** 77:18
**hands** 57:11,22
57:25 97:4,8,9
**happen** 22:22
62:10

**happened** 43:21
69:25 88:9
91:22
**hard** 97:15
**head** 5:1 58:21
62:20
**hear** 32:10 50:1
53:6,7 72:13
87:3
**held** 67:10
**helicopter** 66:3
**help** 20:5 30:3,6
32:22 33:12,16
34:18,22 35:3,10
38:9 42:7,19
46:13 47:14,16
51:7 52:11,12
74:10,13 98:10
**helped** 38:18,19
48:8 50:20
52:10 54:13
88:13
**helping** 33:17
93:2
**hereinafter** 4:3
**hereunto** 102:1
**hiding** 74:23,24
**high** 17:14 22:8
61:2 62:6 64:2
75:12
**highest** 16:5
**history** 41:4
**hit** 58:8,16 79:13
97:1
**hold** 90:17
**holds** 90:15,18
90:20

**honestly** 50:6
51:20 87:20
**hood** 99:8,10
**hospital** 85:3,15
85:17,25 86:2,3
86:4,6,10,16,18
86:19,22,24,25
87:4 88:2,7 89:2
89:9,14
**hours** 5:18,21
10:21,24 11:1
18:24
**house** 23:20 41:3
42:11 55:20
66:18 75:10
**houses** 22:6
**huh** 5:3 13:16
18:1 20:3 95:15
**huhs** 5:2
**hundred** 49:19
**hundreds** 60:1
**hurt** 42:24 43:6

**i**

**i.e.** 83:11,16
**idea** 15:10
**identification**
2:7,11 28:19,22
84:10
**identify** 19:18,20
**identifying** 6:18
6:23 8:16
**immediately**
23:1 83:18
**important** 4:24
4:25
**incident** 13:12
53:11,12 80:1,16

82:19 83:25
84:19 91:8,22
**incorporated**
105:12
**indiana** 7:18,24
**indicating** 93:22
93:23 94:16
**individual** 35:19
40:8 41:1 44:20
44:23 56:25
66:8 69:4 98:2
**individual's**
56:13 60:8
**individuals**
19:18 20:1,5
25:16 46:13,18
47:4,7,12,19
52:3 68:18 69:1
74:11,17,22
86:17 96:23
**informants** 83:5
**information**
6:19,23 8:16
25:13,21 29:9
40:10 83:16
**informed** 32:16
**infractions** 27:3
28:1,2,3 30:10
30:17
**initial** 26:4,10
**initially** 26:4
36:15,25
**initiated** 21:10
**initiating** 21:12
**initiative** 20:11
65:3,17
**initiatives** 18:25
19:15,23 20:4,7

65:21
**insensitive** 99:24
**inside** 46:16 49:5
49:6,25 67:21,25
68:21 88:14
**instance** 14:18
69:6,24
**instruct** 64:16
64:18 66:6
**instructed** 33:13
33:19
**instructions**
53:25
**intentions** 43:5
**interaction**
25:23 65:7
75:17 79:17
90:14 96:22
**interchange**
20:18
**interest** 55:11
**interested**
101:16
**interview** 18:11
25:22 90:5,13
**investigated**
14:8 80:15
**investigation**
2:10 13:24
14:14,17,19,22
73:19 80:18,22
81:4,5,17 84:7,9
84:25 94:17
**investigative**
83:4
**involve** 83:9
**island** 3:6

**issue** 35:1 98:9
**issues** 10:5 34:23
41:24 42:15

**j**

**j** 3:15 103:5
**jail** 39:5,6 76:18
76:21 77:10,13
77:18 79:4,18
88:8,10,14,16,18
89:4,13,15
**jail's** 88:20
**jim** 51:6
**job** 9:20,22
11:22 13:1
15:14,21 47:9,21
91:25 92:2,3
97:22 98:1,5,6,9
**joining** 15:14
**joke** 99:24
**june** 8:13
**justice** 15:17
**justified** 81:5
83:25 84:18,23

**k**

**k** 26:23 27:1
31:16,24 35:8,24
36:7,10,17 37:13
37:14,21 49:7
50:9,11 51:5
73:5,6,8,10 75:8
82:3 91:1,6
**kamran** 82:2
**kathy** 1:14 101:3
102:6
**keep** 6:21 82:23
**kept** 15:8

**kind** 74:13 97:15
**know** 5:7,11
  10:1 13:4 14:5
  18:17 19:4
  23:15 26:25
  27:24,25 32:15
  37:9 38:24 39:3
  39:7 43:20 44:1
  44:17 48:21
  51:11,20,21
  52:17 54:6,9
  59:11 62:1,5,8
  62:11 64:5
  66:19 67:6,13
  68:8,13 70:1,12
  71:18 72:11,14
  73:18 74:1
  75:24 76:1,2,2
  76:10,11,12,16
  76:23 79:6
  80:21 84:3
  85:13 87:6
  88:22 90:1,3,25
  91:11,16 92:17
  93:19 97:2
  99:25
**known** 23:20

**l**

**l** 82:3
**late** 91:15,19
**laugle** 3:15
**law** 1:16 3:3,4,9
  3:16 25:15 83:7
**lawful** 4:2
**lawsuit** 15:12
**lead** 83:16

**leading** 75:9
**leads** 25:13,14
  26:17,20
**learn** 12:6,10
  17:23,25
**leave** 15:23 17:5
  88:18 94:1
**leaving** 42:11
  75:9 76:6
**left** 55:20
**legal** 103:1 106:1
**legs** 61:23,25
  62:10,13,19 63:6
  63:12
**leonard** 3:15
  103:5
**leonard.bazelak**
  3:18
**letlow** 50:24
  51:1 60:22 61:1
  61:18 62:6 67:7
  67:14
**letter** 103:20
**level** 14:4 16:5
**license** 24:15,19
  25:10 26:15
**lieutenant** 82:7
**lift** 38:19 64:2
**lights** 23:25
  79:14
**line** 105:7 106:3
**listed** 28:2 105:7
  105:17
**listen** 35:15
**listing** 105:7
**little** 40:5 43:8
  64:13 70:5
  72:20 87:11

**lived** 6:4 7:18
  8:3
**location** 21:16
  66:10 93:7
  103:15
**locations** 11:19
  11:19
**lock** 66:5
**log** 91:16
**logged** 91:17
**long** 3:6 6:7 7:8
  9:18 15:21
  20:15 30:14
  31:5 64:9 65:25
  79:15
**longer** 31:11
**looked** 57:21
**looking** 79:2
**loss** 25:5
**lot** 90:13 97:15
**lower** 25:6

**m**

**m** 82:3
**madam** 103:10
**magill** 71:12,13
  85:7,8,11
**mail** 18:2,5
**making** 21:24
  64:14 74:21
**man** 40:19 99:14
**manner** 101:16
**mark** 28:18
**marked** 2:4,6,10
  28:21 84:10
**married** 8:10,12
**matter** 14:14
  15:11 49:23

**76:25 81:18**
  103:12
**matters** 83:11
**mean** 6:22 10:3
  12:21 13:8
  22:11,20 29:2
  30:19,23 32:19
  34:25 36:20
  39:6 40:3 49:8
  49:14,17 50:17
  51:12 61:15
  74:8 95:7 99:17
**means** 14:18
  74:12 77:8
  98:20
**meant** 99:20,25
**medical** 83:12
  88:5,20,22,25
  89:13,14,23,24
**medication** 5:21
**medics** 34:17,21
**memo** 14:23,24
  14:25 80:23,24
  81:9 94:20,21,22
  94:24,25
**memos** 94:11,13
  94:15
**mention** 38:22
**mentioned** 27:25
  35:24 59:16
  67:16
**met** 18:8
**miami** 93:20,20
**middle** 28:4
**midnight** 10:14
**midnights** 10:12
  10:14

**midwest** 106:1
**miles** 86:8
**minute** 48:23
**minutes** 30:18
  31:10 86:13
**misconduct**
  95:11
**misspoke** 78:17
**mjn** 1:7
**momentarily**
  83:8
**money** 72:20,25
  73:2,3,4,16 85:7
  99:7,10,15
**montgomery**
  88:8,10 101:2
**months** 12:2,10
  17:4
**morning** 91:24
**moved** 7:10
**moving** 22:24
  34:18 57:25
  97:10
**multiple** 35:9
  46:4 48:15
  63:12 72:7
  92:25
**mute** 79:21
  80:11 82:23,25
  83:3,8,15
**muting** 80:8,19
  81:6 83:24
  84:18

**n**

**n** 82:3
**name** 4:7 8:14
  28:15 30:12,13

82:3 103:6
  104:3,4,15 105:3
  105:4,21
**named** 15:12
  101:7
**names** 8:16,25
**narcotics** 21:22
  21:24 22:8 73:6
  74:24
**nature** 83:11
  96:21
**necessarily**
  56:12 68:21
**necessary** 69:1,3
  69:6 74:12
**need** 5:10 10:5
  33:16 34:18,22
  35:3 40:13
  55:12 80:2
  98:10,11
**needed** 52:8,16
  54:22
**needs** 62:20
**neighborhoods**
  9:25
**never** 13:10
  14:17 16:9
  33:20 43:6 46:5
  47:17 56:10
  58:18
**new** 3:6 94:4
**nice** 4:21
**night** 35:18
  38:21 40:8 41:1
  53:23 65:6,18
  76:7 91:13,14,18
  91:21,23

**non** 13:6
**noncompliant**
  35:15 44:24
  68:19
**nope** 41:11
**normal** 95:21
**notary** 1:15
  101:3 102:7
  103:25 104:10
  104:18 105:15
  105:23 106:23
**note** 7:3 8:18 9:3
**notice** 24:21
  25:7
**noticed** 24:24
  37:14,21
**notify** 66:9
**november** 1:17
  102:3 103:4
**number** 6:16
  29:16 90:25
  103:7
**numbers** 7:2
  105:7
**numerous** 25:25
  74:21 90:7,10,24

**o**

**o'clock** 91:20,23
  91:24
**oath** 4:16
**object** 8:15
**objection** 6:17
  7:4 8:19 9:1,3
  31:7 34:5 40:22
  43:1 44:4,25
  45:24,25 47:23
  48:9 51:15

52:23 54:24
  55:15 56:7 59:4
  62:15 63:8
  69:17,19 71:23
  74:5 78:24 81:8
  84:21 97:24
  99:18,21
**obstruction** 68:7
**obviously** 13:14
  13:15 27:5
  30:25 40:8 55:5
  60:18 79:2
  91:15
**occasions** 95:24
**occupant** 66:5,7
**occupants** 37:13
**occurred** 22:19
**october** 6:15
**offenses** 28:4
  68:9
**office** 93:6,9
  102:2 103:14
**officer** 9:21,23
  11:14,24,25 12:7
  12:11,18,20 13:9
  15:16,25 20:14
  20:17,21,24,25
  21:3 22:16
  23:10,14,18 26:5
  26:7,13,21,23,24
  26:25 27:14
  30:4,6 31:16
  32:1,4,7,10,13
  32:15,20 33:16
  35:24 36:17
  37:15,15,19,22
  37:22 38:25
  39:7,11 40:6,10

43:9,13,17,24
44:1,6,8,12,16
45:8,22 49:7
50:3,19,22,23
51:1,2,4,6,7,10
51:13 52:15,21
53:1,2 54:6,12
57:3,12 60:22
61:1 62:6 65:9
67:7,7,12,14,24
72:25 76:5,8,11
76:15,16 77:22
77:24 78:3,10,13
78:19 79:25
81:17 83:24,24
85:16 87:12
90:1 91:2,5 94:2
97:16,18 99:13
**officer's** 98:6,12
**officers** 13:20,21
14:3 33:17 35:5
38:18 39:25
41:25 55:17,24
60:2 66:6 67:17
72:1,5,6,16
74:10 76:10
83:15 88:12
96:2 97:21
**official** 104:15
105:21
**oh** 17:15 46:24
78:7 93:23
96:11
**ohio** 1:2,15,17
3:11,17 6:3 7:11
7:15,19,22 12:7
16:19 93:25
101:1,4 102:2,7

103:2
**okay** 4:15,21 5:6
5:8,15 6:25 8:5
8:25 10:16
12:12 13:6 14:7
14:11,21 17:15
20:7 21:3 23:6
25:18 27:6 28:7
29:20 30:14
33:22 35:4,7
40:18 42:1 43:3
43:8 49:23 50:5
50:7,17 59:20
65:12 81:11,19
**old** 9:6 65:14
**once** 41:22 42:1
42:12 48:1
53:15 57:3 58:5
58:9 60:3,17
75:1 78:19
**ones** 68:11,12
**open** 43:21
**operating** 65:8
**opportunities**
35:10
**opportunity**
46:6 55:4
**orc** 28:8
**order** 58:21
66:24 67:8
82:21 83:23
84:1
**ordered** 27:1
**outcome** 14:13
14:21 15:5
**outlines** 82:22
**outside** 14:16
21:19 23:19

50:2 66:17
70:21 88:3
**overhead** 23:25
**overrule** 96:1
**owensby** 1:5
3:21 4:11 18:17
21:9,23 22:19
23:14,15 24:1,10
25:1,24,24 26:17
28:16 32:8,11,14
32:16,21,22,24
33:8,13,17,19
35:9,22 36:5
37:10,17,20,23
37:25 39:8,14
40:14,16,20 41:2
41:22 42:15,17
43:3,6,13,18,22
44:2,9 45:9,11
45:16,23 46:2,3
46:4,9 47:15
48:16 50:3,20,24
51:8,14 52:7,18
53:1,16,19,21
54:2,3,12,18,20
54:21 55:1,3,6
55:19,22,24
56:17 57:4
60:20,25 62:25
63:17 64:15,16
65:7 66:22,24
67:20 68:4 70:8
70:13,15,17 72:2
73:11,16 74:14
75:1,6,7,14 77:6
78:16 79:17,24
81:23 85:2,9,10
85:15,18,21 87:3

87:12,21 88:1,6
89:11,12 90:6
91:9 93:7 96:8
96:24 97:19
103:6 104:3
105:3
**owensby's** 23:2
23:23 25:19,20
26:3,15,22 29:1
32:2 37:7 40:7
44:10,13 55:11
57:5,11 60:5
62:19 63:6
66:17 71:19
72:17 78:18
91:3 97:4 99:8
99:10
**owner** 29:18

## p

**p.c.** 3:3
**p.m.** 10:11 95:23
100:9
**p.o.** 3:5,17
**page** 2:1 82:2,13
82:14,17 83:22
105:7 106:3
**pain** 59:13 87:14
87:16,18,22 88:2
88:5,15
**paint** 64:3
**pants** 71:20
**paragraph** 82:16
**paraplegic** 25:2
25:4 33:6 35:18
38:1,6,12 39:10
40:9,19 54:16

| | | | |
|---|---|---|---|
| **parentheses** 82:21 | **patting** 68:1 | 74:10 103:3 | **pointing** 94:18 |
| **parked** 36:12,14 | **pause** 48:24 | **physical** 69:10 | **police** 9:16 10:5 |
| **part** 10:25 11:3 | 62:24 81:13 | 69:11 70:1 | 10:6 11:23,25 |
| 11:11,17 12:13 | 87:9 99:5 | **physically** 70:6 | 12:3,6,11,20 |
| 44:10,13 56:21 | **pausing** 45:15 | **pick** 61:4,23 | 13:2,8 15:15,25 |
| 58:20 59:7,11,17 | **pda** 29:16 | **picked** 61:1,19 | 16:3 25:21,23,25 |
| 60:19 65:16,22 | **pedestrians** 72:6 | 62:6 63:22,24 | 31:19 33:17 |
| 67:6 105:9 | 72:7,9 | **picking** 61:13 | 47:25 49:6 59:8 |
| **partially** 25:5 | **pen** 29:10 | **picture** 64:3 | 60:2 68:16 72:3 |
| **participate** 20:4 | **pending** 5:12 | **pistol** 40:9 | 72:5,6,16 80:10 |
| **partner** 20:11,13 | 73:19 | **place** 43:13 50:2 | 82:4 83:9,19 |
| 20:15,25 26:9 | **people** 10:4 13:9 | 56:4,24 60:20,25 | 89:15 90:7,14 |
| 57:9 | 20:22 21:1,20 | 77:6,7 | 94:4 97:21 |
| **partners** 20:18 | 22:12,13 34:17 | **placed** 61:8 | 98:12 |
| **parts** 30:1 | 34:20,20,22 | 63:21,22 64:5 | **policies** 59:12 |
| **party** 15:12 | 35:13,17 42:21 | 67:10 71:5 73:1 | **policy** 37:12 |
| 101:15 | 46:15 47:5,8,13 | 77:2,3,20,22 | 39:23 56:4,9,10 |
| **passenger** 51:20 | 56:15 68:21 | **placing** 87:22 | 56:11,13,15,24 |
| **passive** 35:15 | 75:10 86:21 | **plain** 57:19 | 59:14,17 68:17 |
| 42:6,16 | 90:19 92:9 | **plaintiff** 1:6,12 | 68:20,23,24 |
| **pat** 60:13 | **perceive** 70:19 | 3:2 4:11 | 69:19 79:10 |
| **patrol** 9:21,23 | **period** 7:19,20 | **plaintiff's** 2:5,8 | 80:10 81:2 |
| 9:25 11:5,8,14 | **person** 23:18 | 28:19,20 84:7,8 | **poor** 99:14 |
| 12:18 14:3 23:3 | 34:25 38:14,21 | **plan** 53:17,20 | **port** 77:18 |
| 23:4,6,8,10 | 39:1 44:23 45:8 | 60:23,24 | **position** 66:23 |
| 39:25 51:2 | 54:15 57:9 | **please** 4:7 5:2 | **potential** 40:12 |
| 60:21,25 61:22 | 74:25 96:22 | 7:4 9:4 34:10 | 41:5 42:4 48:4 |
| 62:4 63:16,18 | **personal** 6:18,23 | 63:2 82:18 | 55:20 57:8 |
| 65:9 71:6 77:6 | 8:16 66:14,15 | 83:22 89:18 | 60:12,14 62:7 |
| 78:2,9,11,18 | 83:7,10 86:21 | 103:14 | 68:1 70:25 73:6 |
| 85:19 87:23 | **personally** 34:16 | **pod** 11:5,8 | **potentially** |
| 92:20 93:12,17 | 59:22 104:11 | **point** 25:2 26:5 | 21:21 70:14,15 |
| 94:1,2 98:16 | 105:15 | 26:22 28:1 38:6 | 98:11 |
| **patted** 42:10 | **personnel** 82:22 | 38:10 49:14 | **power** 47:25 |
| 60:11 | 82:25 83:2,4,5,6 | 58:1,4 61:20 | **practice** 58:20 |
| **pattern** 92:25 | 83:8,10,14 | 75:16 76:18 | 59:7,12 |
| | **phone** 35:1,11 | 77:15 79:3,19,22 | **prefer** 103:16 |
| | 55:4 66:12,14,15 | | |

**preparation**
18:13
**prepare** 18:6
**presence** 101:11
**present** 3:20
36:3
**preserving** 83:17
**pretty** 25:17
29:10,11,16
36:12 38:7
42:21 53:2 69:2
92:19
**primary** 20:25
**prior** 7:14 15:14
18:16 21:12,24
22:3 23:1,16,22
26:22 29:25
38:12 46:11
54:1 64:14 70:9
70:18 75:9 76:6
79:3 83:6 91:2,8
93:5
**priority** 60:19
63:11,13,13
**private** 80:12
**proactive** 11:1,4
12:13,15
**probability** 22:9
75:12
**probably** 19:4
26:8 48:22
**problem** 10:5
11:5,9,18 65:15
81:22 84:15
92:3
**procedure** 1:14
44:19,22 45:2
59:14,17 104:5

105:5
**procedures**
59:13
**proceedings**
48:24 62:24
81:13 87:9 99:5
**process** 29:4
66:21
**production**
103:24
**profession** 81:16
**professional** 2:9
82:9,10 84:6,9
**proper** 27:9,10
82:20
**property** 66:16
76:18,20,24 77:2
77:4,7,10,12,16
77:19,21 78:1
**protocol** 31:19
31:21
**provide** 10:6
33:21,22 43:22
45:11 46:2
48:17 53:4,21
54:1,17 56:5
**provided** 33:11
38:17 39:20
40:10 52:12
54:23 55:14
66:14 85:18
86:1
**providing** 45:5
**psb** 18:10
**public** 1:15 83:1
96:23 101:4
102:7 104:10,18
105:15,23

106:23
**pull** 29:9 43:18
44:2 57:4,12
64:16,18,22
69:13
**pulled** 40:20
42:25 70:9
96:24
**pulling** 49:21
58:10 59:20
69:11,16,21 70:1
70:4
**purchased**
103:17
**purpose** 7:1
**purposes** 2:6,11
28:21 84:10
**pursuant** 1:13
**put** 6:20 29:15
30:8,10 66:25
77:25 97:7
**putting** 7:2

**q**

**qualified** 101:5
**quarter** 16:15
17:3
**question** 5:6,12
5:13 34:6,8,10
46:20 47:2 49:1
70:2 78:5
**questions** 4:12
4:15 52:5 86:21
100:6
**quickly** 17:5
96:18

**r**

**r** 82:3,8
**ran** 25:12 26:16
**rchristian** 3:7
**rchristianlaw.c...**
3:7
**reach** 43:18
57:20 67:25
68:2,2
**reached** 43:24
44:8
**reaching** 44:2
58:1
**reactivated**
83:18
**reactively** 69:2
**read** 10:17,19
19:8,10,13 34:11
48:25 49:2
56:22 59:2 63:1
63:3 80:6 82:18
83:21 89:19
94:5,7,22,24,25
100:7 104:5,6,12
105:5,6,17
**reading** 103:12
103:20
**really** 7:9 31:23
58:23 69:10,25
92:18,22 93:19
**reask** 34:7,9
58:23
**reason** 5:23
24:11 30:22
41:4 49:11
64:24 73:11
86:18 105:8
106:3

**reasonable**
  52:12
**reasons** 40:23
  89:6
**recall** 15:3 18:4
  23:21 24:25
  26:14 29:23
  30:3,7,9,11 32:9
  32:12,13 37:24
  38:11 39:4,11
  43:11,16 44:16
  48:2 50:6 51:11
  53:10,13,14 58:3
  60:1,4 62:12,16
  64:4,7 67:5,15
  71:7 75:21,24
  79:1 80:25 81:3
  81:10 87:15,20
  88:3,17 91:4
  97:7 99:7,13
  100:5
**receipt** 103:20
**receive** 47:13
  88:24 89:8
**received** 12:19
  18:2 89:10,14,22
  93:10 94:11
  95:2
**recognize** 27:19
**record** 4:8 6:21
  7:4 8:19 10:19
  19:10,13 25:17
  25:19 34:11
  35:14 45:14
  49:2 56:22 59:2
  62:22 63:3 80:6
  81:12 87:8
  89:19 94:7 99:3

  105:9
**recording** 82:23
  83:1
**records** 15:8
  89:15,15,16
**reduced** 101:10
  101:12
**reduction** 18:25
  19:15 65:3,17,21
**reference** 103:7
  104:2 105:2
**referenced**
  103:11 104:11
  105:15
**referring** 14:10
  14:15 21:5
  52:20
**refused** 74:8,9
  74:22 88:19,21
  89:1,3
**refusing** 42:6,18
  42:18 75:11
**regard** 13:3
  38:22 52:3
  64:15 81:17
**regarding** 80:19
**regards** 14:14
**registration**
  24:16
**related** 80:1
**relative** 101:15
**relevant** 62:19
  83:16
**relief** 83:7
**remember** 16:1
  16:24 31:15
  43:21 48:5
  58:13 86:23

87:13,17,21
  90:22 94:11
**remove** 33:20
  37:12 46:2
  50:20 51:7,24
  52:3 53:3 56:3,5
  56:25 58:21
  68:18
**removed** 35:19
  37:11 38:14
  46:14 50:9,23
  53:17,19,22,23
  55:13,23 66:22
  70:17 87:16
**removing** 44:22
  51:13 53:18
  87:12 97:10
**reorg** 94:4
**reorganization**
  94:8
**repeat** 10:13
  11:6 19:24 47:1
  56:20 58:25
  80:4
**rephrase** 5:8
  34:12 37:20
**reporter** 4:22
  104:7
**reporting** 101:17
**representing**
  4:11
**request** 39:21
  41:13 96:5
  105:9,11
**requested** 26:23
  31:16 39:24
  41:23 95:25
  96:16,17,19

**required** 103:25
**reserve** 100:5
**resistance** 45:4
**resisted** 46:4,5
  62:18
**resisting** 48:16
  56:17 60:10
  68:7 69:2 74:8
**respond** 9:24
  10:2
**responded** 71:10
**responding** 66:6
**response** 11:5,9
  11:18 32:25
  38:2,4 39:8
  65:15 92:3
**rest** 6:21
**restate** 89:17
**restraint** 27:9,12
  28:6
**result** 80:15
**results** 80:21
  81:4
**retired** 51:3
**returned** 103:19
**review** 18:9
  89:21,25 103:14
  104:1 105:1
**reviewed** 90:2,5
**reviewing** 84:17
**revised** 12:7
**rid** 94:3
**ride** 20:22 21:1
**right** 5:9,14 7:3
  9:24 13:12,14
  16:20 17:13
  23:7 24:13 28:9
  45:21 46:20

**[right - sitting]**

68:25 80:16
86:8 100:5,7
**riley** 3:4 4:10
**river** 93:18,20
**road** 11:13 21:12
**room** 45:16
62:25 81:23
88:4
**route** 66:7
**rpr** 102:6
**rule** 101:19
**rules** 1:13 104:5
105:5
**running** 21:19
25:20 66:8

**s**

**s** 1:14 101:3
102:6 105:8,8
106:3
**safe** 32:22 33:18
54:18 55:21
56:3,5 68:3
**safely** 33:8,19
35:19 42:12
46:2 53:18,25
55:13,23 56:25
60:24 64:6
**safety** 38:22
55:12 57:5,7,9
60:6,9,15,19
62:13,18 63:6,10
63:12 67:17,24
97:23 98:2,5,8
**sales** 21:17
**sally** 77:18
**sat** 35:20 63:19
64:6 88:3

**saved** 98:11
**saw** 36:15 49:7
90:16 97:19,20
**saying** 24:25
54:3 87:15,25
89:7
**says** 28:5 82:2,4
82:7,9
**scene** 10:8 35:9
35:25 36:3 37:1
37:15 38:18
39:15,25 49:7,8
49:9,14,17,20,22
50:11,16 70:10
70:14,16 72:2,16
83:17 86:7 91:1
96:5,7
**schedule** 10:10
10:15
**school** 17:14
95:6
**screaming** 42:21
72:14,15
**seal** 102:2
104:15 105:21
**search** 72:17
73:11 75:6
**searched** 67:20
**seat** 27:8,12
43:24 79:25
**seats** 63:22
**second** 35:23
45:15 49:5
62:23 81:11
99:4
**section** 82:22
**secured** 42:13
60:17 62:20

63:14 79:24
**security** 6:16
**see** 25:16,16
36:17,21 37:19
37:22 43:17
44:9 49:10,13,16
49:21 57:15,20
58:1 64:8 75:23
76:14,15,22
77:15,20 80:2
85:10 91:17
97:4,9,13,15,16
97:20
**seeing** 75:10
**seen** 59:20,24
64:10 81:25
85:12
**sell** 22:12
**selling** 21:22
**send** 48:1
**sensitive** 83:11
**sentence** 83:21
**september** 10:22
18:16,19 21:5,6
21:9 28:13
46:11 91:25
95:14 98:24
**sergeant** 71:8,9
71:12,13 85:7,8
85:11
**served** 29:15
**service** 10:4
65:14 93:17
**set** 102:1
**seven** 6:9 7:9
9:19 47:9 82:13
**shake** 5:1

**sheet** 105:7,10
105:18 106:1
**sheldon** 82:8
**shift** 10:12 91:11
**shirt** 39:14,18,24
40:1 41:12,20,23
42:9,13 71:2
**shirts** 95:25
**shoes** 58:13,16
58:17,18
**shootings** 93:1
**short** 7:19,20
**show** 10:7 27:17
35:14 81:9
**showed** 90:6
**side** 24:6,7,8,20
26:4 32:1,3,6
51:21 72:21
91:3,5
**sign** 29:15
**signature** 28:10
30:5 102:5
103:14
**signed** 98:15,18
98:20 104:13
105:18
**signing** 103:12
103:20
**sincerely** 103:23
**sinclair** 16:13,16
16:18,20,21
17:12,13
**single** 47:12
**sir** 21:6 103:10
**sit** 42:7,8
**sitting** 21:19
40:9 41:3

**situation** 38:11
40:2,4,5 48:8
96:21
**situations** 35:4
**six** 7:9,22,23
12:2,10 83:22
90:15,16,17,19
90:23
**sixth** 3:10
**small** 27:8
**smith** 3:9
**sniff** 31:20
**social** 6:16
**sole** 11:18
**solutions** 103:1
106:1
**somewhat** 12:10
**sorry** 7:17,24
9:14 10:13
17:12 19:11,24
27:11 28:2
45:20 72:4
78:15 93:25
94:8,14 95:18
**sosh** 87:2
**southern** 1:2
**speak** 13:10
18:13 39:1,4
41:23 42:14
71:13,15 72:9
86:15 87:3
**speaking** 32:8,21
37:19,23
**specific** 92:16,22
**specifically**
51:12 92:14
**spelled** 82:3

**spoke** 39:6 85:6
85:8 87:5
**spot** 92:22
**spouse's** 8:14
**ss** 101:2
**staff** 77:19 86:24
86:25 87:4 88:5
88:20,23,25 89:4
89:13,13,23,24
**stand** 42:9
**standards** 2:9
81:16 82:9,10
84:6,9
**standing** 72:8
**stands** 84:3
**start** 12:7 31:1
59:10 67:25
**started** 16:3,13
**state** 1:15 4:7
7:16,17 16:14,23
50:8,8 86:18
88:1,15 101:1,4
102:7 104:10
105:15
**stated** 14:16
17:9 31:15 33:7
37:1,25 40:25
41:4 43:10
48:15 49:6
54:20,22 55:9
60:7 70:24 75:1
80:25 81:5 88:4
90:5,6 91:7
95:13 96:20
**statement** 38:5
104:13,14
105:19,19

**states** 1:1 52:10
82:23
**stating** 21:16
39:8 87:13,17,21
**statute** 8:17
**stay** 57:23
**steering** 42:20
42:24 43:4
57:14,23
**stenographically**
101:11
**step** 32:14 35:23
38:1
**stewart** 51:6,7
51:10 72:25
**stop** 21:10,12,25
22:18,25 23:16
23:24 24:1,11
25:2 26:11,24
27:1,19 29:3,21
30:1 38:10,25
41:1 45:3 49:12
50:18 60:10,19
64:14,25 71:16
74:3,12 75:9
79:11,17 82:22
82:25 83:2 97:3
**stopped** 24:3
30:3,23,25
**stoppers** 92:23
**stopping** 22:3
23:1
**stops** 74:21 92:8
92:9
**straight** 58:11
**strategy** 83:10
**street** 1:16 3:5
3:10,16 6:3

11:20 16:21
20:8,9,10 21:19
36:13,14 86:9
92:4,16,21
**streets** 93:13
**stuff** 29:19
**subject** 92:8
**subordinate**
96:2
**subscribed**
104:10 105:14
106:21
**successfully**
51:24 53:3,23
73:2 85:24
**suite** 3:10 103:2
**superior** 103:1
**supervisor** 13:10
13:22 14:2,4
39:19,20 40:14
41:12 89:12
96:4,6,13,19
**supervisors**
83:14 95:25
**support** 66:1,2
**supposed** 41:13
**sure** 7:10 36:12
38:8 53:2 98:15
**surprised** 73:22
73:24
**suspended** 17:16
17:17
**suspicion** 22:4
**sustained** 84:2
**swat** 20:21,21
**sworn** 4:3,19
101:8 104:10,13
105:14,18

**[sworn - transcript]**

106:21
system 26:17

**t**

tactics 12:8
83:10
take 5:13 29:4
30:15 31:5
35:23 39:5 45:7
48:20,23 60:24
65:14 86:17
taken 1:14 5:20
83:20 85:2,5
88:6 103:11
takes 30:25
talk 4:24
talking 13:11
47:13 59:3
68:11 69:18
80:3,13 85:10
86:20 87:24
92:9 94:19 96:8
taser 69:14
teacher 52:2
team 11:5,9,18
65:15 92:3
technique 59:21
69:11
techniques 70:1
tell 4:19 38:8
53:9 54:4,5
55:22 64:22
telling 32:13
tells 25:22 92:24
ten 7:12,22
30:18 31:10,10
37:9

testified 94:10
94:20
testify 101:8
testimony
101:10 104:6,7
105:6,9,12
texas 7:7,8,21
thank 81:21 84:5
thing 5:11 29:12
29:14
things 30:21
think 15:22
46:19 48:7 67:6
90:19 100:2
third 1:16 3:16
6:3 10:11
thirty 6:13 98:23
99:2 103:19
thought 22:8
45:12
threat 70:20
71:1
three 6:13 16:15
65:23 73:1
89:10
thursday 1:17
ticket 2:5 26:17
26:20 27:4,13,18
27:20,22 28:4,20
28:25 29:5 30:2
30:15 31:2,6
50:1 75:15,25
76:6,9,12,19,20
77:4,5,7,11,12
77:12,15,25 78:3
78:10,11,13,14
78:18,21 98:13
98:15,19,20,21

time 4:24 7:19
7:20,21 10:25
17:2 19:2 20:20
20:23 21:16
22:10 26:8
29:23 31:1,13,24
32:9 34:24 35:8
36:1,22,24 38:10
39:13 40:15
41:16,17,25
43:14 46:7
48:17,20,23
49:11 52:13,25
53:13 55:21
57:7,10 58:3
60:9,12 62:11,17
62:18 63:13
64:9 65:7,9 71:1
71:18 74:14
76:20 78:20
79:1,22,24 80:11
82:17,19 86:12
87:24 88:4 91:4
91:11,16,17
95:21 99:23
times 46:4 48:15
60:3 63:12
65:20,23 97:3,5
97:7
timewise 90:21
tint 22:24,25
24:12 27:5 28:5
64:19,21,23,25
title 9:20 92:3
today 4:12,23
5:25 18:7 87:2
told 40:13 53:8
53:14 54:6,8,12

54:13 64:20
77:11,11 92:14
97:20
top 62:20
torso 61:18
traffic 21:10,12
21:25 22:18,25
23:16 24:11
25:2 26:24 27:1
27:3,18,19 29:3
29:5,21 30:1,15
30:16 31:1
38:10,25 41:1
45:3 49:12
50:18 60:10,19
68:10 71:16
74:2,11,21 75:9
75:15,25 76:6,12
76:19,19 79:11
79:17 83:17
92:8
training 11:22
12:5,9,9,13
14:23,24,25
20:22 46:12,15
46:17 47:4,8,9
47:13,19,21,22
48:4 54:14
74:20 80:23,24
81:9 94:11,13,15
94:20,21
transcribe 4:22
transcribed
104:7
transcript
103:11,16 104:5
104:12 105:5,11
105:17

**transported** 35:3
  61:10
**transporting**
  61:22
**traveling** 22:4
**treatment** 89:14
**truly** 40:11
**truth** 4:19 101:8
  101:8,9
**truthful** 5:25
**trying** 32:21
  36:22 40:16
  44:2 57:16,20,24
  64:3
**turn** 79:19 82:14
**twelve** 7:12,22
  7:24 9:8,10
  20:24
**twenty** 5:18,21
  72:21 82:13,14
  82:17 83:22
  99:2
**twice** 60:3
**two** 9:12 11:16
  16:8 20:16
  33:17 45:12
  46:8 72:21 86:8
  90:12 97:14
  98:23 99:1,2
**type** 12:4 14:1
  42:19 46:12
  54:16 69:14
  88:4
**typewriting**
  101:13
**typically** 30:14
  31:6 96:18

**u**

**uh** 5:2 13:16
  18:1 20:3 95:15
**uhs** 5:3
**unable** 34:15
  47:19 52:3
**unbuckled** 43:24
**uncuffed** 85:21
**undercover** 83:3
**undergo** 11:21
  12:12
**undergone** 46:12
  47:18
**underneath** 82:4
  82:7,9
**understand** 4:16
  4:17,18 5:4,5,7
  34:6 58:24
  98:14
**understanding**
  25:3 31:18
  39:17 68:14
**unit** 11:1,3,4,12
  11:14 12:14,15
  20:23 21:2 27:1
  31:16 36:10
  65:14,22 91:1
  94:3
**united** 1:1
**units** 83:4
**unknown** 42:5
  42:10 57:8
  67:25
**unmarked** 80:13
  92:7
**unmute** 83:6
**unusual** 35:5

**usage** 82:20
**use** 56:14 68:17
  69:1,18 73:6
**usually** 22:14
  34:17 35:2
  74:23 86:20
  87:1

**v**

**v** 103:6 104:3
  105:3
**valid** 25:16 46:6
**vantage** 49:14
**varied** 11:1
**vehicle** 21:21,24
  22:23 23:2,3
  24:1,3,4,9 25:8
  26:6,8,10,16
  27:15 28:25
  29:19 31:4,25
  32:2,23 33:2,14
  33:15,20 36:6,11
  36:16,18,19,21
  36:23 37:3,4,5,6
  37:7,11,13,18
  38:9,19 40:12
  41:6,22 42:2,20
  42:22 43:5,9,10
  43:23 44:3,9,20
  44:23 45:9,23
  46:4,7,16 48:17
  49:5,6,25 50:10
  50:14,21,23 51:8
  51:14,21 52:4,10
  52:11,14,20 53:2
  53:4,17,20,22
  54:4 55:13,21,23
  56:3,4,6,15,18

57:1,8,13 58:9
  58:10,22 60:11
  66:10,17,23
  67:21,25 68:18
  69:12,13 70:7,9
  70:18 71:21
  72:17 75:11,11
  87:13,16 91:3
  96:25 99:9
**vehicles** 46:14
  47:4,7 68:21
**verbally** 5:1
**verbiage** 81:1,10
**veritext** 103:1,7
  106:1
**video** 47:25 48:5
  64:7,8
**videos** 48:1
**videotape** 74:12
**view** 57:19
**vincent** 1:11 4:1
  4:9 101:7 103:8
  104:4,9 105:4,13
  106:20
**violation** 65:1
  84:1
**violent** 19:17,19
**visit** 88:7
**vs** 1:7

**w**

**wait** 17:11
**waived** 103:13
  103:21
**walked** 61:2
  77:17
**want** 23:5 30:22
  31:24 43:4

45:11 46:21
47:3 48:22 49:4
64:13 74:14,18
81:9 84:11 98:8
**wanted** 19:18
20:1,6 33:7
35:13 46:1 55:6
60:12 75:5
**watch** 47:24
**watched** 48:7
64:9,11
**watching** 21:17
48:2,5
**way** 30:21 32:22
33:14 42:19
43:22 46:3,6
48:17 52:12
53:21,25 54:18
55:22 56:3,5
66:4 69:12 74:1
74:7 93:22
**wayne** 8:2 20:14
**weapon** 22:10
41:3 57:21 58:2
68:2,3 70:25
**weapons** 22:5
26:2 42:11
57:15 60:12,14
60:18 68:1
73:20,23 74:19
74:23 75:3
**week** 11:2 18:24
18:25 65:20,23
**weigh** 98:22,23
98:24
**weight** 99:1
**welcome** 42:14

**went** 16:14
20:10 25:12
30:6 39:6 44:12
44:15 58:11
78:20 86:4
88:14
**west** 1:16 3:10
3:16 6:3 11:5,8
11:8 47:10 51:2
72:8 86:9,10
92:20 93:16,18
93:19,21
**whatnot** 19:19
79:18 80:14
92:24 93:1
**wheel** 42:20,24
43:4 57:14,23
**wheelchair**
33:11,23,25
54:22 55:2,3,5
55:13,19 85:20
85:23,24 86:1
88:12,13,14
**wheelchairs**
33:24 34:1
55:18
**wheeled** 85:25
**when's** 6:14
**whereof** 102:1
**white** 21:18
23:19 39:14,18
39:24 40:1
41:12,19,23 42:9
42:13 71:2
95:24
**wholeheartedly**
35:21

**window** 22:24
22:25 24:12,21
27:5 28:5 64:19
64:20,23,25
**windows** 50:5
**wish** 52:13
**withdraw** 12:24
**withdrawn**
14:12 29:25
31:14 37:20
39:23 44:21
53:15 54:2
61:21 68:15
70:14,16 85:1
**witness** 8:23 9:8
11:8 31:9 34:7
40:25 43:3 44:5
45:2 46:1,21
47:3,24 48:10
51:17,19 52:25
55:1,17 56:12
59:6 62:16
63:10 69:21
71:24 74:7 78:7
79:1 84:22 94:8
95:18 98:1
99:23 101:12
102:1 103:8
104:1,4,11 105:1
105:4,15
**witnessed** 59:22
**word** 56:9
**work** 9:15,16
12:17 19:22,25
20:8,17 65:10
91:11 92:7
**worked** 9:18
18:24 47:10

**working** 18:19
21:4 65:2,19
91:7
**worn** 82:21 84:4
**wright** 16:14,23
**wrist** 44:17
**wrists** 44:18
67:10
**write** 26:17,20
29:10 30:5,12
77:5 78:11
84:14
**writing** 27:13
28:24 29:2,3
36:4 50:1 78:2,9
78:18 101:11
**written** 12:23
**wrong** 50:7
**wrote** 30:13
78:20 79:6
**wysong** 1:14
101:3 102:6

**y**

**yanking** 45:22
**yeah** 13:13 16:20
23:4 29:7 46:25
50:13,15 59:10
66:13 69:24
76:13 78:17
82:6 86:14 87:5
93:22 94:19,22
95:5 96:7,11
**year** 6:5 15:22
16:1,8,16,22
17:7
**years** 6:9 7:9
9:19 16:10,15

**[years - zone]**                                              Page 21

   17:8 20:16
   47:10
**yelling**  72:15
**yep**  9:11 13:15
   28:14 82:12,15
   85:20 93:24
**york**  3:6
**young**  7:10

**z**

**z**  82:3
**zone**  40:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.