Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  CIVIL DIVISION

4                    *   *   *

5  CLIFFORD OWENSBY,

6        Plaintiff,

7       vs.          CASE NO. 3:21-cv-00343-MJN-CHG

8  CITY OF DAYTON, et al.,

9        Defendants.

10                   *   *   *

11         Deposition of WAYNE HAMMOCK, Defendant

12  herein, called by the Plaintiff for

13  cross-examination pursuant to the Rules of Civil

14  Procedure, taken before me, Kathy S. Wysong, a

15  Notary Public in and for the State of Ohio, at the

16  City Law Department, 101 West Third Street,

17  Dayton, Ohio, on Thursday, November 10, 2022, at

18  2:13 p.m.

19                   *   *   *

20

21

22

23

24

25

Page 2

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3           Christian Law, P.C.
 4      By:  Riley Christian
             Attorney at Law
 5           4602 21st Street
             P.O. Box 1648
 6           Long Island City, New York  11101
             929-816-3011
 7           rchristian@rchristianlaw.com
 8           and
 9      By:  Clarissa A. Smith
             Attorney at Law
10           1220 West Sixth Street
             Suite 308
11           Cleveland, Ohio  44113
             216-523-1100
12           clarissa.a.smithesq@gmail.com
13      On behalf of the Defendants:
14           City of Dayton
15      By:  Leonard J. Bazelak
             Adam Laugle
16           Attorneys at Law
             101 West Third Street
17           P.O. Box 22
             Dayton, Ohio  45401 937-333-4100
18           leonard.bazelak@daytonohio.gov
             adam.laugle@daytonohio.gov
19
                         *   *   *
20
21
22
23
24
25
```

```
                                              Page 3
 1                    WAYNE HAMMOCK
 2   of lawful age, Defendant herein, having been first
 3   duly cautioned and sworn, as hereinafter
 4   certified, was examined and said as follows:
 5                    CROSS-EXAMINATION
 6   BY MS. SMITH:
 7           Q.   Good afternoon.  How are you?
 8           A.   I'm good.  How are you?
 9           Q.   I'm doing okay.  Could you state your
10   name for the record?
11           A.    My name is Wayne Hammock.
12           Q.    Wayne Hammock, it's nice to meet you
13   officially.  My name is Clarissa Smith.  I
14   represent the plaintiff in this case, Clifford
15   Owensby, along with Attorney James Willis and Ryan
16   Christian.
17               So I'm going to start off by saying
18   usually I say I won't ask too many questions.
19   That's not the case here.  So if at any point
20   during the deposition you feel like you need a
21   break, you need to get some air, stand up, stretch
22   your legs, go to the restroom, let me know, we'll
23   pause the deposition.  I just ask that if there's
24   a question posed on the table, that you answer it.
25   But I guess before that I should have asked you,
```

```
                                          Page 4
 1    have you ever been deposed before?

 2           A.   I believe so, right?  Yes.

 3           Q.   Okay.  So you kind of know how it

 4    goes.  Has it been a while though?

 5           A.   Yes, it's been a couple years.

 6           Q.   Okay.  Well, I'll go over the rules,

 7    like the one rule we just mentioned, just so we

 8    have a clear understanding.

 9                First and foremost, the court

10    reporter is taking down everything that we're

11    saying so if you could give verbal answers.  In

12    common conversation we like to use body gestures,

13    uh-uh, huh-uhs instead of actual words.  It's

14    easier for the court reporter to take down if you

15    actually speak.

16                With that being said as well, she can

17    only take down one person speaking at a time so as

18    you're answering, I will do my very best not to

19    interrupt you as you're giving me an answer.  I'll

20    ask you to extend me the same courtesy, if I'm

21    asking a question, wait until I'm done and then

22    answer the question.

23           A.   All right.

24           Q.   If I ask you a question and it's

25    unclear, you don't understand, you don't hear it,
```

Page 5

1  please ask me to repeat it or clarify.  If you

2  answer the question that I've posed, I'm going to

3  assume that you understood it.  Okay?

4          A.   All right.

5          Q.   You understand that today you are

6  under oath and that your testimony will carry the

7  same weight as if you were testifying in court at

8  a trial?

9          A.   Yes.

10          Q.   And you're sworn to tell the truth?

11          A.   Yes.

12          Q.   Do you feel as if you are prepared to

13  answer my questions today?

14          A.   Yes.

15          Q.   Do you feel that your judgment is

16  clear, your mind is clear, you're not under any

17  influence of any drugs, alcohol, or medication?

18          A.   Yes, I'm ready.

19          Q.   First and foremost, can you state

20  your first and last name and spell your last name

21  for the record?

22          A.   Yeah.  It's Wayne Hammock,

23  H-A-M-M-O-C-K.

24          Q.   What's your birth date, Mr. Hammock?

25              MR. BAZELAK:  Just give her your age.

```
                                              Page 6
 1   Date of birth is really not discoverable.  You can
 2   give her your age.
 3   BY MS. SMITH:
 4            Q.   Age is fine.
 5            A.   All right.  I'm thirty-two.
 6            Q.   And where do you live?
 7            A.   I live here in Dayton.  Dayton area.
 8            Q.   Okay.  How long have you lived in the
 9   Dayton area?
10            A.   Since 2009, so thirteen years.
11            Q.   Where did you grow up?  And first and
12   foremost, should I call you Officer Hammock,
13   Mr. Hammock?  I want to be respectful.
14            A.   Either is fine.
15            Q.   Either is fine.  Where did you grow
16   up?
17            A.   I'm from Louisville, Kentucky.
18            Q.   Louisville, Kentucky.  Cassius Clay
19   is from there, isn't he?
20            A.   Yes.
21            Q.   So is Mr. Willis, my co-counsel.
22            A.   Nice.
23            Q.   Wonderful.  When did you move to
24   Ohio?
25            A.   2009.
```

Page 7

1         Q.    2009.  Okay.  Why did you move to
2    Ohio from the great state of Kentucky?
3         A.    I came here for college.
4         Q.    Yeah?
5         A.    Yeah.
6         Q.    Where were you going?
7         A.    I was in med school.
8         Q.    Really?
9         A.    Yes.
10        Q.    How was med school?  Did you enjoy
11   it?
12        A.    It was all right.
13        Q.    Yeah?  Where were you going, to
14   Wright?
15        A.    No, Kettering.
16        Q.    Kettering, okay.  I don't want to
17   assume, but did you finish that program?
18        A.    No.
19        Q.    Why not?  Too much blood?
20        A.    No.  Personal reasons.
21        Q.    Okay.  So that kind of segues into my
22   next question about your educational history.
23   Where did you go to high school?
24        A.    I went to Indiana Academy High
25   School.  That's where I graduated from.  I

1  actually went to two different high schools, but I

2  graduated from Indiana Academy High School.

3          Q.   Okay.  And after high school where

4  did you go?

5          A.   I came here --

6          Q.   Okay.

7          A.   -- for college.

8          Q.   Okay.  And you were at Kettering?

9          A.   Yes.

10         Q.   Okay.  How long were you at

11 Kettering?

12         A.   Three years.

13         Q.   During your time at Kettering did you

14 have any academic issues?

15         A.   As in?

16         Q.   Any grade issues, any --

17         A.   No.

18         Q.   -- misconduct issues, anything like

19 that?

20         A.   No.

21         Q.   What did you do after you left

22 Kettering?

23         A.   I began just working.

24         Q.   Okay.  Where were you working?

25         A.   I worked at a nursing home called

Page 9

1   Bethany Village.

2           Q.   How long did you work there?

3           A.   For five years.

4           Q.   Why did you leave?

5           A.   Leave where?

6           Q.   The nursing home.

7           A.   That's when I started the police

8   academy.

9           Q.   Okay.  And what year was that?

10          A.   2015.

11          Q.   Okay.  And the police academy, is

12  that attached to any particular police department

13  or is that just in Ohio, the --

14          A.   It's the Dayton -- it's Dayton Police

15  Department's academy.

16          Q.   Okay.  How long was your training at

17  the academy?

18          A.   Six months.

19          Q.   Six months.  And after you got out of

20  the academy, how did that segue into, I'm

21  assuming, your current job?

22          A.   Yeah, I was hired by the City of

23  Dayton.  I started the police academy.  Upon

24  graduation I'm assigned to a patrol district.

25          Q.   Okay.  You said, I'm sorry, what year

Page 10

1   was that?

2           A.   I started in 2015, graduated in 2016.

3           Q.   2016.  At the academy or outside of

4   the academy what special training did you obtain

5   in order to work for the police department?  And

6   you can just summarize the topics that you were

7   taught.

8           A.   I mean, there's a -- there's a

9   variety of topics that you have to cover in the

10  police academy in order to qualify for the State's

11  certification to be a police officer.

12          Q.   Okay.  Can you give me a summary of

13  those topics or they're kind of hard to remember?

14          A.   It's a wide range.  I mean, it --

15  from subject stops to law to defensive tactics to

16  firearms.  It's a lot within six months.

17          Q.   Okay.  Did you have any other

18  training outside of that six months, any

19  subsequent training or --

20          A.   For?

21          Q.   To be an officer.

22          A.   No.

23          Q.   Okay.  So are you saying that the

24  only training you've had for your career was

25  during that police academy?

1          A.    Prior to graduating and becoming a

2     police officer, yes.

3          Q.    Okay.  So what about after you became

4     a police officer?

5          A.    There's yearly trainings that we go

6     through.  Trainings through our electronic system,

7     Power DMS that we receive.  That's common.  We

8     commonly get trained through Power DMS and do

9     trainings every year that cover different topics.

10          Q.    Okay.  Have you only worked solely

11     for the police department or have you had any

12     assignments that have lent you out to another

13     agency, any task force or anything like that?

14          A.    My sole job has been the police

15     department since getting hired.

16          Q.    Okay.  Since you've been hired with

17     the police department, have you -- other than this

18     situation here, have you been notified of any oral

19     or written complaints against you?

20          A.    No, I don't believe so.  No oral or

21     written complaints, no.

22          Q.    Okay.  Have you ever been

23     reprimanded?

24          A.    Yes.

25          Q.    Could you -- one time or more than

1   once?

2          A.   I believe I've been reprimanded twice

3   in my entire career.

4          Q.   Okay.  I want to take them one by

5   one.  Can you explain to me the first time you

6   were reprimanded what happened?

7          A.   I received a -- I think a written for

8   a traffic accident, which was one of my prior

9   lawsuits.

10          Q.   What happened in that accident?

11          A.   I --

12          Q.   How did it happen, I suppose?

13          A.   Basically I wrecked into a lady

14   going -- in response -- while I was going to a

15   call for service.

16          Q.   Okay.  And the woman filed a lawsuit,

17   you said?

18          A.   Yes.

19          Q.   Okay.  What year was that?

20          A.   I would have to ask the attorneys.

21          Q.   Okay.  At some point?

22              MR. BAZELAK:  If you don't know, just

23   say you don't.

24              THE WITNESS:  Yeah, I don't know.

25   BY MS. SMITH:

Page 13

1          Q.    Do you know how that case resolved?
2     Did it go to trial or not?
3          A.    No, I didn't go to trial for it.
4          Q.    Okay.
5          A.    Again, I don't know -- I would have
6     to direct it to the attorneys.
7          Q.    Do you know where that case was
8     pending?
9          A.    Meaning?
10         Q.    Was it in state court or federal
11    court, municipal court?
12         A.    I believe municipal.
13         Q.    And you said you received a second
14    reprimand?
15         A.    Yes, I think so.  I don't -- I can't
16    recall right now.  I don't --
17         Q.    Okay.  Now, as far as you know, do
18    reprimands go into any personnel files?
19         A.    Yes, they go into your disciplinary
20    record.
21         Q.    And is there an opportunity to purge
22    that record of reprimands and complaints and those
23    type of entries?
24         A.    Yes.
25         Q.    How do those entries get removed from

Page 14

1  your file?

2          A.   By request after two years from the

3  date.

4          Q.   Did you make a request for those two

5  incidents to be removed?

6          A.   Yes.

7          Q.   Do you recall when you made that

8  request?

9          A.   No.

10          Q.   Was your request granted or denied?

11          A.   Granted.

12          Q.   Both times?

13          A.   If -- I made one request.  If there

14  were two times in there, the one request would

15  cover both incidents --

16          Q.   Okay.  Got you.

17          A.   -- if there were two.

18          Q.   Have you ever pled guilty to or been

19  convicted of a crime other than a traffic

20  violation?

21          A.   No.

22          Q.   Okay.  When did you first learn about

23  this deposition?

24          A.   I don't remember.  Not too long ago.

25          Q.   Would it have been within the past

Page 15

1   week or two weeks?

2          A.    No.  A couple months ago.

3          Q.    Okay.  How were you notified?

4          A.    In writing.

5          Q.    Okay.  In a letter, e-mail?

6          A.    An e-mail.

7          Q.    Did you do anything to prepare for

8   your deposition today?

9          A.    Yes.

10         Q.    What did you do?

11         A.    Met with --

12         Q.    I'm not talking about any

13  communications with your counsel, just in general

14  what did you do?

15         A.    Reviewed documents.

16         Q.    What documents did you review?

17         A.    Interrogatories and statements that I

18  made in the report.

19         Q.    Did you speak with anyone outside of

20  your counsel about the deposition today?

21         A.    No.

22         Q.    Did you discuss with Officer Vincent

23  Carter the fact that you two were going to be

24  deposed today?

25         A.    I mean, we both knew we were going to

Page 16

1    be deposed but --

2           Q.   Did you have a conversation about it?

3           A.   No.

4           Q.   Now, you understand that we're here

5    to discuss the matters that happened on September

6    30th, 2021 involving Clifford Owensby, right?

7           A.   Yes.

8           Q.   Okay.  Prior to September 30th, 2021,

9    did you know or know of Clifford Owensby?

10          A.   I had had an encounter with him prior

11   to that date.

12          Q.   Explain to me that encounter.

13          A.   I was one of the officers who

14   conducted a traffic stop on Owensby while he was

15   driving a minivan -- a white minivan.  He had

16   marijuana inside the vehicle.  You could smell the

17   smell of raw marijuana coming from the vehicle.

18   Subsequently we assisted him from the vehicle into

19   a wheelchair onto the sidewalk where he waited

20   with the front passenger while we searched the

21   vehicle and located his marijuana.

22          Q.   You said you assisted him into a

23   wheelchair.  Was that a wheelchair -- was that his

24   wheelchair?

25          A.   Yes.

Page 17

1          Q.    Okay.  Do you recall the initial

2    purpose of the stop?

3          A.    No.

4          Q.    Okay.  And you said he had a

5    passenger with him --

6          A.    Yes.

7          Q.    -- or it was just him?  Just one

8    passenger?

9          A.    Yes.

10         Q.    Now, during that stop, do you recall

11   if a supervisor responded?

12         A.    No, I don't believe one did.  There

13   was no reason for one to respond.

14         Q.    Okay.  Do you recall if he asked for

15   a supervisor during that stop?

16         A.    No.  If he would have requested one,

17   one would have responded.

18         Q.    What is the department's policy when

19   it comes to calling supervisors?

20         A.    If someone requests a supervisor, one

21   is to be requested as soon as possible deeming,

22   you know, the scene is safe, there's no danger to

23   anyone there.  So once the scene is safe,

24   everything is under control, at the earliest

25   convenience a supervisor has to be called.

1          Q.   What is the role of the supervisor
2     when they actually show up?
3          A.   To field the citizen's complaint or
4     see if there's any violation of policy or issue or
5     law or whatever the person is complaining about.
6          Q.   In your experience over the course of
7     your career, have you ever seen a supervisor
8     respond to a traffic stop and overrule what the, I
9     guess, patrol officer has chosen to do?
10         A.   No.
11         Q.   Okay.  Would you say that it's in
12    their prerogative to overrule if they see fit, or
13    are they just kind of a buffer to explain to the
14    citizen why the officers acted the way they did?
15              MR. BAZELAK:  Objection as to the
16    form.  If you understand it.
17              MS. SMITH:  Yeah, that was a little
18    complicated so let me rephrase it.  I'm sorry.
19              MR. BAZELAK:  Just overrule is just
20    where I'm having an issue.  Overruling, I don't
21    know what that means.
22              MS. SMITH:  Yeah.  Yeah.
23    BY MS. SMITH:
24         Q.   I suppose what I'm trying to ask, is
25    a supervisor able to, I guess, change or redirect

Page 19

1    what a patrol officer has done during a stop?

2              A.   Yes.

3              Q.   Okay.  But you haven't experienced

4    that --

5              A.   No.

6              Q.   -- in your career?  Okay.  Can you

7    recall any other times prior to September 30th,

8    2021 and the most recent -- well, I guess not most

9    recent, but the event you just spoke of that you

10   encountered Mr. Owensby?

11             A.   I didn't have any other encounters

12   with Owensby.

13             Q.   Do you recall when that other

14   encounter was?

15             A.   Sometime in 2020.

16             Q.   Okay.  At the time that you stopped

17   Mr. Owensby on September 30th, 2021, were you

18   familiar with any members of Mr. Owensby's family

19   in Dayton?

20             A.   No.

21             Q.   Okay.  So as far as you could tell,

22   the only interaction that you had with Mr. Owensby

23   or anybody else that you would have been aware of

24   would have been in 2015?

25             A.   Correct.

Page 20

1          Q.   I want to kind of take it slow

2     because I want to kind of understand how you came

3     to be in contact with Mr. Owensby on September

4     30th, 2021.  How did you become aware of him?

5          A.   We were contacted by Cody Hartings,

6     who was conducting surveillance.  Hartings had

7     told us that there was a vehicle leaving a house

8     that he was watching for suspected narcotics and

9     he requested we make a traffic stop on the car.

10         Q.   And who is Cody Hartings?

11         A.   Cody Hartings at the time, he was a

12    detective in the narcotics bureau working closely

13    with detectives of the DEA.

14         Q.   Okay.  And when he called, how did he

15    call?  Was it on a radio or on the phone?

16         A.   I remember him making contact with us

17    over the radio, giving us the location and the

18    type of car, and then giving us the details of the

19    direction the car was heading when it left the

20    house.

21         Q.   And where were you actually when you

22    received that call?

23         A.   I don't remember.

24         Q.   Who were you with?

25         A.   I was the passenger.  Vincent Carter

Page 21

1    was the driver.

2          Q.    Okay.  So you guys were driving

3    around --

4          A.    Yes.

5          Q.    -- and had the radio?

6          A.    Yes.

7          Q.    Okay.  So Detective Hartings says I

8    see a vehicle in front of this house.  Did he ask

9    you to initiate a traffic stop, or what did he

10   want you to do once he alerted you that there was

11   this car in this drug area?

12         A.    Yeah, he requested a traffic stop be

13   initiated on the vehicle.

14         Q.    Okay.  Did he suggest to you any

15   basis for a traffic stop, or did he just inform

16   you that the car needed to be stopped?

17         A.    I believe he told us the car had

18   window tint, but we would later confirm that by

19   seeing the vehicle and noticing the window tint

20   ourselves.

21         Q.    Do you know why he wanted you to stop

22   the vehicle?

23         A.    I mean, it's his investigation.

24         Q.    Okay.  How long after you received

25   that car -- that call did you catch up with the

Page 22

1   car?

2           A.   I don't remember.

3           Q.   Was it less than a half hour?

4           A.   Yes.

5           Q.   Do you think it was less than twenty

6   minutes?

7           A.   Yes.

8           Q.   Less than ten minutes?

9           A.   Maybe.  Around there.

10          Q.   So you guys weren't too far away?

11          A.   No.

12          Q.   Okay.  Do you recall what your patrol

13  was that day?

14          A.   What do you mean?

15          Q.   What area of Dayton you were assigned

16  to patrol or were you just all over?

17          A.   I worked for GPM, Greater Dayton

18  Premier management.  Officer Carter was assigned

19  to west POD carpet to the community problem

20  response team.  Our task -- we could go anywhere

21  in the city, but mainly our focus was west Dayton,

22  anywhere in west Dayton we patrol.

23          Q.   Okay.  Now, you said the first one a

24  little fast.  I've heard of the other one.  What's

25  the difference between the two -- what would you

Page 23

1    call them?  I wouldn't call them an organization.

2            A.    We call them task forces.

3            Q.    Task forces.  What is the difference

4    between the two task forces that you and Officer

5    Carter were a part of?

6            A.    Officer Carter's focus was more on

7    complaints fielded by citizens throughout west

8    Dayton.  My -- my focus was more complaints

9    fielded by management and people who live in the

10   low-income housing properties throughout the city.

11           Q.    And are those just any complaints or

12   complaints of a certain nature?

13           A.    My complaints are any complaints.

14   Officer Carter's complaints were complaints of a

15   certain nature, primarily guns and narcotics.

16           Q.    And being on that task force, is that

17   your everyday job -- or at that time was it your

18   everyday job or was it only certain days out of

19   the week you operated in conjunction with the task

20   force?

21           A.    No, that was our everyday job.

22           Q.    Okay.  So explain to me after you get

23   the radio saying, hey, Mr. Owensby -- well, you

24   didn't get Mr. Owensby, you got a car that was

25   driving that needed to be pulled over, what

Page 24

1    happened?

2           A.    So yeah, we were told it was a white

3    sedan leaving the address and the direction.  It

4    was traveling eastbound on West Grand.  I don't

5    remember what street we came off of, but we then

6    noticed the vehicle still traveling eastbound on

7    West Grand.  Noticed the equipment violation and

8    conducted the traffic stop.

9           Q.    What was your role in the traffic

10   stop?

11          A.    I was the secondary officer.  Officer

12   Carter was the primary contact officer.

13          Q.    And how did you effectuate that stop

14   initially?

15          A.    As in?

16          Q.    Did you get on the horn and tell him

17   to stop?  Did you --

18          A.    No.

19          Q.    -- turn on the lights?

20          A.    Yeah, we activated our lights.

21          Q.    Okay.  And did Mr. Owensby come to an

22   immediate stop or did he take a while to stop?

23          A.    He came to a stop.  It wasn't

24   immediate or abrupt, but it was reasonable.

25          Q.    Once he stopped, I'm assuming you

1    parked -- or Officer Carter parked the car, who

2    made initial contact with Mr. Owensby?

3           A.   As I said, Officer Carter was the

4    primary contact so he would make the initial

5    contact, explain the reason for the stop, explain

6    who he was.

7           Q.   Did you exit the cruiser and approach

8    the car at the same time as Officer Carter --

9           A.   Yes.

10          Q.   -- or did you come later?  Same time?

11          A.   Same time.

12          Q.   And what side did you approach from?

13          A.   As secondary, I approached from the

14   passenger side.

15          Q.   Did you say anything to Mr. Owensby

16   at that time?

17          A.   No.

18          Q.   Did you recognize the driver as being

19   Clifford Owensby when you approached the car?

20          A.   No.

21          Q.   Okay.  At any time during the stop

22   did you recognize the driver to be the driver that

23   you had pulled over in 2020?

24          A.   No.

25          Q.   Okay.  At what point in the stop --

1  well, did you hear Officer Carter tell Mr. Owensby

2  why he was being pulled over?

3        A.    I heard Officer Carter talking to

4  Mr. Owensby.  My focus at the time was to see if I

5  could see anything in plain view.

6        Q.    Did you see anything in plain view?

7        A.    Nothing of contraband.

8        Q.    Were you looking for anything in

9  particular based on the call that you had gotten

10  from Detective Hartings?

11        A.    Yeah.  So as a secondary officer, as

12  I said, I'm looking for what's in plain view.

13  What I'm looking for more specifically are weapons

14  that are readily available, within reach that

15  could potentially harm us at that time.  That's

16  what I'm looking for are weapons.

17        Q.    Did you have any reason to believe in

18  particular that Mr. Owensby had any weapons on

19  him?

20        A.    Prior to Officer Carter running his

21  information, yes, I did.

22        Q.    Could you explain?

23        A.    It's common knowledge that

24  individuals who partake in narcotics are often

25  armed to protect their product.  Being that this

Page 27

1    is a narcotics investigation, the chance and
2    likelihood of him being armed is high.
3            Q.   Was there anything else that you
4    might think Mr. Owensby would be in possession of
5    based off of this narcotics investigation other
6    than firearms?
7            A.   A weapon is not just sim -- just a
8    firearm.  I mean, you could potentially have a
9    knife that's a deadly weapon, but also narcotics.
10           Q.   Okay.  And explain to me again the
11   connection between narcotics and weapons.
12           A.   The connection is, is that
13   individuals who, again, partake in dealings with
14   narcotics arm themselves to protect their product
15   or protect being robbed.
16           Q.   Robbed of their product?
17           A.   Yes.
18           Q.   Potentially robbed of money?
19           A.   Potentially.
20           Q.   So you guys believe that he might
21   have some money with him?
22           A.   I mean, that's a potential.  But,
23   like I said, at the time my main focus was
24   weapons.
25           Q.   Would you have -- with your

Page 28

1    experience over the past I guess it would be six

2    years, that along with drugs and guns or firearms

3    or weapons, money is also in that group --

4            A.    Yes.

5            Q.    -- of things that go together?

6            A.    Yes.

7            Q.    Okay.  So you didn't see anything in

8    plain view, correct?

9            A.    I didn't see any weapons of concern

10   at that time in plain view.

11           Q.    Okay.  After not having seen any

12   weapons in plain view, what did you do next?

13           A.    I waited until Officer Carter began

14   to walk away from the vehicle.

15           Q.    Did you wait outside or in the

16   cruiser?

17           A.    I returned to the cruiser with

18   Officer Carter.

19           Q.    Okay.  Did you guys have any

20   conversation once you returned to the cruiser?

21           A.    Yeah.  Officer Carter ran the driver,

22   who was later found out to be Clifford Owensby,

23   his information.  He was able to pull up a driving

24   status, check for warrants, field interview cards

25   which tells the history that we've had with him,

1    and he informed me that the driver, Owensby, did

2    have a criminal history of guns and drugs and

3    failure to comply with law enforcement or police.

4         Q.   Did you actually read that

5    information yourself or did Officer Carter just

6    communicate that to you?

7         A.   No, I didn't read that for myself.

8    Officer Carter just summarized it for me.

9         Q.   Okay.  At that point a ticket was

10   being written.

11        A.   Yes, Officer Carter did start to

12   write the ticket, the traffic citation.

13        Q.   Do you know what the citation was

14   being issued for?

15        A.   At the least, to my knowledge at the

16   time, window tint.

17        Q.   At some point you tested the tint of

18   the window, correct?

19        A.   Yeah, to complete the citation we

20   have to test the window tent.

21        Q.   Do you recall if you tested the

22   window tint before or after he started writing the

23   ticket?

24        A.   It was right as he was beginning, so

25   I would say after.

1    Q.   Okay.  And at that point you got

2  whatever the percentage was so that it could be

3  specific for the ticket, right?

4        A.   Right.

5        Q.   Okay.  After you tested the window,

6  came back to the cruiser and gave that information

7  to Officer Carter, what did you do?

8        A.   I waited in the cruiser for the K-9

9  to arrive.

10       Q.   So at some point you called a K-9?

11       A.   Yes.

12       Q.   When did you call the K-9?

13       A.   When Officer Carter had informed me

14  that -- of Owensby's history.

15       Q.   And how did you call the K-9; on the

16  car radio, on a body radio?

17       A.   I believe -- it was the body radio.

18       Q.   Okay.  Based on the investigation,

19  why didn't you call the K-9 earlier?

20       A.   I -- I don't know.  It didn't matter.

21  I figured -- believed the K-9 would arrive within

22  time anyway, so.

23       Q.   Okay.  But you knew that you were

24  going to call a K-9 at some point?

25       A.   Eventually.  The likelihood of

                                        Page 31

1    calling a K-9 was high.

2          Q.   Was there anything that would have

3    led you to make the decision to not call the K-9?

4          A.   No, I think I would have just called

5    the K-9.  Just reassurance.

6          Q.   Because we can agree that the tint

7    was a pretext for searching the car, right?

8               MR. BAZELAK:  Objection.

9               THE WITNESS:  No, the tint is not a

10   pretext for searching the car.

11   BY MS. SMITH:

12         Q.   The detective wanted to find guns or

13   other contraband in the car, right?

14              MR. BAZELAK:  Objection.

15              THE WITNESS:  I don't -- I can't

16   speak for what the detective wanted to do.

17   BY MS. SMITH:

18         Q.   The purpose of the stop was to

19   further an investigation into the drugs and

20   contraband, correct?

21         A.   Yes.

22         Q.   And to seize that from the driver if

23   he had it, right?

24         A.   I think that would be the purpose of

25   any police investigation where drugs and narcotics

Page 32

1    are found.

2            Q.    Right.  And in your experience, and

3    correct me if I'm wrong, typically drugs and guns

4    are not just on the dashboard, right?

5            A.    Correct.

6            Q.    You have to search the car to find

7    those things, right?

8            A.    Oftentimes, yes, you have to conduct

9    a search to locate it.

10           Q.    Okay.  About how long do you -- if

11   you can recall, how long did you sit in the

12   vehicle after you called the K-9 before you

13   approached Mr. Owensby's driver's side?

14           A.    It was seven minutes from the time

15   the stop was initiated until the K-9 arrived.

16           Q.    You were in the car the entire time?

17           A.    I made my initial approach.  I made a

18   second approach to test the tint.  And the third

19   time I approached the vehicle was to remove

20   Owensby from the vehicle because the K-9 was

21   arriving.

22           Q.    Okay.  So from that second time that

23   you went to the cruiser to notify Officer Carter

24   of the percentage of opacity of the window, about

25   how much time, if you can recall, elapsed from

1  that moment to you approaching Mr. Owensby's car?

2      A.   That I don't know.

3      Q.   When you left the police cruiser to

4  speak with Mr. Owensby, do you know if Officer

5  Carter was still writing the traffic citation?

6      A.   At which time?

7      Q.   When you finally went to go tell him

8  he needed to remove himself from the vehicle.

9      A.   I asked to help him remove himself

10  from the vehicle, but Officer Carter was still in

11  the cruiser filling out the citation.

12      Q.   Okay.  And at the moment you stepped

13  out of the car, the K-9 was there, correct?

14      A.   Yeah.  I observed Detective Stewart,

15  his K-9 cruiser, approaching from the east to our

16  stop.

17      Q.   So he wasn't actually there, he was

18  down the street; is that right?

19      A.   No.  The traffic stop happened at an

20  intersection.

21      Q.   Okay.

22      A.   Detective Stewart and his K-9 partner

23  were just across the street at the stop sign.

24      Q.   Okay.  How many feet away would you

25  say?

Page 34

```
 1          A.    Thirty feet.
 2          Q.    Okay.  You said a stop sign or a
 3    stoplight?
 4          A.    Stop sign.
 5          Q.    Stop sign.  Okay.  So from the moment
 6    you saw him at the stop sign to getting across the
 7    street, how many seconds do you think that would
 8    be?
 9          A.    I was speaking with Owensby when he
10    was parking his cruiser.
11          Q.    Do you recall what you first said to
12    Mr. Owensby when you first came to his driver's
13    side window?
14          A.    No, not exactly.
15          Q.    At the time -- well, actually, when
16    during the stop did you become aware that
17    Mr. Owensby suffered from paraplegia?
18          A.    When Officer Carter and I returned to
19    the vehicle after our first approach.
20          Q.    When you were testing the tint?
21          A.    Prior to that.
22          Q.    Prior to that.  So when you initially
23    went to the passenger side and Officer Carter went
24    to the driver's side?
25          A.    It was when Officer Carter was
```

Page 35

1    running Owensby's information.

2         Q.   Okay.  Did you find out through the

3    information that was being gathered in the cruiser

4    or did you find out from Mr. Owensby?

5         A.   I found out from Officer Carter.

6         Q.   Officer Carter.  Okay.  And what did

7    Officer Carter say to you that notified you that

8    Mr. Owensby had paraplegia?

9         A.   I don't recall his exact words.

10        Q.   Did he -- do you recall if he just

11   told you that he had paraplegia, or did he tell

12   you that Mr. Owensby told him that he had

13   paraplegia, or do you not recall?

14        A.   Officer Carter had relayed to me that

15   he suffered from paraplegia.  How -- I don't know

16   how Officer Carter became aware of that.

17        Q.   At that time how familiar were you

18   with paraplegia?

19        A.   I, from my prior job, had had

20   experience with dealing with individuals who had

21   paraplegia.

22        Q.   Without violating any HIPAA, did you

23   have any patients that suffered from paraplegia or

24   was that just something in general the nursing

25   home dealt with?

Page 36

1         A.    I don't recall how many patients I
2    had that suffered from paraplegia, but I dealt
3    with several individuals and patients who suffered
4    from immobility.
5         Q.    And during that experience, were you
6    able to learn a little bit about the disability of
7    those unable to ambulate, unable to use their
8    extremities?
9         A.    Yes, that was the -- one of the tasks
10   of my job was assisting those people who --
11        Q.    And I might not have asked you, what
12   were your job responsibilities at the nursing
13   home?
14        A.    At the nursing home I was a nurse's
15   aide.  I assisted people mainly with transfers and
16   daily living exercises and activities.
17        Q.    Okay.  And during that career did you
18   ever have to transfer anyone who had paraplegia?
19        A.    Again, I mean, I transported several
20   immobile people.  The degree or their actual
21   reason for being immobile, it varies.
22        Q.    Yeah.  I understand.
23        A.    Did I deal with paraplegia?  Yeah.
24   Did I just deal with people who couldn't walk?
25   Yes.

Page 37

1    Q.   And I would imagine that would have

2  taken some sort of training to know how to

3  transport those with mobility issues?

4    A.   Yes.

5    Q.   Okay.  What kind of training did you

6  have in that type of transport?

7    A.   I mean, I was trained on proper

8  techniques for transport.  I had to maintain a

9  State certification to continue that kind of work.

10    Q.   Were you taught anything special

11  about how those with mobility issues should be

12  transported to keep them from suffering injury?

13    A.   Transferred or transported?

14    Q.   Transferred, transported, both.

15    A.   There's a difference.

16    Q.   I know.  If you could take them both.

17  Let's do transport first.

18    A.   In a nursing home, people with

19  disabilities generally are transported around with

20  assistive equipment depending on the level of

21  their immobility.

22    Q.   So an individual with moderate

23  immobility would be transported differently than

24  somebody with severe immobility, correct?

25    A.   Again, in a nursing home, it's -- you

Page 38

1    try to encourage the patient to move around to the

2    best of their ability with the least amount of

3    assistance.  Most of the time, you know, they're

4    just bound to a wheelchair.

5         Q.   Now, when it comes to transferring,

6    what kind of special techniques did you learn to

7    ensure that those with mobility issues were

8    transferred safely, whether it was from a bed to a

9    wheelchair, wheelchair to a bed, or what have you?

10        A.   The technique is -- it's fairly a

11   simple technique.  You try to transfer from high

12   to low.  If you can't, I mean, to the best of your

13   ability and with as much assistance as possible

14   to -- and with the cooperation of the person being

15   transferred, limit injury, especially in the

16   elderly with pulls and tears of the skin.  But

17   it's a simple technique.  You kind of grab them

18   around the waste.  Again, if there's assistive

19   equipment available, then you use that.  And it's

20   a pivot from one surface to another.

21        Q.   In that job, did you find that those

22   with mobility issues might be more prone or more

23   susceptible to suffering injury if not transferred

24   appropriately?

25        A.   Yes.

1          MR. BAZELAK:  Objection.  Go ahead.

2    Sorry.

3    BY MS. SMITH:

4          Q.   Coming back to the stop -- I

5    appreciate you giving me that information.  I

6    didn't know some of the things that you said.

7               You had found out from Officer Carter

8    that Mr. Owensby suffered from paraplegia.  The

9    K-9 had arrived from across the street after

10   having crossed over from the stop sign.  And you

11   are at Mr. Owensby's window.  You said that you

12   did not recall exactly what you said to him when

13   you first approached, correct?

14         A.   Correct.

15         Q.   Do you recall what Mr. Owensby said

16   to you?

17         A.   Initially, no.  I mean, I recall

18   statements that we both said.

19         Q.   What were those statements?

20         A.   There were statements from me that I

21   offered assistance.  I asked him how I could help

22   him.  There were statements from him that he was

23   not getting out of the car.  That he would file a

24   lawsuit.  He wanted a white shirt.

25         Q.   Okay.  And a white shirt or a

Page 40

1    supervisor was not called, right, at that moment?

2              A.    Right.   At that moment.

3              Q.    Why is that?

4              A.    Because at that moment I cannot be

5    sure that the scene was safe and that Owensby was

6    not armed.   As I explained earlier and as I

7    explained to Owensby at the time, a supervisor

8    would be called later.   First and foremost the

9    scene needed to be safe, make sure he was not

10   armed or he did not have the ability to reach a

11   weapon while he was there.

12             Q.    While you were at the side of

13   Mr. Owensby's car, did you ever notice him

14   reaching for or grabbing at anything?

15             A.    At which point when I was at the side

16   of the car?

17             Q.    When you were telling him to step

18   out.

19             A.    No.

20             Q.    Were his hands always where you could

21   see them?

22             MR. BAZELAK:   At what point in time?

23   Again, just at that initial --

24   BY MS. SMITH:

25             Q.    Yeah, we're just talking at that

Page 41

1    initial -- at the car window, you had just told

2    him to get out.  This is the first kind of order

3    to be removed from the vehicle?

4            A.   Yeah, I don't recall where his hands

5    were exactly.

6            Q.   Understanding the type of

7    investigation that had been occurring and the

8    officer -- I'm sorry, the detective having

9    instructed you and Officer Carter to stop the

10   vehicle, when you first approach the car, were you

11   concerned that Mr. Owensby might be armed and

12   dangerous?

13           A.   So the detective asked us if we could

14   make a stop on the vehicle, and, yes, as explained

15   earlier, it's a narcotics investigation, the

16   likelihood of him being armed is high.  So the

17   fear that there was a weapon in the vehicle was

18   high.

19           Q.   Why didn't you ask him to get out of

20   the vehicle when he was initially stopped?

21           A.   At that time I could have asked him

22   to get out of the vehicle, but I wanted to wait

23   until the K-9 was closer and/or in this case on

24   scene.

25           Q.   I just want to make sure that I

Page 42

1    understand.  The concern with there being a

2    firearm in the vehicle was your own safety, right?

3              A.    The safety of me, Officer Carter, and

4    others around.

5              Q.    Right.  So that wouldn't be

6    contingent on the K-9 being there, right?

7              A.    I could have asked Owensby to exit

8    the vehicle at that time, but we decided to wait a

9    little longer.

10             Q.    Why?

11             A.    Because we were -- we were going --

12   well, later on when we requested the K-9, we were

13   going to wait for the K-9 to get there.

14             Q.    Okay.  So you weren't concerned for

15   your safety prior to the K-9 arriving?

16             MR. BAZELAK:  Objection.

17             THE WITNESS:  No, I was concerned

18   with my safety, that's why I returned back to the

19   cruiser and didn't just stand on the side of the

20   car.

21   BY MS. SMITH:

22             Q.    Could other people have been hurt if

23   he was dangerous and you were safe in your car?

24             A.    Potentially.  But at that moment

25   there was no one around.

Page 43

1          Q.   Okay.  So there wasn't a safety
2    issue?
3               MR. BAZELAK:  Objection.  He already
4    said there was, but go ahead, say it again.
5               THE WITNESS:  Yes, there was a safety
6    issue.  But a risk on our part with no one around,
7    we returned to our cruiser.
8    BY MS. SMITH:
9          Q.   So what had changed between the
10   initial stop and you now asking Mr. Owensby out of
11   the vehicle, what had changed that now raised a
12   danger issue?
13         A.   To further the investigation, the K-9
14   arrived.  The free air sniff needed to be
15   conducted, and for that to be conducted, Owensby
16   needed to be removed from the vehicle.
17         Q.   Is it your -- well, I guess what's
18   your understanding of the sequence when a free air
19   sniff is to be conducted, what is the sequence of
20   having someone removed from the car?  Is the
21   person to be removed when a K-9 is en route or
22   when a K-9 is actually on scene?
23         A.   A person can be removed prior to a
24   K-9 arriving.  But with the K-9 being there, it
25   was time for Owensby to be removed from the

Page 44

1   vehicle.

2         Q.   What would be the reason for removing

3   a person from their vehicle prior to a K-9

4   arriving?

5         A.   As an officer, we can ask anybody to

6   step out of a vehicle while they're being issued

7   their citation.  If the K-9 arrives in a timely

8   manner, then the free air will be conducted.  And

9   if not, the person would receive their citation

10   and be let go.

11         Q.   And all of this is operating under

12   the City of Dayton's Police Department policy,

13   right?

14         A.   The policy, the City of Dayton Police

15   Department, and case law.

16         Q.   So explain to me what happened

17   from -- and we talked about it a little bit --

18   from you asking Mr. Owensby to get out of the

19   vehicle to him actually being removed from the

20   vehicle?  Could you describe that process?

21         A.   Yeah.  He was offered assistance to

22   get out of the vehicle -- be removed from the

23   vehicle.  We had already had a plan in place on

24   what we were going to do with him due to his

25   disability.  Instantly was met with passive

Page 45

1   resistance by his verbal statements that he was

2   not going to exit the vehicle.

3            After attempts to offer him

4   assistance, I then reached in to grab his right

5   arm, at which point Owensby slapped my hand away.

6   I then again reached in to grab him.  He leaned

7   further into the vehicle away from me.  Whale I'm

8   trying to pull him from the vehicle, he's using

9   both his hands to press against me and fight me

10  making it more difficult for me to try to remove

11  him from the vehicle.

12           At a point in time he then grips the

13  steering wheel again preventing me from removing

14  him from the vehicle and which it takes several

15  officers to remove him.

16       Q.   Now, you said that you offered

17  assistance and that you had a plan for once he was

18  out of the vehicle.  What assistance were you

19  offering?

20       A.   The assistance to help him get out of

21  the vehicle.  Unfortunately he didn't have any of

22  his assistive equipment that would have made it

23  easy, but he needed to be out of the vehicle in

24  order for the free air to be conducted to further

25  the investigation.

Page 46

1          Q.   When did it come to your attention

2     that he didn't have any of his assistive

3     equipment?

4          A.   From looking around the car, I didn't

5     see a wheelchair.

6          Q.   When would you say a -- at what point

7     during the stop did you realize that he didn't

8     have a wheelchair in there, at his vehicle?

9          A.   I would say when I tested the window

10    tint and I noticed that there was a toddler in the

11    back seat not in a car seat.

12         Q.   And if I'm remembering the sequence

13    right, you tested the window and then you called

14    for the K-9; is that right?

15         A.   No.  The K-9 was called after the

16    first approach.

17         Q.   Okay.  But then you went into the

18    car -- the cruiser to wait for the K-9 to come

19    after you tested the window?

20         A.   Yes.

21         Q.   During that time, is there anybody

22    you could have called to say, hey, we have a

23    paraplegic man here and he doesn't have a

24    wheelchair, can we get some assistance here?

25         A.   No.

1          Q.   Does the Dayton Police Department
2     have any protocol in place to assist those with
3     disabilities or mobility issues during traffic
4     stops?
5               MR. BAZELAK:  Objection as to form.
6     Go ahead.
7               THE WITNESS:  The Dayton Police
8     Department doesn't have anything in place for
9     people with mobility issues.
10    BY MS. SMITH:
11         Q.   Again, if the police are called to --
12    respond to any call and an individual is there
13    with mobility issues requiring assistance, what
14    would you as an officer do?
15         A.   As an officer, I think it would be
16    upon that person to have their assistive devices
17    with them.  As a police officer, I can't provide
18    them assistive equipment.  I'm not a therapist
19    or -- so it's on that person.  I will try my best
20    to accommodate them, but I don't have a wheelchair
21    in my cruiser.
22         Q.   So when we talk about best efforts to
23    accommodate, without any equipment available, what
24    does that look like?
25               MR. BAZELAK:  In general?  Objection.

Page 48

1   In general or are we talking about this incident?

2                   MS. SMITH:  This incident.

3                   MR. BAZELAK:  Okay.

4                   THE WITNESS:  First and foremost, it

5   requires cooperation from the other person, that's

6   the easiest and best way to accommodate safely.

7                   Then taking their opinion into

8   consideration on how to do this so that they feel

9   safe and establishing a plan so that they remain

10  safe.

11  BY MS. SMITH:

12          Q.  If a person is uncooperative, does

13  that mean that all concerns of safety are out the

14  window?

15          A.  No, that's not what that means.

16  Unfortunately in this case the person was

17  uncooperative and safety still matters, but that

18  now heightens my fear that my safety is more at

19  risk and the safety of the other officers there is

20  more at risk because of their uncooperativeness.

21          Q.  As you were removing Mr. Owensby from

22  the vehicle, what did you do to keep in mind his

23  own safety?

24          A.  To ensure Mr. Owensby's safety, I

25  tried to gain control, maintain control of his

1  hands.  He made that difficult with his active

2  resistance.  But to help him stay as safe as

3  possible, the goal was just to remove him from the

4  vehicle and place him onto the ground.

5         Q.   Now, what was your plan for removing

6  Mr. Owensby -- had this resistance not occurred,

7  what was your plan for removing Mr. Owensby from

8  the vehicle?

9         A.   Our plan, in which we had conducted

10  twelve hours before, was to remove him from the

11  vehicle, place him near the curb in the grassy

12  area, which is a softer area for him to sit on and

13  out of the lane of traffic of travel.  One of us

14  would have stood with him to make sure that he was

15  all right during this investigation.

16         Q.   And did you plan to grab his waist,

17  kind of how you described earlier at the nursing

18  home, in order to remove him?

19         A.   Yeah, to the best of our ability, we

20  would try to grab to support most of his body

21  weight near the waist or below him and help

22  support most of his body weight.

23         Q.   Would you have been concerned about

24  his legs hitting or dragging on the ground?

25         A.   Had he cooperated, no.  We would have

1  been able to ensure that his feet or legs would

2  have drug on the ground or he would have not had

3  any injuries.

4          Q.   Was there -- well, let me go in a

5  different direction.  In the time since you've

6  been an officer, had you had any training on

7  accommodating or interacting with individuals with

8  disabilities during traffic stops?

9          A.   Yes.  We receive training on dealing

10 with subjects with disabilities.

11         Q.   Did that disabilities training

12 include those who have mobility issues?

13         A.   No, but as an officer and in my case

14 someone with experience with that, I have

15 training.  We try to always accommodate those with

16 disabilities to the best of our ability.

17         Q.   When was the last time you had

18 training on accommodating individuals with

19 disabilities prior to September 30th, 2021?

20         A.   I couldn't give you a date.  I don't

21 recall.

22         Q.   And, now, you mentioned that you had

23 been involved in a traffic stop with another

24 paraplegic man the night before, correct?

25         A.   I can't say that he was paraplegic,

Page 51

1   but he did have immobility issues.

2           Q.   Okay.  He had mobility issues.  So

3   you had been working the night before?

4           A.   Yes.

5           Q.   What time would you say you got off

6   your shift that night before --

7           A.   I don't remember.

8           Q.   -- on September 29th?

9           A.   I don't remember.

10          Q.   Okay.  Would it have been before

11  midnight?

12          A.   I don't remember.

13          Q.   You're not sure?  Do you recall what

14  time you came into work on September 30th, 2021?

15          A.   No.  It was mid-morning sometime I'm

16  sure.  I don't remember.

17          Q.   Was that your scheduled shift or did

18  you come in early or later on September 30th?

19          A.   I worked various hours.

20          Q.   What are the shifts like?  What are

21  they, eight hours, ten, twelve?

22          A.   They are ten-hour shifts.

23          Q.   And is Officer Vincent Carter your

24  partner -- or was he your partner at the time?

25          A.   Yes, he was my partner at the time.

1          Q.   Is he still your partner now?

2          A.   No.

3          Q.   Now, you said that you and two other

4     officers had to assist in getting Mr. Owensby out

5     of the vehicle, correct?

6          A.   Yes.

7          Q.   Can you describe where your hands

8     were on Mr. Owensby's body when you were removing

9     him from the vehicle?

10         A.   At which time?  Which part of the

11    removal I should say?

12         Q.   Toward the end when he's finally

13    about to be extricated from the car.

14         A.   Yeah, I grabbed Owensby's hair.  I

15    pulled his hair.  That technique induces pain and

16    pain will encourage compliance so to grab -- to

17    grab and pull his hair initially is to cause pain

18    to gain compliance and then also, as I said

19    earlier, the goal was to get him to the ground.

20    It was a low car so the distance from his seat to

21    the ground was not high, or much.  I directed his

22    head out of the vehicle toward the ground.

23         Q.   When you say pulling hair causes

24    pain, where does it cause pain in the body?

25         A.   It causes pain to the scalp.

1        Q.   Okay.  Is it limited to the scalp,

2   the pain?

3        A.   Yes, it's a -- it's a limited pain

4   area.  It's pulling of the hair.  The hair is

5   located on the head.

6        Q.   Did you have both of your hands in

7   his hair?

8        A.   I don't recall.

9        Q.   Okay.  Now, the other officer is with

10   you, they also were helping to remove him from the

11   vehicle at that time of the stop when he's finally

12   about to be out of the car, right?

13        A.   Yes, it was Officer Carter and I on

14   the driver's side, and then Detective Stewart had

15   helped remove Owensby's hand from the steering

16   wheel from the passenger's side.

17        Q.   Is that all that Officer Stewart did

18   to help remove Mr. Owensby?

19        A.   Yes.

20        Q.   Officer Carter, how did he help in

21   the efforts to remove Owensby from the car?

22        A.   I can't tell you what his exact

23   technique was or what he did, but the -- we were

24   on the same goal, which was to remove Owensby from

25   the car, so he was pulling him from the vehicle.

Page 54

1        Q.   Did Mr. Owensby give any indication

2   that he was in pain or discomfort as he was being

3   pulled out of the vehicle?

4        A.   He yelled, but from my experience,

5   that's typical of an uncompliant -- like someone

6   who is not being compliant and resisting, they're

7   going to yell.  I don't recall if he said he was

8   in pain or if he was hurting -- if we were hurting

9   him or not, but, again, my goal was to cause pain

10  to gain compliance.  I didn't want to use strikes.

11  I just wanted compliance from Owensby using the

12  least amount of force.

13        Q.   So because you were trying to cause

14  pain, any comments he might have made about being

15  in pain would have been a nonfactor to you?

16             MR. BAZELAK:  Objection.

17             THE WITNESS:  Any comments he had

18  about pain -- pain from where?  I mean, I -- if

19  it's from his head, yeah, I know I'm causing you

20  pain.  It's because I'm wanting you to work with

21  me and cooperate with me so we can get you removed

22  from the car as safe as possible.

23  BY MS. SMITH:

24        Q.   Did you ever ask him what hurts?

25        A.   At that time what hurt wasn't of a

Page 55

1   priority to us because our safety was priority at
2   the time.
3         Q.   Now, when Mr. Owensby hit the ground,
4   did you make any efforts to soften the impact or
5   lessen the impact of his back hitting the ground?
6         A.   I don't believe that he hit the
7   ground.  Hit the ground sounds like he violently
8   fell.  As I explained earlier, the distance from
9   the seat of the car to the ground, it's a
10  low-riding car.
11        Q.   How would you describe it if he
12  didn't hit the ground?  What would you say
13  happened?
14        A.   We were -- we had -- we had
15  control -- I wouldn't say control, but we grabbed
16  Owensby, removed him from the car, and we placed
17  him on the ground.  We didn't -- the way you word
18  it, it sounds like we dropped him.
19        Q.   Okay.  So you placed him on the
20  ground?
21        A.   Yes.
22        Q.   Okay.  And when he was on the ground,
23  what happened?
24        A.   He continued to actively resist us
25  trying to push himself off the ground to roll

Page 56

```
 1   over.  We continued our efforts to gain control
 2   and place him in handcuffs.
 3            Q.   What were those efforts to gain
 4   control?
 5            A.   Verbal commands for him to stop.
 6   Both Officer Carter and I fighting to gain control
 7   of both his hands and place them behind his back
 8   due to his resistance, and then, like I said, put
 9   him in handcuffs.
10            Q.   Do you recall a time where you or
11   Officer Carter placed your knees on Mr. Owensby's
12   body to get him under control?
13            A.   No, I don't recall.  I don't recall
14   doing that.
15            Q.   Okay.  Do you think that placing a
16   knee on an individual's body as they're on the
17   ground and resting one's weight on that person, do
18   you think that's an appropriate way to, quote,
19   unquote, get somebody under control?
20                 MR. BAZELAK:  Objection.
21                 THE WITNESS:  Yes.  It's actually an
22   effective way.  For example, if you place your
23   knee just above someone's buttocks, it prevents
24   them from gaining footing and getting up and
25   prevents them from being able to fight you.
```

Page 57

1    BY MS. SMITH:

2         Q.   Do you believe -- and that's

3    standard.  Is that appropriate to say that that's

4    a standard technique of subduing a suspect?

5         A.   I would say that it is an effective

6    technique.  If you can't get up, then you can't

7    fight me.

8         Q.   Is that one that is taught at the

9    academy -- the police academy?

10         A.   I would say yes, it's a technique

11    that we practice at the police academy.

12         Q.   Okay.  At the police academy are you

13    taught to modify techniques based on the ability

14    or the disability of the person being interacted

15    with?

16         A.   No, because a person with a

17    disability who is actively resisting is just as

18    dangerous as a fully capable person.  Although you

19    may not have use of your legs, in this case

20    Owensby was not checked or searched for weapons,

21    and he still had use of his hands and still posed

22    a threat to us.

23         Q.   Have you ever had a situation where

24    you've been able to search somebody -- somebody's

25    person in -- while they're still in their vehicle?

1          A.   No, because you cannot thoroughly

2    search someone while they're in their vehicle, and

3    it poses an officer safety thing.  Furthermore,

4    you cannot -- you cannot ensure that there's not a

5    weapon concealed in that vehicle somewhere around

6    them.

7          Q.   Okay.  So you've never had a

8    situation where you've seen fit to search somebody

9    while they are still sitting in their vehicle?

10          A.   I have not, and I would strongly

11    discourage from doing that because of the threat

12    it poses to the officer trying to do that.

13          Q.   So I want to talk briefly, before we

14    go any further, about the ticket that Mr. Owensby

15    was issued.  When Officer Carter joined you at the

16    side of Mr. Owensby's car and K-9 officer I think

17    at the time, I think he's a detective now, Stewart

18    was at the steering wheel, do you know if the

19    citation had been completed at that time?

20          A.   No, I don't know.

21          Q.   Are you taught how to write citations

22    at the police academy?

23          A.   Yes.

24          Q.   Can you walk me through what writing

25    a citation looks like?

Page 59

1        A.   Our citations are handwritten

2    citations.  After you've gathered all the

3    information you need to complete a citation,

4    driver info, vehicle info, in this case the

5    percentage of the window tint.  As a two-man crew,

6    as Officer Carter and I were on this date, Officer

7    Carter began writing the ticket.  However --

8    whatever boxes he started writing on first, I

9    don't know.  But all the boxes of the ticket have

10   to be completed with all the information needed

11   before issuing the citation.

12        Q.   What for you is typically the last

13   step of writing a citation?  What's the last thing

14   you put on the ticket?

15        A.   The last thing before issuing the

16   citation I put on the ticket would be their

17   current address and phone number.

18        Q.   About how long would you say it takes

19   to fill out a traffic citation?

20        A.   To complete a traffic citation, it

21   varies.  Fifteen minutes or so.  It depends on how

22   much information you have to gather; suspensions,

23   reason for the stop.

24        Q.   Now, after Mr. Owensby was

25   handcuffed, he was taken to a police cruiser,

Page 60

```
 1    correct?

 2            A.    Yes.

 3            Q.    Whose cruiser was he taken to?

 4            A.    Officer Carter and I's.

 5            Q.    How did he get there?

 6            A.    Officer Carter and Officer Darryl

 7    Letlow took him back to the cruiser.

 8            Q.    Did you see Mr. Owensby being taken

 9    to the cruiser?

10            A.    I noticed those two officers taking

11    him to the cruiser, but I was picking up items

12    discarded in the street and putting them back the

13    in the car.

14            Q.    What items were in the street?

15            A.    A shoe and I think another item.

16            Q.    And those were Mr. Owensby's?

17            A.    Yes.

18            Q.    How did his shoe get in the street?

19            A.    It came off his foot.

20            Q.    When did it come off his foot?

21            A.    Sometime during the removal of him

22    from the vehicle.

23            Q.    Do you know how it came off his foot?

24            A.    No.

25            Q.    You said you really didn't pay
```

Page 61

1    attention to him being taken to the police

2    cruiser, right, Mr. Owensby?

3          A.    That's correct.

4          Q.    And I might have asked you this

5    already and if I did, I'm sorry.  When he was on

6    the ground, did he give any indication that he was

7    in pain?

8          A.    No, he was screaming for help.

9          Q.    While he was on the ground, you

10   pulled him by the hair again, right?

11         A.    No, I didn't pull his hair, but I

12   used his hair as a means to control his head.  As

13   I said, he was trying to push himself off the

14   ground, and the same technique I used for removing

15   him from the car, which was directing his head out

16   of the car, I used it to direct his head and keep

17   him down to the ground so he could not roll over.

18         Q.    Now, when you say direct his head as

19   opposed to pulling, what is the difference?

20         A.    The difference is, is that it

21   required at times me to put pressure or push down

22   his head toward the ground in a manner that didn't

23   injure him, but when he attempted to move, the

24   push-back that I delivered would counter his

25   resistance.

Page 62

1        Q.   And that would cause pain to the

2    scalp?

3        A.   No, that was not pain compliance.

4    That was control.

5        Q.   Okay.  I'm a little confused.  Do you

6    give both at the same time or is one technique

7    different than the other?

8        A.   The techniques are different.

9    Pulling the hair is pain compliance.  I wasn't

10   pulling his hair when I was pushing his head to

11   the ground.

12       Q.   Okay.  So while he was on the ground,

13   you were using his hair to push his head to the

14   ground?

15       A.   I was using his hair to control his

16   head, yes, while I was pushing trying to maintain

17   him low to the ground.

18       Q.   Okay.  But when he was being taken

19   out of the car, you were pulling to make him pain

20   compliant?

21       A.   Yes, I was pulling to gain pain

22   compliance.

23       Q.   Gain pain.  Okay.  Got you.  At any

24   time did you ask Mr. Owensby if he felt okay or if

25   he was injured?

Page 63

1          A.   After Owensby was escorted to the

2    cruiser, I had very little contact with him, if

3    any.

4          Q.   Do you know if anybody inquired as to

5    whether Mr. Owensby was hurt?

6          A.   Yes.

7          Q.   Who?

8          A.   Sergeant Magill did.

9          Q.   And do you know if Sergeant Magill

10   found injuries on Mr. Owensby or confirmed that he

11   was or was not hurt?

12         A.   I know that Owensby had informed

13   Sergeant Magill that his feet hurt.

14         Q.   Do you know if anything was done as a

15   result of Mr. Owensby notifying Sergeant Magill

16   that he was hurt?

17         A.   Yes.  He was transported to the

18   hospital for an evaluation.

19         Q.   Mr. Owensby was ultimately arrested,

20   right, he wasn't just let back out on the street?

21         A.   Yes, he was arrested.

22         Q.   What happened to his car?

23         A.   The car that he was driving was

24   towed.

25         Q.   Was there an inventory done of his

Page 64

1    vehicle?

2            A.   Yes, there was.

3            Q.   Did you participate in that

4    inventory?

5            A.   Yes, I did.

6            Q.   Do you know the results of that

7    inventory?

8            A.   Yes.  Twenty-two thousand dollars in

9    cash -- twenty-two thousand plus in cash,

10   miscellaneous items, clothes.  That was pretty

11   much it.

12           Q.   Okay.  Were there any drugs in there?

13           A.   No, not from my search.

14           Q.   Do you know if anybody found any

15   drugs in there?

16           A.   No.

17           Q.   Okay.  Were any firearms located in

18   the vehicle?

19           A.   No.

20           Q.   Were any other weapons located in the

21   vehicle?

22           A.   No.

23           Q.   You didn't see any contraband

24   whatsoever located in the vehicle?

25           A.   The money.

Page 65

1          Q.    The money was contraband?

2          A.    Yes.

3          Q.    How was the money contraband?

4          A.    The money was found to be -- or

5     believed to be used in the sale of narcotics.

6          Q.    What was that based off of?  What

7     evidence?

8          A.    The basis of it was the surveillance

9     that Detective Hartings had conducted, the lack of

10    proof of where the money came from, the quantity

11    of the money, the way the money was packaged, just

12    in a plastic bag.

13         Q.    I hear all that.  Could you explain

14    in particular how of all the potential crimes in

15    the world and non-crimes in the world you

16    determined that money to be the proceeds of drug

17    sales?

18              MR. BAZELAK:  Objection.  He didn't

19    say that he determined anything.  He said he

20    believed it could be, but go ahead.

21              THE WITNESS:  Due to the possibility

22    that the money was part of the trafficking in

23    narcotics and the amount that was there, and the

24    fact that it is uncommon for any normal person to

25    drive around with twenty-two plus thousand dollars

Page 66

1  in a grocery bag at their feet, the Dayton Police

2  Department has a policy in which we can seize

3  money with that information and with the

4  assistance of a K-9 conducting a free air.  They

5  have a -- they have a process in which if the dog

6  alerts to the money, the money is then seized and

7  then it is taken up in court and a judge decides

8  whether or not this money is given back to the

9  defendant or if it is, in fact, used for

10 narcotics.

11 BY MS. SMITH:

12       Q.   You participated in counting that

13 money, correct?

14       A.   Yes.

15       Q.   Who participated, other than

16 yourself, in counting the money that was taken

17 from the vehicle?

18       A.   Myself, Officer Carter, Sergeant

19 Magill, Detective Hartings, and Sergeant Thomas, I

20 believe.

21       Q.   Do you know who made the decision to

22 seize the money?

23       A.   The decision was made by Detective

24 Hartings after speaking with his supervisor and

25 abiding by our policy due to the amount that was

Page 67

1    there and their investigation.

2         Q.    After you all were finished counting

3    the money, what happened to it, do you know?

4         A.    The conclusion of counting it, the

5    proper paperwork filled out, the money was placed

6    inside an envelope and secured in our cruiser.

7         Q.    Was Mr. Owensby given a receipt?

8         A.    Yes.

9         Q.    Now, over the course of this traffic

10   stop, on various occasions -- well, let me ask you

11   this first; does everybody in the Dayton Police

12   Department -- police force have a body cam or is

13   it only issued to certain officers?

14        A.    Now or then?

15        Q.    Then.  Not currently, September 30th.

16        A.    Then it was only those who were in a

17   patrol-type of position.

18        Q.    And so you had one?

19        A.    Yes.

20        Q.    Okay.  And in general, what is the

21   protocol for using a body camera for officers --

22   for the patrol officers?

23        A.    The body camera will be activated

24   when and during contact with subjects.

25        Q.    Is there anything that automatically

Page 68

1  triggers the camera to operate or is that

2  something manual that each officer has to do to

3  get the camera to turn on?

4         A.   Emergency lights, activation of

5  emergency equipment will automatically trigger all

6  the cameras in the immediate area to turn on.

7         Q.   Okay.  And your camera was turned on

8  that day on September 30th based on the fact that

9  you operated -- or Officer Carter operated the

10  overhead lights on the vehicle?

11         A.   Yes.

12         Q.   Does the audio and the video activate

13  at the same time?

14         A.   So when the cameras receive the

15  stimulus to activate, there is a minute playback

16  where there is no audio.

17         Q.   At the very beginning?

18         A.   So at the beginning of reviewing a

19  video --

20         Q.   Uh-huh.

21         A.   -- from the Dayton Police Department

22  there's a one minute where there's no audio.  At

23  the moment the audio starts is when something, as

24  in the emergency equipment being turned on, that

25  will activate all the cameras.

Page 69

1    Q.   Okay.  Is there a way for officers to

2  manually turn off the video -- the video feed of

3  the body cam?

4    A.   You can turn off your camera.

5    Q.   Okay.  And is there a way to turn off

6  the audio component of the body camera?

7    A.   Yes.

8    Q.   In the same way that there is that

9  minute of play back where there's no audio but

10  there is some video, is that same type of playback

11  available once the camera is turned off manually?

12    A.   If you completely turn the camera

13  off, yes.

14    Q.   Okay.  How long are you supposed to

15  keep your body cam video and audio on during a

16  stop?  Once it's activated, how long -- when are

17  you able to turn it off after it's turned on?

18    A.   You are able to turn off your body

19  camera at the conclusion of the contact with

20  whoever the subject you're dealing with.

21    Q.   What would that conclusion be?  Would

22  that be taking the person to jail or letting them

23  go on their way or would that extend to writing of

24  a report or something like that?  When is the end

25  of the contact?

1        A.   The end of the contact would be going

2   to jail.  In this case, if you go to the hospital,

3   due to HIPAA, you turn off the camera.  But when

4   you come into contact or you make contact, then

5   the camera has to be activated.

6        Q.   And on various occasions you turned

7   off your audio feed, correct?

8        A.   Yes.

9        Q.   Why did you do that?

10       A.   It was my belief that officers are

11  allowed private conversations when not in the

12  presence of citizens or subjects.

13       Q.   Is there -- yet was that kind of how

14  officers in general in the police department

15  handled their body cams?  Was that kind of a

16  common practice?

17            MR. BAZELAK:  Objection.  If you

18  know.  I mean --

19  BY MS. SMITH:

20       Q.   If you know from working with your

21  colleagues.

22       A.   It was a practice that I have seen

23  others do.

24       Q.   Is that something -- I don't want to

25  say tradition, that's the wrong word.  Is that a

Page 71

1   practice that you started or is that something

2   that you learned during your time at the Dayton

3   Police Department?

4                MR. BAZELAK:  Objection.  Go ahead.

5                THE WITNESS:  Body cameras were a new

6   thing and it was something we were taught when

7   going through the training for body cameras was

8   how to mute it.

9   BY MS. SMITH:

10               Q.   And that training was taught -- or

11  administered by the police department?

12               A.   It was taught by Axon with other

13  members of the police department.

14               Q.   Do you recall while you were -- you

15  and others were counting the money that was seized

16  on the police cruiser's hood a comment was made to

17  Officer Carter asking why did you beat that poor

18  man up, or something along those lines?  Do you

19  recall that statement being made?

20               A.   Yeah.  I made that statement.  It was

21  insensitive and inappropriate.  It was in an

22  attempt to lighten what was a tense situation to

23  kind of get everyone to ease up.  I don't believe

24  we beat him up by any means.  I didn't believe we

25  caused him any injury.

1          Q.    So it was a joke, in other words?

2          A.    Yes.

3          Q.    Meant to lighten the mood?

4          A.    Yes.

5          Q.    Did you think it was a funny joke?

6          A.    No, it -- I said it and then I was

7    like, ah, I realized I probably shouldn't have

8    said it.

9          Q.    Now, after you got done counting the

10   money, what was your next step of this entire

11   investigation?  Did you participate in the K-9

12   sniff of the money?

13         A.    The K-9 sniff of the money happened

14   before counting it.

15         Q.    Okay.  So after you get done counting

16   it, what happened?

17         A.    Owensby was taken to a local

18   hospital.

19         Q.    He was taken in the cruiser driven by

20   Officer Carter and yourself?

21         A.    Correct.

22         Q.    Did you have any conversations with

23   Mr. Owensby on the drive to the hospital?

24         A.    The conversation with Owensby on the

25   drive to the hospital was kept just to the

Page 73

1    pertinent information for filling out his booking

2    screen and whatever information would be needed to

3    give to the charge nurse for checking him into the

4    hospital.

5            Q.   And at that point that he was

6    arrested, what was he under arrest for?

7            A.   He was -- he was under arrest for

8    obstructing official business and resisting arrest

9    due to his actions that he did when we lawfully

10   asked him to let us assist him out of the vehicle.

11           Q.   Do you know if he was actually ever

12   charged with obstructing official business and

13   resisting arrest?

14           A.   He was charged with both of those

15   that day.

16           Q.   Do you know what happened to that

17   case?

18           A.   The case was dismissed.

19           Q.   Do you know why it was dismissed?

20           A.   I've never been told the exact

21   reason.

22           Q.   Okay.  Do you recall how long it was

23   or how much time had elapsed between Mr. Owensby

24   being arrested and being taken to the hospital?

25           A.   No.

Page 74

1        Q.   Do you know if it was hours later?

2        A.    It wasn't hours later.  It wasn't

3   even an hour later.  It was less than an hour.

4        Q.   When you got to the hospital, did you

5   have an opportunity to speak with any of the

6   hospital staff or medical providers about

7   Mr. Owensby's condition?

8        A.    No, that's his -- that's for his --

9   that's his business.

10       Q.    Were you ever made aware that

11  Mr. Owensby had sustained any injuries while you

12  were at the hospital?

13       A.    No, we weren't told of any injuries.

14       Q.    Did anybody speak to you about using

15  extra care in transporting Mr. Owensby wherever

16  you were taking him as a result of his evaluation

17  at the hospital?

18       A.    No.

19       Q.    About how long was he at the hospital

20  before he was discharged?

21       A.    I don't recall.

22       Q.    Was it over an hour?

23       A.    I don't know.

24       Q.    When you got to the hospital, how did

25  Mr. Owensby get into the hospital building from

Page 75

1   the cruiser?

2          A.   The hospital has wheelchairs.  We

3   went and retrieved a wheelchair, and then Officer

4   Carter and I helped him into the wheelchair.  As I

5   explained earlier, it's easier to transfer from a

6   high to low position, the cruiser is set up higher

7   than the wheelchair, and with Owensby's

8   cooperation, it was a smooth transfer from the

9   cruiser to the wheelchair.

10         Q.   Can you describe what parts of his

11  body you grabbed versus Officer Carter to

12  transport him from the cruiser to the wheelchair?

13         A.   I don't remember.

14         Q.   Okay.  And would that have been the

15  same technique that you used to get him back into

16  the cruiser to go to the jail?

17         A.   From my recollection, he almost put

18  himself into the cruiser from the wheelchair with

19  little assistance from Officer Carter.

20         Q.   Okay.  So you and Officer Carter

21  helped him from the cruiser into the wheelchair,

22  and then when it was time to go back into the

23  cruiser, Mr. Owensby transferred himself.

24         A.   With little assistance from Officer

25  Carter.

Page 76

1          Q.    Okay.  After you left the hospital
2     you took Mr. Owensby to jail, right?
3          A.    After leaving the hospital, yes, we
4     were en route to the jail.  Officer Carter dropped
5     me off to the safety building, which is where our
6     property room is, so that I could tag in the
7     money.
8          Q.    So you had the money with you when
9     you went to the hospital?
10         A.    The money was secured in our cruiser.
11         Q.    Where was it in the car?
12         A.    In the trunk, I believe.
13         Q.    Was it locked away outside of just
14    the locks of the car?
15         A.    The trunk of our cruiser has metal
16    cages.
17         Q.    So you didn't actually accompany
18    Mr. Owensby to jail?
19         A.    No, I did not.
20         Q.    Do you know if he was ever booked
21    into the jail?
22         A.    I found out that he was not accepted
23    into the jail.
24         Q.    Why wasn't he accepted?
25         A.    I don't know.  I wasn't there.

1          Q.   Okay.  Now, prior to you taking

2     Mr. Owensby to the hospital while you were still

3     at the scene of the incident, did anybody talk to

4     you about what had happened, any other officers or

5     supervisor?

6          A.   So, yes, upon the first supervisor,

7     which was Sergeant Magill, I explained to him what

8     happened and the details of the incident.

9          Q.   Did Mr. -- or Sergeant Magill make

10    any indications to you that he would follow up on

11    what had happened or that an investigation might

12    ensue?

13         A.   Me telling Sergeant Magill the

14    details of the incident is what allowed him to

15    make the decision if there needed to be an

16    investigation.  Due to the details and the

17    statements made, he had decided that there was

18    going to be an investigation.

19         Q.   So he informed you at the scene that

20    there would be an investigation into what

21    happened?

22         A.   Yes, there would be an internal

23    investigation.

24         Q.   And do you know if that internal

25    investigation happened?

Page 78

1          A.   Yes.

2          Q.   How were you a part of that internal

3    investigation?

4          A.   Due to my part that I did in the

5    incident, I had to complete a special report

6    telling and detailing what happened, my actions

7    and the actions of Owensby.

8          Q.   Did you have to do anything else?

9          A.   For the internal investigation, no.

10         Q.   Do you know the results of that

11   internal investigation?

12         A.   I believe it counts as an exoneration

13   with training.

14         Q.   An exoneration with training?

15         A.   Yes.

16         Q.   What kind of training?

17         A.   Training and/or counseling for my

18   insensitive comment and for muting my body camera.

19         Q.   Have you undergone that training

20   and/or counseling?

21         A.   Yes.

22         Q.   Could you describe the training?

23         A.   It's an explanation of what's

24   expected and the understanding of how the policy

25   is written for those two violations.

1          Q.   Is that in just reading material or
2    was that an actual in-person course?
3          A.   It's -- yeah, it's an in-person
4    course with the lieutenant of our Professional
5    Standards Bureau.
6          Q.   Do you recall who actually put the
7    handcuffs on Mr. Owensby?
8          A.   Officer Carter and I were the two
9    that placed the handcuffs on him.
10         Q.   And you handcuffed him to the front
11   or to the back?
12         A.   He was handcuffed in the back due to
13   his active resistance.
14         Q.   Do you know if handcuffing him to the
15   front or to the back -- well, do you know if
16   having his hands cuffed behind his back -- well,
17   strike that.
18              At any time did Mr. Owensby express
19   any pain or discomfort from having his hands
20   cuffed behind his back?
21         A.   I don't remember.
22         Q.   Give me one minute.
23              MS. SMITH:  Actually, can we take a
24   five-minute break?
25              MR. BAZELAK:  Sure.

Page 80

1          (Pause in proceedings.)

2    BY MS. SMITH:

3          Q.   On September 30th, 2021, were there

4    any protocols in place for transferring an

5    individual with mobility issues who was being

6    arrested into a police cruiser?

7          A.   No, there were no specific protocols,

8    procedures, or policies.  We are taught to try to

9    accommodate people to the best of our ability.

10         Q.   And, again, you said there's no real

11   equipment to aid in those accommodations provided

12   by the police department, right?

13         A.   No, the police department doesn't

14   provide any type of equipment or devices for

15   people with mobility issues.

16         Q.   So any accommodations that would be

17   made would be improvised?

18              MR. BAZELAK:  Objection.

19              THE WITNESS:  I believe that it's put

20   on the person to have their devices to assist with

21   their mobility issues, but yes, it's improvised.

22   It's a come up with an agreement between -- or a

23   plan between the subject we're dealing with and

24   the officer to the best of our ability to safely

25   transfer and transport.

Page 81

1   BY MS. SMITH:

2        Q.   And you might have told me and if

3   I've forgotten, forgive me.  At what point in the

4   stop did you realize that you had encountered

5   Mr. Owensby on that prior occasion in 2020?

6        A.   At no point during that stop did I

7   know that.

8        Q.   Okay.  But you know that now?

9        A.   Yes.

10        Q.   So at what point, I guess, from

11   September 30 of 2020 to present did you realize

12   that Mr. Owensby had been encountered by you in

13   2020?

14        A.   Shortly after.  A couple days or

15   weeks after it was brought to my attention that

16   Owensby had a field interview card or an FIC

17   filled out by me detailing the prior stop.

18        Q.   Who brought it to your attention?

19        A.   I don't remember.

20        Q.   Do you know if it was in a

21   conversation or an e-mail?

22        A.   It was in a conversation, not an

23   e-mail.  Like I said, I don't remember who it was.

24        Q.   Okay.  And afterwards I know you

25   spoke with Sergeant Magill at the scene and I know

1  that there was an investigation afterwards and you

2  indicated that there was some training on two

3  infractions.  Were you ever interviewed by

4  anybody -- outside of that extensive police report

5  that you had to create, were you ever actually

6  interviewed by anybody about what happened?

7          A.   I was interviewed by a Professional

8  Standards Bureau.

9          Q.   Do you know who interviewed you?

10         A.   Sergeant Matlock and Sergeant --

11  Justin Poe.

12         Q.   And did you do anything to prepare

13  for that interview?

14         A.   I reviewed my report and the video of

15  the incident.

16         Q.   Did you and Officer Carter discuss

17  the incident afterwards at any time?

18         A.   Yes.

19         Q.   What were the nature of those

20  discussions?

21         A.   It was to gather his observations and

22  the actions that he did for the details of the

23  special report and for completing the criminal

24  report.

25         Q.   Did you guys submit a joint special

Page 83

1    report?

2          A.    No.   We each have to type a special

3    report.

4          Q.    Okay.   But you needed his perspective

5    in order to give a complete report?

6          A.    Yes.   I didn't want to assume what I

7    thought he did and incorrectly state what he did

8    and submit that when I was wrong.

9          Q.    Okay.   You guys were interviewed.

10   You were interviewed separately?

11         A.    Yes.

12               MS. SMITH:   Okay.   Well, I will

13   reserve my right to recall, and I don't have any

14   more questions.

15               MR. BAZELAK:   We'll read.

16               (Thereupon, the deposition was

17   concluded at 4:08 p.m.)

18

19

20

21

22

23

24

25

Page 84

```
 1   STATE OF OHIO          )

 2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE

 3               I, Kathy S. Wysong, a Notary

 4   Public within and for the State of Ohio, duly

 5   commissioned and qualified,

 6               DO HEREBY CERTIFY that the

 7   above-named WAYNE HAMMOCK, was by me first duly

 8   sworn to testify the truth, the whole truth and

 9   nothing but the truth.

10               Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14               I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20

21

22

23

24

25
```

Page 85

1          IN WITNESS WHEREOF, I have hereunto set

2     my hand and seal of office at Dayton, Ohio, on

3     this 21st day of November, 2022.

4                     *Kathy S. Wysong*

5          _____

6

                  KATHY S. WYSONG, RPR

7                 NOTARY PUBLIC, STATE OF OHIO

                  My commission expires 12-25-2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                      Page 86

 1                        Veritext Legal Solutions
                              1100 Superior Ave
 2                                Suite 1820
                            Cleveland, Ohio 44114
 3                           Phone: 216-523-1313
 4
     November 29, 2022
 5
     To: Leonard J. Bazelak
 6
     Case Name: Owensby, Clifford v. The City Of Dayton Et Al.
 7
     Veritext Reference Number: 5511220
 8
     Witness:  Wayne Hammock          Deposition Date:  11/10/2022
 9
10   Dear Sir/Madam:
11
     The deposition transcript taken in the above-referenced
12
     matter, with the reading and signing having not been
13
     expressly waived, has been completed and is available
14
     for review and signature.  Please call our office to
15
     make arrangements for a convenient location to
16
     accomplish this or if you prefer a certified transcript
17
     can be purchased.
18
19   If the errata is not returned within thirty days of your
20   receipt of this letter, the reading and signing will be
21   deemed waived.
22
23   Sincerely,
24   Production Department
25

     NO NOTARY REQUIRED IN CA
```

Page 87

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5511220
3        CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
         DATE OF DEPOSITION: 11/10/2022
4        WITNESS' NAME: Wayne Hammock
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____        _____
9   Date                    Wayne Hammock
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
              Statement; and
14       Their execution of this Statement is of
              their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

Page 88

 1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS

 2

        ASSIGNMENT REFERENCE NO: 5511220
 3      CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
        DATE OF DEPOSITION: 11/10/2022
 4      WITNESS' NAME: Wayne Hammock
 5           In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7           I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9           I request that these changes be entered
        as part of the record of my testimony.
10

             I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____

        Date                    Wayne Hammock
14

             Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22      this _____ day of_____, 20_____.
23                      _____

                        Notary Public
24

                        _____
25                      Commission Expiration Date

Page 89

1                        ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 11/10/2022
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                  Wayne Hammock
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

**[00343 - al]**                                                    Page 1

**0**

**00343** 1:7

**1**

**10** 1:17
**101** 1:16 2:16
**11/10/2022** 86:8
  87:3 88:3 89:2
**1100** 86:1
**11101** 2:6
**12-25-2023** 85:7
**1220** 2:10
**1648** 2:5
**1820** 86:2

**2**

**20** 87:16 88:22
  89:22
**2009** 6:10,25 7:1
**2015** 9:10 10:2
  19:24
**2016** 10:2,3
**2020** 19:15 25:23
  81:5,11,13
**2021** 16:6,8 19:8
  19:17 20:4
  50:19 51:14
  80:3
**2022** 1:17 85:3
  86:4
**216-523-1100**
  2:11
**216-523-1313**
  86:3
**21st** 2:5 85:3
**22** 2:17
**22255** 85:5
**28** 84:19

**29** 86:4
**29th** 51:8
**2:13** 1:18

**3**

**30** 81:11
**308** 2:10
**30th** 16:6,8 19:7
  19:17 20:4
  50:19 51:14,18
  67:15 68:8 80:3
**3:21** 1:7

**4**

**44113** 2:11
**44114** 86:2
**45401** 2:17
**4602** 2:5
**4:08** 83:17

**5**

**5511220** 86:7
  87:2 88:2

**9**

**9** 30:8,10,12,15
  30:19,21,24 31:1
  31:3,5 32:12,15
  32:20 33:13,15
  33:22 39:9
  41:23 42:6,12,13
  42:15 43:13,21
  43:22,24,24 44:3
  44:7 46:14,15,18
  58:16 66:4
  72:11,13
**929-816-3011**
  2:6
**937-333-4100**
  2:17

**a**

**abiding** 66:25
**ability** 38:2,13
  40:10 49:19
  50:16 57:13
  80:9,24
**able** 18:25 28:23
  36:6 50:1 56:25
  57:24 69:17,18
**abrupt** 24:24
**academic** 8:14
**academy** 7:24
  8:2 9:8,11,15,17
  9:20,23 10:3,4
  10:10,25 57:9,9
  57:11,12 58:22
**accepted** 76:22
  76:24
**accident** 12:8,10
**accommodate**
  47:20,23 48:6
  50:15 80:9
**accommodating**
  50:7,18
**accommodatio...**
  80:11,16
**accompany**
  76:17
**accomplish**
  86:16
**acknowledge**
  87:11 88:16
**act** 87:14 88:20
**acted** 18:14
**action** 84:16
**actions** 73:9 78:6
  78:7 82:22

**activate** 68:12
  68:15,25
**activated** 24:20
  67:23 69:16
  70:5
**activation** 68:4
**active** 49:1 79:13
**actively** 55:24
  57:17
**activities** 36:16
**actual** 4:13
  36:20 79:2
**adam** 2:15
**adam.laugle**
  2:18
**address** 24:3
  59:17
**administered**
  71:11
**affiliated** 84:18
**affixed** 87:15
  88:21
**afternoon** 3:7
**age** 3:2 5:25 6:2
  6:4
**agency** 11:13
**ago** 14:24 15:2
**agree** 31:6
**agreement** 80:22
**ah** 72:7
**ahead** 39:1 43:4
  47:6 65:20 71:4
**aid** 80:11
**aide** 36:15
**air** 3:21 43:14,18
  44:8 45:24 66:4
**al** 1:8 86:6 87:3
  88:3

alcohol 5:17
alerted 21:10
alerts 66:6
allowed 70:11
  77:14
ambulate 36:7
amount 38:2
  54:12 65:23
  66:25
answer 3:24
  4:19,22 5:2,13
answering 4:18
answers 4:11
anybody 19:23
  44:5 46:21 63:4
  64:14 74:14
  77:3 82:4,6
anyway 30:22
appear 87:11
  88:15
appearances 2:1
appended 88:11
  88:18
appreciate 39:5
approach 25:7
  25:12 32:17,18
  34:19 41:10
  46:16
approached
  25:13,19 32:13
  32:19 39:13
approaching
  33:1,15
appropriate
  56:18 57:3
appropriately
  38:24

area 6:7,9 21:11
  22:15 49:12,12
  53:4 68:6
arm 27:14 45:5
armed 26:25
  27:2 40:6,10
  41:11,16
arrangements
  86:15
arrest 73:6,7,8
  73:13
arrested 63:19
  63:21 73:6,24
  80:6
arrive 30:9,21
arrived 32:15
  39:9 43:14
arrives 44:7
arriving 32:21
  42:15 43:24
  44:4
asked 3:25 17:14
  33:9 36:11
  39:21 41:13,21
  42:7 61:4 73:10
asking 4:21
  43:10 44:18
  71:17
assigned 9:24
  22:15,18
assignment 87:2
  88:2 89:2
assignments
  11:12
assist 47:2 52:4
  73:10 80:20
assistance 38:3
  38:13 39:21

44:21 45:4,17,18
  45:20 46:24
  47:13 66:4
  75:19,24
assisted 16:18,22
  36:15
assisting 36:10
assistive 37:20
  38:18 45:22
  46:2 47:16,18
assume 5:3 7:17
  83:6
assuming 9:21
  24:25
attached 9:12
  88:7
attempt 71:22
attempted 61:23
attempts 45:3
attention 46:1
  61:1 81:15,18
attorney 2:4,9
  3:15 84:15
attorneys 2:16
  12:20 13:6
audio 68:12,16
  68:22,23 69:6,9
  69:15 70:7
authorize 88:11
automatically
  67:25 68:5
available 26:14
  38:19 47:23
  69:11 86:13
ave 86:1
aware 19:23
  20:4 34:16
  35:16 74:10

axon 71:12

**b**

back 30:6 39:4
  42:18 46:11
  55:5 56:7 60:7
  60:12 61:24
  63:20 66:8 69:9
  75:15,22 79:11
  79:12,15,16,20
bag 65:12 66:1
based 26:9 27:5
  30:18 57:13
  65:6 68:8
basically 12:13
basis 21:15 65:8
bazelak 2:15
  5:25 12:22
  18:15,19 31:8,14
  39:1 40:22
  42:16 43:3 47:5
  47:25 48:3
  54:16 56:20
  65:18 70:17
  71:4 79:25
  80:18 83:15
  86:5
beat 71:17,24
becoming 11:1
bed 38:8,9
began 8:23
  28:13 59:7
beginning 29:24
  68:17,18
behalf 2:2,13
belief 70:10
believe 4:2 11:20
  12:2 13:12

17:12 21:17
26:17 27:20
30:17 55:6 57:2
66:20 71:23,24
76:12 78:12
80:19
**believed**  30:21
65:5,20
**best**  4:18 38:2,12
47:19,22 48:6
49:19 50:16
80:9,24
**bethany**  9:1
**birth**  5:24 6:1
**bit**  36:6 44:17
**blood**  7:19
**body**  4:12 30:16
30:17 49:20,22
52:8,24 56:12,16
67:12,21,23 69:3
69:6,15,18 70:15
71:5,7 75:11
78:18
**booked**  76:20
**booking**  73:1
**bound**  38:4
**box**  2:5,17
**boxes**  59:8,9
**break**  3:21 79:24
**briefly**  58:13
**brought**  81:15
81:18
**buffer**  18:13
**building**  74:25
76:5
**bureau**  20:12
79:5 82:8

**business**  73:8,12
74:9
**buttocks**  56:23

**c**

**c**  5:23
**ca**  86:25
**cages**  76:16
**call**  6:12 12:15
20:15,22 21:25
23:1,1,2 26:9
30:12,15,19,24
31:3 47:12
86:14
**called**  1:12 8:25
17:25 20:14
30:10 31:4
32:12 40:1,8
46:13,15,22
47:11
**calling**  17:19
31:1
**cam**  67:12 69:3
69:15
**camera**  67:21,23
68:1,3,7 69:4,6
69:11,12,19 70:3
70:5 78:18
**cameras**  68:6,14
68:25 71:5,7
**cams**  70:15
**capable**  57:18
**car**  20:9,18,19
21:11,16,17,25
22:1 23:24 25:1
25:8,19 30:16
31:7,10,13 32:6
32:16 33:1,13

39:23 40:13,16
41:1,10 42:20,23
43:20 46:4,11,18
52:13,20 53:12
53:21,25 54:22
55:9,10,16 58:16
60:13 61:15,16
62:19 63:22,23
76:11,14
**card**  81:16
**cards**  28:24
**care**  74:15
**career**  10:24
12:3 18:7 19:6
36:17
**carpet**  22:19
**carry**  5:6
**carter**  15:23
20:25 22:18
23:5 24:12 25:1
25:3,8 26:1,3,20
28:13,18,21 29:5
29:8,11 30:7,13
32:23 33:5,10
34:18,23,25 35:5
35:6,7,14,16
39:7 41:9 42:3
51:23 53:13,20
56:6,11 58:15
59:6,7 60:4,6
66:18 68:9
71:17 72:20
75:4,11,19,20,25
76:4 79:8 82:16
**carter's**  23:6,14
**case**  1:7 3:14,19
13:1,7 41:23
44:15 48:16

50:13 57:19
59:4 70:2 73:17
73:18 86:6 87:3
88:3
**cash**  64:9,9
**cassius**  6:18
**catch**  21:25
**cause**  52:17,24
54:9,13 62:1
**caused**  71:25
**causes**  52:23,25
**causing**  54:19
**cautioned**  3:3
**certain**  23:12,15
23:18 67:13
**certificate**  84:2
88:11
**certification**
10:11 37:9 87:1
88:1
**certified**  3:4
86:16
**certify**  84:6,14
**chance**  27:1
**change**  18:25
88:8 89:3
**changed**  43:9,11
**changes**  87:7
88:7,9
**charge**  73:3
**charged**  73:12
73:14
**check**  28:24
**checked**  57:20
**checking**  73:3
**chg**  1:7
**chosen**  18:9

christian 2:3,4
3:16
citation 29:12,13
29:19 33:5,11
44:7,9 58:19,25
59:3,11,13,16,19
59:20
citations 58:21
59:1,2
citizen 18:14
citizen's 18:3
citizens 23:7
70:12
city 1:8,16 2:6
2:14 9:22 22:21
23:10 44:12,14
86:6 87:3 88:3
civil 1:3,13
84:19 87:5 88:5
clarify 5:1
clarissa 2:9 3:13
clarissa.a.smit...
2:12
clay 6:18
clear 4:8 5:16,16
cleveland 2:11
86:2
clifford 1:5 3:14
16:6,9 25:19
28:22 86:6 87:3
88:3
closely 20:12
closer 41:23
clothes 64:10
cody 20:5,10,11
colleagues 70:21
college 7:3 8:7

come 24:21
25:10 46:1,18
51:18 60:20
70:4 80:22
comes 17:19
38:5
coming 16:17
39:4
commands 56:5
comment 71:16
78:18
comments 54:14
54:17
commission 85:7
87:19 88:25
89:25
commissioned
84:5
common 4:12
11:7 26:23
70:16
commonly 11:8
communicate
29:6
communications
15:13
community
22:19
complaining
18:5
complaint 18:3
complaints
11:19,21 13:22
23:7,8,11,12,13
23:13,14,14
complete 29:19
59:3,20 78:5
83:5

completed 58:19
59:10 86:13
completely
69:12
completing
82:23
compliance
52:16,18 54:10
54:11 62:3,9,22
compliant 54:6
62:20
complicated
18:18
comply 29:3
component 69:6
concealed 58:5
concern 28:9
42:1
concerned 41:11
42:14,17 49:23
concerns 48:13
concluded 83:17
conclusion 67:4
69:19,21
condition 74:7
conduct 32:8
conducted 16:14
24:8 43:15,15,19
44:8 45:24 49:9
65:9
conducting 20:6
66:4
confirm 21:18
confirmed 63:10
confused 62:5
conjunction
23:19

connection
27:11,12
consideration
48:8
contact 20:3,16
24:12 25:2,4,5
63:2 67:24
69:19,25 70:1,4
70:4
contacted 20:5
contingent 42:6
continue 37:9
continued 55:24
56:1
contraband 26:7
31:13,20 64:23
65:1,3
contract 84:18
control 17:24
48:25,25 55:15
55:15 56:1,4,6
56:12,19 61:12
62:4,15
convenience
17:25
convenient
86:15
conversation
4:12 16:2 28:20
72:24 81:21,22
conversations
70:11 72:22
convicted 14:19
cooperate 54:21
cooperated
49:25
cooperation
38:14 48:5 75:8

[correct - detective]

**correct** 19:25
28:8 29:18
31:20 32:3,5
33:13 37:24
39:13,14 50:24
52:5 60:1 61:3
66:13 70:7
72:21
**corrections**
88:17
**counsel** 6:21
15:13,20
**counseling** 78:17
78:20
**counter** 61:24
**counting** 66:12
66:16 67:2,4
71:15 72:9,14,15
**counts** 78:12
**county** 84:2
87:10 88:15
**couple** 4:5 15:2
81:14
**course** 18:6 67:9
79:2,4
**court** 1:1 4:9,14
5:7 13:10,11,11
66:7 84:17 87:7
**courtesy** 4:20
**cover** 10:9 11:9
14:15
**create** 82:5
**crew** 59:5
**crime** 14:19
**crimes** 65:14,15
**criminal** 29:2
82:23

**cross** 1:13 3:5
**crossed** 39:10
**cruiser** 25:7
28:16,17,20 30:6
30:8 32:23 33:3
33:11,15 34:10
35:3 42:19 43:7
46:18 47:21
59:25 60:3,7,9
60:11 61:2 63:2
67:6 72:19 75:1
75:6,9,12,16,18
75:21,23 76:10
76:15 80:6
**cruiser's** 71:16
**cuffed** 79:16,20
**curb** 49:11
**current** 9:21
59:17
**currently** 67:15
**cv** 1:7

**d**

**d** 84:19
**daily** 36:16
**danger** 17:22
43:12
**dangerous** 41:12
42:23 57:18
**darryl** 60:6
**dashboard** 32:4
**date** 5:24 6:1
14:3 16:11
50:20 59:6 86:8
87:3,9,19 88:3
88:13,25 89:20
89:25

**day** 22:13 68:8
73:15 85:3
87:16 88:22
89:22
**days** 23:18 81:14
86:19
**dayton** 1:8,17
2:14,17 6:7,7,9
9:14,14,23 19:19
22:15,17,21,22
23:8 44:14 47:1
47:7 66:1 67:11
68:21 71:2 85:2
86:6 87:3 88:3
**dayton's** 44:12
**daytonohio.gov**
2:18,18
**dea** 20:13
**deadly** 27:9
**deal** 36:23,24
**dealing** 35:20
50:9 69:20
80:23
**dealings** 27:13
**dealt** 35:25 36:2
**dear** 86:10
**decided** 42:8
77:17
**decides** 66:7
**decision** 31:3
66:21,23 77:15
**deed** 87:14 88:20
**deemed** 86:21
**deeming** 17:21
**defendant** 1:11
3:2 66:9
**defendants** 1:9
2:13

**defensive** 10:15
**defined** 84:18
**degree** 36:20
**delivered** 61:24
**denied** 14:10
**department** 1:16
9:12 10:5 11:11
11:15,17 44:12
44:15 47:1,8
66:2 67:12
68:21 70:14
71:3,11,13 80:12
80:13 86:24
**department's**
9:15 17:18
**depending** 37:20
**depends** 59:21
**deposed** 4:1
15:24 16:1
**deposition** 1:11
3:20,23 14:23
15:8,20 83:16
86:8,11 87:1,3
88:1,3
**describe** 44:20
52:7 55:11
75:10 78:22
**described** 49:17
**detailing** 78:6
81:17
**details** 20:18
77:8,14,16 82:22
**detective** 20:12
21:7 26:10
31:12,16 33:14
33:22 41:8,13
53:14 58:17
65:9 66:19,23

**detectives** 20:13
**determined**
65:16,19
**devices** 47:16
80:14,20
**difference** 22:25
23:3 37:15
61:19,20
**different** 8:1
11:9 50:5 62:7,8
**differently** 37:23
**difficult** 45:10
49:1
**direct** 13:6 61:16
61:18
**directed** 52:21
**directing** 61:15
**direction** 20:19
24:3 50:5
**disabilities**
37:19 47:3 50:8
50:10,11,16,19
**disability** 36:6
44:25 57:14,17
**discarded** 60:12
**discharged**
74:20
**disciplinary**
13:19
**discomfort** 54:2
79:19
**discourage**
58:11
**discoverable** 6:1
**discuss** 15:22
16:5 82:16
**discussions**
82:20

**dismissed** 73:18
73:19
**distance** 52:20
55:8
**district** 1:1,2
9:24
**division** 1:3
**dms** 11:7,8
**documents**
15:15,16
**dog** 66:5
**doing** 3:9 56:14
58:11
**dollars** 64:8
65:25
**dragging** 49:24
**drive** 65:25
72:23,25
**driven** 72:19
**driver** 21:1
25:18,22,22
28:21 29:1
31:22 59:4
**driver's** 32:13
34:12,24 53:14
**driving** 16:15
21:2 23:25
28:23 63:23
**dropped** 55:18
76:4
**drug** 21:11 50:2
65:16
**drugs** 5:17 28:2
29:2 31:19,25
32:3 64:12,15
**due** 44:24 56:8
65:21 66:25
70:3 73:9 77:16

78:4 79:12
**duly** 3:3 84:4,7

**e**

**e** 15:5,6 81:21,23
**earlier** 30:19
40:6 41:15
49:17 52:19
55:8 75:5
**earliest** 17:24
**early** 51:18
**ease** 71:23
**easier** 4:14 75:5
**easiest** 48:6
**east** 33:15
**eastbound** 24:4
24:6
**easy** 45:23
**educational** 7:22
**effective** 56:22
57:5
**effectuate** 24:13
**efforts** 47:22
53:21 55:4 56:1
56:3
**eight** 51:21
**either** 6:14,15
84:15
**elapsed** 32:25
73:23
**elderly** 38:16
**electronic** 11:6
**emergency** 68:4
68:5,24
**en** 43:21 76:4
**encounter** 16:10
16:12 19:14

**encountered**
19:10 81:4,12
**encounters**
19:11
**encourage** 38:1
52:16
**enforcement**
29:3
**enjoy** 7:10
**ensue** 77:12
**ensure** 38:7
48:24 50:1 58:4
**entered** 88:9
**entire** 12:3 32:16
72:10 87:5 88:5
**entries** 13:23,25
**envelope** 67:6
**equipment** 24:7
37:20 38:19
45:22 46:3
47:18,23 68:5,24
80:11,14
**errata** 86:19
88:7,10,18 89:1
**escorted** 63:1
**especially** 38:15
**establishing**
48:9
**et** 1:8 86:6 87:3
88:3
**evaluation** 63:18
74:16
**event** 19:9 84:16
**eventually** 30:25
**everybody** 67:11
**everyday** 23:17
23:18,21

**[evidence - general]** Page 7

| | | | |
|---|---|---|---|
| **evidence** 65:7 | **expressly** 86:13 | **file** 14:1 39:23 | **forces** 23:2,3,4 |
| **exact** 35:9 53:22 73:20 | **extend** 4:20 69:23 | **filed** 12:16 | **foregoing** 87:13 88:18 |
| **exactly** 34:14 39:12 41:5 | **extensive** 82:4 | **files** 13:18 | **foremost** 4:9 5:19 6:12 40:8 48:4 |
| **examination** 1:13 3:5 | **extra** 74:15 | **fill** 59:19 | |
| | **extremities** 36:8 | **filled** 67:5 81:17 | **forgive** 81:3 |
| **examined** 3:4 | **extricated** 52:13 | **filling** 33:11 73:1 | **forgotten** 81:3 |
| **example** 56:22 | **f** | **finally** 33:7 52:12 53:11 | **form** 18:16 47:5 |
| **executed** 88:10 | **fact** 15:23 65:24 66:9 68:8 | **find** 31:12 32:6 35:2,4 38:21 | **found** 28:22 32:1 35:5 39:7 63:10 64:14 65:4 76:22 |
| **execution** 87:14 88:19 | **failure** 29:3 | **fine** 6:4,14,15 | |
| **exercises** 36:16 | **fairly** 38:10 | **finish** 7:17 | **free** 43:14,18 44:8 45:24 66:4 87:14 88:20 |
| **exit** 25:7 42:7 45:2 | **familiar** 19:18 35:17 | **finished** 67:2 | |
| **exoneration** 78:12,14 | **family** 19:18 | **firearm** 27:8 42:2 | **front** 16:20 21:8 79:10,15 |
| **expected** 78:24 | **far** 13:17 19:21 22:10 | **firearms** 10:16 27:6 28:2 64:17 | **fully** 57:18 |
| **experience** 18:6 28:1 32:2 35:20 36:5 50:14 54:4 | **fast** 22:24 | **firm** 84:17 | **funny** 72:5 |
| | **fear** 41:17 48:18 | **first** 3:2 4:9 5:19 5:20 6:11 12:5 14:22 22:23 34:11,12,19 37:17 39:13 40:8 41:2,10 46:16 48:4 59:8 67:11 77:6 84:7 | **further** 31:19 43:13 45:7,24 58:14 84:14 |
| **experienced** 19:3 | **federal** 13:10 | | **furthermore** 58:3 |
| **expiration** 87:19 88:25 89:25 | **feed** 69:2 70:7 | | **g** |
| **expires** 85:7 | **feel** 3:20 5:12,15 48:8 | | **gain** 48:25 52:18 54:10 56:1,3,6 62:21,23 |
| **explain** 12:5 16:12 18:13 23:22 25:5,5 26:22 27:10 44:16 65:13 | **feet** 33:24 34:1 50:1 63:13 66:1 | **fit** 18:12 58:8 | |
| | **fell** 55:8 | **five** 9:3 79:24 | **gaining** 56:24 |
| | **felt** 62:24 | **focus** 22:21 23:6 23:8 26:4 27:23 | **gather** 59:22 82:21 |
| **explained** 40:6,7 41:14 55:8 75:5 77:7 | **fic** 81:16 | **follow** 77:10 | **gathered** 35:3 59:2 |
| | **field** 18:3 28:24 81:16 | **follows** 3:4 | |
| **explanation** 78:23 | **fielded** 23:7,9 | **foot** 60:19,20,23 | **general** 15:13 35:24 47:25 48:1 67:20 |
| **express** 79:18 | **fifteen** 59:21 | **footing** 56:24 | |
| | **fight** 45:9 56:25 57:7 | **force** 11:13 23:16,20 54:12 67:12 | |
| | **fighting** 56:6 | | |
| | **figured** 30:21 | | |

[general - home]                                                                 Page 8

70:14
**generally** 37:19
**gestures** 4:12
**getting** 11:15
34:6 39:23 52:4
56:24
**give** 4:11 5:25
6:2 10:12 50:20
54:1 61:6 62:6
73:3 79:22 83:5
**given** 66:8 67:7
**giving** 4:19
20:17,18 39:5
**gmail.com** 2:12
**go** 3:22 4:6 7:23
8:4 11:5 13:2,3
13:18,19 22:20
28:5 33:7 39:1
43:4 44:10 47:6
50:4 58:14
65:20 69:23
70:2 71:4 75:16
75:22
**goal** 49:3 52:19
53:24 54:9
**goes** 4:4
**going** 3:17 5:2
7:6,13 12:14,14
15:23,25 30:24
42:11,13 44:24
45:2 54:7 70:1
71:7 77:18
**good** 3:7,8
**gotten** 26:9
**gpm** 22:17
**grab** 38:17 45:4
45:6 49:16,20
52:16,17

**grabbed** 52:14
55:15 75:11
**grabbing** 40:14
**grade** 8:16
**graduated** 7:25
8:2 10:2
**graduating** 11:1
**graduation** 9:24
**grand** 24:4,7
**granted** 14:10
14:11
**grassy** 49:11
**great** 7:2
**greater** 22:17
**grips** 45:12
**grocery** 66:1
**ground** 49:4,24
50:2 52:19,21,22
55:3,5,7,7,9,12
55:17,20,22,25
56:17 61:6,9,14
61:17,22 62:11
62:12,14,17
**group** 28:3
**grow** 6:11,15
**guess** 3:25 18:9
18:25 19:8 28:1
43:17 81:10
**guilty** 14:18
**guns** 23:15 28:2
29:2 31:12 32:3
**guys** 21:2 22:10
27:20 28:19
82:25 83:9

**h**

**h** 5:23

**hair** 52:14,15,17
52:23 53:4,4,7
61:10,11,12 62:9
62:10,13,15
**half** 22:3
**hammock** 1:11
3:1,11,12 5:22
5:24 6:12,13
84:7 86:8 87:4,9
88:4,13 89:20
**hand** 45:5 53:15
85:2
**handcuffed**
59:25 79:10,12
**handcuffing**
79:14
**handcuffs** 56:2,9
79:7,9
**handled** 70:15
**hands** 40:20
41:4 45:9 49:1
52:7 53:6 56:7
57:21 79:16,19
**handwritten**
59:1
**happen** 12:12
**happened** 12:6
12:10 16:5 24:1
33:19 44:16
55:13,23 63:22
67:3 72:13,16
73:16 77:4,8,11
77:21,25 78:6
82:6
**hard** 10:13
**harm** 26:15
**hartings** 20:5,6
20:10,11 21:7

26:10 65:9
66:19,24
**head** 52:22 53:5
54:19 61:12,15
61:16,18,22
62:10,13,16
**heading** 20:19
**hear** 4:25 26:1
65:13
**heard** 22:24 26:3
**heightens** 48:18
**help** 33:9 39:21
45:20 49:2,21
53:18,20 61:8
**helped** 53:15
75:4,21
**helping** 53:10
**hereinafter** 3:3
**hereunto** 85:1
**hey** 23:23 46:22
**high** 7:23,24 8:1
8:2,3 27:2 31:1
38:11 41:16,18
52:21 75:6
**higher** 75:6
**hipaa** 35:22 70:3
**hired** 9:22 11:15
11:16
**history** 7:22
28:25 29:2
30:14
**hit** 55:3,6,7,12
**hitting** 49:24
55:5
**home** 8:25 9:6
35:25 36:13,14
37:18,25 49:18

**hood** 71:16
**horn** 24:16
**hospital** 63:18
  70:2 72:18,23,25
  73:4,24 74:4,6
  74:12,17,19,24
  74:25 75:2 76:1
  76:3,9 77:2
**hour** 22:3 51:22
  74:3,3,22
**hours** 49:10
  51:19,21 74:1,2
**house** 20:7,20
  21:8
**housing** 23:10
**huh** 4:13 68:20
**hurt** 42:22 54:25
  63:5,11,13,16
**hurting** 54:8,8
**hurts** 54:24

**i**

**imagine** 37:1
**immediate** 24:22
  24:24 68:6
**immobile** 36:20
  36:21
**immobility** 36:4
  37:21,23,24 51:1
**impact** 55:4,5
**improvised**
  80:17,21
**inappropriate**
  71:21
**incident** 48:1,2
  77:3,8,14 78:5
  82:15,17

**incidents** 14:5
  14:15
**include** 50:12
**income** 23:10
**incorporated**
  88:12
**incorrectly** 83:7
**indiana** 7:24 8:2
**indicated** 82:2
**indication** 54:1
  61:6
**indications**
  77:10
**individual** 37:22
  47:12 80:5
**individual's**
  56:16
**individuals**
  26:24 27:13
  35:20 36:3 50:7
  50:18
**induces** 52:15
**influence** 5:17
**info** 59:4,4
**inform** 21:15
**information**
  26:21 28:23
  29:5 30:6 35:1,3
  39:5 59:3,10,22
  66:3 73:1,2
**informed** 29:1
  30:13 63:12
  77:19
**infractions** 82:3
**initial** 17:1 25:2
  25:4 32:17
  40:23 41:1
  43:10

**initially** 24:14
  34:22 39:17
  41:20 52:17
**initiate** 21:9
**initiated** 21:13
  32:15
**injure** 61:23
**injured** 62:25
**injuries** 50:3
  63:10 74:11,13
**injury** 37:12
  38:15,23 71:25
**inquired** 63:4
**insensitive** 71:21
  78:18
**inside** 16:16 67:6
**instantly** 44:25
**instructed** 41:9
**interacted** 57:14
**interacting** 50:7
**interaction**
  19:22
**interested** 84:16
**internal** 77:22
  77:24 78:2,9,11
**interrogatories**
  15:17
**interrupt** 4:19
**intersection**
  33:20
**interview** 28:24
  81:16 82:13
**interviewed** 82:3
  82:6,7,9 83:9,10
**inventory** 63:25
  64:4,7
**investigation**
  21:23 27:1,5

30:18 31:19,25
  41:7,15 43:13
  45:25 49:15
  67:1 72:11
  77:11,16,18,20
  77:23,25 78:3,9
  78:11 82:1
**involved** 50:23
**involving** 16:6
**island** 2:6
**issue** 18:4,20
  43:2,6,12
**issued** 29:14
  44:6 58:15
  67:13
**issues** 8:14,16,18
  37:3,11 38:7,22
  47:3,9,13 50:12
  51:1,2 80:5,15
  80:21
**issuing** 59:11,15
**item** 60:15
**items** 60:11,14
  64:10

**j**

**j** 2:15 86:5
**jail** 69:22 70:2
  75:16 76:2,4,18
  76:21,23
**james** 3:15
**job** 9:21 11:14
  23:17,18,21
  35:19 36:10,12
  38:21
**joined** 58:15
**joint** 82:25

**[joke - maintain]**

**joke** 72:1,5
**judge** 66:7
**judgment** 5:15
**justin** 82:11

**k**

**k** 5:23 30:8,10
30:12,15,19,21
30:24 31:1,3,5
32:12,15,20
33:13,15,22 39:9
41:23 42:6,12,13
42:15 43:13,21
43:22,24,24 44:3
44:7 46:14,15,18
58:16 66:4
72:11,13
**kathy** 1:14 84:3
85:6
**keep** 37:12 48:22
61:16 69:15
**kentucky** 6:17
6:18 7:2
**kept** 72:25
**kettering** 7:15
7:16 8:8,11,13
8:22
**kind** 4:3 7:21
10:13 18:13
20:1,2 37:5,9
38:6,17 41:2
49:17 70:13,15
71:23 78:16
**knee** 56:16,23
**knees** 56:11
**knew** 15:25
30:23

**knife** 27:9
**know** 3:22 4:3
12:22,24 13:1,5
13:7,17 16:9,9
17:22 18:21
21:21 29:13
30:20 33:2,4
35:15 37:2,16
38:3 39:6 54:19
58:18,20 59:9
60:23 63:4,9,12
63:14 64:6,14
66:21 67:3
70:18,20 73:11
73:16,19 74:1,23
76:20,25 77:24
78:10 79:14,15
81:7,8,20,24,25
82:9
**knowledge** 26:23
29:15

**l**

**lack** 65:9
**lady** 12:13
**lane** 49:13
**laugle** 2:15
**law** 1:16 2:3,4,9
2:16 10:15 18:5
29:3 44:15
**lawful** 3:2
**lawfully** 73:9
**lawsuit** 12:16
39:24
**lawsuits** 12:9
**leaned** 45:6
**learn** 14:22 36:6
38:6

**learned** 71:2
**leave** 9:4,5
**leaving** 20:7
24:3 76:3
**led** 31:3
**left** 8:21 20:19
33:3 76:1
**legal** 86:1 89:1
**legs** 3:22 49:24
50:1 57:19
**lent** 11:12
**leonard** 2:15
86:5
**leonard.bazelak**
2:18
**lessen** 55:5
**letlow** 60:7
**letter** 15:5 86:20
**letting** 69:22
**level** 37:20
**lieutenant** 79:4
**lighten** 71:22
72:3
**lights** 24:19,20
68:4,10
**likelihood** 27:2
30:25 41:16
**limit** 38:15
**limited** 53:1,3
**line** 88:7 89:3
**lines** 71:18
**listed** 88:7,17
**listing** 88:7
**little** 18:17 22:24
36:6 42:9 44:17
62:5 63:2 75:19
75:24

**live** 6:6,7 23:9
**lived** 6:8
**living** 36:16
**local** 72:17
**locate** 32:9
**located** 16:21
53:5 64:17,20,24
**location** 20:17
86:15
**locked** 76:13
**locks** 76:14
**long** 2:6 6:8 8:10
9:2,16 14:24
21:24 32:10,11
59:18 69:14,16
73:22 74:19
**longer** 42:9
**look** 47:24
**looking** 26:8,12
26:13,16 46:4
**looks** 58:25
**lot** 10:16
**louisville** 6:17,18
**low** 23:10 38:12
52:20 55:10
62:17 75:6

**m**

**m** 5:23,23
**madam** 86:10
**magill** 63:8,9,13
63:15 66:19
77:7,9,13 81:25
**mail** 15:5,6
81:21,23
**main** 27:23
**maintain** 37:8
48:25 62:16

**making** 20:16
45:10
**man** 46:23 50:24
59:5 71:18
**management**
22:18 23:9
**manner** 44:8
61:22 84:16
**manual** 68:2
**manually** 69:2
69:11
**marijuana** 16:16
16:17,21
**material** 79:1
**matlock** 82:10
**matter** 30:20
86:12
**matters** 16:5
48:17
**mean** 10:8,14
15:25 21:23
22:14 27:8,22
36:19 37:7
38:12 39:17
48:13 54:18
70:18
**meaning** 13:9
**means** 18:21
48:15 61:12
71:24
**meant** 72:3
**med** 7:7,10
**medical** 74:6
**medication** 5:17
**meet** 3:12
**members** 19:18
71:13

**mentioned** 4:7
50:22
**met** 15:11 44:25
**metal** 76:15
**mid** 51:15
**midnight** 51:11
**midwest** 89:1
**mind** 5:16 48:22
**minivan** 16:15
16:15
**minute** 68:15,22
69:9 79:22,24
**minutes** 22:6,8
32:14 59:21
**miscellaneous**
64:10
**misconduct** 8:18
**mjn** 1:7
**mobility** 37:3,11
38:7,22 47:3,9
47:13 50:12
51:2 80:5,15,21
**moderate** 37:22
**modify** 57:13
**moment** 33:1,12
34:5 40:1,2,4
42:24 68:23
**money** 27:18,21
28:3 64:25 65:1
65:3,4,10,11,11
65:16,22 66:3,6
66:6,8,13,16,22
67:3,5 71:15
72:10,12,13 76:7
76:8,10
**montgomery**
84:2

**months** 9:18,19
10:16,18 15:2
**mood** 72:3
**morning** 51:15
**move** 6:23 7:1
38:1 61:23
**municipal** 13:11
13:12
**mute** 71:8
**muting** 78:18

**n**

**name** 3:10,11,13
5:20,20 86:6
87:3,4,15 88:3,4
88:21
**named** 84:7
**narcotics** 20:8
20:12 23:15
26:24 27:1,5,9
27:11,14 31:25
41:15 65:5,23
66:10
**nature** 23:12,15
82:19
**near** 49:11,21
**need** 3:20,21
59:3
**needed** 21:16
23:25 33:8 40:9
43:14,16 45:23
59:10 73:2
77:15 83:4
**never** 58:7 73:20
**new** 2:6 71:5
**nice** 3:12 6:22
**night** 50:24 51:3
51:6

**non** 65:15
**nonfactor** 54:15
**normal** 65:24
**notary** 1:15 84:3
85:7 86:25
87:10,18 88:15
88:23 89:23
**notice** 40:13
**noticed** 24:6,7
46:10 60:10
**noticing** 21:19
**notified** 11:18
15:3 35:7
**notify** 32:23
**notifying** 63:15
**november** 1:17
85:3 86:4
**number** 59:17
86:7
**numbers** 88:7
**nurse** 73:3
**nurse's** 36:14
**nursing** 8:25 9:6
35:24 36:12,14
37:18,25 49:17

**o**

**o** 5:23
**oath** 5:6
**objection** 18:15
31:8,14 39:1
42:16 43:3 47:5
47:25 54:16
56:20 65:18
70:17 71:4
80:18
**observations**
82:21

**observed** 33:14
**obstructing** 73:8
  73:12
**obtain** 10:4
**occasion** 81:5
**occasions** 67:10
  70:6
**occurred** 49:6
**occurring** 41:7
**offer** 45:3
**offered** 39:21
  44:21 45:16
**offering** 45:19
**office** 85:2 86:14
**officer** 6:12
  10:11,21 11:2,4
  15:22 18:9 19:1
  22:18 23:4,6,14
  24:11,11,12 25:1
  25:3,8 26:1,3,11
  26:20 28:13,18
  28:21 29:5,8,11
  30:7,13 32:23
  33:4,10 34:18,23
  34:25 35:5,6,7
  35:14,16 39:7
  41:8,9 42:3 44:5
  47:14,15,17 50:6
  50:13 51:23
  53:9,13,17,20
  56:6,11 58:3,12
  58:15,16 59:6,6
  60:4,6,6 66:18
  68:2,9 71:17
  72:20 75:3,11,19
  75:20,24 76:4
  79:8 80:24
  82:16

**officers** 16:13
  18:14 45:15
  48:19 52:4
  60:10 67:13,21
  67:22 69:1
  70:10,14 77:4
**official** 73:8,12
  87:15 88:21
**officially** 3:13
**oftentimes** 32:8
**ohio** 1:2,15,17
  2:11,17 6:24 7:2
  9:13 84:1,4 85:2
  85:7 86:2
**okay** 3:9 4:3,6
  5:3 6:8 7:1,16
  7:21 8:3,6,8,10
  8:24 9:9,11,16
  9:25 10:12,17,23
  11:3,10,16,22
  12:4,16,19,21
  13:4,17 14:16,22
  15:3,5 16:8 17:1
  17:4,14 18:11
  19:3,6,16,21
  20:14 21:2,7,14
  21:24 22:12,23
  23:22 24:21
  25:21,25 27:10
  28:7,11,19 29:9
  30:1,5,18,23
  32:10,22 33:12
  33:21,24 34:2,5
  35:2,6 36:17
  37:5 39:25
  42:14 43:1
  46:17 48:3 51:2
  51:10 53:1,9

55:19,22 56:15
57:12 58:7 62:5
62:12,18,23,24
64:12,17 67:20
68:7 69:1,5,14
72:15 73:22
75:14,20 76:1
77:1 81:8,24
83:4,9,12
**once** 12:1 17:23
  21:10 24:25
  28:20 45:17
  69:11,16
**one's** 56:17
**opacity** 32:24
**operate** 68:1
**operated** 23:19
  68:9,9
**operating** 44:11
**opinion** 48:7
**opportunity**
  13:21 74:5
**opposed** 61:19
**oral** 11:18,20
**order** 10:5,10
  41:2 45:24
  49:18 83:5
**organization**
  23:1
**outside** 10:3,18
  15:19 28:15
  76:13 82:4
**overhead** 68:10
**overrule** 18:8,12
  18:19
**overruling** 18:20
**owensby** 1:5
  3:15 16:6,9,14

19:10,12,17,22
20:3 23:23,24
24:21 25:2,15,19
26:1,4,18 27:4
28:22 29:1
32:20 33:4 34:9
34:12,17 35:4,8
35:12 39:8,15
40:5,7 41:11
42:7 43:10,15,25
44:18 45:5
48:21 49:6,7
52:4 53:18,21,24
54:1,11 55:3,16
57:20 58:14
59:24 60:8 61:2
62:24 63:1,5,10
63:12,15,19 67:7
72:17,23,24
73:23 74:11,15
74:25 75:23
76:2,18 77:2
78:7 79:7,18
81:5,12,16 86:6
87:3 88:3
**owensby's** 19:18
  30:14 32:13
  33:1 35:1 39:11
  40:13 48:24
  52:8,14 53:15
  56:11 58:16
  60:16 74:7 75:7

| p | |
|---|---|
**p.c.** 2:3
**p.m.** 1:18 83:17
**p.o.** 2:5,17

**packaged** 65:11
**page** 88:7 89:3
**pain** 52:15,16,17
 52:24,24,25 53:2
 53:3 54:2,8,9,14
 54:15,18,18,20
 61:7 62:1,3,9,19
 62:21,23 79:19
**paperwork** 67:5
**paraplegia**
 34:17 35:8,11,13
 35:15,18,21,23
 36:2,18,23 39:8
**paraplegic** 46:23
 50:24,25
**parked** 25:1,1
**parking** 34:10
**part** 23:5 43:6
 52:10 65:22
 78:2,4 88:9
**partake** 26:24
 27:13
**participate** 64:3
 72:11
**participated**
 66:12,15
**particular** 9:12
 26:9,18 65:14
**partner** 33:22
 51:24,24,25 52:1
**parts** 75:10
**party** 84:15
**passenger** 16:20
 17:5,8 20:25
 25:14 34:23
**passenger's**
 53:16

**passive** 44:25
**patient** 38:1
**patients** 35:23
 36:1,3
**patrol** 9:24 18:9
 19:1 22:12,16,22
 67:17,22
**pause** 3:23 80:1
**pay** 60:25
**pending** 13:8
**people** 23:9
 36:10,15,20,24
 37:18 42:22
 47:9 80:9,15
**percentage** 30:2
 32:24 59:5
**person** 4:17 18:5
 38:14 43:21,23
 44:3,9 47:16,19
 48:5,12,16 56:17
 57:14,16,18,25
 65:24 69:22
 79:2,3 80:20
**personal** 7:20
**personally** 87:11
 88:15
**personnel** 13:18
**perspective** 83:4
**pertinent** 73:1
**phone** 20:15
 59:17 86:3
**picking** 60:11
**pivot** 38:20
**place** 44:23 47:2
 47:8 49:4,11
 56:2,7,22 80:4
**placed** 55:16,19
 56:11 67:5 79:9

**placing** 56:15
**plain** 26:5,6,12
 28:8,10,12
**plaintiff** 1:6,12
 2:2 3:14
**plan** 44:23 45:17
 48:9 49:5,7,9,16
 80:23
**plastic** 65:12
**play** 69:9
**playback** 68:15
 69:10
**please** 5:1 86:14
**pled** 14:18
**plus** 64:9 65:25
**pod** 22:19
**poe** 82:11
**point** 3:19 12:21
 25:25 29:9,17
 30:1,10,24 40:15
 40:22 45:5,12
 46:6 73:5 81:3,6
 81:10
**police** 9:7,11,12
 9:14,23 10:5,10
 10:11,25 11:2,4
 11:11,14,17 29:3
 31:25 33:3
 44:12,14 47:1,7
 47:11,17 57:9,11
 57:12 58:22
 59:25 61:1 66:1
 67:11,12 68:21
 70:14 71:3,11,13
 71:16 80:6,12,13
 82:4
**policies** 80:8

**policy** 17:18
 18:4 44:12,14
 66:2,25 78:24
**poor** 71:17
**posed** 3:24 5:2
 57:21
**poses** 58:3,12
**position** 67:17
 75:6
**possession** 27:4
**possibility** 65:21
**possible** 17:21
 38:13 49:3
 54:22
**potential** 27:22
 65:14
**potentially**
 26:15 27:8,18,19
 42:24
**power** 11:7,8
**practice** 57:11
 70:16,22 71:1
**prefer** 86:16
**premier** 22:18
**prepare** 15:7
 82:12
**prepared** 5:12
**prerogative**
 18:12
**presence** 70:12
 84:11
**present** 81:11
**press** 45:9
**pressure** 61:21
**pretext** 31:7,10
**pretty** 64:10
**preventing**
 45:13

**prevents** 56:23
  56:25
**primarily** 23:15
**primary** 24:12
  25:4
**prior** 11:1 12:8
  16:8,10 19:7
  26:20 34:21,22
  35:19 42:15
  43:23 44:3
  50:19 77:1 81:5
  81:17
**priority** 55:1,1
**private** 70:11
**probably** 72:7
**problem** 22:19
**procedure** 1:14
  87:5 88:5
**procedures** 80:8
**proceedings**
  80:1
**proceeds** 65:16
**process** 44:20
  66:5
**product** 26:25
  27:14,16
**production**
  86:24
**professional**
  79:4 82:7
**program** 7:17
**prone** 38:22
**proof** 65:10
**proper** 37:7 67:5
**properties** 23:10
**property** 76:6
**protect** 26:25
  27:14,15

**protocol** 47:2
  67:21
**protocols** 80:4,7
**provide** 47:17
  80:14
**provided** 80:11
**providers** 74:6
**public** 1:15 84:4
  85:7 87:10,18
  88:15,23 89:23
**pull** 28:23 45:8
  52:17 61:11
**pulled** 23:25
  25:23 26:2
  52:15 54:3
  61:10
**pulling** 52:23
  53:4,25 61:19
  62:9,10,19,21
**pulls** 38:16
**purchased** 86:17
**purge** 13:21
**purpose** 17:2
  31:18,24
**pursuant** 1:13
**push** 55:25
  61:13,21,24
  62:13
**pushing** 62:10
  62:16
**put** 56:8 59:14
  59:16 61:21
  75:17 79:6
  80:19
**putting** 60:12

**q**

**qualified** 84:5
**qualify** 10:10
**quantity** 65:10
**question** 3:24
  4:21,22,24 5:2
  7:22
**questions** 3:18
  5:13 83:14
**quote** 56:18

**r**

**radio** 20:15,17
  21:5 23:23
  30:16,16,17
**raised** 43:11
**ran** 28:21
**range** 10:14
**raw** 16:17
**rchristian** 2:7
**rchristianlaw.c...**
  2:7
**reach** 26:14
  40:10
**reached** 45:4,6
**reaching** 40:14
**read** 29:4,7
  83:15 87:5,6,12
  88:5,6,17
**readily** 26:14
**reading** 79:1
  86:12,20
**ready** 5:18
**real** 80:10
**realize** 46:7 81:4
  81:11
**realized** 72:7

**really** 6:1 7:8
  60:25
**reason** 17:13
  25:5 26:17
  36:21 44:2
  59:23 73:21
  88:8 89:3
**reasonable**
  24:24
**reasons** 7:20
**reassurance**
  31:5
**recall** 13:16 14:7
  17:1,10,14 19:7
  19:13 22:12
  29:21 32:11,25
  34:11 35:9,10,13
  36:1 39:12,15,17
  41:4 50:21
  51:13 53:8 54:7
  56:10,13,13
  71:14,19 73:22
  74:21 79:6
  83:13
**receipt** 67:7
  86:20
**receive** 11:7 44:9
  50:9 68:14
**received** 12:7
  13:13 20:22
  21:24
**recognize** 25:18
  25:22
**recollection**
  75:17
**record** 3:10 5:21
  13:20,22 88:9

[redirect - school]

**redirect** 18:25
**reduced** 84:10
  84:12
**reference** 86:7
  87:2 88:2
**referenced** 86:11
  87:11 88:15
**relative** 84:15
**relayed** 35:14
**remain** 48:9
**remember** 10:13
  14:24 20:16,23
  22:2 24:5 51:7,9
  51:12,16 75:13
  79:21 81:19,23
**remembering**
  46:12
**removal** 52:11
  60:21
**remove** 32:19
  33:8,9 45:10,15
  49:3,10,18 53:10
  53:15,18,21,24
**removed** 13:25
  14:5 41:3 43:16
  43:20,21,23,25
  44:19,22 54:21
  55:16
**removing** 44:2
  45:13 48:21
  49:5,7 52:8
  61:14
**repeat** 5:1
**rephrase** 18:18
**report** 15:18
  69:24 78:5 82:4
  82:14,23,24 83:1
  83:3,5

**reporter** 4:10,14
  87:7
**reporting** 84:17
**represent** 3:14
**reprimand**
  13:14
**reprimanded**
  11:23 12:2,6
**reprimands**
  13:18,22
**request** 14:2,4,8
  14:10,13,14 88:9
  88:11
**requested** 17:16
  17:21 20:9
  21:12 42:12
**requests** 17:20
**required** 61:21
  86:25
**requires** 48:5
**requiring** 47:13
**reserve** 83:13
**resist** 55:24
**resistance** 45:1
  49:2,6 56:8
  61:25 79:13
**resisting** 54:6
  57:17 73:8,13
**resolved** 13:1
**respectful** 6:13
**respond** 17:13
  18:8 47:12
**responded** 17:11
  17:17
**response** 12:14
  22:20
**responsibilities**
  36:12

**resting** 56:17
**restroom** 3:22
**result** 63:15
  74:16
**results** 64:6
  78:10
**retrieved** 75:3
**returned** 28:17
  28:20 34:18
  42:18 43:7
  86:19
**review** 15:16
  86:14 87:1 88:1
**reviewed** 15:15
  82:14
**reviewing** 68:18
**riding** 55:10
**right** 4:2,23 5:4
  6:5 7:12 13:16
  16:6 29:24 30:3
  30:4 31:7,13,23
  32:2,4,7 33:18
  40:1,2 42:2,5,6
  44:13 45:4
  46:13,14 49:15
  53:12 61:2,10
  63:20 76:2
  80:12 83:13
**riley** 2:4
**risk** 43:6 48:19
  48:20
**robbed** 27:15,16
  27:18
**role** 18:1 24:9
**roll** 55:25 61:17
**room** 76:6
**route** 43:21 76:4

**rpr** 85:6
**rule** 4:7 84:19
**rules** 1:13 4:6
  87:5 88:5
**running** 26:20
  35:1
**ryan** 3:15

**s**

**s** 1:14 84:3 85:6
  88:8,8 89:3
**safe** 17:22,23
  40:5,9 42:23
  48:9,10 49:2
  54:22
**safely** 38:8 48:6
  80:24
**safety** 42:2,3,15
  42:18 43:1,5
  48:13,17,18,19
  48:23,24 55:1
  58:3 76:5
**sale** 65:5
**sales** 65:17
**saw** 34:6
**saying** 3:17 4:11
  10:23 23:23
**says** 21:7
**scalp** 52:25 53:1
  62:2
**scene** 17:22,23
  40:5,9 41:24
  43:22 77:3,19
  81:25
**scheduled** 51:17
**school** 7:7,10,23
  7:25 8:2,3

**[schools - state]**

**schools** 8:1
**screaming** 61:8
**screen** 73:2
**seal** 85:2 87:15
 88:21
**search** 32:6,9
 57:24 58:2,8
 64:13
**searched** 16:20
 57:20
**searching** 31:7
 31:10
**seat** 46:11,11
 52:20 55:9
**second** 13:13
 32:18,22
**secondary** 24:11
 25:13 26:11
**seconds** 34:7
**secured** 67:6
 76:10
**sedan** 24:3
**see** 18:4,12 21:8
 26:4,5,6 28:7,9
 40:21 46:5 60:8
 64:23
**seeing** 21:19
**seen** 18:7 28:11
 58:8 70:22
**segue** 9:20
**segues** 7:21
**seize** 31:22 66:2
 66:22
**seized** 66:6
 71:15
**separately** 83:10
**september** 16:5
 16:8 19:7,17

**20**:3 50:19 51:8
 51:14,18 67:15
 68:8 80:3 81:11
**sequence** 43:18
 43:19 46:12
**sergeant** 63:8,9
 63:13,15 66:18
 66:19 77:7,9,13
 81:25 82:10,10
**service** 12:15
**set** 75:6 85:1
**seven** 32:14
**severe** 37:24
**sheet** 88:7,10,18
 89:1
**shift** 51:6,17
**shifts** 51:20,22
**shirt** 39:24,25
**shoe** 60:15,18
**shortly** 81:14
**show** 18:2
**side** 25:12,14
 32:13 34:13,23
 34:24 40:12,15
 42:19 53:14,16
 58:16
**sidewalk** 16:19
**sign** 33:23 34:2,4
 34:5,6 39:10
**signature** 85:5
 86:14
**signed** 87:13
 88:18
**signing** 86:12,20
**sim** 27:7
**simple** 38:11,17
**sincerely** 86:23

**sir** 86:10
**sit** 32:11 49:12
**sitting** 58:9
**situation** 11:18
 57:23 58:8
 71:22
**six** 9:18,19 10:16
 10:18 28:1
**sixth** 2:10
**skin** 38:16
**slapped** 45:5
**slow** 20:1
**smell** 16:16,17
**smith** 2:9 3:6,13
 6:3 12:25 18:17
 18:22,23 31:11
 31:17 39:3
 40:24 42:21
 43:8 47:10 48:2
 48:11 54:23
 57:1 66:11
 70:19 71:9
 79:23 80:2 81:1
 83:12
**smooth** 75:8
**sniff** 43:14,19
 72:12,13
**soften** 55:4
**softer** 49:12
**sole** 11:14
**solely** 11:10
**solutions** 86:1
 89:1
**somebody** 37:24
 56:19 57:24
 58:8
**somebody's**
 57:24

**someone's** 56:23
**soon** 17:21
**sorry** 9:25 18:18
 39:2 41:8 61:5
**sort** 37:2
**sounds** 55:7,18
**southern** 1:2
**speak** 4:15 15:19
 31:16 33:4 74:5
 74:14
**speaking** 4:17
 34:9 66:24
**special** 10:4
 37:10 38:6 78:5
 82:23,25 83:2
**specific** 30:3
 80:7
**specifically**
 26:13
**spell** 5:20
**spoke** 19:9 81:25
**ss** 84:2
**staff** 74:6
**stand** 3:21 42:19
**standard** 57:3,4
**standards** 79:5
 82:8
**start** 3:17 29:11
**started** 9:7,23
 10:2 29:22 59:8
 71:1
**starts** 68:23
**state** 1:15 3:9
 5:19 7:2 13:10
 37:9 83:7 84:1,4
 85:7 87:10
 88:15

**state's** 10:10
**statement** 71:19
  71:20 87:13,14
  88:19,19
**statements** 15:17
  39:18,19,20,22
  45:1 77:17
**states** 1:1
**status** 28:24
**stay** 49:2
**steering** 45:13
  53:15 58:18
**stenographically**
  84:11
**step** 40:17 44:6
  59:13 72:10
**stepped** 33:12
**stewart** 33:14,22
  53:14,17 58:17
**stimulus** 68:15
**stood** 49:14
**stop** 16:14 17:2
  17:10,15 18:8
  19:1 20:9 21:9
  21:12,15,21 24:8
  24:10,13,17,22
  24:22,23 25:5,21
  25:25 31:18
  32:15 33:16,19
  33:23 34:2,4,5,6
  34:16 39:4,10
  41:9,14 43:10
  46:7 50:23
  53:11 56:5
  59:23 67:10
  69:16 81:4,6,17
**stoplight** 34:3

**stopped** 19:16
  21:16 24:25
  41:20
**stops** 10:15 47:4
  50:8
**street** 1:16 2:5
  2:10,16 24:5
  33:18,23 34:7
  39:9 60:12,14,18
  63:20
**stretch** 3:21
**strike** 79:17
**strikes** 54:10
**strongly** 58:10
**subduing** 57:4
**subject** 10:15
  69:20 80:23
**subjects** 50:10
  67:24 70:12
**submit** 82:25
  83:8
**subscribed**
  87:10 88:14
  89:21
**subsequent**
  10:19
**subsequently**
  16:18
**suffered** 34:17
  35:15,23 36:2,3
  39:8
**suffering** 37:12
  38:23
**suggest** 21:14
**suite** 2:10 86:2
**summarize** 10:6
**summarized**
  29:8

**summary** 10:12
**superior** 86:1
**supervisor** 17:11
  17:15,20,25 18:1
  18:7,25 40:1,7
  66:24 77:5,6
**supervisors**
  17:19
**support** 49:20
  49:22
**suppose** 12:12
  18:24
**supposed** 69:14
**sure** 40:5,9
  41:25 49:14
  51:13,16 79:25
**surface** 38:20
**surveillance**
  20:6 65:8
**susceptible**
  38:23
**suspect** 57:4
**suspected** 20:8
**suspensions**
  59:22
**sustained** 74:11
**sworn** 3:3 5:10
  84:8 87:10,13
  88:14,18 89:21
**system** 11:6

**t**

**table** 3:24
**tactics** 10:15
**tag** 76:6
**take** 4:14,17
  12:4 20:1 24:22
  37:16 79:23

**taken** 1:14 37:2
  59:25 60:3,8
  61:1 62:18 66:7
  66:16 72:17,19
  73:24 86:11
**takes** 45:14
  59:18
**talk** 47:22 58:13
  77:3
**talked** 44:17
**talking** 15:12
  26:3 40:25 48:1
**task** 11:13 22:20
  23:2,3,4,16,19
**tasks** 36:9
**taught** 10:7
  37:10 57:8,13
  58:21 71:6,10,12
  80:8
**team** 22:20
**tears** 38:16
**technique** 38:10
  38:11,17 52:15
  53:23 57:4,6,10
  61:14 62:6
  75:15
**techniques** 37:8
  38:6 57:13 62:8
**tell** 5:10 19:21
  24:16 26:1 33:7
  35:11 53:22
**telling** 40:17
  77:13 78:6
**tells** 28:25
**ten** 22:8 51:21
  51:22
**tense** 71:22

**[tent - two]**

**tent** 29:20
**test** 29:20 32:18
**tested** 29:17,21
  30:5 46:9,13,19
**testify** 84:8
**testifying** 5:7
**testimony** 5:6
  84:10 87:6,7
  88:6,9,12
**testing** 34:20
**therapist** 47:18
**thing** 58:3 59:13
  59:15 71:6
**things** 28:5 32:7
  39:6
**think** 12:7 13:15
  22:5 27:4 31:4
  31:24 34:7
  47:15 56:15,18
  58:16,17 60:15
  72:5
**third** 1:16 2:16
  32:18
**thirteen** 6:10
**thirty** 6:5 34:1
  86:19
**thomas** 66:19
**thoroughly** 58:1
**thought** 83:7
**thousand** 64:8,9
  65:25
**threat** 57:22
  58:11
**three** 8:12
**thursday** 1:17
**ticket** 29:9,12,23
  30:3 58:14 59:7
  59:9,14,16

**time** 4:17 8:13
  11:25 12:5
  19:16 20:11
  23:17 25:8,10,11
  25:16,21 26:4,15
  27:23 28:10
  29:16 30:22
  32:14,16,19,22
  32:25 33:6
  34:15 35:17
  38:3 40:7,22
  41:21 42:8
  43:25 45:12
  46:21 50:5,17
  51:5,14,24,25
  52:10 53:11
  54:25 55:2
  56:10 58:17,19
  62:6,24 68:13
  71:2 73:23
  75:22 79:18
  82:17
**timely** 44:7
**times** 14:12,14
  19:7 61:21
**tint** 21:18,19
  29:16,17,22 31:6
  31:9 32:18
  34:20 46:10
  59:5
**today** 5:5,13
  15:8,20,24
**toddler** 46:10
**told** 20:7 21:17
  24:2 35:11,12
  41:1 73:20
  74:13 81:2

**topics** 10:6,9,13
  11:9
**towed** 63:24
**tradition** 70:25
**traffic** 12:8
  14:19 16:14
  18:8 20:9 21:9
  21:12,15 24:8,9
  29:12 33:5,19
  47:3 49:13 50:8
  50:23 59:19,20
  67:9
**trafficking** 65:22
**trained** 11:8
  37:7
**training** 9:16
  10:4,18,19,24
  37:2,5 50:6,9,11
  50:15,18 71:7,10
  78:13,14,16,17
  78:19,22 82:2
**trainings** 11:5,6
  11:9
**transcribed** 87:7
**transcript** 86:11
  86:16 87:5,12
  88:5,11,17
**transfer** 36:18
  38:11 75:5,8
  80:25
**transferred**
  37:13,14 38:8,15
  38:23 75:23
**transferring**
  38:5 80:4
**transfers** 36:15
**transport** 37:3,6
  37:8,17 75:12

**80:25
**transported**
  36:19 37:12,13
  37:14,19,23
  63:17
**transporting**
  74:15
**travel** 49:13
**traveling** 24:4,6
**trial** 5:8 13:2,3
**tried** 48:25
**trigger** 68:5
**triggers** 68:1
**trunk** 76:12,15
**truth** 5:10 84:8,8
  84:9
**try** 38:1,11
  45:10 47:19
  49:20 50:15
  80:8
**trying** 18:24
  45:8 54:13
  55:25 58:12
  61:13 62:16
**turn** 24:19 68:3
  68:6 69:2,4,5,12
  69:17,18 70:3
**turned** 68:7,24
  69:11,17 70:6
**twelve** 49:10
  51:21
**twenty** 22:5 64:8
  64:9 65:25
**twice** 12:2
**two** 6:5 8:1 14:2
  14:4,14,17 15:1
  15:23 22:25
  23:4 52:3 59:5

**[two - wheelchair]**                    Page 19

60:10 64:8,9
65:25 78:25
79:8 82:2
**type** 13:23 20:18
37:6 41:6 67:17
69:10 80:14
83:2
**typewriting**
84:13
**typical** 54:5
**typically** 32:3
59:12

**u**

**uh** 4:13,13 68:20
**uhs** 4:13
**ultimately** 63:19
**unable** 36:7,7
**unclear** 4:25
**uncommon**
65:24
**uncompliant**
54:5
**uncooperative**
48:12,17
**uncooperative...**
48:20
**undergone** 78:19
**understand** 4:25
5:5 16:4 18:16
20:2 36:22 42:1
**understanding**
4:8 41:6 43:18
78:24
**understood** 5:3
**unfortunately**
45:21 48:16

**united** 1:1
**unquote** 56:19
**use** 4:12 36:7
38:19 54:10
57:19,21
**usually** 3:18

**v**

**v** 86:6 87:3 88:3
**varies** 36:21
59:21
**variety** 10:9
**various** 51:19
67:10 70:6
**vehicle** 16:16,17
16:18,21 20:7
21:8,13,19,22
24:6 28:14
32:12,19,20 33:8
33:10 34:19
41:3,10,14,17,20
41:22 42:2,8
43:11,16 44:1,3
44:6,19,20,22,23
45:2,7,8,11,14
45:18,21,23 46:8
48:22 49:4,8,11
52:5,9,22 53:11
53:25 54:3
57:25 58:2,5,9
59:4 60:22 64:1
64:18,21,24
66:17 68:10
73:10
**verbal** 4:11 45:1
56:5
**veritext** 86:1,7
89:1

**versus** 75:11
**video** 68:12,19
69:2,2,10,15
82:14
**view** 26:5,6,12
28:8,10,12
**village** 9:1
**vincent** 15:22
20:25 51:23
**violating** 35:22
**violation** 14:20
18:4 24:7
**violations** 78:25
**violently** 55:7
**vs** 1:7

**w**

**waist** 49:16,21
**wait** 4:21 28:15
41:22 42:8,13
46:18
**waited** 16:19
28:13 30:8
**waived** 86:13,21
**walk** 28:14
36:24 58:24
**want** 6:13 7:16
12:4 20:1,2
21:10 41:25
54:10 58:13
70:24 83:6
**wanted** 21:21
31:12,16 39:24
41:22 54:11
**wanting** 54:20
**warrants** 28:24
**waste** 38:18

**watching** 20:8
**way** 18:14 48:6
55:17 56:18,22
65:11 69:1,5,8
69:23
**wayne** 1:11 3:1
3:11,12 5:22
84:7 86:8 87:4,9
88:4,13 89:20
**we've** 28:25
**weapon** 27:7,9
40:11 41:17
58:5
**weapons** 26:13
26:16,18 27:11
27:24 28:3,9,12
57:20 64:20
**week** 15:1 23:19
**weeks** 15:1
81:15
**weight** 5:7 49:21
49:22 56:17
**went** 7:24 8:1
32:23 33:7
34:23,23 46:17
75:3 76:9
**west** 1:16 2:10
2:16 22:19,21,22
23:7 24:4,7
**whale** 45:7
**whatsoever**
64:24
**wheel** 45:13
53:16 58:18
**wheelchair**
16:19,23,23,24
38:4,9,9 46:5,8
46:24 47:20

**[wheelchair - york]** Page 20

75:3,4,7,9,12,18
75:21
**wheelchairs**
75:2
**whereof** 85:1
**white** 16:15 24:2
39:24,25
**wide** 10:14
**willis** 3:15 6:21
**window** 21:18
21:19 29:16,18
29:20,22 30:5
32:24 34:13
39:11 41:1 46:9
46:13,19 48:14
59:5
**witness** 12:24
31:9,15 42:17
43:5 47:7 48:4
54:17 56:21
65:21 71:5
80:19 84:12
85:1 86:8 87:1,4
87:11 88:1,4,15
**woman** 12:16
**wonderful** 6:23
**word** 55:17
70:25
**words** 4:13 35:9
72:1
**work** 9:2 10:5
37:9 51:14
54:20
**worked** 8:25
11:10 22:17
51:19
**working** 8:23,24
20:12 51:3

70:20
**world** 65:15,15
**wrecked** 12:13
**wright** 7:14
**write** 29:12
58:21
**writing** 15:4
29:22 33:5
58:24 59:7,8,13
69:23 84:11
**written** 11:19,21
12:7 29:10
78:25
**wrong** 32:3
70:25 83:8
**wysong** 1:14
84:3 85:6

**y**

**yeah** 5:22 7:4,5
7:13 9:22 12:24
18:17,22,22
21:12 24:2,20
26:11 28:21
29:19 33:14
36:22,23 40:25
41:4 44:21
49:19 52:14
54:19 71:20
79:3
**year** 9:9,25 11:9
12:19
**yearly** 11:5
**years** 4:5 6:10
8:12 9:3 14:2
28:2
**yell** 54:7

**yelled** 54:4
**york** 2:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.