Page 1

1            IN THE UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION AT DAYTON

4                       *    *    *

5    CLIFFORD OWENSBY,

6            Plaintiff,

7          vs.                 CASE NO.

                               3:21-cv-00343-MJN-CHG

8    CITY OF DAYTON,

9    et al.,

10           Defendants.

11                      *    *    *

12           Deposition of CLIFFORD OWENSBY,

13   Plaintiff herein, called by the Defendants for

14   cross-examination pursuant to the Rules of Civil

15   Procedure, taken before me, Karen M. Rudd, a

16   Notary Public in and for the State of Ohio, at

17   the offices of Dayton City Hall, 101 W. Third

18   Street, Dayton, Ohio, on Thursday,

19   February 9, 2023, at 9:21 a.m.

20                      *    *    *

21

22

23

24

25

Page 2

1                 EXAMINATION CONDUCTED       PAGE

2      BY MR. BAZELAK:.......................      4

3

4                    EXHIBITS MARKED

5      (Thereupon, Defendants' Exhibit 1,

6      rent receipts, was marked for

7      purposes of identification.)..........      34

8      (Thereupon, Defendants' Exhibit 2,

9      affidavit, was marked for purposes

10     of identification.)...................      63

11     (Thereupon, Defendants' Exhibit 3,

12     photo, was marked for purposes of

13     identification.)......................      74

14     (Thereupon, Defendants' Exhibit 4,

15     First Set of Interrogatories of

16     Defendant City of Dayton Directed to

17     Plaintiff Clifford Owensby, was

18     marked for purposes of

19     identification.)......................     124

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3      By:  James R. Willis
               Attorney at Law
 4             75 Erieview Plaza
               Suite 108
 5             Cleveland, Ohio 44114
               216 523-1100
 6             216 274-9915 fax
               jrwillis-barrister@sbcglobal.net
 7
        and
 8
               Clarissa A. Smith Attorney at Law
 9
        By:  Clarissa A. Smith
10             Attorney at Law
               1220 W. Sixth Street
11             Suite 308
               Cleveland, Ohio 44114
12             216 523-1100
               216 274-9915 fax
13             clarissa.a.smithesq@gmail.com
14      On behalf of the Defendants:
15             City of Dayton
16      By:  Leonard J. Bazelak
               Adam M. Laugle
17             Attorneys at Law
               101 W. Third Street
18             Dayton, Ohio 45402
               937 333-4100
19             937 333-3628 fax
               leonard.bazelak@daytonohio.gov
20             adam.laugle@daytonohio.gov
21                           *   *   *
22
23
24
25
```

Page 4

1              CLIFFORD OWENSBY

2    of lawful age, Plaintiff herein, having been

3    first duly cautioned and sworn, as hereinafter

4    certified, was examined and said as follows:

5                CROSS-EXAMINATION

6    BY MR. BAZELAK:

7         Q.    Good morning, sir.  My name is Len

8    Bazelak, and I'm an attorney for the City of

9    Dayton in the lawsuit that you've filed against

10   the city.

11             I'm going to ask you a series of

12   questions today.  It's called a deposition.

13   Have you ever had your deposition taken before?

14        A.    No.

15        Q.    All right.  Just a few ground rules

16   so that we're on the same page.  First of all,

17   you have to give audible or verbal responses to

18   my questions so our court reporter here can take

19   down your answers.  Okay?

20        A.    Yes.

21        Q.    All right.  You're doing well with

22   that.  So, secondly, if you don't understand one

23   of my questions, which certainly could happen in

24   this deposition, just please let me know, and

25   I'll try to rephrase the question so that it's

Page 5

```
 1  clarified.  Okay?
 2          A.   Yes.
 3          Q.   All right.  Another ground rule,
 4  again, for the benefit of the court reporter
 5  here, please let me finish my question before
 6  you start to respond so that we're not talking
 7  over each other.  It will make life much more
 8  difficult for our court reporter.  Does that
 9  make sense?
10          A.   Yes.
11          Q.   All right.  If you need to take a
12  break, sir, at any time, please let me know.  As
13  long as it's not during a pending question, feel
14  free to take whatever breaks that you need to.
15  Does that make sense?
16          A.   Yes.
17          Q.   All right.  Why don't you go ahead
18  and tell us your full name, please.
19          A.   Clifford Devaughn Owensby.
20          Q.   And what is your current address,
21  Mr. Owensby?
22          A.   1709 West Grand Avenue, Apartment 3,
23  Dayton, Ohio, 45402.
24          Q.   And who do you reside with, if
25  anybody, at the Grand Avenue address?
```

```
                                              Page 6

 1              A.   My two oldest children, CeeJaye
 2   Owensby, Clifford Owensby, Jr.
 3              Q.   So CeeJaye Owensby and Clifford
 4   Owensby are your two oldest children?
 5              A.   Correct.
 6              Q.   How old is CeeJaye?
 7              A.   She is about to be 17.  Well,
 8   actually, she is 17.  She was born 6-3-05.
 9              Q.   And then Clifford?
10              A.   He is 15.  He was born 3-5-07.
11              Q.   Have you ever been married, sir?
12              A.   No.
13              Q.   Other than CeeJaye and Clifford, do
14   you have any other children?
15              A.   Yes.
16              Q.   Okay.  Can you tell me their names
17   and ages?
18              A.   Yes.  Okay.  We've got Shevaughn
19   Owensby, and August 15th -- you've got to
20   forgive me, I'm -- I'm not like savvy with the
21   years.  It's kind of hard to remember each year.
22   But she is the third child, and I believe -- I
23   believe 2012 or '13.  I'm not sure the exact
24   year.
25                   Then you have Shyona Owensby.  Her
```

1  birthday is 11-05.  And the years is -- it's

2  kind of hard to keep up with the years when

3  you've got so many kids.  Those are my

4  biological children right there.

5          Q.    Okay.

6          A.    Then I have three that I help take

7  care of, as well.

8          Q.    Okay.  Who is CeeJaye and

9  Clifford's mother?

10          A.    Jasmine Lyna Hughes.  She's

11  deceased.

12          Q.    How did she die?

13          A.    I'm not sure what the ruling of her

14  death was, but she passed like -- she passed

15  maybe five, six years ago roughly.  I'm not sure

16  of the exact date, but it's been a while.

17          Q.    Okay.  And then the other two, I

18  think those were both girls?

19          A.    Correct.

20          Q.    Who is their mother?

21          A.    Shenae Campbell.

22          Q.    And where does she live?

23          A.    In Dayton, Ohio.

24          Q.    Do you know her address?

25          A.    I'm not sure of the address.

```
                                        Page 8

 1           Q.    And then the three kids that you
 2    help take care of, who is their mother?
 3           A.    One of them is Shenae Campbell,
 4    it's her child.  Then the other two is the woman
 5    that I'm currently with now.
 6           Q.    Okay.  And who are you currently
 7    with?
 8           A.    Chaniece Laney.
 9           Q.    L A N E Y?
10           A.    Correct.
11           Q.    Where does she live?
12           A.    In Dayton, Ohio.
13           Q.    Her address?
14           A.    I believe it's -- I'm not sure of
15    the address.
16           Q.    Okay.  So she is your current
17    girlfriend; is that correct?
18           A.    Correct.
19           Q.    All right.  And she has got --
20           A.    Two children.
21           Q.    -- two children who you help out
22    with?
23           A.    Correct.
24           Q.    Any other children?
25           A.    No.
```

1        Q.    When you say help out with, what do
2    you do in terms of helping out with those
3    children?
4        A.    Help them get to and from school.
5    Pretty much like clothes, food.  The same things
6    that I help out with with my children, as well.
7        Q.    Do you pay support for them at all?
8        A.    No support.
9        Q.    No court-ordered support?
10       A.    No.
11       Q.    Just some financial assistance?
12       A.    Correct.  I'm not on child support
13   for any of them.
14       Q.    Okay.  We're going to get into your
15   medical history, but is there anybody currently
16   that helps out with your own medical situation?
17            You said you live at Grand Avenue
18   in that apartment.  Is there somebody that comes
19   in and helps and assists you with your medical
20   care?
21       A.    At this time, I just get assistance
22   from my two oldest children mainly, and from
23   time to time I've got family members that come
24   and check in on me and stuff like that.
25       Q.    Before you started the deposition

1  here, you mentioned something about your mother.

2         A.    Uh-huh.

3         Q.    Does she help out with your medical

4  care?

5         A.    When she can, but she's usually

6  helping out my sister and her children, as well.

7         Q.    You have one sister?

8         A.    No, I have -- my mom has nine kids,

9  so --

10        Q.    Okay.

11        A.    Do you want me to run down those

12  names?

13        Q.    I don't, no.  Your mom helps out

14  with the other kids a lot, and then from time to

15  time helps out with you; is that fair?

16        A.    As much as she can, yes.

17        Q.    All right.  Let's talk about your

18  educational background.  I think you went to

19  Colonel White High School; is that right?

20        A.    Correct.

21        Q.    Did you graduate?

22        A.    Yes.

23        Q.    What year?

24        A.    2000.

25        Q.    Any education past high school?

Page 11

1        A.   I have some college education,

2  Sinclair.

3        Q.   When did you take classes at

4  Sinclair?

5        A.   I'm not sure of the year, but it

6  was quite a while after I graduated.  Maybe

7  2013.  I took up business management and real

8  estate.

9        Q.   How many classes did you take at

10  Sinclair?

11        A.   I can't remember the exact amount

12  of classes, but I did drop out, so --

13        Q.   So you didn't get any type of

14  associate's degree or anything from Sinclair,

15  but you did take a few classes; is that fair?

16        A.   Correct.

17        Q.   And that was around the 2013 time

18  frame?

19        A.   Correct.

20        Q.   All right.  Any other formal

21  training or education after high school?

22        A.   No.

23        Q.   Did you do any sports or anything

24  in high school?

25        A.   No.

Page 12

1          Q.   We're going to talk about your

2    employment and businesses and the work that

3    you've done since high school, but other than

4    that, I mean, what do you like -- what are your

5    hobbies?  What do you like to do?

6          A.   I like to draw.  I also do poetry.

7    I'm pretty acrobatic.  I like to do flips and

8    stuff pretty much, like gymnastics.  I like to

9    work with my hands.

10         Q.   All right.  After high school, can

11   you kind of take us through your employment,

12   jobs that you've had since high school?

13         A.   It's going back, but I can do my

14   best.  I remember having -- well, you said after

15   high school, right?

16         Q.   Right.

17         A.   Okay.  So I remember being employed

18   at Arby's.  That was my first real job outside

19   of, you know, I was in the youth program

20   where -- Jobs for Graduates, and stuff like

21   that, where we rode on the back of the

22   paramedics and with the firefighters and on

23   their routes and had to do training and stuff

24   like that, but -- you know, running in and out

25   of burning buildings and carrying like the test

1   dummies, stuff like that, with apparatus, full

2   gear and stuff like that on.  Other than that --

3           Q.   Was that a full-time job?

4           A.   It was like a summer program.

5           Q.   Okay.  How long did you do that?

6           A.   Three or four years.

7           Q.   Just in the summers though?

8           A.   Correct.

9           Q.   Is that while you were working for

10  Arby's?

11          A.   No.  No, that was -- that was

12  pretty much before Arby's.

13          Q.   Okay.  How long did you work for

14  Arby's?

15          A.   Arby's lasted, I'm thinking, maybe

16  six months max.

17          Q.   Okay.  What's the next thing you

18  remember?  Kind of go as chronologically as you

19  can.

20          A.   Right.  Jiffy Lube.  I used to work

21  at Jiffy Lube changing oil and doing mechanic

22  work.  After Jiffy Lube, I remember doing

23  deliveries for like Macy's and Lazarus.  And we

24  delivered not only furniture and stuff, but

25  appliances and stuff, as well.  I did that for a

1  few years.  And then after that, I got into real

2  estate.

3          Q.    Anything else you can remember in

4  terms of any significant employment with any

5  employers before you got into the real estate?

6          A.    Well, around the same time and

7  still after, like during the time I was in the

8  real estate, I worked for the City of Dayton

9  Water Reclamation Plant, waste treatment plant.

10         Q.    When did you do that?

11         A.    I can't remember the exact year,

12  but I did do it for a couple of years.

13         Q.    Do you remember who you worked for

14  out there?

15         A.    The waste treatment water plant

16  right off of Nicholas Road.  I got that job

17  through a temp agency, but it lasted for a

18  couple years until the contract was up, and then

19  pretty much was let go after that.

20         Q.    Okay.  Anything else?

21         A.    Pretty much, you know, just like

22  working for myself, you know, to try to build my

23  career after that.

24         Q.    When was the last time that you had

25  any type of like employment with an employer

Page 15

1   working for somebody else, getting a paycheck

2   from an employer?

3           A.    That was the City of Dayton, the

4   water reclamation plant.

5           Q.    And you don't remember when that

6   was?

7           A.    Not exactly.

8           Q.    Ten years ago?

9           A.    It's 2023 now.  I can't remember

10  the exact year, but I'm sure that once I look in

11  my paperwork, I can probably figure that out.

12          Q.    So all the jobs that you talked

13  about, that's basically how you generated income

14  and survived financially up until the time that

15  you went into like real estate?

16          A.    Correct.

17          Q.    Okay.  And so when did you start

18  getting into the real estate?

19          A.    It was -- it was, I want to say,

20  2013, because it was at the same time that I was

21  going to Sinclair taking up the classes and

22  stuff.

23          Q.    Okay.  So from 2000 to essentially

24  2013, after you graduated from high school, you

25  told us kind of all the jobs that you had to

1   make income and pay your bills, do whatever --

2          A.    Uh-huh.

3          Q.    -- until about 2013, when you

4   started taking classes -- some classes at

5   Sinclair, and then got into real estate?

6          A.    Correct.

7          Q.    All right.  When you say you got

8   into real estate, what did you do?

9          A.    I was -- started off like just

10  working with like -- like people just, you know,

11  helping fix up their like properties and stuff

12  like that.  And, you know, I found a love and

13  then started doing the stuff for myself.

14         Q.    And so it sounds like you did hook

15  up with some business that did that?

16         A.    Just like if people needed help

17  with stuff like that, they will call me and see

18  if I was available pretty much.  So it wasn't

19  like a full-time job.  Call it a hobby.  But I

20  liked it.

21         Q.    Who would call you when you first

22  got started?  This is like rehabbing properties?

23         A.    Correct.

24         Q.    Is that what you're talking about?

25         A.    Correct.  I started out with

1   Habitat of Humanity, so that's where I kind of

2   picked up on the trade and skills, volunteer

3   work.

4           Q.    All right.  And then did you start

5   doing that as a way of generating income for

6   yourself, or when did that happen?

7           A.    Can you rephrase that question for

8   me?

9           Q.    Yeah.  So you said you got into

10  real estate.  And I'm just wondering how you

11  made money doing that.

12          A.    Well --

13          Q.    It sounds like Habitat was a

14  volunteer job, but eventually --

15          A.    Yeah, but that was just to get the

16  skills that I needed to be able to -- you know,

17  be able to do anything.  So I basically picked

18  up on -- from all the skills that I learned, and

19  I used them to my advantage to help other people

20  and save the money up until I was able to afford

21  my own property.

22          Q.    Okay.  So you would get just paid

23  by -- who would you get paid by to save the

24  money up?

25          A.    Well, from the previous jobs and

1    stuff that I had, I had money saved up.  And

2    then like I would work for churches and stuff

3    like that, you know, to get whatever funds that

4    I could to save up and stuff like that.

5            Q.    All right.  Eventually you formed

6    some type of -- you formed several types of

7    businesses over the years I think since 2013.

8            A.    Uh-huh.

9            Q.    One of them was called CeeJaye and

10   CJ Home Improvement, and then CeeJaye and CJ

11   Lawn Care, LLC?

12           A.    Correct.

13           Q.    Tell me about those businesses.

14   What are those businesses?

15           A.    The home improvement is pretty much

16   self-explanatory.  We rehab residential homes,

17   painting, flooring, drywall, roofing.

18   Everything but concrete work.  I didn't really

19   get a chance to learn that much of that concrete

20   work, so --

21           Q.    All right.  It looks like those

22   businesses were formed in like the 2017 time

23   frame?

24           A.    Correct.

25           Q.    Does that make sense?

1          A.     Correct.

2          Q.     What I'm trying to get an

3    understanding of, Mr. Owensby, is since 2013,

4    where you went to the real estate classes, and

5    then you said you would just go to churches and

6    work and just make some money --

7          A.     Side jobs.

8          Q.     -- doing odd jobs, side jobs,

9    right --

10          A.     Uh-huh.

11          Q.     -- from that time up until the time

12    you organized your business, was it just the

13    same, you would just do odd jobs, or did you --

14          A.     No, I was --

15          Q.     Were you in business and just

16    not --

17          A.     I was still working for contractors

18    and stuff doing the deliveries, like the

19    furniture and the appliances and stuff.

20          Q.     Okay.  Really, I'm just trying to

21    figure out the sources of your income over the

22    years.  That's kind of really -- so if you can

23    tell me what you remember back during that time

24    frame of any sources of income that you had,

25    whether it was working for somebody, who you

Page 20

1    worked for, your own self-employment income, and

2    how you generated that income, that's what I'm

3    interested in.

4             A.   Right.  I also got a settlement

5    from a couple car accidents and stuff like that,

6    so that's where some of the income came in, as

7    well, which really, you know, boosted me to be

8    able to provide for myself on the first property

9    that I invested in, so --

10             Q.   Okay.  We'll talk about those.  I'm

11    just going to go through -- as a way to organize

12    this, just kind of go through your other

13    businesses, and if you can tell me about those.

14    Daniels Industrial Cleaning Service, do you know

15    what that is?

16             A.   Yes.

17             Q.   What is that?

18             A.   A cleaning service that I own.  I

19    started that.  That was one of the first

20    businesses that I started to, you know, try to

21    get, you know, contracts to be able to -- you

22    know, just doing like -- started cleaning out

23    houses and like a lot of cleaning and stuff like

24    that.  But it wasn't -- I didn't have that many

25    employees, so that didn't last long at all.  So

Page 21

1    if you want to call it a failed business --

2          Q.    Okay.   You mentioned employees.

3    Did you have employees for Daniels Industrial?

4          A.    Family members that I worked with.

5          Q.    Which family members were your

6    employees for that business?

7          A.    My little brothers, Storm Smith and

8    Sean Smith.

9          Q.    Okay.   Did you ever have like

10   actual employees for CeeJaye or CeeJaye and CJ

11   Lawn Care?

12         A.    No, I just do subcontractors.

13         Q.    When you say you do subcontractors,

14   tell me about that.   What do you mean?

15         A.    Finding contractors that can

16   actually do the work, and then I hire them to

17   give me estimates on the job, and then put my

18   price on top of it to benefit from the business.

19         Q.    Who are the subcontractors that you

20   work with for CeeJaye?

21         A.    One of them -- let me tell you the

22   exact name.   Hold on.   Wireman Services.

23         Q.    Wireman, W I R E M A N?

24         A.    Correct.   And that's an

25   electrician.   Because I got it in my emails.   I

Page 22

1    don't want to tell you the wrong name.  White's

2    Plumbing.  Let me see.

3           Q.   Who is Wireman -- and I'll let you

4    finish, but Wireman Services, who is the actual

5    person that runs that business and subcontracts

6    with you?

7           A.   I believe it's Jody Williams.  I

8    think that's his last name.

9           Q.   Do you have any contact

10   information --

11          A.   Yes.

12          Q.   -- for Jody Williams?

13          A.   Yes.  (937) 613-4277.

14          Q.   Okay.  He is an electrician?

15          A.   Correct.

16          Q.   And then White's -- did you say

17   White's Plumbing?

18          A.   White's Plumbing.

19          Q.   Who is that?

20          A.   I can't remember the exact person,

21   because they had a crew that they had come in.

22   So I'm not sure.  I can't remember the name of

23   whoever was running the show.

24               But I got rid of them, because

25   they -- they basically did faulty work and kept

```
 1   complaining about having bigger contracts that
 2   they needed to -- you know, that they were
 3   basically trying to focus on instead of doing
 4   the proper work that needed to be done.  So I
 5   had to get rid of them.
 6          Q.   So when you -- let's just go
 7   through.  Any other subcontractors that you can
 8   tell me about over the years?
 9          A.   I can't remember everybody's name
10   just right offhand.  I have to do some research
11   to be able to get you the names of businesses
12   and stuff, but I can get them for you.
13          Q.   All right.  If you can do that and
14   provide those names and contact information of
15   the businesses and individuals involved in those
16   companies that do work for you --
17          A.   Uh-huh.
18          Q.   -- over the years for your
19   businesses, and provide that to your attorney.
20          A.   Uh-huh.
21          Q.   Okay?  And then also any -- other
22   than the names and info, any -- well, let me
23   just ask you, do you have any documentation with
24   regard to your contracts, subcontracts, with all
25   these companies that have done work for you?
```

1          A.    A lot of them are just verbal

2     contracts or like, you know, handshake and stuff

3     like that.  But I don't have a lot of

4     documentation, because I wasn't -- I wasn't sure

5     if they were going to be able to complete the

6     jobs and stuff like that.  I was just testing

7     them out to see the type of work and stuff they

8     did.

9          Q.    When you say jobs, can you give me

10    some of the major jobs that you did with CeeJaye

11    over the years?  Did you have regular repeat

12    customers?  Did you --

13         A.    Pretty much word of mouth.  Pretty

14    much word of mouth.

15         Q.    Can you tell me a couple jobs that

16    you did for CeeJaye with these contractors?

17         A.    Let's see.  Fixed up 1954 West

18    Grand Avenue.

19         Q.    Is that one of your properties?

20         A.    Correct.  Also 3643 Dandridge

21    Drive, 4704 Forsythe, 4651 Bluehaven, 330 Middle

22    Street.

23         Q.    So -- do any other ones come to

24    mind?

25         A.    Not right offhand.  I can pretty

Page 25

1   much try to get you a list of those.

2        Q.   It sounds like you would purchase

3   properties yourself or through your business and

4   then you would hire people or do the work

5   yourself up until a certain point, or

6   subcontract people -- and subcontract people and

7   then fix up the house and try to sell them to

8   generate some money?

9        A.   Or rent them out.

10       Q.   Or rent them out?

11       A.   Uh-huh.

12       Q.   Okay.  So those are pretty much the

13  jobs that you talked about?

14       A.   The main ones.

15       Q.   There may be some other ones, but

16  that's the main thing that you did over the

17  years?

18       A.   Correct.

19       Q.   All right.  And any other employees

20  that you had that helped you or subcontractors

21  that helped you do that work that you can recall

22  at this time?  I know you're going to check on

23  that and provide that to your attorney.

24       A.   Not right offhand.

25       Q.   All right.  What is Surge Services?

1          A.    A company that I started that I

2    wanted to be able to try to do multi -- multiple

3    things that didn't last for me, as well.  So

4    another failed business opportunity.

5          Q.    What was the business supposed to

6    do?

7          A.    Pretty much you name it.  Lawn

8    care, home improvement, anything that -- any

9    services that you can think of that's needed.

10          Q.    Who helped you organize these

11    businesses?  Did you have an attorney do that

12    for you?

13          A.    No.

14          Q.    You did that on your own?

15          A.    Correct.

16          Q.    Have you had an accountant that has

17    helped out with any of your businesses to help

18    you with taxes and financial matters?

19          A.    No.

20          Q.    Who has helped you at all with

21    filing of taxes for the businesses or you as an

22    individual over the years?

23          A.    My mother.

24          Q.    Does she have any background or

25    training?

Page 27

1          A.    Yes.

2          Q.    What is her background and

3    training?

4          A.    She's a tax accountant now.

5          Q.    When you say now, when did she get

6    that?

7          A.    Well, she has plenty of -- let me

8    see, plenty of experience with filing taxes and

9    like helping other people file their taxes and

10   stuff like that.  That's what she does.  I'm not

11   sure what you want to call the name, but, I

12   mean, if you want to ask her, she can probably --

13         Q.    Okay.

14         A.    -- give you whatever answers that

15   you need.

16         Q.    Would she have records or documents

17   pertaining to your businesses and tax filings

18   and things like that?

19         A.    I believe so.

20         Q.    And all of these businesses are

21   what are called LLCs.  Are you the only member

22   of the corporations?

23         A.    Yes.

24         Q.    No other -- no one else has a share

25   in these companies other than you?

Page 28

1          A.    Correct.

2          Q.    Your mom doesn't have a share in

3    them?

4          A.    No.

5          Q.    All right.  Let's talk about then

6    the properties that you own, sir.  Can you tell

7    me what properties -- that's the disadvantage of

8    opening the windows.  Nice temperature in here,

9    but that's going to happen.

10               So tell me what properties -- let's

11   just start with properties that you currently

12   own.  Can you tell me those?

13         A.    Do you want the names of them or

14   the addresses?

15         Q.    The addresses, yeah.

16         A.    Okay.  330 Middle Street, 2049

17   Rustic Road, 1954 West Grand Avenue, 3643

18   Dandridge Drive, 1300 West Hillcrest, 30 and 32

19   Cambridge Drive, 912 Westwood.

20         Q.    4651 Bluehaven?

21         A.    That's an old address.  I sold that

22   one.

23         Q.    Okay.  You sold the property on

24   Bluehaven?

25         A.    Correct.

1          Q.    Is that one of the ones that you

2     fixed up and sold?

3          A.    Correct.

4          Q.    Did you make a profit out of that?

5          A.    Yes.

6          Q.    How much?

7          A.    About 40 to 50 grand probably.

8          Q.    When did you sell that?

9          A.    Last year.

10         Q.    2022?

11         A.    This has went into 2023.  So it

12    might have been 2021.  But I can get you those

13    records.

14         Q.    Was it after this incident?

15         A.    Yes.

16         Q.    Okay.  Other than the Bluehaven

17    one, any other properties that you owned before

18    and then fixed up and sold for money or profit?

19         A.    Yes.  4704 Forsythe.

20         Q.    And what was your profit from that

21    rehab?

22         A.    I think like maybe 10,000.

23         Q.    Any other ones you can recall right

24    now?

25         A.    Not -- not at the time, no.

Page 30

1          Q.   All right.  When did you sell the
2   Forsythe property?
3          A.   I'm not sure what year it was, but
4   it was -- it was before -- let me see.  I'm sure
5   it's in the -- in the auditor's, the county
6   auditor's.  I'm not sure.
7          Q.   Okay.  The ones that you said that
8   you currently own, you live in the West Grand
9   one, right?
10         A.   No.
11         Q.   Oh.  Is that a different West Grand
12  address?
13         A.   1709 West Grand is where I live at
14  now.
15         Q.   That's right, 1709 West Grand.  But
16  1954 you currently own too?
17         A.   Correct.
18         Q.   Do you own 1709?
19         A.   No, I do not.
20         Q.   You rent that?
21         A.   Correct.
22         Q.   Who is your landlord there?
23         A.   Enhanced Estates.
24         Q.   Who is Enhanced Estates?  Like is
25  there a person that you deal with?

Page 31

1          A.    Jamila Cobb.

2          Q.    How much do you pay in rent?

3          A.    Right now, it's like 1,375,

4     utilities included.

5          Q.    And that's a house?

6          A.    It's a three-bedroom like loft

7     apartment type.

8          Q.    Okay.  You said it was Apartment --

9          A.    3.

10         Q.    3, yeah.

11         A.    Uh-huh.

12         Q.    Okay.  So do you rent out, then,

13    these other properties, 330 Middle, the Rustic

14    one, the 1954 West Grand, Dandridge, Hillcrest,

15    Westwood, Cambridge?

16         A.    Correct.

17         Q.    Do you rent out all of those

18    currently?

19         A.    Yes.  Yes.  Well, not Cambridge,

20    but all the rest of them other than Cambridge

21    and Hillcrest.

22         Q.    And did you -- and you purchased

23    all of those properties, or did you -- did you

24    get -- did you -- how did you acquire all of

25    those properties?

Page 32

1          A.   Yeah, when I got them, they wasn't

2    rentable.  I had to put money into them in order

3    to get them rehabbed and ready to rent.  So they

4    were pretty much fixer uppers, so I got them

5    kind of cheap.

6          Q.   I mean, did you go through -- like

7    the city has a program to give out, you know,

8    vacant, abandoned, dilapidated properties.  Did

9    you ever go through that, or who did you --

10         A.   They were private owners.  Private

11   owners.

12         Q.   And you would pay a cheap price for

13   those because they were in bad condition?

14         A.   Correct.

15         Q.   And you would fix those up, and

16   then you've rented those out?

17         A.   Rented them out, correct.

18         Q.   All right.  We're going to go into

19   the rental income that you receive.  Can you

20   tell me basically for each of these properties

21   what your rental income is for those?

22         A.   Yes, I can.

23         Q.   What is it?

24         A.   Let's see.  For -- which property

25   do you want to start at?  Give me my list, and I

Page 33

1    can tell you.

2         Q.   Let's start Middle Street.

3         A.   Middle Street, let's see, $850 a

4    month.

5         Q.   Okay.  Let's go Westwood.

6         A.   600 a month.

7         Q.   All right.

8         A.   Are you talking about now or then,

9    because --

10        Q.   Well, let's talk about, say, in the

11   last year, because I'm going to show you some

12   receipts that we got that you prepared for 2021.

13        A.   Right.

14        Q.   600 in 2021 for Westwood?

15        A.   It was 550 at first, but then it

16   went up, so I'm not sure which.

17        Q.   Okay.  Let's go -- Bluehaven you

18   sold, right?

19        A.   Correct.

20        Q.   Let's go Rustic Road.

21        A.   $850 a month.

22        Q.   1954 Grand?

23        A.   550 each unit, I believe.

24        Q.   How many units?

25        A.   Four units.

Page 34

1          Q.    Four units?

2          A.    Correct.

3          Q.    Any other rental properties that

4    you can think of that we haven't talked about?

5          A.    No.

6                (Thereupon, Defendants' Exhibit 1,

7    rent receipts, was marked for purposes of

8    identification.)

9    BY MR. BAZELAK:

10         Q.    Mr. Owensby, I'm showing you what

11   has been marked as Defendants' Exhibit 1.  Can

12   you identify what these are?

13         A.    Yes, these are rent receipts.

14               MS. SMITH:  Take a look at all of

15   them.

16   BY MR. BAZELAK:

17         Q.    They are receipts that were signed

18   by you for rental payments made to you; is that

19   fair?

20         A.    Correct.

21         Q.    All right.  And it looks like the

22   dates on them are for 4-1-2021 up until --

23         A.    Are these copies or the same?

24               MS. SMITH:  I'm assuming all the

25   pages are different.  They have different dates

Page 35

1    on them.

2              THE WITNESS:  Okay.

3    BY MR. BAZELAK:

4         Q.    The dates are up at the very top.

5    Did you fill these out?

6         A.    Yes.

7         Q.    All right.  4-1-2021 and then the

8    last one is 7-1-2021.  If we can go through

9    them.  There's one for 1954 Grand, correct, West

10   Grand?

11        A.    Correct.

12        Q.    912 Westwood, right?  It's the

13   second page.

14        A.    Yeah.  Okay, it has different

15   multiple addresses on there.  But yes, I'm

16   following you.

17        Q.    330 Middle Street is at least one

18   there?

19        A.    Correct.

20        Q.    There's one for Bluehaven.  So that

21   was maybe before you sold the property?

22        A.    Correct, before I sold the

23   property.

24        Q.    There's Rustic Road, correct?

25        A.    Correct.

1          Q.    Westwood, Derrick Hutchinson?

2          A.    Yeah.   I thought we already said

3    that one, but yes.

4          Q.    Okay.

5          A.    I didn't hear you say Middle

6    Street.

7          Q.    Yeah, Middle Street is in there

8    too.   So those are your -- the people that have

9    paid you these rental payments are identified on

10   there.   So David Dewberry, he rents out -- he's

11   one of the renters of 1954 Grand?

12         A.    Correct.

13               MR. BAZELAK:  Do you want to go

14   ahead and take a short break?

15               MR. WILLIS:  Two more minutes.

16               MR. BAZELAK:  All right.  I'm sure

17   I won't get to a logical stopping spot in two

18   minutes, but that's fine.

19               MR. WILLIS:  It doesn't make any

20   difference.  We can go now.

21               MR. BAZELAK:  It doesn't.

22               MR. WILLIS:  I'm hoping they answer

23   promptly.

24   BY MR. BAZELAK:

25         Q.    Let's do this first, and then we

Page 37

1   will probably take a short break, and that is

2   these are only rental receipts that we requested

3   in the discovery process and they're from April

4   of 2021 to July of 2021.  Why aren't there any

5   other receipts other than from those dates?

6           A.   Because that was probably six

7   months prior to -- I didn't know that I needed

8   to have all of them, but I can provide those if

9   need be.

10          Q.   All right.  So is it fair to say

11  that through this lawsuit, you got a request

12  maybe from your attorney to provide basically

13  proof of rental income, and you just went

14  through and just prepared all these receipts for

15  the times that you can recall, or how did that

16  work?

17          A.   No.

18          MS. SMITH:  We'll object on the

19  basis of attorney/client privilege,

20  conversations had between us and our client.

21          MR. BAZELAK:  That's fair.

22  BY MR. BAZELAK:

23          Q.   I'm not asking you about any

24  conversations that you had with your attorney.

25  But in terms of gathering documents for this

Page 38

1    case, as a plaintiff in the case, what did you

2    do in order to provide the proof of your rental

3    income?  How did you prepare these?

4            A.    I made copies from my receipt book.

5            Q.    All right.  And, again, why didn't

6    you just go through and do every rental other

7    than from just five months during 2021?

8            A.    I'm not sure.  I didn't think that

9    it was necessary.

10               MR. BAZELAK:  All right, let's take

11   a short break.

12               (Recess taken.)

13   BY MR. BAZELAK:

14           Q.    We're back on the record, sir.

15   Before we took the break, we were kind of

16   talking about your rental income.  And, again,

17   you have in front of you that Defendants'

18   Exhibit 1 that we identified.  And this was the

19   information that we received as proof of your

20   rental income over the years.  And it sounds

21   like this isn't all.

22           A.    Correct.

23           Q.    Correct?

24           A.    Correct.

25           Q.    So there's additional rental

1   payments or cash payments, check payments,

2   whatever it is, from your tenants --

3          A.   Uh-huh.

4          Q.   -- that have been made that are not

5   reflected in Defendants' Exhibit 1, right?

6          A.   Correct.

7          Q.   All right.  And you said that you

8   could provide that?

9          A.   Yes.

10          MR. BAZELAK:  And I don't know what

11  our specific request was, Clarissa, in terms of

12  how far back.

13  BY MR. BAZELAK:

14          Q.   But if there's anything else that

15  you can provide in response other than this

16  five-month period, we would ask that you do

17  that, provide that to your attorney, okay?

18          A.   Yes.

19          Q.   And are all these tenants -- this

20  is, again, four or five months in 2021, are they

21  still currently your tenants?

22          A.   Yes.  Well, all but Daniel

23  McDougal.  I have a new tenant in that

24  apartment.  As well as Andrea Alexander, she

25  don't stay at Apartment 2 anymore, but she is a

Page 40

1    tenant at 330 Middle Street.

2         Q.   Okay.   Do you have a new tenant,

3    then, at Apartment 1?

4         A.   Yes.

5         Q.   Who is that?

6         A.   Cedric Mac -- let me see what his

7    last name is.   One second.   He just moved in

8    there a few months ago.   Cedric Douglas.

9         Q.   Okay.

10        A.   And that's currently.

11        Q.   Okay.   Maybe you can tell us this,

12   how much do you estimate that you make on a

13   monthly basis in rental income?

14        A.   It's in between four and five

15   thousand a month.

16        Q.   Has that been pretty consistent

17   then?

18        A.   Yes.

19        Q.   For how long?

20        A.   For the last few years.

21        Q.   When you say few years, since 2013,

22   '14, '15?

23        A.   It gradually increased as I

24   purchased other properties, so it -- you'll see

25   an incline or increase over the time from my tax

Page 41

1    returns.

2           Q.    All right.  We'll get into your tax

3    returns.

4           A.    Uh-huh.

5           Q.    But let's just go back to, say,

6    2015.  So can you give us an estimate of like

7    just rental income in '15?

8           A.    I got -- I can't, not right

9    offhand.  I'd have to look and see.  I don't

10   want to tell you the wrong number, so I just --

11   I'll have to look at it.

12          Q.    All right.  And, again, you would

13   have documentation of those rental payments --

14          A.    Receipts, yes.

15          Q.    -- back through that time?

16          A.    Correct.

17          Q.    So my next question is when you get

18   these -- it looks like there's a lot of cash

19   payments.  You're writing out receipts, right?

20          A.    Correct.  Some money orders, but,

21   you know --

22          Q.    So where are you depositing these

23   rental payments?

24          A.    Well, sometimes I keep a shoe box

25   and stuff like that.  I like to keep my cash at

Page 42

1    home.

2         Q.   Okay.  So you had some cash that

3    you keep at home, and then do you have bank

4    accounts that you deposit money into?

5         A.   Bill money.  The bill money I

6    deposit into the bank accounts.

7         Q.   Okay.  Where is that?

8         A.   Wright-Patt Credit Union.

9         Q.   Anywhere else?

10        A.   Nope.

11        Q.   So say back through 2015, any

12   rental payments that you received you would have

13   either kept in cash or deposited in the

14   Wright-Patt account?

15        A.   Just the cash that I keep at home.

16   The only money I put in the bank is for the

17   bills that I need to pay out.

18        Q.   So let's say starting from the 2015

19   time frame, you said you started generating more

20   and more cash rental receipts and rent payments.

21   How much cash would you have had on hand, say,

22   from 2015 forward?

23        A.   I don't know.

24        Q.   And with regard to any other income

25   that you would receive through your real estate

Page 43

1  transactions, buying -- the Bluehaven one you

2  sold.  Would the proceeds for that go into any

3  bank accounts?

4          A.    From the rental -- the sale of the

5  property?

6          Q.    Right.

7          A.    Correct.

8          Q.    To Wright-Patt?

9          A.    Yes.

10          Q.    All right.  And any other income

11  that you would receive from just general work,

12  like subcontracting out and doing work on houses

13  or rehabbing or lawn care, whatever it is --

14          A.    Uh-huh.

15          Q.    -- that income, you would either

16  keep that income in cash, or if you needed to

17  deposit it, it would be in that Wright-Patt

18  account?

19          A.    Yes.  I usually keep the cash

20  though.  I don't like keeping a lot of money in

21  the bank.

22          Q.    All right.  So in terms of -- and

23  we'll talk about your income, because we have

24  your tax -- I think we were provided your tax --

25  at least your summary sheets for your taxes for

Page 44

1    several years.  But in terms of savings, money

2    that you had saved, can you give us any idea as

3    to money that you had saved, say, from 2015

4    forward?

5           A.   I don't know.  I don't want to just

6    throw a number out there, you know, and not be

7    accurate, so I don't know.

8           Q.   Well, is it fair to say that the

9    money that was recovered in this particular case

10   regarding your incident was approximately

11   $22,500, right?

12          A.   Correct.

13          Q.   And it's my understanding that you

14   had indicated that that was basically money that

15   you had saved, correct?

16          A.   From rental properties and stuff

17   like that, yes.

18          Q.   Yeah.  So my question is how long

19   had you saved that money and when did you

20   generate that savings?

21          A.   It would have been over a period of

22   time.  But that wasn't just the rental income

23   money, that was like from the PPP loan that I

24   had got.  So some of that money was from the PPP

25   loan.

Page 45

1          Q.   All right.  Let me just ask you
2    about that, because -- and we're going to get
3    into that PPP money, but I don't believe --
4    correct me if I'm wrong, but I don't believe you
5    mentioned anything about the PPP loan being the
6    source of that $22,000 at the time of this
7    incident.  Did you?
8          A.   They didn't ask me exactly like
9    where all the money came from.  Like I told them
10   that, you know, it's part of my savings and --
11         Q.   I understand.  But I'm just saying
12   you never indicated that this money is from a
13   PPP loan.  You never told that to the police or
14   anybody after this incident?
15         A.   No one really ever interviewed me
16   to ask me any of that information, sir.
17         Q.   All right.  But you indicated it
18   was from savings though.  You were interviewed
19   in this case, and you indicated --
20         A.   I was in the back of the cruiser
21   when they was asking me that stuff, so I was
22   just telling them -- I didn't get a chance to
23   explain everything.  They were trying to arrest
24   me, so -- you understand.
25         Q.   That's fine.  If you'd just answer

Page 46

1    my question though.  You never explained that

2    the money that you had in the vehicle, the

3    22,000 plus dollars, you never -- you never

4    volunteered that information that that was from

5    PPP proceeds, did you?  Yes or no.

6             A.    Correct.

7             Q.    All right.  But here today you're

8    telling me that some of that money that you had

9    in terms of cash in the vehicle on the date of

10   this incident was from some federal money that

11   you were provided through the PPP program

12   related to your businesses, correct?

13             MS. SMITH:  We'll object.  I mean,

14   I think that's what he said, that part of it was

15   savings, including money he got from his PPP

16   loan.

17   BY MR. BAZELAK:

18             Q.    Do you know how much of it was

19   related to the PPP?

20             A.    Well, I got 18,000 from PPP.

21             Q.    Okay.  All right.  And when did you

22   get the PPP money?

23             A.    I'd have to check my records.

24             Q.    All right.  By the records that we

25   were provided in discovery, it looks like in May

Page 47

1   of 2021, that there was a deposit of about

2   $18,193 -- no, that's the balance.  It was a

3   total of just 18,000, you're right.  $18,000 of

4   a deposit, and it says PPP funding, and that was

5   deposited in the Wright-Patt Credit Union

6   account in May of 2021.

7            A.   Correct.

8            Q.   Do you agree with that?

9            A.   Correct.

10           Q.   And then you also on the same day

11   withdrew 18,000 of cash?

12           A.   Correct.

13           Q.   All right.  So was the 18 -- was

14   the $22,000 that you had in the car that day,

15   was it from this PPP money?

16           A.   Most of it, but the rest would have

17   been from my rental income, sir.

18           Q.   All right.  Now, I think we've

19   asked in discovery for any documentation related

20   to your whole application process to get that

21   PPP money.  Have you looked into that?

22           A.   That was done online, so I don't

23   have any of that information right now.

24           Q.   Well, have you asked whether you

25   could get that from the website that --

Page 48

1          A.    It's no longer available.  It's no

2     longer available.

3          Q.    Have you investigated that?

4          A.    Can't sign in.  I tried to sign in,

5     but it won't -- it won't -- there's nothing I

6     can do about it.  The link was expired.

7          Q.    Did you try to set up a new account

8     and get into your information?  Usually if it's

9     your account, you can get in and get the

10    information that you submitted.

11         A.    I didn't know I had that option.

12         Q.    Okay.  Well, again, I'd ask that

13    you again try to get any documentation regarding

14    your application for PPP funds with the federal

15    government back when you did that, whether it's

16    online or through them, and provide that to your

17    attorney.  Okay?

18         A.    Can you re --

19         Q.    Any documentation related to your

20    PPP application.

21         A.    It was done online, so I don't -- I

22    don't have the application to be able to tell

23    you.

24         Q.    Well, whether it was online or in

25    paper, you should be able to get access to

Page 49

1    printouts or documentation.

2              A.   I haven't been able to get into the

3    system to be able to do that.  That's what I'm

4    explaining to you.

5              Q.   All right.  Again, I would request

6    that you get into the account to get any

7    information that you have.  You said it expired,

8    but you said you haven't tried to establish a

9    new account and get that information.

10             A.   I wasn't aware you can establish a

11   new account.

12             Q.   That's what I'm asking you to do is

13   to check into that and see if you can get that

14   documentation.  That's all I'm asking.

15             A.   No problem.

16             Q.   All right.  All right.  Again, I

17   want to just kind of take it back to the 2015

18   time frame.  And do you know approximately what

19   your total income, whether it's rental income,

20   work that you did in your businesses, profit

21   from selling properties, what your total income

22   was say back in 2015?

23             A.   I'm not sure.

24             Q.   Approximately?

25             A.   I'm not sure.

1          Q.    2016?

2          A.    I'm not sure.

3          Q.    All right.  We've got from tax

4    period through December 2017 it looks like you

5    had an adjusted gross income of $15,133.  Does

6    that sound right?

7          A.    I'm not sure, but if that's what

8    the document says -- I'd have to take a look at

9    it.

10         Q.    Do you want to take a look at it?

11         A.    No problem.

12         Q.    Again, this is -- again, these are

13   documents that were provided to us by your

14   counsel I think during our -- during the case.

15   And I won't mark that, but I'll just show that

16   to you.

17               MR. BAZELAK:  I probably have an

18   extra copy here for you, Clarissa.

19               MS. SMITH:  Thank you.  I can just

20   look at this one.

21               THE WITNESS:  It looks accurate.

22   BY MR. BAZELAK:

23         Q.    Again, this is -- this document

24   that I just showed you is from the Internal

25   Revenue Service, right?

1          A.    Correct.

2          Q.    And it's not the tax return that

3   you filed, it's just kind of a summary sheet

4   regarding your account for that year, correct?

5   Is that what it looks like?

6          A.    Yes, that's fair to say.

7          Q.    And it goes through what your

8   income was, what your potential like refund was,

9   what payments were made, things like that,

10  right?

11         A.    I believe so.

12         Q.    And in 2013 -- '17, I'm sorry, it

13  looks like again your adjusted gross income was

14  about $15,133, right?

15         A.    I believe so.

16         Q.    All right.  In 2018, it looks like

17  your adjusted gross income was about 8,443?

18         A.    I believe so.

19         Q.    All right.  And I know that you're

20  looking at the document saying that's what the

21  document says, but I'm trying to get from you

22  just confirmation that that is basically

23  consistent with the amount of income that you

24  think you would have made in 2017 and 2018.

25         A.    Can you redo the question?  I'm

Page 52

1    trying to understand better.

2         Q.   Yeah.  So these are IRS documents --

3         A.   Uh-huh.

4         Q.   -- reflecting the income that you

5    received and reported to the IRS for all the

6    income that you received for these years.  I'm

7    just -- I'm just asking you does that sound

8    correct in terms of what you earned?

9         A.   I'm not sure, because by looking at

10   that, it's not showing me the whole overview.

11        Q.   Well, if you would have earned

12   more, you would have reported it to the IRS,

13   right?

14        A.   Well, a lot of the income that I

15   earned went right back into the properties, so I

16   invested it back into the company --

17        Q.   Yeah.

18        A.   -- unless I'm not understanding

19   your question.

20        Q.   Well, if it's income, it has to be

21   reported to the IRS.  Do you agree with that?

22        A.   Right.

23        Q.   Yeah.  So if it's income, then I'm

24   only trying to find out, are we missing income,

25   a significant amount of income, from these years

1  based upon the IRS documents?  I mean, do you

2  think you made substantially more money than

3  that in 2017 or '18, or is that fair?

4           A.   I'm not saying that, but, you know,

5  when you do your taxes, you have deductions and

6  stuff like that that you have to put in, right?

7           Q.   Right.

8           A.   So would that be accounted as

9  income, or would that be -- I'm not sure what

10  you're asking, because that's not the full --

11           Q.   Right.  So, again, do you know --

12  if there's a difference there, then can you tell

13  me what that difference is?  Do you think --

14           A.   I'm not sure.

15           Q.   All right.  Well, one of the

16  reasons we don't know is because we don't have

17  your tax returns.  We've requested your tax

18  returns.  Are you able to get your tax returns?

19  It sounds like your mother has been involved in

20  preparing tax returns for all these years.

21  Instead of an amount from the IRS that just says

22  adjusted gross income, so we can look at your

23  deductions, so we can look at everything, and

24  your total income and whether you deducted for

25  business expenses and all of that, can you get

1  that for us?

2          A.   I'm not sure.

3          Q.   You don't know that it's available?

4          A.   I'm not sure.  I'll have to look

5  into it.

6          Q.   All right.  Well, I'd ask you to do

7  that so that we can get the actual tax returns

8  back from 2017, 2018 forward, okay?

9          A.   Okay.

10          Q.   All right.  I'll just go through

11  the rest of them.  2019, it says adjusted gross

12  income 16,092.  Do you see that?  That's at

13  least what the IRS has as your adjusted gross

14  income for 2019, correct?

15          A.   I believe so.

16          Q.   All right.  2020, 17,425; is that

17  right?

18          A.   I believe so.

19          Q.   And then the 2021 tax year, 7,462,

20  correct, as your adjusted gross income?

21          A.   I believe so.

22          Q.   Correct?  Just curious, in 2018, it

23  looks like the adjusted gross income was lower,

24  as it was in 2021.  In 2018, it was 8,443.  Do

25  you have any idea why it would have been

Page 55

1    significantly lower, about half as the other

2    years, in 2018?  Was something going on then?

3           A.    What do you mean in 2018?

4           Q.    When was your gunshot?

5           A.    I believe it might have been 2018.

6    I'm not sure.  I'd have to look at the records.

7           Q.    Okay.

8           A.    I believe it was 2018.

9           Q.    Okay.  We may come back to more of

10   this financial stuff.  Adam will keep me

11   straight on that.  Let's talk about -- you have

12   a criminal history, true?

13          A.    Yes.

14          Q.    All right.  Can you tell me --

15                MS. SMITH:  We'll object to all

16   questions relating to his criminal history, but

17   you can go ahead and answer.

18                MR. BAZELAK:  That's fair.

19   BY MR. BAZELAK:

20          Q.    So you have some previous drug

21   charges; is that right?

22          A.    Yes.

23          Q.    All right.  Can you tell me what

24   those are?

25          A.    Possession of marijuana.

Page 56

1          Q.    That was over 200 grams, but less

2    than 1,000 grams, 2006.  Does that sound right?

3          A.    I'm not sure.

4          Q.    All right.  Anything else?

5          A.    I believe possession of cocaine.

6          Q.    Okay.  I've got just 2002,

7    possession of cocaine, one gram, less than five

8    grams, crack.  And that was a conviction; is

9    that right?

10         A.    Correct.

11         Q.    All right.  And then 2005,

12   possession of cocaine, five grams, but less than

13   ten grams, crack.

14         A.    I'm not sure about that.

15         Q.    Okay.  You don't recall that being

16   a separate charge, drug charge --

17         A.    No.

18         Q.    -- or conviction?

19         A.    I don't -- I don't remember that

20   being --

21         Q.    All right.  Do you remember in 2013

22   having a weapons under disability --

23         A.    Yes.

24         Q.    -- charge?

25         A.    Yes.

Page 57

1           Q.   And that's related to having a

2    prior drug conviction and possessing a weapon,

3    right?

4           A.   I believe -- I believe it was due

5    to having prior drug convictions, the reason why

6    they came up with that charge.

7           Q.   Having -- and possessing a weapon

8    when you have a previous drug conviction, right,

9    that's the weapons under disability to your

10   understanding?

11          A.   Well, I didn't have a weapon.  They

12   said attempt to carry weapons under disability.

13          Q.   And was that a conviction?

14          A.   I pleaded out to it, yes.

15          Q.   You pled out in 2013 to that?

16          A.   Correct.

17          Q.   That's a felony, right?

18          A.   Yes, I believe so.

19          Q.   In 2007, you had a carrying a

20   concealed weapon charge.  Did you get convicted

21   for that?

22          A.   I believe I got probation, if you

23   want to call that conviction.

24          Q.   You pled?  You pled to that?

25          A.   Yeah, I pled to that.

1          Q.   All right.  I've got another -- no,
2     that's the same case.  Sorry.  And I'm not going
3     to go through all your other charges, but you
4     have a lot of traffic charges, right?
5          A.   Do you mean like running stop signs
6     and stuff like that?
7          Q.   A lot of window tint violations,
8     which is what you were charged with in this
9     case, right?
10         A.   I believe so.
11         Q.   Have you ever done any jail time?
12         A.   Yes.
13         Q.   How much?
14         A.   18 months.
15         Q.   Where did you serve that?
16         A.   What is that?  Off Gettysburg.  It
17    was MEPRC.
18         Q.   What charge was that related to
19    where you had to serve some time?
20         A.   I'm not sure.
21         Q.   What years; do you remember?
22         A.   I believe 2008, 2009.
23         Q.   Any other like significant jail or
24    prison time?
25         A.   No.  I've been rehabilitated since

1  then.

2          Q.   Okay.  Let's -- you mentioned that

3  you had a lawsuit and you had a settlement that

4  enabled you to kind of invest back into your

5  business.  Do you recall that?

6          A.   Correct.

7          Q.   Can you tell us about previous

8  lawsuits that you've been involved in?

9          A.   I wouldn't consider that a lawsuit.

10  That's just a settlement.  But the only other

11  lawsuit I believe would have been to get a

12  vehicle back, but I believe that's it.

13          Q.   Okay.  Well, tell us about the

14  settlement.  And you're right, if it wasn't a

15  lawsuit -- it may not have been a lawsuit, but

16  it was a claim or something that you

17  submitted --

18          A.   Uh-huh.

19          Q.   -- and you got a settlement.  Tell

20  me about that one.

21          A.   I wasn't at fault.  I was hit by

22  another driver, and the insurance paid -- paid

23  me out.

24          Q.   How much did you get in that

25  settlement?

Page 60

1          A.    I'm not sure.

2          Q.    Can you give me an estimate,

3    like --

4          A.    It was a couple times that it

5    happened, so I'm not sure.  I don't want to give

6    you a number and, you know, I'm not accurate,

7    but I'm not sure.

8          Q.    Well, was it, I mean, a couple

9    times it happened?  Are you saying two different

10   accidents?

11         A.    Correct.

12         Q.    A couple different accidents?

13         A.    Correct.

14         Q.    I have got you had a motor vehicle

15   accident in 2015, correct?  Was it related to

16   that one?

17         A.    Does it say which vehicle I was in?

18   Because that might help me remember.

19         Q.    No, but I can maybe give you some

20   information about it.  July of 2015, you were a

21   restrained driver and were struck in the front

22   driver's side.  Someone was coming out of an

23   alleyway.

24         A.    That was in the Suburban, but I do

25   not remember how much the payout was.

Page 61

1          Q.    But you did get a payout back in
2      2015 for that?
3          A.    Correct.
4          Q.    All right.  And I'm going to have
5      to try to pin you down a little bit more.  I
6      mean, there's a big difference between -- did
7      you get a couple thousand dollars or did you get
8      $50,000, or $100,000?  You would know the
9      difference, right?
10         A.    Yeah, it wouldn't have been a
11     significant amount like that.  I would say under
12     ten grand.
13         Q.    Okay.  That's all I'm interested
14     in.  You don't have to give me an exact number.
15         A.    Uh-huh.
16         Q.    So for that one, you got maybe
17     ten -- under 10,000.  Was there any settlements
18     or accidents or claims before that, before 2015?
19         A.    I'm not sure.
20         Q.    Okay.  Was that the one that helped
21     you with your business, investing in the
22     business?
23         A.    That was part of it, but, like I
24     said, I've been in a couple accidents prior to,
25     which those -- those settlements actually helped

Page 62

1    me with -- you know, with income and stuff like

2    that.  But I'm not sure what dates and stuff

3    like that, because it was just so long ago.

4              Q.   How many do you think you've been

5    involved in?

6              A.   I'm not sure.

7              Q.   How many settlements from insurance

8    companies have you gotten?

9              A.   Maybe two or three.

10             Q.   Okay.  I've got a 2018 motor

11   vehicle accident where you were a passenger.  Do

12   you remember that one?

13             A.   Yes.

14             Q.   What was the settlement for that?

15             A.   I believe it was less than ten

16   grand.

17             Q.   Did you have attorneys for these

18   claims?

19             A.   No.  Do you know what, I believe

20   Dyer, Garofalo, Mann & Schultz, but I'm not sure

21   for which one of those -- which one of those

22   that was.  But I do believe that that amount

23   probably was over the ten grand amount, because

24   I believe my children was in the car, as well.

25   So they got paid out, as well.  So I just can't

Page 63

1    tell you the details, because I don't remember.

2              (Thereupon, Defendants' Exhibit 2,

3    affidavit, was marked for purposes of

4    identification.)

5    BY MR. BAZELAK:

6         Q.   Mr. Owensby, I'm showing you what

7    has been marked as Defendants' Exhibit 2.  Is

8    that your signature at the bottom?

9         A.   I do believe so.

10        Q.   Almost the bottom.  It's the middle

11   of the page.  It says this is -- you're signing

12   an affidavit, and that's your signature, isn't

13   it?

14        A.   I believe so.

15        Q.   Do you know what that is?

16        A.   No.  Can you explain it to me?

17        Q.   Well, it looks like a case in

18   Common Pleas Court where you were naming the

19   Dayton Police Department as a defendant, and you

20   filed some action back then.  Do you recall

21   this?

22        A.   I think that was to get the vehicle

23   back that they were trying to seize.

24        Q.   Okay.  The second paragraph

25   there -- and the date of this is February 10th

Page 64

1    of 2016, correct?

2            A.    Correct.

3            Q.    And the second paragraph says that

4    you were swearing under oath that you didn't

5    have any funds or assets to give cash for court

6    costs at that time; is that right?

7            A.    It's possible.

8            Q.    Is that true?

9            A.    I'm not sure.

10           Q.    You're not sure if it was true?

11           A.    No, I'm not sure what you're

12   asking.  Are you saying I am without funds or

13   assets to give security or cash deposit to

14   secure counsel at that time?  Well, if I put it

15   on there at the time, it must have been true.

16           Q.    All right.  And you think this was

17   a case to get your vehicle back?  It wasn't

18   involving a personal injury or anything?

19           A.    Yeah, I don't believe it had

20   anything to do with a personal injury.

21           Q.    All right.  Do you remember an

22   attorney in our office here, Mr. Musto,

23   representing the city in that case?

24           A.    I'm not sure.

25           Q.    Okay.  Any other claims or lawsuits

Page 65

1   that you've been involved in in the past that we

2   haven't talked about?

3          A.   Not as I can remember.

4          Q.   Have you ever filed any type of

5   workers' compensation claim or anything like

6   that?

7          A.   No.

8          Q.   All right.  Let's shift gears and

9   talk about your -- again, this is before this

10  incident.  Let's talk about your prior medical

11  history.  Again, in 2015, we talked about that

12  you had that motor vehicle accident.  It sounds

13  like you said you were in a Suburban, or a

14  Suburban hit you?

15         A.   No, I was in a truck, a Suburban.

16         Q.   Okay.  And do you recall back in

17  that time frame, 2015, that you went into Miami

18  Valley Hospital after the incident?

19         A.   I believe so.

20         Q.   All right.  And you complained of

21  neck pain and back pain, lower back pain,

22  correct?

23         A.   Correct.

24         Q.   And so you injured your neck and

25  back during that incident; is that right?

Page 66

1      A.   Yeah.  I believe he hit my driver's

2  side, right like where I was sitting.  You know,

3  I'm driving down.  He came out the alley and hit

4  on that side, yes.

5      Q.   Okay.  And then in August of 2018,

6  you were involved in another motor vehicle

7  accident where you were treated at Miami Valley

8  Hospital.  Do you recall that?

9      A.   I believe so.

10      Q.   All right.  That's one we kind of

11  referenced that you were a passenger in the

12  front seat of the car and somebody rear-ended

13  you and spun you around.  Do you remember that?

14      A.   I believe so.

15      Q.   All right.  And you went to the

16  hospital with injuries to your neck, mid back,

17  and right shoulder blade from that accident?

18      A.   Correct.

19      Q.   All right.  And then in December --

20  so we were talking about your tax returns, and

21  we were looking at that tax year of 2018 where

22  your income was -- at least your adjusted gross

23  income was down to like 7,000, and we talked

24  about you had a previous gunshot incident.  That

25  didn't happen until early December, December 1st

Page 67

1   of 2018.  Does that sound accurate?

2          A.    That does sound accurate, yes.

3          Q.    All right.  So you were out of

4   commission in terms of making money or at least

5   on your own being able to do stuff after

6   December 2018, correct?

7          A.    I believe so.

8          Q.    But the previous 11 months you were

9   able to work and generate some income?

10         A.    I was physically able to do work

11  and stuff like that until December 1st, 2018.

12         Q.    And other than -- we talked about

13  the automobile accident 8-13 where you were

14  released.  You didn't stay in the hospital?

15         A.    Correct.

16         Q.    You just went and got checked out.

17  You had the neck, mid back, and right shoulder

18  injuries, right?

19         A.    Correct.

20         Q.    All right.  Tell me about the

21  gunshot incident.  What happened?

22         A.    Well, I was shopping at the state

23  liquor store on Salem Avenue, and, I mean, I

24  can't remember exactly the details of what

25  happened, but I believe the guy came in to rob

Page 68

1   the place, and I was -- I was shot in the

2   process.

3           Q.   You were shopping at the liquor

4   store, some guy came in, and he had a gun, I

5   guess?

6           A.   I believe so.

7           Q.   All right.  When you say he was

8   robbing the store, I mean, was he -- what did

9   you see exactly?

10          A.   I don't remember that incident like

11  that.  I really can't tell you much about what

12  happened in that incident, because I really

13  don't remember.  I just hear hearsay of what

14  they say happened.  So it's a lot of what I was

15  told that happened and stuff like that by other

16  people.  So I really don't have a lot of

17  recollection of that incident.

18          Q.   You had a weapon that day, right?

19          A.   I'm not sure.

20          Q.   You haven't learned anything about

21  the incident since that happened?

22          A.   No.  I heard that it happened on

23  camera, but I haven't yet seen any video,

24  anything like that, no.

25          Q.   What have you heard?

Page 69

1          A.   I heard that I got shot.  That was
2    pretty much it.  I didn't get to see the video.
3          Q.   Did you fire a weapon that day?
4          A.   I'm not sure.
5          Q.   You never found out whether --
6    you're not sure whether you had a weapon that
7    day or whether you fired a weapon?
8          A.   They never showed me -- they never
9    showed me any video, and I don't remember any of
10   that.
11         Q.   Why don't you remember?  Were
12   you --
13         A.   I'm not sure.  I think I almost
14   died, so --
15         Q.   I get that.  You haven't looked
16   at -- you haven't seen the video?
17         A.   No.
18         Q.   Were you charged for that?
19         A.   No.
20         Q.   Was there anybody else that got
21   injured that day, or hurt; do you know?
22         A.   I'm not sure.
23         Q.   Were you under the influence that
24   day?
25         A.   I hadn't had a chance to drink

Page 70

1    anything, because I was just there purchasing my

2    order, and that's when everything happened.

3            Q.   Do you know who shot you?

4            A.   No.

5            Q.   Do you know if he was charged?

6            A.   I'm not sure.

7            Q.   Again, you don't recall, or you're

8    saying no, that you weren't charged with

9    anything?

10           MS. SMITH:   Object to that

11   question.  I think he said several times that he

12   doesn't recall what happened that day, that he

13   hasn't seen any evidence, he has no idea.

14   BY MR. BAZELAK:

15           Q.   Yep, I understand you don't recall

16   that day.  I'm asking if you know if you were

17   charged with a crime after that.  And you don't

18   know?  You're saying you don't know?

19           A.   I don't remember if there was any

20   charges brought up.

21           Q.   All right.  As a result of that

22   gunshot wound, you suffered serious injuries,

23   correct?

24           A.   Correct.

25           Q.   You ended up fracturing your spine.

Page 71

1   You had a spinal cord injury that left you with

2   paraplegia, correct?

3            A.    I believe so.

4            Q.    You had a lung laceration, correct?

5   Do you recall that?

6            A.    I believe so.

7            Q.    You had your spleen removed?

8            A.    I believe so.

9            Q.    I think you had some rib fractures;

10  is that right?

11           A.    I believe so.

12           Q.    You had some kidney damage?

13           A.    I believe so.

14           Q.    And you were in the hospital and

15  doing rehab for several months, correct?

16           A.    I believe so.

17           Q.    Another thing that you developed

18  after that gunshot incident over the course of

19  the next several months and years is you

20  developed a pressure ulcer on your backside,

21  correct?

22           A.    Yes.

23           Q.    And that's basically been an

24  ongoing issue since the time that you had to go

25  through the rehab, right?

Page 72

1          A.    It took a while for it to actually

2     heal, but it did eventually heal.

3          Q.    All right.  Well, as I understand

4     it just going through your records, you were

5     ultimately discharged from a rehab facility in

6     like January of 2019, and then you followed up

7     for several months with a wound clinic, right?

8          A.    I believe that's from the wound

9     being developed from lack of movement.

10          Q.    Right.

11          A.    Yes.

12          Q.    So it's called a pressure ulcer.

13          A.    I believe so.

14          Q.    Because of your long time -- over

15     the course of hours and hours you're sitting and

16     not being able to get up, you develop these

17     pressure ulcers or sores.  So they tried to get

18     you to move and move, but the wound still

19     developed, and you needed to be treated for

20     those, right?

21          A.    Correct.

22          Q.    All right.  And so you went into

23     this wound clinic to go back and get it looked

24     at, get it cleaned out and treated, right, at

25     this wound clinic?

Page 73

1      A.   I believe so.

2      Q.   So you went back, and I have in

3  February of 2019 there was a visit.  Do you

4  recall that?

5      A.   Yeah, because they made me follow

6  up, do follow-up appointments.

7      Q.   Yeah.  I've got several, several

8  wound clinic follow-ups for that pressure ulcer,

9  whether it was a stage two or stage three,

10  throughout that time, all the way through --

11  well, in 2019 all the way through the end of the

12  year, correct?

13      A.   I believe so.

14      Q.   All right.  By the way, in the end

15  of 2019, you also had another motor vehicle

16  accident.  Do you remember that one?  A tire

17  blew out, and you slid on the ice and struck a

18  pole?

19      A.   I believe so, but I'm not sure.  I

20  don't really remember too much about that.

21      Q.   All right.  You don't recall you

22  complained of back pain related to that?  Do you

23  remember that?

24      A.   I don't recall.

25      Q.   All right.  Then do you remember in

Page 74

1  February of 2020, you slid out of your wheelchair

2  and reported pain in your tailbone and had to go

3  to the emergency room for that?

4          A.   Yeah, I do -- I remember that.

5          Q.   Do you remember what they did for

6  you there?

7          A.   There was nothing they could do.

8          Q.   There was just a contusion, again,

9  to your kind of backside down there?

10         A.   It was bruised.

11         Q.   Yeah.  Then you're still being

12 treated again here as of 2020, 6-2-2020.  So

13 this would have been a year and a half or so

14 after your gunshot incident, you're still being

15 treated for that stage three pressure ulcer and

16 going through debridement procedures.  Do you

17 remember that?

18         A.   It was follow-ups, follow-up

19 appointments.

20              (Thereupon, Defendants' Exhibit 3,

21 photo, was marked for purposes of

22 identification.)

23 BY MR. BAZELAK:

24         Q.   Sir, I have identified or marked

25 Defendants' Exhibit 3 for identification.  And

Page 75

1   this is a scan dated 6-2-2020 of the pressure

2   ulcer; is that right?

3           A.    Correct.

4           Q.    All right.  So, again, this is

5   December of '18 through 6-2-2020, you're still

6   having issues with getting that pressure ulcer

7   healed at least as of 6-2-2020, correct?

8           A.    I believe so.

9           Q.    Did they ever tell you like why it

10  never really healed during that time?

11          A.    I had to stay off of it, pretty

12  much start doing pressure relief to keep the

13  pressure off of it so it can start healing back,

14  and I had to also like let air -- air get to it

15  in order for it to actually close.  So, yes,

16  they did tell me that.

17          Q.    Well, they told you kind of what to

18  do to try to get it healed, but it never --

19  despite -- I assume you tried to do that, right?

20          A.    Well, I wasn't successful in doing

21  it, because I had to like be up, up in my chair

22  a lot, which, you know, if you're sitting

23  upright, that's the area where -- I don't have a

24  lot of muscle mass and stuff down there, so when

25  I'm sitting up like this, like right now, you

Page 76

1  just pretty much got that bone trying to, you

2  know, pierce through.

3          Q.   Yeah.  And it's hard to heal, right?

4          A.   Well, it started healing, and I

5  actually started gaining some traction to get it

6  healed.

7          Q.   And you still had a pressure

8  ulcer -- as of September 30th, 2021, you still

9  had some pressure ulcer that existed on your

10  back, correct?

11          A.   It was closed.  I had finally got

12  it to close, and it was healing up perfectly.

13          Q.   All right.  Let's keep going

14  through your medical history here.  You

15  basically from, say, February of 2020 or so up

16  through the date of this incident you still were

17  being treated in some Miami Valley Hospital

18  rehab program, right?

19          A.   Correct, CORP.

20          Q.   And they were working on trying to

21  increase your --

22          A.   Strengthening my legs and getting

23  back to --

24          Q.   -- ability to move, right?

25          A.   -- walk.  Correct.  They wouldn't

Page 77

1   have allowed me to do that program if I had an

2   open wound, so I had to make sure that I was fit

3   for rehab.  They wouldn't have allowed me to do

4   rehab with an open ulcer.

5           Q.   All right.  Let's -- we're going to

6   talk about the incident and the injuries that

7   you're alleging in this case, but let's talk

8   about the -- that day, September 30th, 2021.

9   You were home in the morning that day, right?

10          A.   Correct.

11          Q.   And as I understand it, you took

12  your kids to school?

13          A.   Correct.

14          Q.   And did you take them in the white

15  Audi?

16          A.   Correct.

17          Q.   That's what you were driving that

18  day?

19          A.   Correct.

20          Q.   And after you took the kids to

21  school, you went back home and started watching

22  some TV with one of your other kids?

23          A.   Correct.

24          Q.   And who was that, which child?

25          A.   Jerraun.  It's my girlfriend's

1  youngest son.

2        Q.   Is that who was in the car with you

3  on the date of this incident?

4        A.   Correct.

5        Q.   It's not your kid?

6        A.   Correct.

7        Q.   It's your girlfriend's kid?

8        A.   Correct, but I claim him as my son,

9  because I help raise him just as the rest of

10  them.

11        Q.   All right.  And then as you're

12  watching TV with Jerraun -- is that what you

13  said?

14        A.   Correct.

15        Q.   You're watching TV with Jerraun,

16  and with him you decided to -- you needed to

17  take some cable boxes somewhere?

18        A.   I had to go and pick up cable boxes

19  from one of my residences.

20        Q.   Who is that?

21        A.   1954 West Grand Avenue, the

22  apartment building.

23        Q.   When you say one of your residents,

24  who?

25        A.   It was all four of the residents.

Page 79

1   I was no longer offering cable as an incentive

2   for the property.  Trying to save the company

3   money, so --

4           Q.   So you were going to basically just

5   take out their cable and remove the cable box?

6           A.   Yes.  I informed them prior to that

7   that it was going to be happening, and everybody

8   was okay with it.

9           Q.   So you put Jerraun in the back seat

10  then and started heading over to 1954 West

11  Grand?

12          A.   Correct.

13          Q.   And you didn't have him in a car

14  seat, right?

15          A.   He was buckled in in the seat belt.

16  He actually got hisself in the car and buckled

17  hisself in.  I wouldn't have been able to get

18  back there to latch him in.

19          Q.   My question was he wasn't in a car

20  seat, correct?

21          A.   Correct.

22          Q.   All right.  And you started driving

23  over to West Grand with him buckled in, but not

24  in a car seat, and then you arrived at that

25  location about what time?

Page 80

1          A.    If my memory serves me correct, I

2    believe it was in between the 11 and 12:00 hour.

3          Q.    And then what did you do when you

4    got in there?

5          A.    When I got in where?

6          Q.    Did you go inside the residence?

7          A.    No, I did not.

8          Q.    Weren't you going in there to get

9    the cable boxes?

10         A.    I pulled up out in front of the

11   residence, and I called in for the residents to

12   bring the boxes out.

13         Q.    Okay.  Did they do that?

14         A.    Yes, they did.

15         Q.    All right.  How long were you

16   parked outside of 1954 Grand?

17         A.    Maybe 45 minutes, because I had to

18   call the cable company and check the serial

19   numbers on the merchandise they brought out to

20   make sure that I had everything that I was there

21   to collect.

22         Q.    What cable company did you call?

23         A.    Spectrum.

24         Q.    And so you were just sitting

25   outside there.  Jerraun is in the back.  You're

Page 81

1  sitting outside in the white Audi for about 45

2  minutes outside of 1954 West Grand.  You called

3  and spent some time talking to Spectrum.

4  Anything else you were doing?

5          A.   Sitting there talking to the

6  residents.  They were pretty much standing

7  around the car as they were bringing the stuff

8  out.  So just having a casual conversation while

9  I was on the phone with Spectrum.

10          Q.   When did you put the 22,000 plus

11  dollars in the car?

12          A.   When I left the house.

13          Q.   Why?

14          A.   What do you mean why?

15          Q.   Why did you put $22,000 in your car

16  when you left the house?

17          A.   Well, I was planning on going to

18  the bank to make a deposit that day, but I

19  hadn't had a chance to do it yet.

20          Q.   All right.  After 45 minutes

21  elapsed and you said they brought out -- how

22  many cable boxes are we talking about here?

23          A.    It wasn't just cable boxes.  It was

24  the actual cable boxes and the Wi-Fi equipment.

25  So it was quite -- quite a few items, the modem,

Page 82

1    the Wi-Fi box, and the cable boxes, as well, per

2    unit.

3          Q.   So you said you were talking to

4    these residents.  Can you tell me specifically

5    who?  Of your residents or tenants, who was

6    there that day?

7          A.   I believe one of the tenants left

8    their equipment in the hallway, which another

9    one of the tenants was able to bring out for

10    them.  Andrea Alexander, David Dewberry, those

11    were the two tenants that brought out the

12    equipment.  The other tenants had left their

13    equipment in the hallway prior to me getting

14    there so that way I can make sure that I could

15    pick them up.

16          Q.   All right.  This white Audi, had

17    you been pulled over in that vehicle before?

18          A.   No.

19          Q.   You had been pulled over before for

20    having too dark of a window tint though, right?

21          A.   In my vehicles, yes.

22          Q.   So you knew that was a violation of

23    law, right, to have too dark of a window tint?

24    Not enough light gets through there.  You knew

25    that was a violation of law before you went out

Page 83

1    that day?

2         A.   In my vehicles, my tint was a lot

3    darker than what was on the Audi, so I wasn't

4    sure what that tint breather was or the

5    percentage of that tint.  Not sure.

6         Q.   All right.  So you think at about

7    11 or 12 you arrived at North [sic] Grand, and

8    you were there 45 minutes or so before you left.

9    So it was around 12 to 1:00 p.m. that day that

10   you left that residence.  And where were you

11   headed then?

12        A.   I was headed back to Spectrum to

13   return the cable boxes that I just picked up.  I

14   literally had just gotten off the phone with a

15   female representative from Spectrum, because we

16   were joking about, you know, how long I was on

17   the phone and all of the equipment, because she

18   wanted to know how many TVs I had, et cetera,

19   whatnot.

20        Q.   All right.  So how soon after you

21   left West Grand did you get stopped by the

22   police?

23        A.   I probably made it a few blocks.

24        Q.   All right.  And so you, I guess,

25   saw lights and siren behind you?

Page 84

1          A.    I heard the siren, so I pulled over
2     thinking that they was going to go around me.
3          Q.    Okay.  So once you heard the siren,
4     you pulled over.  You weren't expecting to --
5     for them to come up to you?
6          A.    Once I seen them getting out of the
7     car, I mean, apparently they was stopping me.
8     But I had pulled over and parked immediately as
9     soon as I seen the lights.
10         Q.    Well, you knew it was the police,
11    right?
12         A.    From the sirens, yes.
13         Q.    Yeah.  You knew -- you saw the
14    police cruiser, and you saw the officer in
15    uniform approaching the vehicle, right?  That's
16    why you were stopping?
17         A.    Correct.
18         Q.    All right.  And Officer Carter, who
19    you didn't know the name at the time, but the
20    white officer, approached you on the driver's
21    side, correct?
22         A.    Correct.
23         Q.    And he contacted you and asked you
24    for your license, ID?
25         A.    I believe the first thing he said

Page 85

1    was nice car, and then he goes the reason why I

2    stopped you was because your tint is too dark,

3    my man.

4          Q.    Yeah.  He also -- you agree with

5    this, he also said something about the device

6    you had on your car and asked you what's up with

7    that, is that how you drive, some words to that

8    effect?

9          A.    Correct.  And I told him sir, I'm a

10   paraplegic.

11         Q.    Yeah.

12         A.    And he said oh, that's cool.  And I

13   gave him my driver's license, and he went back

14   to his cruiser.

15         Q.    Yeah.  So he knew that you were a

16   paraplegic from the initial encounter you had

17   with him, right?

18         A.    I believe so.

19         Q.    All right.  And then the next thing

20   that happened is the other officer, the black

21   officer on the scene, approached the driver's

22   side -- sorry, mistake -- passenger's side of

23   your vehicle.  Do you recall that?

24         A.    Yes.

25         Q.    All right.  And he asked you to

Page 86

1   roll down your window, and then you had to roll

2   it back up a little bit, but he was trying to do

3   the window tint test, right?

4           A.   That's what he said.

5           Q.   And that's -- you saw him doing

6   that, right?

7           A.   I believe so.

8           Q.   All right.  And you recall him at

9   that time, he asked you about the child in the

10  back seat, correct?

11          A.   Correct.

12          Q.   You said it's not my kid, it's my

13  girl's kid?

14          A.   Correct.

15          Q.   He asked you about why the child

16  wasn't in a car seat, right?

17          A.   I don't recall him asking me that.

18          Q.   All right.  You don't recall saying

19  that I was just pulling out from down the

20  street, sir?

21          A.   I do remember telling him that I

22  just left from down the street, correct.

23          Q.   And then he left, went back to his

24  cruiser, right?

25          A.   I believe so.

Page 87

1          Q.   And the other officer was not at

2     the cruiser either.   They were both back near

3     the cruiser or in the cruiser.   They weren't by

4     your vehicle at that time, right?

5          A.   Correct.

6          Q.   All right.   And then Officer

7     Hammock returned to your driver's side this

8     time, right?   This is the African-American

9     officer.   Correct?

10          A.   Correct.

11          Q.   All right.   He said what's your

12     name again.   You replied Clifford Owensby.   Do

13     you recall that?

14          A.   Yes.

15          Q.   All right.   And then he asked you

16     to turn off the car, and you did that, right?

17          A.   Yes.

18          Q.   Do you need to take a break, sir?

19     At any time, feel free to let me know that.   I'm

20     not here to have you be upset.   I don't want to

21     do that to you.

22          A.   You can go ahead.

23          Q.   I think the last question, he asked

24     you to turn off the car, and you did turn off

25     the car, right?

Page 88

1          A.    Yes.

2          Q.    And he said he is going to have to

3   have you step out of the car, correct?

4          A.    Yes.  I replied to him that I can't

5   step out of the car, because I'm a paraplegic.

6          Q.    Right.  And then after you told him

7   that you were a paraplegic -- you had already

8   told Officer Carter you were a paraplegic.

9   Officer Hammock in response said well, I'll help

10  you get out.  He said that, correct?

11         A.    I'm not sure.  I believe he did say

12  something like that.

13         Q.    In fact, he said well, I'll help

14  you getting out.  And you said excuse me, and he

15  said I'm going to help you get out.  That's what

16  he said, right?

17         A.    I believe so.

18         Q.    All right.  And your response to

19  that was well, I don't think that's going to

20  happen, sir.  And you shook your head and said I

21  don't think that's going to happen, sir.  Right,

22  that's what you did?

23         A.    Before that I asked him could they

24  call a supervisor.

25         Q.    Well, I'm asking you in response to

Page 89

1   him saying I'm helping you get out, you shook

2   your head and said I don't think that's going to

3   happen, sir.  That's what you said, correct?

4           A.   Before all of that happened, sir --

5           Q.   We can get into that, but I'm just

6   saying that's what you said, correct?

7           A.   Correct.

8           Q.   And he said -- he said well, I do,

9   because I'm asking you, but I'm telling you, so

10  it's not an option.  And you said can I ask

11  what's the problem.  Do you remember that?  You

12  said what's the problem?

13          A.   Yes.

14          Q.   All right.  And he told you -- when

15  you asked him what the problem was, he told you

16  that it's because of your history, I'm going

17  to -- going to have to have a dog do a free air

18  around the car, and you have to get out of the

19  car to do that.  That's what he told you, true?

20          A.   I believe so.

21          Q.   All right.  And then you still,

22  despite that, said I can't get out of the

23  vehicle, sir.  You said that again, I can't get

24  out of the vehicle.

25          A.   I told him that I can't step out.

Page 90

1    He was demanding me to step out of the vehicle,

2    and he told me that if I didn't step out, then

3    he was going to drag me out, and those were my

4    only two options.

5            Q.   Well, we'll get to that.  In fact,

6    he said in response to I can't get out of the

7    vehicle -- in fact, he said again, he said sir,

8    I'm going to assist you getting out of the

9    vehicle, as someone else assisted you getting in

10   the vehicle.  That's what he said, correct?

11           A.   I'm not sure.

12           Q.   All right.  And after he said that,

13   you said no, no, you're not.  No, you're not.

14   You're not going to touch me.  You definitely

15   about to touch me, and I'm about to go ahead and

16   get somebody on the line, because I will.  It

17   will be a lawsuit if you put your hands on me

18   for no reason, bro.  That's what you said.  You

19   recall saying that, don't you?

20           A.   I recall saying that.

21           Q.   And when you said for no reason, he

22   said well, there is a reason.  He started to say

23   well, the reason is that I'm asking you to get

24   out of the car.  And you said no, no, no, we

25   ain't going to go there.  We about to get some

Page 91

1  people here that's about to witness what's going

2  on, right?

3          A.    Correct.

4          Q.    And do you remember the white

5  officer was also around at that point and said

6  that you've got to step out?  He said you've got

7  to step out, bud.  Do you remember him saying

8  that?

9          A.    I believe so.

10          Q.    Do you remember Officer Carter

11  saying something to the effect that we had this

12  situation last night?  Do you remember anything

13  about that?

14          A.    I remember him saying something

15  like that, but I didn't have a situation with

16  them the night before.

17          Q.    Yeah.  Well, you may not have

18  known, but are you aware now that they had just

19  had a situation with a disabled individual they

20  stopped the night before who was sitting on a

21  gun?  Did you know that?

22          A.    I didn't know that.

23          Q.    In any event, you did call

24  somebody.  You called on your cell phone.  Who

25  did you call, by the way?

Page 92

1          A.    I called my brother.

2          Q.    Who is that?

3          A.    Lashon Owensby.

4          Q.    All right.  You said hey, bro, can

5    you come down to the street on Ferguson and

6    Grand.  The police just pulled me over and

7    they're trying to make me get out of the car.

8    I'm telling them I'm a paraplegic and I can't

9    get out of the car without no help and shit, and

10   these motherfuckers are trying to fucking --

11   they on some bullshit.  Just come down the

12   street.  Bring some people with cameras.  Come

13   down the street.  Bring cameras.  Just

14   somebody -- just bring -- just bring somebody so

15   they can witness what's going on.  That's

16   essentially what you said, correct?

17         A.    Yes.

18         Q.    So you weren't calling anybody to

19   assist you to get out of the car, were you?  You

20   were calling somebody to witness the incident.

21   That's what you said, right?

22         A.    Correct.

23         Q.    Well, we already talked about the

24   times Officer Hammock had offered assistance to

25   get you out of the car, but you said I'm not

1  getting out.  I just told you I'm a paraplegic.

2  I cannot get out.  Hammock said sir, I do not --

3  I do not -- I do not want to have to pull you

4  out.  And Carter said we're going to help you

5  out then.

6          A.    I don't recall.

7          Q.    Do you remember that?

8          A.    I don't recall that.

9          Q.    Well, at that point -- at that

10  point -- after all those conversations, at that

11  point you asked for them to call a white shirt,

12  right?

13          A.    I had already asked previous to

14  that for them to call their supervisor, and he

15  goes it doesn't work like that.  That's what was

16  said.

17          Q.    Right.  In response to you asking

18  for a white shirt, they said that they will call

19  a white shirt once --

20          A.    After they get me out of the

21  vehicle.  After the second time that I asked.

22  The first time he told me it didn't work like

23  that.

24          Q.    So I'll just read you the

25  transcript, and you tell me if you think this is

1  somehow not an accurate depiction of what

2  happened and what words were said.

3         But you said can you call a white

4  shirt, and Hammock said I will once -- if you

5  pull me out of here, you better expect -- you

6  better -- Hammock said so here's the thing, I'm

7  going to pull you out, and then I'll call a

8  white shirt because you're getting out of the

9  car.  He said it was not an option for you to

10  stay in the car.  He told you that, right?

11         A.   I believe something like that.

12         Q.   And you -- again, you said I'd like

13  you to call for a white shirt.  He said I will

14  when I'm done, but you have to get out of the

15  car.  That's what he said, right?

16         A.   I believe so.

17         Q.   By the way, a white shirt is your

18  understanding of a --

19         A.   Supervisor.

20         Q.   -- supervisor, right?

21         A.   Correct.

22         Q.   All right.  All right.  It's at

23  that point, after that exchange, Officer

24  Hammock, the African-American officer, reached

25  in and grabbed your left arm and began pulling

Page 95

1    on it, correct?

2           A.    I believe so.

3           Q.    All right.  You at that point

4    grabbed the steering wheel, right?

5           A.    I actually grabbed onto the -- what

6    do you call it, the thing above the driver's

7    seat where you might hang your shirt and stuff

8    like that on.  As he was pulling me out, I tried

9    to catch my balance by grabbing onto that.

10          Q.    Oh, like the little handle?

11          A.    Yes.

12          Q.    Okay.  You don't dispute that you

13   also -- you grabbed onto the steering wheel at

14   some point?

15          A.    With one arm, because he had my

16   left arm like trying to yank me out of the

17   vehicle.

18          Q.    Your right arm -- your right hand

19   you grabbed the steering wheel?

20          A.    Correct.

21          Q.    Left hand, right hand, grabbing

22   onto something.

23          A.    I grabbed onto the thing with my

24   right arm, and then I grabbed the steering wheel

25   afterwards trying to keep my balance inside the

Page 96

1    vehicle.

2            Q.    Right.  And you did that because

3    you didn't want to get out of the vehicle,

4    right?

5            A.    No.

6            Q.    No what?

7            A.    I didn't -- it wasn't about me not

8    wanting to get out of the vehicle.  He was

9    trying to yank me out of the vehicle, and I was

10   trying to tell him that I needed help getting

11   out.  That wasn't the way that I was expecting

12   to get help to get out of the vehicle.

13           Q.    Right.  You were not allowing them

14   to assist you out of the vehicle, correct?

15           A.    Can I say something?

16           Q.    If you answer my question.  It's a

17   simple -- it's a simple question.

18           A.    I understand that.

19           Q.    You were not allowing them -- maybe

20   you have a reason, sir.  Maybe you have a

21   reason.  I'll give you a chance to say that.

22   I'm just asking you that you were not allowing

23   them to take you out and assist you out of the

24   vehicle?

25           A.    I need you to understand something.

Page 97

```
 1          Q.    True or false?  Just true or false?
 2   True or false first?
 3          A.    False.
 4          Q.    False.  Okay.
 5          A.    Now can I say something?
 6          Q.    Sure, explain.
 7          A.    Those same two officers pulled me
 8   over 18 months prior to this situation, and they
 9   wanted to do the same exact thing, wanted to run
10   the dog around the vehicle and all of that, and
11   they called for a white shirt at that time.  I
12   did not have to get out of the vehicle at that
13   time.  Now you can go ahead with whatever
14   questions.
15          Q.    When is the first time that you
16   indicated that you had been pulled over by these
17   officers 18 months prior?
18          A.    Nobody ever gave me an opportunity
19   to say that.
20          Q.    Is today the first time that you
21   said that to anybody?
22          A.    No.  No.
23          Q.    To any law enforcement?
24          A.    I told the Professional Standards
25   Bureau this.  And they showed up with maybe ten,
```

1  12 cops.  The supervisor showed up then, and he

2  allowed for them to search the vehicle while I

3  was in the vehicle.

4        Q.    Do you know -- do you know now that

5  there's a policy that mandates -- that requires

6  occupants of a vehicle to be removed from the

7  vehicle to do a free air sniff?  Are you aware

8  of that?

9        A.    For a window tint?  No.

10             MR. WILLIS:  I object to that.

11  That's not the law, so I'm advising him not to

12  answer.  That simply is not the law.

13  BY MR. BAZELAK:

14        Q.    I'm asking you if you're aware of

15  that City of Dayton policy.

16             MR. WILLIS:  I told him not to

17  answer.  Go to the next question.

18  BY MR. BAZELAK:

19        Q.    By the way, did you at any time

20  during the exchange with the officers -- before

21  you were taken out of the vehicle, did you tell

22  them that you had $22,500 of cash in the car?

23        A.    Why would I have to tell them that?

24        Q.    You have to answer my question.

25        A.    Well, I need you to rephrase the

Page 99

1    question.

2            Q.    The answer is -- you have to -- the

3    answer is -- did you tell them that?  If you

4    did, the answer is yes.  If you didn't, the

5    answer is no.  So is the answer no, you didn't

6    tell them that?

7            A.    No, I didn't.

8            Q.    All right.  Did you ever tell the

9    officers how to help you out of the vehicle?

10           A.    They never asked me how to help me

11   out.

12           Q.    I'm going to try to get an answer

13   again.  So did you ever tell them how to help

14   you out of the vehicle?  Did you affirmatively

15   do that?  Whether they asked you or not, did you

16   ever tell them how to get you out of the

17   vehicle, yes or no?

18           A.    I told the Professional Standards

19   Bureau.  So if you -- you're saying officers.

20   They're included with the officers.

21           Q.    No, that night at that incident.

22   Did you say anything to the officers about how

23   to get you out of the vehicle, yes or no?

24           A.    I don't know.

25           Q.    Okay.  Did you reference anything

1  about equipment or wheelchair, wheelchairs or

2  anything about how to assist you out of the

3  vehicle?  Did you say anything to them about

4  that?

5          A.   I don't know.  I don't believe we

6  got that far.

7          Q.   Eventually some people did come

8  that you had called to come there to witness it,

9  right?

10         A.   Actually, only one person came that

11 I called.  The rest were just innocent

12 bystanders who were witnessing the situation.

13         Q.   Do you think it's unreasonable for

14 the officers that night to think that you

15 possibly could have had a weapon?

16         A.   Yes.

17         Q.   Eventually they got your hands off

18 the steering wheel, took you out of the vehicle.

19 You were on the ground.  Eventually they got you

20 handcuffed and put you in the back of the

21 cruiser, correct?

22         A.   Yes.

23         Q.   At any time did any of the officers

24 strike you or punch you?

25         A.   I don't know.

Page 101

1          Q.   Did any of the officers at any time

2    Tase you?

3          A.   No.

4          Q.   Did they pepper spray you?

5          A.   No.

6          Q.   Did a supervisor or a white shirt

7    eventually come to the scene?

8          A.   Eventually.

9          Q.   And you talked to that supervisor.

10   Do you remember that conversation?

11         A.   Yes.

12         Q.   What do you remember about that?

13         A.   He was automatically assuming that

14   I was wrong when he got there and told me that

15   he didn't believe that any of the stuff that I

16   had told him about happened, like I was making

17   it up.

18         Q.   Well, it's on videotape, so -- and

19   I think -- I assume he knew it was -- there were

20   body cameras there, right?

21         A.   I would assume.

22         Q.   Eventually then you went to the

23   hospital to get checked out after this incident,

24   correct?

25         A.   Yes.

1          Q.    And that was at Kettering Hospital,
2    if I recall?
3          A.    Grandview.
4          Q.    Yeah, sorry, it's Grandview.
5    It's -- Kettering is the -- it's a Kettering
6    affiliated hospital.  But you went to Grandview,
7    you're right.  Correct?
8          A.    Yes.
9          Q.    Do you need to take a break?
10         A.    No.
11         Q.    And at the emergency room, you
12   said -- you reported pain in the left hip and
13   low back, correct?
14         A.    And my side and my back and my neck
15   and stuff, yes.
16         Q.    All right.  And they did a bunch of
17   tests, correct?
18         A.    Yes.
19         Q.    And there were no fractures that
20   were discovered related to this incident,
21   correct?
22         A.    I'm not sure.  They never let me
23   see any results.  They just released me to the
24   custody of the police.
25         Q.    Well, they diagnosed you with low

1  back pain, numbness and tingling of the lower

2  extremity, bilateral leg and foot pain, some hip

3  pain, and pressure from the pressure ulcer.  Do

4  you -- does that sound correct?

5         A.   When I was laying in the bed, I

6  started noticing some discharge coming from my

7  backside once the nurse came in and checked me,

8  and she told me that my pressure ulcer was

9  reopened.

10        Q.   Okay.  Let me ask you about that.

11 So who noticed the blood, you or somebody else?

12        A.   The nurse.

13        Q.   The nurse noticed the blood.  And

14 then they checked out your back.  And then what

15 did they do for it there?

16        A.   She put a bandage and stuff over

17 it, and then they just released me to the police.

18        Q.   And then at some point later that

19 night, correct me if I'm wrong, Officer Carter

20 actually assisted you into a vehicle that night,

21 correct?

22        A.   Once I got back to the station.

23 But when we got to the -- when we got to the

24 hospital, they didn't even want to help me get

25 out of the vehicle.  They didn't try to assist

1   me to get out of the vehicle.  They told me to

2   get out myself.  They wanted me to transfer out

3   of there myself.

4          Q.   Well, you did get transferred out

5   of there.  Who did it?

6          A.   I believe one of the nurses at the

7   hospital helped.

8          Q.   But then later Officer Carter, who

9   was actually one of the officers at the scene,

10  the white officer at the scene that night, he

11  actually picked you up and assisted you.  It's

12  on video I think.  So he assisted you --

13         A.   After -- after it was verified that

14  I was a paraplegic and that I needed help and

15  all that, yeah, he tried to assist to try to

16  make hisself look good.

17         Q.   Well, they knew you were a

18  paraplegic from the very beginning of the

19  incident.  We already established that, right?

20         A.   They didn't act like it.

21         Q.   What is it that you thought they

22  should do instead of --

23         A.   What do you mean?

24         Q.   What is it that you think they

25  should have done once it was determined that you

Page 105

1    were not getting out of the car, and they had to

2    get you out of the car, what is it that you

3    think they should have done?

4            A.   They could have provided a

5    wheelchair or something to help get me out of

6    the vehicle, for one, so I could have been

7    comfortable getting out of the vehicle.

8            Q.   Do you know --

9            A.   They didn't have any of that.

10           Q.   Do you know why they didn't?

11           A.   Your guess is as good as mine.

12           Q.   Okay.  Well, you sat through their

13   depositions, and they explained that they were

14   concerned that -- about getting you out of the

15   car because -- for your safety and their safety,

16   that was their job to get you out of the

17   vehicle and --

18                MR. WILLIS:  I object to that

19   question.

20                MR. BAZELAK:  You can object.

21                MR. WILLIS:  It was not their job

22   to get him out of the vehicle.

23                MR. BAZELAK:  Let me finish it

24   before you object to it.

25                MR. WILLIS:  He doesn't have to

```
 1    answer that question.  You go to another

 2    question.

 3                    MR. BAZELAK:  Let me finish it

 4    before you object.

 5                    MR. WILLIS:  Okay.  Well, I'm going

 6    to object.

 7                    MR. BAZELAK:  Okay.  Well, let me

 8    finish it first.

 9                    MR. WILLIS:  Okay.

10                    MR. BAZELAK:  Maybe you won't

11    object after I finish.

12                    MR. WILLIS:  I'm going to object.

13                    MR. BAZELAK:  Okay.

14    BY MR. BAZELAK:

15        Q.   You're aware now that the reason

16    the officers could not take the time to call a

17    supervisor or get you additional assistance to

18    get you out of the car is because for their

19    safety and your safety, they needed to secure

20    the scene and get you out of the car?

21                    MR. WILLIS:  I object to that.

22    BY MR. BAZELAK:

23        Q.   You're aware of that?  You're aware

24    of that now?

25                    MR. BAZELAK:  You can object.  He
```

                                          Page 107

1   can answer.

2               MR. WILLIS:  I'll object.  Don't

3   answer.

4               THE WITNESS:  No, I wasn't aware of

5   that.

6               MR. BAZELAK:  There's no basis for

7   him not to answer.

8               MR. WILLIS:  Yes, there is a basis.

9               MR. BAZELAK:  No, other than you

10  just saying it and telling him not to, but

11  there's no basis.

12              MR. WILLIS:  Because what you're

13  saying in incorrect.

14              MR. BAZELAK:  Well, he can tell me

15  that.

16              MR. WILLIS:  I'm saying it --

17              THE WITNESS:  You are incorrect.

18              MR. WILLIS:  -- for him.

19  BY MR. BAZELAK:

20        Q.   All right, I'm incorrect.  Why am I

21  incorrect?

22              MR. WILLIS:  Don't answer any more

23  questions along that line.  Let me deal with him

24  and the Court and the jury about that whether or

25  not he's correct.

Page 108

1              MR. BAZELAK:  It doesn't matter.

2     It doesn't matter.

3     BY MR. BAZELAK:

4          Q.   So let's talk about -- you had some

5     treatment after this incident by medical

6     providers.  I want to go into that.  This

7     pressure ulcer that you had treatment for after

8     this incident, you went to the wound clinic for

9     several visits.

10               10-15, 10-22, and 10-29, you went

11    to the wound clinic to get that looked at and

12    treated, do you recall that, after this?

13         A.   I believe so.

14         Q.   All right.  And you had another

15    motor vehicle accident, it looks like, in

16    October of 2022?

17         A.   I'm not sure.

18         Q.   All right.  We'll go through it.

19    Patient reports that you were a restrained

20    driver in a motor vehicle accident.  States

21    another car struck them in the front fender

22    driver's door.  And you were complaining of back

23    pain, headache, I think, and bilateral leg pain.

24    That's 10-29-2021, emergency department, Miami

25    Valley Hospital.  You don't remember that?

Page 109

1          A.    Oh, yes.

2          Q.    So that motor vehicle accident

3     caused you pain in your back and -- lower back

4     and upper back; is that right?

5          A.    I don't recall exactly what I told

6     them at the time.

7          Q.    And just -- I've been asked this,

8     and I know that you understand it, because

9     you've lived this, but, you know, you make

10    complaints of bilateral leg pain, but -- so you

11    actually can have some feeling in your lower

12    extremities?

13         A.    Yes.

14         Q.    Right.  So you do feel some pain?

15    If you have pain, you have some pain feeling in

16    your legs despite the paraplegia, right?

17         A.    Correct.

18         Q.    All right.  Going back to the wound

19    care, then, after this incident.  Again, you

20    have several wound care visits in November and

21    December of -- this is actually 2021.  I think I

22    misspoke.  So November, December of 2021, and

23    then eventually you had to have a procedure on

24    that wound, correct, in February of 2022?

25         A.    Correct.

Page 110

1          Q.    And you had a removal of the
2     pressure ulcer and a flap closure is basically
3     what it was called.  That was the procedure?
4          A.    I believe so.
5          Q.    And then in May of 2022, you had an
6     incident where you fell forward, hit your knees
7     on the ground, had to go into the hospital, and
8     you had a fracture of your femur, right?
9          A.    Correct.
10         Q.    All right.  That wasn't related to
11    anything to this incident, right?  That was a
12    separate incident?
13         A.    Well, due to weakness from not
14    being able to move for several months, my wrists
15    basically was weakened.  And I use my upper body
16    for everything.  So I wasn't able to transfer
17    into the chair the way I usually do, and that's
18    when I broke my femur bone.
19         Q.    All right.  Then if you think that,
20    that's fine.  My question is has any doctor
21    indicated that your fractured femur was related
22    to the incident on September 30th, 2021?
23         A.    I'm not sure about the femur bone,
24    but when I got my surgery for my flap-over,
25    whatever they called it, they discovered a piece

Page 111

1    of my tailbone lodged in the wound, which was

2    keeping it from healing back properly, and they

3    removed the piece of my tailbone out of the

4    wound.

5             Q.   Right.  But that was the wound

6    surgery.  I'm talking about all your treatment

7    and care you received in May.  You were in the

8    hospital for like several days related to that

9    femur fracture, right?

10            A.   I believe so.

11            Q.   And you were not real happy with

12   the care you received in the hospital that time,

13   right?

14            A.   Correct.

15            Q.   In fact, you did a Facebook video

16   where you basically said that they tried to kill

17   you in there?

18            A.   I felt like they was trying to do

19   something to me.

20            Q.   That they intentionally gave you

21   medication to try to kill you.  That's basically

22   what your Facebook video said, right?

23            A.   I don't -- I'm not sure if I said

24   those exact words.

25            Q.   You remember something to that

Page 112

1  effect, right?

2       A.   I remember complaining to the

3  hospital about the care, and I asked to speak to

4  a higher person at the hospital, because the

5  person that they had coming in was trying to

6  give me medication that wasn't prescribed to me,

7  yes.

8       Q.   In fact, there's a note here from

9  5-10-2022 where you reported that you thought

10 they were using you as an experiment to take

11 your blood, and you don't want to give any blood

12 anymore.  Do you remember that?

13      A.   I don't recall those exact words,

14 but I did refuse to give blood samples at one

15 point.

16      Q.   You told them that you have been

17 cooperating with the physical exams even if you

18 don't want -- but you really don't want to.  Do

19 you remember saying something like that?

20      A.   No, I do not.

21      Q.   You stated that if you don't get to

22 go home, you'll have to start an investigation

23 against the care providers.  Do you remember

24 that?

25      A.   I told -- I told them that they

Page 113

1  needed to have someone higher up to investigate

2  what was going on, because once he administered

3  whatever medicine he did to my IV, I started

4  feeling a whole other way that I wasn't feeling

5  before.  So I wanted them to have somebody look

6  into it, correct.

7          Q.   Did you file any type of claim,

8  medical claim, malpractice claim --

9          A.   No, I did not.

10          Q.   -- or look into that?  Did you

11  contact an attorney to try to do that?

12          A.   No, I did not.  I was happy that

13  they were willing to release me after that.

14          Q.   All right.  Then in June of 2022,

15  you went back to the burn clinic.  And basically

16  the wound was healing, about healed?

17          A.   They had me doing treatment to

18  make -- to do follow-up after the surgery to

19  make sure that the wound had -- that the surgery

20  had taken as is supposed to, and then they

21  discharged me shortly after that.

22          Q.   Well, right.  So you were doing

23  well with that back back in March of 2022.  It

24  says the patient was -- that you were doing well

25  with the ulcer and flap reconstruction as of

1    March '22.  Do you agree with that, that you

2    were doing well with it?

3            A.    I believe so.

4            Q.    And then as of June, they basically

5    discharged you, said you were doing well and

6    that it was basically healed, right?

7            A.    I believe so.

8            Q.    All right.  Since June, have you

9    had any other medical care and treatment?

10           A.    No.

11           Q.    In fact, the last thing that I have

12   from June is basically after you were

13   discharged, that you were goal oriented, working

14   towards participating more fully in your

15   children's lives, increasing your mobility both

16   throughout the house and in the public, right?

17   That's what the goal was when you were discharged

18   in June of 2022?

19           A.    I'm not sure if that's what I told

20   them or that's just what they put in there.

21           Q.    All right.  So I'm going back to a

22   record we have from July 9th of 2021.  So this

23   would have been a month or two before this

24   incident.  And you said -- you said that you had

25   this pressure ulcer.  You were still at that

1  time, July of 2021, treating that pressure

2  ulcer, right, with the topical ointment?

3          A.   I'm not sure.  I'm not sure.

4          Q.   Balsam Peru-castor oil two times a

5  day, topical ointment, was being prescribed for

6  you at that point in time?

7          A.   I'm not sure if that was to help

8  with the discoloration from the skin or whatnot,

9  but I'm not sure.

10          Q.   And there's also a 20 percent

11  topical zinc oxide treatment that you were

12  applying two times a day.  These are your

13  continue to take these medications orders in

14  your records if you want to see them.

15          A.   That's fine.

16          Q.   I mean, you don't disagree that

17  that was being prescribed for you in July of

18  2029 [sic] is to continue using these ointments,

19  right?

20          A.   I believe so.

21          MR. LAUGLE:  2021, right?

22          MR. BAZELAK:  Yeah.

23          MR. LAUGLE:  You said 2029.

24          MR. BAZELAK:  Did I say 2029?  That

25  means it's time to take a little break and

1    then -- we'll take a short little break, and I

2    don't have that much more.  So we'll take a

3    short little break and reconvene here in a

4    second.  Thanks.  I appreciate it.

5                    (Recess taken.)

6    BY MR. BAZELAK:

7            Q.    Back on the record.  I just have a

8    few more questions, Mr. Owensby.  First of all,

9    we talked about your medical treatment.  Have

10   you received any type of treatment for mental

11   health issues, depression, anxiety related to

12   this incident?

13           A.    Yes.

14           Q.    Who have you received treatment

15   from?

16           A.    Mahajan Therapeutics.

17           Q.    What's it called?

18           A.    Mahajan Therapeutics.

19           Q.    Where is that?

20           A.    It's located on North Main Street.

21                 MR. BAZELAK:  Do we have those

22   records?

23                 MS. SMITH:  You should.  If not, I

24   can forward them to you again.

25                 MR. LAUGLE:  I'm not sure if we do.

Page 117

1  BY MR. BAZELAK:

2          Q.    Who is the therapist that you see

3  there?

4          A.    It's a couple.  It's two different

5  ladies that I see, but I'm not sure -- I can't

6  remember their names right offhand.

7          Q.    When did you start seeing them?

8          A.    I'm not sure the exact date, but it

9  was after this incident.

10         Q.    Is it affiliated with a hospital at

11  all, or is it just a separate private facility?

12         A.    I'm not sure.

13         Q.    And what are they doing for you?

14         A.    They prescribed me some medicine to

15  try to help me sleep and to help get my appetite

16  back and depression.

17         Q.    What are you taking?

18         A.    I can't remember the name of the

19  medication, but I can get that information for

20  you.

21              MS. SMITH:  If you guys take a

22  look, on August 2nd, a Tuesday, it's the last

23  attachment on an email titled Ongoing Service of

24  Discovery.

25  BY MR. BAZELAK:

1        Q.   So when I said any treatment since
2    June, you have had some treatment since June,
3    but for this -- for therapy?
4        A.   Correct.  I haven't -- I didn't
5    understand the question at the time, I believe.
6    That's why I was asking you could you be more
7    specific.
8        Q.   Well, so let me ask you clearly,
9    since June of '22, you have seen some medical
10   care providers, and it's -- Mahajan Therapeutics
11   is one of them?
12       A.   Mahajan Therapeutics, correct.
13       Q.   Anybody else?  Anybody that you've
14   seen up until present day?
15       A.   I went back to Dr. Pedoto to get --
16   I can't remember what it is, but he basically
17   checked out both of my wrists for nerve damage
18   and et cetera.
19       Q.   When was that?  You don't know?
20       A.   Like maybe a month or two ago at
21   max.
22       Q.   Nerve damage from what?
23       A.   From weakness in my wrists.
24       Q.   Did he do anything for you?
25       A.   He did like some type of test,

Page 119

1    said -- I guess he was testing to see if I had

2    any nerve damage or carpal tunnel, et cetera.

3         Q.    What prompted you to go see him?

4         A.    Weakness in my wrists that wasn't

5    there before.

6         Q.    Okay.  Well, we'll go ahead and get

7    those records, additional records.  Anything

8    else?

9         A.    I can't think of anything at the

10   moment, but if -- it's possible that I might not

11   be remembering everything.  So if I can remember

12   anything else, I'll try to forward that

13   information to you all.

14             MR. BAZELAK:  All right.  And,

15   Clarissa, if you can get us any updated records.

16             MS. SMITH:  I will.

17             MR. BAZELAK:  I do recall that

18   email you sent, but if there's been anything

19   since then.

20             MS. SMITH:  I'll see if I can't put

21   everything in an email and just forward it over

22   again, or maybe just a Zip drive, and then I'll

23   just mail it off to you guys.  That will

24   probably be easier.

25             MR. BAZELAK:  That's fine.

                                          Page 120

1              MS. SMITH:  I'll send you the

2   tracking.

3   BY MR. BAZELAK:

4        Q.    Have you talked to anybody else

5   about this case, other than your attorneys, in

6   terms of like professionals, like expert

7   witnesses or anything like that?  Have you met

8   with like an expert witness to talk about the

9   case?

10       A.    What do you consider expert

11  witnesses?

12       Q.    Somebody that -- either a physician

13  or a police expert or anything like that.

14       A.    Not to my knowledge.

15       Q.    All right.  You're on Medicare and

16  Medicaid; is that right?

17       A.    Correct.

18       Q.    And all of your medical bills have

19  been taken care of by Medicare or Medicaid

20  payments, correct?

21       A.    I believe so.

22       Q.    And if it hasn't been taken care of

23  by Medicare or Medicaid payments, it's been

24  basically written off by the hospitals or the

25  doctors, right?

1          A.   I'm not sure, but I would imagine.

2          Q.   Yeah.  Well, the only thing you can

3    tell me is has anybody -- has anybody billed you

4    for any out-of-pocket expenses, medical bills,

5    that you have not paid yet that they remain

6    unpaid or that you have paid?

7          A.   Not that I'm aware of.

8          Q.   All right.  Are you making a claim

9    in this case for losing any type of income or

10   wages?

11         A.   Yes.

12         Q.   All right.  Can you put that

13   like -- can you quantify that, put that in any

14   type of numbers in terms of income lost related

15   to the incident?

16         A.   I got a couple properties that I

17   was planning on turning for profit that I wasn't

18   able to, you know, complete or, you know, they

19   have been on hold ever since the situation when

20   they took the moneys and, you know, I've been

21   going through everything that I've been going

22   through.

23         Q.   All right.  Well, that's -- okay.

24   When you said that they took the money, so you

25   are referring to a different case than this

Page 122

1   case.  That's the case in Montgomery County with

2   regard to you filed a lawsuit to get the

3   funds --

4           A.   Returned.

5           Q.   -- taken returned to you, right?

6   That's pending and being basically put off until

7   a later time, right?

8           A.   I guess so.  I don't -- I thought

9   that it was all tied together, but I guess

10  you're making sense with what you're saying.

11          Q.   Got you.  All right.  Because

12  obviously if you had that money, you could use

13  that in your business, invest it, do whatever?

14          A.   Correct.

15          Q.   So that's what you're referring to,

16  right?

17          A.   (Witness nodding head up and down.)

18          Q.   Right?

19          A.   Yes.

20          Q.   I asked you in the beginning of the

21  deposition about any employees that you have in

22  any of your businesses, and you -- we talked

23  about that, but I don't know if I asked you with

24  regard to CeeJaye and CJ Lawn Care.  There's two

25  separate companies?

Page 123

1          A.    Correct.

2          Q.    Do you have any employees for those

3    companies?

4          A.    No.

5          Q.    So we've talked about in this

6    deposition all the employees that you have in

7    any of your businesses?

8          A.    Correct.

9          Q.    Have you kept any type of journal

10   or diary -- you said you like to draw and you

11   like to use your hands and stuff, but have you

12   kept a diary or a journal of anything that's

13   happened relating to this incident or after?

14         A.    Do you mean --

15         Q.    Written stuff down about --

16         A.    My day-to-day stuff that I've been

17   going through?

18         Q.    Yep.

19         A.    Kind of/sort of.

20         Q.    All right.  And if you have

21   anything on your own that you've written down in

22   terms of a diary or a journal, notes, or

23   anything to document, you know, what's happened

24   to you, if you could provide those to your

25   attorney.

1        MR. BAZELAK:  And I'll make a

2    request for those, Clarissa, if he has got any

3    notes, a journal --

4        MS. SMITH:  Okay.

5    BY MR. BAZELAK:

6        Q.   Or anything that you've written

7    down, anything to document.  I just don't want

8    later you have all these notes that you're going

9    to use at a trial or whatever that I haven't

10   seen.

11       A.   Right.

12       Q.   If you have them and we're entitled

13   to them, I just want you to turn them over to

14   your attorney.  She can look at them and then

15   get them to us.  Is that fair?

16       A.   Okay.

17       Q.   So if you do that, you can just

18   provide them to your attorney.

19            (Thereupon, an off-the-record

20   discussion was held.)

21            (Thereupon, Defendants' Exhibit 4,

22   First Set of Interrogatories of Defendant City

23   of Dayton Directed to Plaintiff Clifford

24   Owensby, was marked for purposes of

25   identification.)

Page 125

1    BY MR. BAZELAK:

2          Q.    Okay.   Mr. Owensby, I've shown you

3    what's been marked as Defendants' Exhibit 4 for

4    identification purposes.   And let's just go to

5    page seven.   There's a verification page at the

6    back there.   And is that your signature?

7          A.    Yes.

8          Q.    All right.   So you acknowledged

9    there under oath that you had answered all of

10   these questions that were submitted in the state

11   case that we talked about, correct?

12         A.    I'll have to look over this to see

13   what you're talking about.

14         Q.    Yeah, this is involving the $22,450

15   US currency, and we had sent out questions for

16   you to answer in that case.

17         A.    I believe I remember this.

18         Q.    All right.   And in the first

19   question, it just asked you the residences that

20   you reside, and you took the Fifth.   You pleaded

21   the Fifth Amendment in response to that

22   question, correct?

23         A.    Okay.

24         Q.    Yes?

25         A.    I believe so.

Page 126

1          Q.   All right.  And then in paragraph
2     two, it's just asking about your formal
3     education, et cetera.  You pleaded the Fifth
4     Amendment, correct?
5               A.   I believe so.
6               Q.   Then it asks about your employment,
7     where you worked and everything, and you took
8     the Fifth Amendment, correct?
9               A.   I believe so.
10              Q.   And then paragraph four, basically
11     it's asking you about where you got the $22,000
12     that we talked about today, right?  And then you
13     took the Fifth?
14              A.   I believe so.
15              Q.   And, again, numerous other
16     questions about the sources of the money that
17     was recovered in the car.  And instead of
18     answering basically the source of the income,
19     you took the Fifth Amendment against your rights
20     to protect yourself from self-incrimination?
21              A.   I believe so.
22              Q.   Why did you do that?
23              MR. WILLIS:  Object to why he took
24     the Fifth Amendment, because it states why he
25     took it.

                                            Page 127

1                    MR. BAZELAK:  It's a civil case.

2                    MR. WILLIS:  But it's not relevant

3     to why you took the money from him.

4     BY MR. BAZELAK:

5          Q.   Well, I'm asking you why you took

6     the Fifth Amendment?

7                    MR. WILLIS:  He doesn't have to

8     explain that.  He took it because the

9     Constitution gives him the right to take that,

10    and it's not relevant to whether or not the city

11    was out of order in taking his money.

12    BY MR. BAZELAK:

13         Q.   Do you understand what the Fifth

14    Amendment is?

15                   MR. WILLIS:  Don't answer that

16    question.  Get a Court order.

17                   MR. BAZELAK:  I have this.  I don't

18    need a Court order.  That's all I need.  All

19    right.  Anything else?

20                   MR. LAUGLE:  No.

21                   MR. BAZELAK:  That's all I have.

22    Thanks.

23                   MS. SMITH:  Okay.  We will read.

24    Thank you.

25                   (Thereupon, the deposition was

Page 128

1    concluded at 12:54 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 129

1    STATE OF OHIO           )
2    COUNTY OF MONTGOMERY )  SS:   CERTIFICATE
3                I, Karen M. Rudd, a Notary
4    Public within and for the State of Ohio, duly
5    commissioned and qualified,
6                DO HEREBY CERTIFY that the
7    above-named CLIFFORD OWENSBY, was by me first
8    duly sworn to testify the truth, the whole truth
9    and nothing but the truth.
10               Said testimony was reduced to
11   writing by me stenographically in the presence
12   of the witness and thereafter reduced to
13   typewriting.
14               I FURTHER CERTIFY that I am not a
15   relative or Attorney of either party, in any
16   manner interested in the event of this action,
17   nor am I, or the court reporting firm with which
18   I am affiliated, under a contract as defined in
19   Civil Rule 28(D).
20
21
22
23
24
25

Page 130

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 14th day of February, 2023.

4                    *Karen M. Rudd*

                    _____

5              _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

                    KAREN M. RUDD

6                    NOTARY PUBLIC, STATE OF OHIO

                    My commission expires 5-21-2027

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 131

```
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4

     February 22, 2023
 5

     To: Clarissa A. Smith, Esq.
 6

     Case Name: Owensby, Clifford v. The City Of Dayton Et Al.
 7

     Veritext Reference Number: 5702490
 8

     Witness:  Clifford Owensby        Deposition Date:  2/9/2023
 9

10   Dear Sir/Madam:

11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20

21   Sincerely,

22   Production Department

23

24

25   NO NOTARY REQUIRED IN CA
```

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

2
        ASSIGNMENT REFERENCE NO: 5702490
3       CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
        DATE OF DEPOSITION: 2/9/2023
4       WITNESS' NAME: Clifford Owensby
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have made no changes to the testimony
    as transcribed by the court reporter.

8
    _____        _____
9   Date                    Clifford Owensby
10          Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:

12
            They have read the transcript;
13          They signed the foregoing Sworn
                Statement; and
14          Their execution of this Statement is of
                their free act and deed.

15
            I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5702490
 3      CASE NAME: Owensby, Clifford v. The City Of Dayton Et Al.
        DATE OF DEPOSITION: 2/9/2023
 4      WITNESS' NAME: Clifford Owensby
 5          In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7          I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9          I request that these changes be entered
        as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____
        Date                    Clifford Owensby
14
            Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22      this _____ day of_____, 20_____.
23              _____
                Notary Public
24
                _____
25              Commission Expiration Date
```

Page 134

1                          ERRATA SHEET

               VERITEXT LEGAL SOLUTIONS MIDWEST

2                    ASSIGNMENT NO: 5702490

3        PAGE/LINE(S) /         CHANGE          /REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19

         _____      _____

20       Date                  Clifford Owensby

21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22       DAY OF _____, 20_____ .

23                      _____

                        Notary Public

24

                        _____

25                      Commission Expiration Date

**[& - 28]**

Page 1

| & | | | |
|---|---|---|---|

**&**

**&** 62:20

**0**

**00343** 1:7

**1**

**1** 2:5 34:6,11
38:18 39:5
40:3
**1,000** 56:2
**1,375** 31:3
**10,000** 29:22
61:17
**10-15** 108:10
**10-22** 108:10
**10-29** 108:10
**10-29-2021**
108:24
**100,000** 61:8
**101** 1:17 3:17
**108** 3:4
**10th** 63:25
**11** 67:8 80:2
83:7
**11-05** 7:1
**1100** 131:1
**12** 83:7,9 98:1
**1220** 3:10
**124** 2:19
**12:00** 80:2
**12:54** 128:1
**13** 6:23
**1300** 28:18
**14** 40:22

**14th** 130:3
**15** 6:10 40:22
41:7
**15,133** 50:5
51:14
**15th** 6:19
**16,092** 54:12
**17** 6:7,8 51:12
**17,425** 54:16
**1709** 5:22
30:13,15,18
**18** 47:13 53:3
58:14 75:5
97:8,17
**18,000** 46:20
47:3,3,11
**18,193** 47:2
**1820** 131:2
**1954** 24:17
28:17 30:16
31:14 33:22
35:9 36:11
78:21 79:10
80:16 81:2
**1:00** 83:9
**1st** 66:25 67:11

**2**

**2** 2:8 39:25
63:2,7
**2/9/2023** 131:8
132:3 133:3
**20** 115:10
132:16 133:22
134:22

**200** 56:1
**2000** 10:24
15:23
**2002** 56:6
**2005** 56:11
**2006** 56:2
**2007** 57:19
**2008** 58:22
**2009** 58:22
**2012** 6:23
**2013** 11:7,17
15:20,24 16:3
18:7 19:3
40:21 51:12
56:21 57:15
**2015** 41:6
42:11,18,22
44:3 49:17,22
60:15,20 61:2
61:18 65:11,17
**2016** 50:1 64:1
**2017** 18:22
50:4 51:24
53:3 54:8
**2018** 51:16,24
54:8,22,24
55:2,3,5,8
62:10 66:5,21
67:1,6,11
**2019** 54:11,14
72:6 73:3,11
73:15
**2020** 54:16
74:1,12 76:15

**2021** 29:12
33:12,14 37:4
37:4 38:7
39:20 47:1,6
54:19,24 76:8
77:8 109:21,22
110:22 114:22
115:1,21
**2022** 29:10
108:16 109:24
110:5 113:14
113:23 114:18
**2023** 1:19 15:9
29:11 130:3
131:4
**2029** 115:18,23
115:24
**2049** 28:16
**216** 3:5,6,12,12
**216-523-1313**
131:3
**22** 114:1 118:9
131:4
**22,000** 45:6
46:3 47:14
81:10,15
126:11
**22,450** 125:14
**22,500** 44:11
98:22
**22261** 130:4
**274-9915** 3:6
3:12
**28** 129:19

**2nd** 117:22

**3**

**3** 2:11 5:22
31:9,10 74:20
74:25
**3-5-07** 6:10
**30** 28:18
**308** 3:11
**30th** 76:8 77:8
110:22
**32** 28:18
**330** 24:21
28:16 31:13
35:17 40:1
**333-3628** 3:19
**333-4100** 3:18
**34** 2:7
**3643** 24:20
28:17
**3:21** 1:7

**4**

**4** 2:2,14 124:21
125:3
**4-1-2021** 34:22
35:7
**40** 29:7
**44114** 3:5,11
131:2
**45** 80:17 81:1
81:20 83:8
**45402** 3:18
5:23
**4651** 24:21
28:20

**4704** 24:21
29:19

**5**

**5-10-2022**
112:9
**5-21-2027**
130:6
**50** 29:7
**50,000** 61:8
**523-1100** 3:5
3:12
**550** 33:15,23
**5702490** 131:7
132:2 133:2
134:2

**6**

**6-2-2020** 74:12
75:1,5,7
**6-3-05** 6:8
**600** 33:6,14
**613-4277** 22:13
**63** 2:10

**7**

**7,000** 66:23
**7,462** 54:19
**7-1-2021** 35:8
**74** 2:13
**75** 3:4

**8**

**8,443** 51:17
54:24
**8-13** 67:13
**850** 33:3,21

**9**

**9** 1:19
**912** 28:19
35:12
**937** 3:18,19
22:13
**9:21** 1:19
**9th** 114:22

**a**

**a.m.** 1:19
**abandoned**
32:8
**ability** 76:24
**able** 17:16,17
17:20 20:8,21
23:11 24:5
26:2 48:22,25
49:2,3 53:18
67:5,9,10
72:16 79:17
82:9 110:14,16
121:18
**above** 95:6
129:7 131:17
**access** 48:25
**accident** 60:15
62:11 65:12
66:7,17 67:13
73:16 108:15
108:20 109:2
**accidents** 20:5
60:10,12 61:18
61:24
**accordance**
132:5 133:5

**account** 42:14
43:18 47:6
48:7,9 49:6,9
49:11 51:4
**accountant**
26:16 27:4
**accounted** 53:8
**accounts** 42:4,6
43:3
**accurate** 44:7
50:21 60:6
67:1,2 94:1
**acknowledge**
132:11 133:16
**acknowledged**
125:8
**acquire** 31:24
**acrobatic** 12:7
**act** 104:20
132:14 133:20
**action** 63:20
129:16
**actual** 21:10
22:4 54:7
81:24
**actually** 6:8
21:16 61:25
72:1 75:15
76:5 79:16
95:5 100:10
103:20 104:9
104:11 109:11
109:21
**adam** 3:16
55:10

**adam.laugle**
  3:20
**additional**
  38:25 106:17
  119:7
**address**  5:20,25
  7:24,25 8:13
  8:15 28:21
  30:12 131:15
**addresses**
  28:14,15 35:15
**adjusted**  50:5
  51:13,17 53:22
  54:11,13,20,23
  66:22
**administered**
  113:2
**advantage**
  17:19
**advising**  98:11
**affidavit**  2:9
  63:3,12
**affiliated**  102:6
  117:10 129:18
**affirmatively**
  99:14
**affixed**  132:15
  133:21
**afford**  17:20
**african**  87:8
  94:24
**age**  4:2
**agency**  14:17
**ages**  6:17

**ago**  7:15 15:8
  40:8 62:3
  118:20
**agree**  47:8
  52:21 85:4
  114:1
**ahead**  5:17
  36:14 55:17
  87:22 90:15
  97:13 119:6
**ain't**  90:25
**air**  75:14,14
  89:17 98:7
**al**  1:9 131:6
  132:3 133:3
**alexander**
  39:24 82:10
**alleging**  77:7
**alley**  66:3
**alleyway**  60:23
**allowed**  77:1,3
  98:2
**allowing**  96:13
  96:19,22
**amendment**
  125:21 126:4,8
  126:19,24
  127:6,14
**american**  87:8
  94:24
**amount**  11:11
  51:23 52:25
  53:21 61:11
  62:22,23

**andrea**  39:24
  82:10
**answer**  36:22
  45:25 55:17
  96:16 98:12,17
  98:24 99:2,3,4
  99:5,5,12
  106:1 107:1,3
  107:7,22
  125:16 127:15
**answered**
  125:9
**answering**
  126:18
**answers**  4:19
  27:14
**anxiety**  116:11
**anybody**  5:25
  9:15 45:14
  69:20 92:18
  97:21 118:13
  118:13 120:4
  121:3,3
**anymore**  39:25
  112:12
**apartment**  5:22
  9:18 31:7,8
  39:24,25 40:3
  78:22
**apparatus**  13:1
**apparently**
  84:7
**appear**  132:11
  133:15

**appearances**
  3:1
**appended**
  133:11,18
**appetite**  117:15
**appliances**
  13:25 19:19
**application**
  47:20 48:14,20
  48:22
**applying**
  115:12
**appointments**
  73:6 74:19
**appreciate**
  116:4
**approached**
  84:20 85:21
**approaching**
  84:15
**approximately**
  44:10 49:18,24
**april**  37:3
**arby's**  12:18
  13:10,12,14,15
**area**  75:23
**arm**  94:25
  95:15,16,18,24
**arrest**  45:23
**arrived**  79:24
  83:7
**asked**  47:19,24
  84:23 85:6,25
  86:9,15 87:15
  87:23 88:23

89:15 93:11,13
93:21 99:10,15
109:7 112:3
122:20,23
125:19
**asking** 37:23
45:21 49:12,14
52:7 53:10
64:12 70:16
86:17 88:25
89:9 90:23
93:17 96:22
98:14 118:6
126:2,11 127:5
**asks** 126:6
**assets** 64:5,13
**assignment**
132:2 133:2
134:2
**assist** 90:8
92:19 96:14,23
100:2 103:25
104:15
**assistance** 9:11
9:21 92:24
106:17
**assisted** 90:9
103:20 104:11
104:12
**assists** 9:19
**associate's**
11:14
**assume** 75:19
101:19,21

**assuming** 34:24
101:13
**attached** 133:7
**attachment**
117:23
**attempt** 57:12
**attorney** 3:3,8
3:10 4:8 23:19
25:23 26:11
37:12,19,24
39:17 48:17
64:22 113:11
123:25 124:14
124:18 129:15
**attorneys** 3:17
62:17 120:5
**audi** 77:15 81:1
82:16 83:3
**audible** 4:17
**auditor's** 30:5
30:6
**august** 6:19
66:5 117:22
**authorize**
133:11
**automatically**
101:13
**automobile**
67:13
**available** 16:18
48:1,2 54:3
**ave** 131:1
**avenue** 5:22,25
9:17 24:18
28:17 67:23

78:21
**aware** 49:10
91:18 98:7,14
106:15,23,23
107:4 121:7

**b**

**back** 12:13,21
19:23 38:14
39:12 41:5,15
42:11 45:20
48:15 49:17,22
52:15,16 54:8
55:9 59:4,12
61:1 63:20,23
64:17 65:16,21
65:21,25 66:16
67:17 72:23
73:2,22 75:13
76:10,23 77:21
79:9,18 80:25
83:12 85:13
86:2,10,23
87:2 100:20
102:13,14
103:1,14,22
108:22 109:3,3
109:4,18 111:2
113:15,23,23
114:21 116:7
117:16 118:15
125:6 131:15
**background**
10:18 26:24
27:2

**backside** 71:20
74:9 103:7
**bad** 32:13
**balance** 47:2
95:9,25
**balsam** 115:4
**bandage**
103:16
**bank** 42:3,6,16
43:3,21 81:18
**barrister** 3:6
**based** 53:1
**basically** 15:13
17:17 22:25
23:3 32:20
37:12 44:14
51:22 71:23
76:15 79:4
110:2,15
111:16,21
113:15 114:4,6
114:12 118:16
120:24 122:6
126:10,18
**basis** 37:19
40:13 107:6,8
107:11
**bazelak** 2:2
3:16 4:6,8 34:9
34:16 35:3
36:13,16,21,24
37:21,22 38:10
38:13 39:10,13
46:17 50:17,22
55:18,19 63:5

**[bazelak - businesses]**

70:14 74:23
98:13,18
105:20,23
106:3,7,10,13
106:14,22,25
107:6,9,14,19
108:1,3 115:22
115:24 116:6
116:21 117:1
117:25 119:14
119:17,25
120:3 124:1,5
125:1 127:1,4
127:12,17,21
**bed** 103:5
**bedroom** 31:6
**began** 94:25
**beginning**
104:18 122:20
**behalf** 3:2,14
**believe** 6:22,23
8:14 22:7
27:19 33:23
45:3,4 51:11
51:15,18 54:15
54:18,21 55:5
55:8 56:5 57:4
57:4,18,22
58:10,22 59:11
59:12 62:15,19
62:22,24 63:9
63:14 64:19
65:19 66:1,9
66:14 67:7,25
68:6 71:3,6,8

71:11,13,16
72:8,13 73:1
73:13,19 75:8
80:2 82:7
84:25 85:18
86:7,25 88:11
88:17 89:20
91:9 94:11,16
95:2 100:5
101:15 104:6
108:13 110:4
111:10 114:3,7
115:20 118:5
120:21 125:17
125:25 126:5,9
126:14,21
**belt** 79:15
**benefit** 5:4
21:18
**best** 12:14
**better** 52:1
94:5,6
**big** 61:6
**bigger** 23:1
**bilateral** 103:2
108:23 109:10
**bill** 42:5,5
**billed** 121:3
**bills** 16:1 42:17
120:18 121:4
**biological** 7:4
**birthday** 7:1
**bit** 61:5 86:2
**black** 85:20

**blade** 66:17
**blew** 73:17
**blocks** 83:23
**blood** 103:11
103:13 112:11
112:11,14
**bluehaven**
24:21 28:20,24
29:16 33:17
35:20 43:1
**body** 101:20
110:15
**bone** 76:1
110:18,23
**book** 38:4
**boosted** 20:7
**born** 6:8,10
**bottom** 63:8,10
**box** 41:24 79:5
82:1
**boxes** 78:17,18
80:9,12 81:22
81:23,24 82:1
83:13
**break** 5:12
36:14 37:1
38:11,15 87:18
102:9 115:25
116:1,3
**breaks** 5:14
**breather** 83:4
**bring** 80:12
82:9 92:12,13
92:14,14

**bringing** 81:7
**bro** 90:18 92:4
**broke** 110:18
**brother** 92:1
**brothers** 21:7
**brought** 70:20
80:19 81:21
82:11
**bruised** 74:10
**buckled** 79:15
79:16,23
**bud** 91:7
**build** 14:22
**building** 78:22
**buildings** 12:25
**bullshit** 92:11
**bunch** 102:16
**bureau** 97:25
99:19
**burn** 113:15
**burning** 12:25
**business** 11:7
16:15 19:12,15
21:1,6,18 22:5
25:3 26:4,5
53:25 59:5
61:21,22
122:13
**businesses** 12:2
18:7,13,14,22
20:13,20 23:11
23:15,19 26:11
26:17,21 27:17
27:20 46:12
49:20 122:22

123:7
**buying** 43:1
**bystanders**
100:12

**c**

**ca** 131:25
**cable** 78:17,18
79:1,5,5 80:9
80:18,22 81:22
81:23,24 82:1
83:13
**call** 16:17,19,21
21:1 27:11
57:23 80:18,22
88:24 91:23,25
93:11,14,18
94:3,7,13 95:6
106:16
**called** 1:13 4:12
18:9 27:21
72:12 80:11
81:2 91:24
92:1 97:11
100:8,11 110:3
110:25 116:17
**calling** 92:18
92:20
**cambridge**
28:19 31:15,19
31:20
**camera** 68:23
**cameras** 92:12
92:13 101:20
**campbell** 7:21
8:3

**car** 20:5 47:14
62:24 66:12
78:2 79:13,16
79:19,24 81:7
81:11,15 84:7
85:1,6 86:16
87:16,24,25
88:3,5 89:18
89:19 90:24
92:7,9,19,25
94:9,10,15
98:22 105:1,2
105:15 106:18
106:20 108:21
126:17
**care** 7:7 8:2
9:20 10:4
18:11 21:11
26:8 43:13
109:19,20
111:7,12 112:3
112:23 114:9
118:10 120:19
120:22 122:24
**career** 14:23
**carpal** 119:2
**carry** 57:12
**carrying** 12:25
57:19
**carter** 84:18
88:8 91:10
93:4 103:19
104:8
**case** 1:7 38:1,1
44:9 45:19

50:14 58:2,9
63:17 64:17,23
77:7 120:5,9
121:9,25 122:1
122:1 125:11
125:16 127:1
131:6 132:3
133:3
**cash** 39:1 41:18
41:25 42:2,13
42:15,20,21
43:16,19 46:9
47:11 64:5,13
98:22
**castor** 115:4
**casual** 81:8
**catch** 95:9
**caused** 109:3
**cautioned** 4:3
**cedric** 40:6,8
**ceejaye** 6:1,3,6
6:13 7:8 18:9
18:10 21:10,10
21:20 24:10,16
122:24
**cell** 91:24
**certain** 25:5
**certainly** 4:23
**certificate**
129:2 133:11
**certification**
132:1 133:1
**certified** 4:4
**certify** 129:6,14

**cetera** 83:18
118:18 119:2
126:3
**chair** 75:21
110:17
**chance** 18:19
45:22 69:25
81:19 96:21
**change** 131:13
131:14 133:8
134:3
**changes** 131:12
132:7 133:7,9
**changing** 13:21
**chaniece** 8:8
**charge** 56:16
56:16,24 57:6
57:20 58:18
**charged** 58:8
69:18 70:5,8
70:17
**charges** 55:21
58:3,4 70:20
**cheap** 32:5,12
**check** 9:24
25:22 39:1
46:23 49:13
80:18
**checked** 67:16
101:23 103:7
103:14 118:17
**chg** 1:7
**child** 6:22 8:4
9:12 77:24
86:9,15

children 6:1,4
6:14 7:4 8:20
8:21,24 9:3,6
9:22 10:6
62:24
children's
114:15
chronologica...
13:18
churches 18:2
19:5
city 1:8,17 2:16
3:15 4:8,10
14:8 15:3 32:7
64:23 98:15
124:22 127:10
131:6 132:3
133:3
civil 1:14 127:1
129:19 132:5
133:5
cj 18:10,10
21:10 122:24
claim 59:16
65:5 78:8
113:7,8,8
121:8
claims 61:18
62:18 64:25
clarified 5:1
clarissa 3:8,9
39:11 50:18
119:15 124:2
131:5

clarissa.a.smi...
3:13
classes 11:3,9
11:12,15 15:21
16:4,4 19:4
cleaned 72:24
cleaning 20:14
20:18,22,23
clearly 118:8
cleveland 3:5
3:11 131:2
client 37:19,20
clifford 1:5,12
2:17 4:1 5:19
6:2,3,9,13
87:12 124:23
129:7 131:6,8
132:3,4,9
133:3,4,13
134:20
clifford's 7:9
clinic 72:7,23
72:25 73:8
108:8,11
113:15
close 75:15
76:12
closed 76:11
closure 110:2
clothes 9:5
cobb 31:1
cocaine 56:5,7
56:12
collect 80:21

college 11:1
colonel 10:19
come 9:23
22:21 24:23
55:9 84:5 92:5
92:11,12 100:7
100:8 101:7
comes 9:18
comfortable
105:7
coming 60:22
103:6 112:5
commission
67:4 130:6
132:19 133:25
134:25
commissioned
129:5
common 63:18
companies
23:16,25 27:25
62:8 122:25
123:3
company 26:1
52:16 79:2
80:18,22
compensation
65:5
complained
65:20 73:22
complaining
23:1 108:22
112:2
complaints
109:10

complete 24:5
121:18
completed
131:15
concealed
57:20
concerned
105:14
concluded
128:1
concrete 18:18
18:19
condition 32:13
conducted 2:1
confirmation
51:22
consider 59:9
120:10
consistent
40:16 51:23
constitution
127:9
contact 22:9
23:14 113:11
contacted
84:23
continue
115:13,18
contract 14:18
129:18
contractors
19:17 21:15
24:16
contracts 20:21
23:1,24 24:2

contusion  74:8
conversation
  81:8 101:10
conversations
  37:20,24 93:10
convicted
  57:20
conviction  56:8
  56:18 57:2,8
  57:13,23
convictions
  57:5
cool  85:12
cooperating
  112:17
copies  34:23
  38:4
cops  98:1
copy  50:18
cord  71:1
corp  76:19
corporations
  27:22
correct  6:5
  7:19 8:10,17
  8:18,23 9:12
  10:20 11:16,19
  13:8 15:16
  16:6,23,25
  18:12,24 19:1
  21:24 22:15
  24:20 25:18
  26:15 28:1,25
  29:3 30:17,21
  31:16 32:14,17

33:19 34:2,20
35:9,11,19,22
35:24,25 36:12
38:22,23,24
39:6 41:16,20
43:7 44:12,15
45:4 46:6,12
47:7,9,12 51:1
51:4 52:8
54:14,20,22
56:10 57:16
59:6 60:11,13
60:15 61:3
64:1,2 65:22
65:23 66:18
67:6,15,19
70:23,24 71:2
71:4,15,21
72:21 73:12
75:3,7 76:10
76:19,25 77:10
77:13,16,19,23
78:4,6,8,14
79:12,20,21
80:1 84:17,21
84:22 85:9
86:10,11,14,22
87:5,9,10 88:3
88:10 89:3,6,7
90:10 91:3
92:16,22 94:21
95:1,20 96:14
100:21 101:24
102:7,13,17,21
103:4,19,21

107:25 109:17
109:24,25
110:9 111:14
113:6 118:4,12
120:17,20
122:14 123:1,8
125:11,22
126:4,8
corrections
  131:12 133:17
costs  64:6
counsel  50:14
  64:14
county  30:5
  122:1 129:2
  132:10 133:15
couple  14:12,18
  20:5 24:15
  60:4,8,12 61:7
  61:24 117:4
  121:16
course  71:18
  72:15
court  1:1 4:18
  5:4,8 9:9 63:18
  64:5 107:24
  127:16,18
  129:17 132:7
crack  56:8,13
credit  42:8 47:5
crew  22:21
crime  70:17
criminal  55:12
  55:16

cross  1:14 4:5
cruiser  45:20
  84:14 85:14
  86:24 87:2,3,3
  100:21
curious  54:22
currency
  125:15
current  5:20
  8:16
currently  8:5,6
  9:15 28:11
  30:8,16 31:18
  39:21 40:10
custody  102:24
customers
  24:12
cv  1:7

d

d  129:19
damage  71:12
  118:17,22
  119:2
dandridge
  24:20 28:18
  31:14
daniel  39:22
daniels  20:14
  21:3
dark  82:20,23
  85:2
darker  83:3
date  7:16 46:9
  63:25 76:16
  78:3 117:8

**[date - discovered]**

131:8 132:3,9
132:19 133:3
133:13,25
134:20,25
**dated** 75:1
**dates** 34:22,25
35:4 37:5 62:2
**david** 36:10
82:10
**day** 47:10,14
68:18 69:3,7
69:21,24 70:12
70:16 77:8,9
77:18 81:18
82:6 83:1,9
115:5,12
118:14 123:16
123:16 130:3
132:16 133:22
134:22
**days** 111:8
131:18
**dayton** 1:3,8,17
1:18 2:16 3:15
3:18 4:9 5:23
7:23 8:12 14:8
15:3 63:19
98:15 124:23
130:2 131:6
132:3 133:3
**daytonohio.g...**
3:19,20
**deal** 30:25
107:23

**dear** 131:10
**death** 7:14
**debridement**
74:16
**deceased** 7:11
**december** 50:4
66:19,25,25
67:6,11 75:5
109:21,22
**decided** 78:16
**deducted** 53:24
**deductions**
53:5,23
**deed** 132:14
133:20
**deemed** 131:19
**defendant** 2:16
63:19 124:22
**defendants**
1:10,13 2:5,8
2:11,14 3:14
34:6,11 38:17
39:5 63:2,7
74:20,25
124:21 125:3
**defined** 129:18
**definitely** 90:14
**degree** 11:14
**delivered** 13:24
**deliveries**
13:23 19:18
**demanding**
90:1
**department**
63:19 108:24

131:22
**depiction** 94:1
**deposit** 42:4,6
43:17 47:1,4
64:13 81:18
**deposited**
42:13 47:5
**depositing**
41:22
**deposition** 1:12
4:12,13,24
9:25 122:21
123:6 127:25
131:8,11 132:1
132:3 133:1,3
**depositions**
105:13
**depression**
116:11 117:16
**derrick** 36:1
**despite** 75:19
89:22 109:16
**details** 63:1
67:24
**determined**
104:25
**devaughn** 5:19
**develop** 72:16
**developed**
71:17,20 72:9
72:19
**device** 85:5
**dewberry**
36:10 82:10

**diagnosed**
102:25
**diary** 123:10
123:12,22
**die** 7:12
**died** 69:14
**difference**
36:20 53:12,13
61:6,9
**different** 30:11
34:25,25 35:14
60:9,12 117:4
121:25
**difficult** 5:8
**dilapidated**
32:8
**directed** 2:16
124:23
**disability** 56:22
57:9,12
**disabled** 91:19
**disadvantage**
28:7
**disagree**
115:16
**discharge**
103:6
**discharged**
72:5 113:21
114:5,13,17
**discoloration**
115:8
**discovered**
102:20 110:25

discovery 37:3
46:25 47:19
117:24
discussion
124:20
dispute 95:12
district 1:1,2
division 1:3
doctor 110:20
doctors 120:25
document 50:8
50:23 51:20,21
123:23 124:7
documentation
23:23 24:4
41:13 47:19
48:13,19 49:1
49:14
documents
27:16 37:25
50:13 52:2
53:1
dog 89:17
97:10
doing 4:21
13:21,22 16:13
17:5,11 19:8
19:18 20:22
23:3 43:12
71:15 75:12,20
81:4 86:5
113:17,22,24
114:2,5 117:13
dollars 46:3
61:7 81:11

door 108:22
douglas 40:8
dr 118:15
drag 90:3
draw 12:6
123:10
drink 69:25
drive 24:21
28:18,19 85:7
119:22
driver 59:22
60:21 108:20
driver's 60:22
66:1 84:20
85:13,21 87:7
95:6 108:22
driving 66:3
77:17 79:22
drop 11:12
drug 55:20
56:16 57:2,5,8
drywall 18:17
due 57:4
110:13
duly 4:3 129:4
129:8
dummies 13:1
dyer 62:20

**e**

e 8:9 21:23
early 66:25
earned 52:8,11
52:15
easier 119:24

education
10:25 11:1,21
126:3
educational
10:18
effect 85:8
91:11 112:1
either 42:13
43:15 87:2
120:12 129:15
elapsed 81:21
electrician
21:25 22:14
email 117:23
119:18,21
131:17
emails 21:25
emergency
74:3 102:11
108:24
employed
12:17
employees
20:25 21:2,3,6
21:10 25:19
122:21 123:2,6
employer 14:25
15:2
employers 14:5
employment
12:2,11 14:4
14:25 20:1
126:6
enabled 59:4

enclosed
131:11
encounter
85:16
ended 66:12
70:25
enforcement
97:23
enhanced
30:23,24
entered 133:9
entire 132:5
133:5
entitled 124:12
equipment
81:24 82:8,12
82:13 83:17
100:1
erieview 3:4
errata 131:13
131:18 133:7
133:10,18
134:1
esq 131:5
essentially
15:23 92:16
establish 49:8
49:10
established
104:19
estate 11:8 14:2
14:5,8 15:15
15:18 16:5,8
17:10 19:4
42:25

[estates - financially]

estates  30:23
  30:24
estimate  40:12
  41:6 60:2
estimates  21:17
et  1:9 83:18
  118:18 119:2
  126:3 131:6
  132:3 133:3
event  91:23
  129:16
eventually
  17:14 18:5
  72:2 100:7,17
  100:19 101:7,8
  101:22 109:23
everybody  79:7
everybody's
  23:9
evidence  70:13
exact  6:23 7:16
  11:11 14:11
  15:10 21:22
  22:20 61:14
  97:9 111:24
  112:13 117:8
exactly  15:7
  45:8 67:24
  68:9 109:5
examination
  1:14 2:1 4:5
examined  4:4
exams  112:17
exchange  94:23
  98:20

excuse  88:14
executed
  133:10
execution
  132:14 133:19
exhibit  2:5,8,11
  2:14 34:6,11
  38:18 39:5
  63:2,7 74:20
  74:25 124:21
  125:3
exhibits  2:4
existed  76:9
expect  94:5
expecting  84:4
  96:11
expenses  53:25
  121:4
experience  27:8
experiment
  112:10
expert  120:6,8
  120:10,13
expiration
  132:19 133:25
  134:25
expired  48:6
  49:7
expires  130:6
explain  45:23
  63:16 97:6
  127:8
explained  46:1
  105:13

explaining  49:4
explanatory
  18:16
extra  50:18
extremities
  109:12
extremity
  103:2

f

facebook
  111:15,22
facility  72:5
  117:11
fact  88:13 90:5
  90:7 111:15
  112:8 114:11
failed  21:1 26:4
fair  10:15
  11:15 34:19
  37:10,21 44:8
  51:6 53:3
  55:18 124:15
false  97:1,1,2,3
  97:4
family  9:23
  21:4,5
far  39:12 100:6
fault  59:21
faulty  22:25
fax  3:6,12,19
february  1:19
  63:25 73:3
  74:1 76:15
  109:24 130:3
  131:4

federal  46:10
  48:14
feel  5:13 87:19
  109:14
feeling  109:11
  109:15 113:4,4
fell  110:6
felony  57:17
felt  111:18
female  83:15
femur  110:8,18
  110:21,23
  111:9
fender  108:21
ferguson  92:5
fi  81:24 82:1
fifth  125:20,21
  126:3,8,13,19
  126:24 127:6
  127:13
figure  15:11
  19:21
file  27:9 113:7
filed  4:9 51:3
  63:20 65:4
  122:2
filing  26:21
  27:8
filings  27:17
fill  35:5
finally  76:11
financial  9:11
  26:18 55:10
financially
  15:14

**find** 52:24 131:11

**finding** 21:15

**fine** 36:18 45:25 110:20 115:15 119:25

**finish** 5:5 22:4 105:23 106:3,8 106:11

**fire** 69:3

**fired** 69:7

**firefighters** 12:22

**firm** 129:17

**first** 2:15 4:3 4:16 12:18 16:21 20:8,19 33:15 36:25 84:25 93:22 97:2,15,20 106:8 116:8 124:22 125:18 129:7

**fit** 77:2

**five** 7:15 38:7 39:16,20 40:14 56:7,12

**fix** 16:11 25:7 32:15

**fixed** 24:17 29:2,18

**fixer** 32:4

**flap** 110:2,24 113:25

**flips** 12:7

**flooring** 18:17

**focus** 23:3

**follow** 73:5,6,8 74:18,18 113:18

**followed** 72:6

**following** 35:16

**follows** 4:4

**food** 9:5

**foot** 103:2

**foregoing** 132:13 133:18

**forgive** 6:20

**formal** 11:20 126:2

**formed** 18:5,6 18:22

**forsythe** 24:21 29:19 30:2

**forward** 42:22 44:4 54:8 110:6 116:24 119:12,21 131:15

**found** 16:12 69:5

**four** 13:6 33:25 34:1 39:20 40:14 78:25 126:10

**fracture** 110:8 111:9

**fractured** 110:21

**fractures** 71:9 102:19

**fracturing** 70:25

**frame** 11:18 18:23 19:24 42:19 49:18 65:17

**free** 5:14 87:19 89:17 98:7 132:14 133:20

**front** 38:17 60:21 66:12 80:10 108:21

**fucking** 92:10

**full** 5:18 13:1,3 16:19 53:10

**fully** 114:14

**funding** 47:4

**funds** 18:3 48:14 64:5,12 122:3

**furniture** 13:24 19:19

**further** 129:14

**g**

**gaining** 76:5

**garofalo** 62:20

**gathering** 37:25

**gear** 13:2

**gears** 65:8

**general** 43:11

**generate** 25:8 44:20 67:9

**generated** 15:13 20:2

**generating** 17:5 42:19

**getting** 15:1,18 75:6 76:22 82:13 84:6 88:14 90:8,9 93:1 94:8 96:10 105:1,7 105:14

**gettysburg** 58:16

**girl's** 86:13

**girlfriend** 8:17

**girlfriend's** 77:25 78:7

**girls** 7:18

**give** 4:17 21:17 24:9 27:14 32:7,25 41:6 44:2 60:2,5,19 61:14 64:5,13 96:21 112:6,11 112:14

**gives** 127:9

**gmail.com** 3:13

**go** 5:17 13:18 14:19 19:5 20:11,12 23:6 32:6,9,18 33:5 33:17,20 35:8 36:13,20 38:6 41:5 43:2 54:10 55:17

58:3 71:24
72:23 74:2
78:18 80:6
84:2 87:22
90:15,25 97:13
98:17 106:1
108:6,18 110:7
112:22 119:3,6
125:4
**goal** 114:13,17
**goes** 51:7 85:1
93:15
**going** 4:11 9:14
12:1,13 15:21
20:11 24:5
25:22 28:9
32:18 33:11
45:2 55:2 58:2
61:4 72:4
74:16 76:13
77:5 79:4,7
80:8 81:17
84:2 88:2,15
88:19,21 89:2
89:16,17 90:3
90:8,14,25
91:1 92:15
93:4 94:7
99:12 106:5,12
109:18 113:2
114:21 121:21
121:21 123:17
124:8
**good** 4:7
104:16 105:11

**gotten** 62:8
83:14
**government**
48:15
**grabbed** 94:25
95:4,5,13,19,23
95:24
**grabbing** 95:9
95:21
**gradually**
40:23
**graduate** 10:21
**graduated** 11:6
15:24
**graduates**
12:20
**gram** 56:7
**grams** 56:1,2,8
56:12,13
**grand** 5:22,25
9:17 24:18
28:17 29:7
30:8,11,13,15
31:14 33:22
35:9,10 36:11
61:12 62:16,23
78:21 79:11,23
80:16 81:2
83:7,21 92:6
**grandview**
102:3,4,6
**gross** 50:5
51:13,17 53:22
54:11,13,20,23
66:22

**ground** 4:15
5:3 100:19
110:7
**guess** 68:5
83:24 105:11
119:1 122:8,9
**gun** 68:4 91:21
**gunshot** 55:4
66:24 67:21
70:22 71:18
74:14
**guy** 67:25 68:4
**guys** 117:21
119:23
**gymnastics**
12:8

## h

**habitat** 17:1,13
**half** 55:1 74:13
**hall** 1:17
**hallway** 82:8
82:13
**hammock** 87:7
88:9 92:24
93:2 94:4,6,24
**hand** 42:21
95:18,21,21
130:2
**handcuffed**
100:20
**handle** 95:10
**hands** 12:9
90:17 100:17
123:11

**handshake**
24:2
**hang** 95:7
**happen** 4:23
17:6 28:9
66:25 88:20,21
89:3
**happened** 60:5
60:9 67:21,25
68:12,14,15,21
68:22 70:2,12
85:20 89:4
94:2 101:16
123:13,23
**happening** 79:7
**happy** 111:11
113:12
**hard** 6:21 7:2
76:3
**head** 88:20
89:2 122:17
**headache**
108:23
**headed** 83:11
83:12
**heading** 79:10
**heal** 72:2,2
76:3
**healed** 75:7,10
75:18 76:6
113:16 114:6
**healing** 75:13
76:4,12 111:2
113:16

**health** 116:11
**hear** 36:5 68:13
**heard** 68:22,25
  69:1 84:1,3
**hearsay** 68:13
**held** 124:20
**help** 7:6 8:2,21
  9:1,4,6 10:3
  16:16 17:19
  26:17 60:18
  78:9 88:9,13
  88:15 92:9
  93:4 96:10,12
  99:9,10,13
  103:24 104:14
  105:5 115:7
  117:15,15
**helped** 25:20
  25:21 26:10,17
  26:20 61:20,25
  104:7
**helping** 9:2
  10:6 16:11
  27:9 89:1
**helps** 9:16,19
  10:13,15
**hereinafter** 4:3
**hereunto** 130:1
**hey** 92:4
**high** 10:19,25
  11:21,24 12:3
  12:10,12,15
  15:24
**higher** 112:4
  113:1

**hillcrest** 28:18
  31:14,21
**hip** 102:12
  103:2
**hire** 21:16 25:4
**hisself** 79:16,17
  104:16
**history** 9:15
  55:12,16 65:11
  76:14 89:16
**hit** 59:21 65:14
  66:1,3 110:6
**hobbies** 12:5
**hobby** 16:19
**hold** 21:22
  121:19
**home** 18:10,15
  26:8 42:1,3,15
  77:9,21 112:22
**homes** 18:16
**hook** 16:14
**hoping** 36:22
**hospital** 65:18
  66:8,16 67:14
  71:14 76:17
  101:23 102:1,6
  103:24 104:7
  108:25 110:7
  111:8,12 112:3
  112:4 117:10
**hospitals**
  120:24
**hour** 80:2
**hours** 72:15,15

**house** 25:7 31:5
  81:12,16
  114:16
**houses** 20:23
  43:12
**hughes** 7:10
**huh** 10:2 16:2
  18:8 19:10
  23:17,20 25:11
  31:11 39:3
  41:4 43:14
  52:3 59:18
  61:15
**humanity** 17:1
**hurt** 69:21
**hutchinson**
  36:1

**i**

**ice** 73:17
**idea** 44:2 54:25
  70:13
**identification**
  2:7,10,13,19
  34:8 63:4
  74:22,25
  124:25 125:4
**identified** 36:9
  38:18 74:24
**identify** 34:12
**imagine** 121:1
**immediately**
  84:8
**improvement**
  18:10,15 26:8

**incentive** 79:1
**incident** 29:14
  44:10 45:7,14
  46:10 65:10,18
  65:25 66:24
  67:21 68:10,12
  68:17,21 71:18
  74:14 76:16
  77:6 78:3
  92:20 99:21
  101:23 102:20
  104:19 108:5,8
  109:19 110:6
  110:11,12,22
  114:24 116:12
  117:9 121:15
  123:13
**incline** 40:25
**included** 31:4
  99:20 131:13
**including** 46:15
**income** 15:13
  16:1 17:5
  19:21,24 20:1
  20:2,6 32:19
  32:21 37:13
  38:3,16,20
  40:13 41:7
  42:24 43:10,15
  43:16,23 44:22
  47:17 49:19,19
  49:21 50:5
  51:8,13,17,23
  52:4,6,14,20,23
  52:24,25 53:9

**[income - kids]** Page 15

53:22,24 54:12
54:14,20,23
62:1 66:22,23
67:9 121:9,14
126:18
**incorporated**
133:12
**incorrect**
107:13,17,20
107:21
**increase** 40:25
76:21
**increased**
40:23
**increasing**
114:15
**incrimination**
126:20
**indicated** 44:14
45:12,17,19
97:16 110:21
**indicating**
131:13
**individual**
26:22 91:19
**individuals**
23:15
**industrial**
20:14 21:3
**influence** 69:23
**info** 23:22
**information**
22:10 23:14
38:19 45:16
46:4 47:23

48:8,10 49:7,9
60:20 117:19
119:13
**informed** 79:6
**initial** 85:16
**injured** 65:24
69:21
**injuries** 66:16
67:18 70:22
77:6
**injury** 64:18,20
71:1
**innocent**
100:11
**inside** 80:6
95:25
**insurance**
59:22 62:7
**intentionally**
111:20
**interested** 20:3
61:13 129:16
**internal** 50:24
**interrogatories**
2:15 124:22
**interviewed**
45:15,18
**invest** 59:4
122:13
**invested** 20:9
52:16
**investigate**
113:1
**investigated**
48:3

**investigation**
112:22
**investing** 61:21
**involved** 23:15
53:19 59:8
62:5 65:1 66:6
**involving** 64:18
125:14
**irs** 52:2,5,12,21
53:1,21 54:13
**issue** 71:24
**issues** 75:6
116:11
**items** 81:25
**iv** 113:3

| j |
|---|

**j** 3:16
**jail** 58:11,23
**james** 3:3
**jamila** 31:1
**january** 72:6
**jasmine** 7:10
**jerraun** 77:25
78:12,15 79:9
80:25
**jiffy** 13:20,21
13:22
**job** 12:18 13:3
14:16 16:19
17:14 21:17
105:16,21
**jobs** 12:12,20
15:12,25 17:25
19:7,8,8,13
24:6,9,10,15

25:13
**jody** 22:7,12
**joking** 83:16
**journal** 123:9
123:12,22
124:3
**jr** 6:2
**jrwillis** 3:6
**july** 37:4 60:20
114:22 115:1
115:17
**june** 113:14
114:4,8,12,18
118:2,2,9
**jury** 107:24

| k |
|---|

**karen** 1:15
129:3 130:5
**keep** 7:2 41:24
41:25 42:3,15
43:16,19 55:10
75:12 76:13
95:25
**keeping** 43:20
111:2
**kept** 22:25
42:13 123:9,12
**kettering** 102:1
102:5,5
**kid** 78:5,7
86:12,13
**kidney** 71:12
**kids** 7:3 8:1
10:8,14 77:12
77:20,22

**[kill - look]**

**kill** 111:16,21
**kind** 6:21 7:2
  12:11 13:18
  15:25 17:1
  19:22 20:12
  32:5 38:15
  49:17 51:3
  59:4 66:10
  74:9 75:17
  123:19
**knees** 110:6
**knew** 82:22,24
  84:10,13 85:15
  101:19 104:17
**know** 4:24 5:12
  7:24 12:19,24
  14:21,22 16:10
  16:12 17:16
  18:3 20:7,14
  20:20,21,22
  23:2 24:2
  25:22 32:7
  37:7 39:10
  41:21 42:23
  44:5,6,7 45:10
  46:18 48:11
  49:18 51:19
  53:4,11,16
  54:3 60:6 61:8
  62:1,19 63:15
  66:2 69:21
  70:3,5,16,18,18
  75:22 76:2
  83:16,18 84:19
  87:19 91:21,22

98:4,4 99:24
100:5,25 105:8
105:10 109:8,9
118:19 121:18
121:18,20
122:23 123:23
**knowledge**
  120:14
**known** 91:18

**l**

**l** 8:9
**laceration** 71:4
**lack** 72:9
**ladies** 117:5
**landlord** 30:22
**laney** 8:8
**lashon** 92:3
**lasted** 13:15
  14:17
**latch** 79:18
**laugle** 3:16
  115:21,23
  116:25 127:20
**law** 3:3,8,10,17
  82:23,25 97:23
  98:11,12
**lawful** 4:2
**lawn** 18:11
  21:11 26:7
  43:13 122:24
**lawsuit** 4:9
  37:11 59:3,9
  59:11,15,15
  90:17 122:2

**lawsuits** 59:8
  64:25
**laying** 103:5
**lazarus** 13:23
**learn** 18:19
**learned** 17:18
  68:20
**left** 71:1 81:12
  81:16 82:7,12
  83:8,10,21
  86:22,23 94:25
  95:16,21
  102:12
**leg** 103:2
  108:23 109:10
**legal** 131:1
  134:1
**legs** 76:22
  109:16
**len** 4:7
**leonard** 3:16
**leonard.bazel...**
  3:19
**letter** 131:19
**license** 84:24
  85:13
**life** 5:7
**light** 82:24
**lights** 83:25
  84:9
**liked** 16:20
**line** 90:16
  107:23 131:13
  133:7 134:3

**link** 48:6
**liquor** 67:23
  68:3
**list** 25:1 32:25
**listed** 133:7,17
**listing** 133:7
**literally** 83:14
**little** 21:7 61:5
  86:2 95:10
  115:25 116:1,3
**live** 7:22 8:11
  9:17 30:8,13
**lived** 109:9
**lives** 114:15
**llc** 18:11
**llcs** 27:21
**loan** 44:23,25
  45:5,13 46:16
**located** 116:20
**location** 79:25
**lodged** 111:1
**loft** 31:6
**logical** 36:17
**long** 5:13 13:5
  13:13 20:25
  40:19 44:18
  62:3 72:14
  80:15 83:16
**longer** 48:1,2
  79:1
**look** 15:10
  34:14 41:9,11
  50:8,10,20
  53:22,23 54:4
  55:6 104:16

113:5,10
117:22 124:14
125:12
**looked** 47:21
69:15 72:23
108:11
**looking** 51:20
52:9 66:21
**looks** 18:21
34:21 41:18
46:25 50:4,21
51:5,13,16
54:23 63:17
108:15
**losing** 121:9
**lost** 121:14
**lot** 10:14 20:23
24:1,3 41:18
43:20 52:14
58:4,7 68:14
68:16 75:22,24
83:2
**love** 16:12
**low** 102:13,25
**lower** 54:23
55:1 65:21
103:1 109:3,11
**lube** 13:20,21
13:22
**lung** 71:4
**lyna** 7:10

**m**

**m** 1:15 3:16
21:23 129:3
130:5

**mac** 40:6
**macy's** 13:23
**madam** 131:10
**made** 17:11
34:18 38:4
39:4 51:9,24
53:2 73:5
83:23 132:7
**mahajan**
116:16,18
118:10,12
**mail** 119:23
**main** 25:14,16
116:20
**major** 24:10
**make** 5:7,9,15
16:1 18:25
19:6 29:4
36:19 40:12
77:2 80:20
81:18 82:14
92:7 104:16
109:9 113:18
113:19 124:1
**making** 67:4
101:16 121:8
122:10
**malpractice**
113:8
**man** 85:3
**management**
11:7
**mandates** 98:5
**mann** 62:20

**manner** 129:16
**march** 113:23
114:1
**marijuana**
55:25
**mark** 50:15
**marked** 2:4,6,9
2:12,18 34:7
34:11 63:3,7
74:21,24
124:24 125:3
**married** 6:11
**mass** 75:24
**matter** 108:1,2
**matters** 26:18
**max** 13:16
118:21
**mcdougal**
39:23
**mean** 12:4
21:14 27:12
32:6 46:13
53:1 55:3 58:5
60:8 61:6
67:23 68:8
81:14 84:7
104:23 115:16
123:14
**means** 115:25
**mechanic** 13:21
**medicaid**
120:16,19,23
**medical** 9:15
9:16,19 10:3
65:10 76:14

108:5 113:8
114:9 116:9
118:9 120:18
121:4
**medicare**
120:15,19,23
**medication**
111:21 112:6
117:19
**medications**
115:13
**medicine** 113:3
117:14
**member** 27:21
**members** 9:23
21:4,5
**memory** 80:1
**mental** 116:10
**mentioned** 10:1
21:2 45:5 59:2
**meprc** 58:17
**merchandise**
80:19
**met** 120:7
**miami** 65:17
66:7 76:17
108:24
**mid** 66:16
67:17
**middle** 24:21
28:16 31:13
33:2,3 35:17
36:5,7 40:1
63:10

**midwest**
131:17 134:1
**mind** 24:24
**mine** 105:11
**minutes** 36:15
36:18 80:17
81:2,20 83:8
**missing** 52:24
**misspoke**
109:22
**mistake** 85:22
**mjn** 1:7
**mobility**
114:15
**modem** 81:25
**mom** 10:8,13
28:2
**moment** 119:10
**money** 17:11
17:20,24 18:1
19:6 25:8
29:18 32:2
41:20 42:4,5,5
42:16 43:20
44:1,3,9,14,19
44:23,24 45:3
45:9,12 46:2,8
46:10,15,22
47:15,21 53:2
67:4 79:3
121:24 122:12
126:16 127:3
127:11
**moneys** 121:20

**montgomery**
122:1 129:2
**month** 33:4,6
33:21 39:16
40:15 114:23
118:20
**monthly** 40:13
**months** 13:16
37:7 38:7
39:20 40:8
58:14 67:8
71:15,19 72:7
97:8,17 110:14
**morning** 4:7
77:9
**mother** 7:9,20
8:2 10:1 26:23
53:19
**motherfuckers**
92:10
**motor** 60:14
62:10 65:12
66:6 73:15
108:15,20
109:2
**mouth** 24:13,14
**move** 72:18,18
76:24 110:14
**moved** 40:7
**movement** 72:9
**multi** 26:2
**multiple** 26:2
35:15
**muscle** 75:24

**musto** 64:22

**n**

**n** 8:9 21:23
**name** 4:7 5:18
21:22 22:1,8
22:22 23:9
26:7 27:11
40:7 84:19
87:12 117:18
131:6 132:3,4
132:15 133:3,4
133:21
**named** 129:7
**names** 6:16
10:12 23:11,14
23:22 28:13
117:6
**naming** 63:18
**near** 87:2
**necessary** 38:9
**neck** 65:21,24
66:16 67:17
102:14
**need** 5:11,14
27:15 37:9
42:17 87:18
96:25 98:25
102:9 127:18
127:18
**needed** 16:16
17:16 23:2,4
26:9 37:7
43:16 72:19
78:16 96:10
104:14 106:19

113:1
**nerve** 118:17
118:22 119:2
**never** 45:12,13
46:1,3,3 69:5,8
69:8 75:10,18
99:10 102:22
**new** 39:23 40:2
48:7 49:9,11
**nice** 28:8 85:1
**nicholas** 14:16
**night** 91:12,16
91:20 99:21
100:14 103:19
103:20 104:10
**nine** 10:8
**nodding** 122:17
**nope** 42:10
**north** 83:7
116:20
**notarized**
131:14
**notary** 1:16
129:3 130:6
131:25 132:10
132:18 133:15
133:23 134:23
**note** 112:8
131:12
**notes** 123:22
124:3,8
**noticed** 103:11
103:13
**noticing** 103:6

**november**
  109:20,22
**number** 41:10
  44:6 60:6
  61:14 131:7,13
**numbers** 80:19
  121:14 133:7
**numbness**
  103:1
**numerous**
  126:15
**nurse** 103:7,12
  103:13
**nurses** 104:6

**o**

**oath** 64:4 125:9
**object** 37:18
  46:13 55:15
  70:10 98:10
  105:18,20,24
  106:4,6,11,12
  106:21,25
  107:2 126:23
**obviously**
  122:12
**occupants** 98:6
**october** 108:16
**odd** 19:8,13
**offered** 92:24
**offering** 79:1
**offhand** 23:10
  24:25 25:24
  41:9 117:6
**office** 64:22
  130:2

**officer** 84:14,18
  84:20 85:20,21
  87:1,6,9 88:8,9
  91:5,10 92:24
  94:23,24
  103:19 104:8
  104:10
**officers** 97:7,17
  98:20 99:9,19
  99:20,22
  100:14,23
  101:1 104:9
  106:16
**offices** 1:17
**official** 132:15
  133:21
**oh** 30:11 85:12
  95:10 109:1
**ohio** 1:2,16,18
  3:5,11,18 5:23
  7:23 8:12
  129:1,4 130:2
  130:6 131:2
**oil** 13:21 115:4
**ointment** 115:2
  115:5
**ointments**
  115:18
**okay** 4:19 5:1
  6:16,18 7:5,8
  7:17 8:6,16
  9:14 10:10
  12:17 13:5,13
  13:17 14:20
  15:17,23 17:22

  19:20 20:10
  21:2,9 22:14
  23:21 25:12
  27:13 28:16,23
  29:16 30:7
  31:8,12 33:5
  33:17 35:2,14
  36:4 39:17
  40:2,9,11 42:2
  42:7 46:21
  48:12,17 54:8
  54:9 55:7,9
  56:6,15 59:2
  59:13 61:13,20
  62:10 63:24
  64:25 65:16
  66:5 79:8
  80:13 84:3
  95:12 97:4
  99:25 103:10
  105:12 106:5,7
  106:9,13 119:6
  121:23 124:4
  124:16 125:2
  125:23 127:23
**old** 6:6 28:21
**oldest** 6:1,4
  9:22
**once** 15:10 84:3
  84:6 93:19
  94:4 103:7,22
  104:25 113:2
**ones** 24:23
  25:14,15 29:1
  29:23 30:7

**ongoing** 71:24
  117:23
**online** 47:22
  48:16,21,24
**open** 77:2,4
**opening** 28:8
**opportunity**
  26:4 97:18
**option** 48:11
  89:10 94:9
**options** 90:4
**order** 32:2 38:2
  70:2 75:15
  127:11,16,18
**ordered** 9:9
**orders** 41:20
  115:13
**organize** 20:11
  26:10
**organized**
  19:12
**oriented**
  114:13
**outside** 12:18
  80:16,25 81:1
  81:2
**overview** 52:10
**owensby** 1:5,12
  2:17 4:1 5:19
  5:21 6:2,2,3,4
  6:19,25 19:3
  34:10 63:6
  87:12 92:3
  116:8 124:24
  125:2 129:7

131:6,8 132:3
132:4,9 133:3
133:4,13
134:20
**own** 9:16 17:21
20:1,18 26:14
28:6,12 30:8
30:16,18 67:5
123:21
**owned** 29:17
**owners** 32:10
32:11
**oxide** 115:11

**p**

**p.m.** 83:9 128:1
**page** 2:1 4:16
35:13 63:11
125:5,5 131:13
131:15 133:7
134:3
**pages** 34:25
**paid** 17:22,23
36:9 59:22,22
62:25 121:5,6
**pain** 65:21,21
65:21 73:22
74:2 102:12
103:1,2,3
108:23,23
109:3,10,14,15
109:15
**painting** 18:17
**paper** 48:25
**paperwork**
15:11

**paragraph**
63:24 64:3
126:1,10
**paramedics**
12:22
**paraplegia**
71:2 109:16
**paraplegic**
85:10,16 88:5
88:7,8 92:8
93:1 104:14,18
**parked** 80:16
84:8
**part** 45:10
46:14 61:23
133:9
**participating**
114:14
**particular** 44:9
**party** 129:15
**passed** 7:14,14
**passenger**
62:11 66:11
**passenger's**
85:22
**past** 10:25 65:1
**patient** 108:19
113:24
**patt** 42:8,14
43:8,17 47:5
**pay** 9:7 16:1
31:2 32:12
42:17
**paycheck** 15:1

**payments**
34:18 36:9
39:1,1,1 41:13
41:19,23 42:12
42:20 51:9
120:20,23
**payout** 60:25
61:1
**pedoto** 118:15
**pending** 5:13
122:6
**people** 16:10,16
17:19 25:4,6,6
27:9 36:8
68:16 91:1
92:12 100:7
**pepper** 101:4
**percent** 115:10
**percentage**
83:5
**perfectly** 76:12
**period** 39:16
44:21 50:4
**person** 22:5,20
30:25 100:10
112:4,5
**personal** 64:18
64:20
**personally**
132:11 133:15
**pertaining**
27:17
**peru** 115:4
**phone** 81:9
83:14,17 91:24

131:3
**photo** 2:12
74:21
**physical** 112:17
**physically**
67:10
**physician**
120:12
**pick** 78:18
82:15
**picked** 17:2,17
83:13 104:11
**piece** 110:25
111:3
**pierce** 76:2
**pin** 61:5
**place** 68:1
**plaintiff** 1:6,13
2:17 3:2 4:2
38:1 124:23
**planning** 81:17
121:17
**plant** 14:9,9,15
15:4
**plaza** 3:4
**pleaded** 57:14
125:20 126:3
**pleas** 63:18
**please** 4:24 5:5
5:12,18 131:11
131:11
**pled** 57:15,24
57:24,25
**plenty** 27:7,8

plumbing  22:2
  22:17,18
plus  46:3 81:10
pocket  121:4
poetry  12:6
point  25:5 91:5
  93:9,10,11
  94:23 95:3,14
  103:18 112:15
  115:6
pole  73:18
police  45:13
  63:19 83:22
  84:10,14 92:6
  102:24 103:17
  120:13
policy  98:5,15
possessing  57:2
  57:7
possession
  55:25 56:5,7
  56:12
possible  64:7
  119:10
possibly  100:15
potential  51:8
ppp  44:23,24
  45:3,5,13 46:5
  46:11,15,19,20
  46:22 47:4,15
  47:21 48:14,20
prepare  38:3
prepared  33:12
  37:14

preparing
  53:20
prescribed
  112:6 115:5,17
  117:14
presence
  129:11
present  118:14
pressure  71:20
  72:12,17 73:8
  74:15 75:1,6
  75:12,13 76:7
  76:9 103:3,3,8
  108:7 110:2
  114:25 115:1
pretty  9:5 12:7
  12:8 13:12
  14:19,21 16:18
  18:15 24:13,13
  24:25 25:12
  26:7 32:4
  40:16 69:2
  75:11 76:1
  81:6
previous  17:25
  55:20 57:8
  59:7 66:24
  67:8 93:13
price  21:18
  32:12
printouts  49:1
prior  37:7 57:2
  57:5 61:24
  65:10 79:6
  82:13 97:8,17

prison  58:24
private  32:10
  32:10 117:11
privilege  37:19
probably  15:11
  27:12 29:7
  37:1,6 50:17
  62:23 83:23
  119:24
probation
  57:22
problem  49:15
  50:11 89:11,12
  89:15
procedure  1:15
  109:23 110:3
  132:5 133:5
procedures
  74:16
proceeds  43:2
  46:5
process  37:3
  47:20 68:2
production
  131:15,17,22
professional
  97:24 99:18
professionals
  120:6
profit  29:4,18
  29:20 49:20
  121:17
program  12:19
  13:4 32:7
  46:11 76:18

77:1
prompted
  119:3
promptly  36:23
proof  37:13
  38:2,19
proper  23:4
properly  111:2
properties
  16:11,22 24:19
  25:3 28:6,7,10
  28:11 29:17
  31:13,23,25
  32:8,20 34:3
  40:24 44:16
  49:21 52:15
  121:16
property  17:21
  20:8 28:23
  30:2 32:24
  35:21,23 43:5
  79:2
protect  126:20
provide  20:8
  23:14,19 25:23
  37:8,12 38:2
  39:8,15,17
  48:16 123:24
  124:18
provided  43:24
  46:11,25 50:13
  105:4
providers
  108:6 112:23
  118:10

**public** 1:16
114:16 129:4
130:6 132:10
132:18 133:15
133:23 134:23
**pull** 93:3 94:5,7
**pulled** 80:10
82:17,19 84:1
84:4,8 92:6
97:7,16
**pulling** 86:19
94:25 95:8
**punch** 100:24
**purchase** 25:2
**purchased**
31:22 40:24
**purchasing**
70:1
**purposes** 2:7,9
2:12,18 34:7
63:3 74:21
124:24 125:4
**pursuant** 1:14
**put** 21:17 32:2
42:16 53:6
64:14 79:9
81:10,15 90:17
100:20 103:16
114:20 119:20
121:12,13
122:6

**q**

**qualified** 129:5
**quantify**
121:13

**question** 4:25
5:5,13 17:7
41:17 44:18
46:1 51:25
52:19 70:11
79:19 87:23
96:16,17 98:17
98:24 99:1
105:19 106:1,2
110:20 118:5
125:19,22
127:16
**questions** 4:12
4:18,23 55:16
97:14 107:23
116:8 125:10
125:15 126:16
**quite** 11:6
81:25,25

**r**

**r** 3:3 21:23
**raise** 78:9
**reached** 94:24
**read** 93:24
127:23 132:5,6
132:12 133:5,6
133:17
**reading** 131:19
**ready** 32:3
**real** 11:7 12:18
14:1,5,8 15:15
15:18 16:5,8
17:10 19:4
42:25 111:11

**really** 18:18
19:20,22 20:7
45:15 68:11,12
68:16 73:20
75:10 112:18
**rear** 66:12
**reason** 57:5
85:1 90:18,21
90:22,23 96:20
96:21 106:15
131:14 133:8
134:3
**reasons** 53:16
**recall** 25:21
29:23 37:15
56:15 59:5
63:20 65:16
66:8 70:7,12
70:15 71:5
73:4,21,24
85:23 86:8,17
86:18 87:13
90:19,20 93:6
93:8 102:2
108:12 109:5
112:13 119:17
**receipt** 38:4
131:18
**receipts** 2:6
33:12 34:7,13
34:17 37:2,5
37:14 41:14,19
42:20
**receive** 32:19
42:25 43:11

**received** 38:19
42:12 52:5,6
111:7,12
116:10,14
**recess** 38:12
116:5
**reclamation**
14:9 15:4
**recollection**
68:17
**reconstruction**
113:25
**reconvene**
116:3
**record** 38:14
114:22 116:7
124:19 133:9
**records** 27:16
29:13 46:23,24
55:6 72:4
115:14 116:22
119:7,7,15
**recovered** 44:9
126:17
**redo** 51:25
**reduced** 129:10
129:12
**reference** 99:25
131:7 132:2
133:2
**referenced**
66:11 132:11
133:15
**referring**
121:25 122:15

**reflected** 39:5
**reflecting** 52:4
**refund** 51:8
**refuse** 112:14
**regard** 23:24
  42:24 122:2,24
**regarding**
  44:10 48:13
  51:4
**regular** 24:11
**rehab** 18:16
  29:21 71:15,25
  72:5 76:18
  77:3,4
**rehabbed** 32:3
**rehabbing**
  16:22 43:13
**rehabilitated**
  58:25
**related** 46:12
  46:19 47:19
  48:19 57:1
  58:18 60:15
  73:22 102:20
  110:10,21
  111:8 116:11
  121:14
**relating** 55:16
  123:13
**relative** 129:15
**release** 113:13
**released** 67:14
  102:23 103:17
**relevant** 127:2
  127:10

**relief** 75:12
**remain** 121:5
**remember** 6:21
  11:11 12:14,17
  13:18,22 14:3
  14:11,13 15:5
  15:9 19:23
  22:20,22 23:9
  56:19,21 58:21
  60:18,25 62:12
  63:1 64:21
  65:3 66:13
  67:24 68:10,13
  69:9,11 70:19
  73:16,20,23,25
  74:4,5,17
  86:21 89:11
  91:4,7,10,12,14
  93:7 101:10,12
  108:25 111:25
  112:2,12,19,23
  117:6,18
  118:16 119:11
  125:17
**remembering**
  119:11
**removal** 110:1
**remove** 79:5
**removed** 71:7
  98:6 111:3
**rent** 2:6 25:9
  25:10 30:20
  31:2,12,17
  32:3 34:7,13
  42:20

**rentable** 32:2
**rental** 32:19,21
  34:3,18 36:9
  37:2,13 38:2,6
  38:16,20,25
  40:13 41:7,13
  41:23 42:12,20
  43:4 44:16,22
  47:17 49:19
**rented** 32:16,17
**renters** 36:11
**rents** 36:10
**reopened** 103:9
**repeat** 24:11
**rephrase** 4:25
  17:7 98:25
**replied** 87:12
  88:4
**reported** 52:5
  52:12,21 74:2
  102:12 112:9
**reporter** 4:18
  5:4,8 132:7
**reporting**
  129:17
**reports** 108:19
**representative**
  83:15
**representing**
  64:23
**request** 37:11
  39:11 49:5
  124:2 133:9,11
**requested** 37:2
  53:17

**required**
  131:25
**requires** 98:5
**research** 23:10
**reside** 5:24
  125:20
**residence** 80:6
  80:11 83:10
**residences**
  78:19 125:19
**residential**
  18:16
**residents** 78:23
  78:25 80:11
  81:6 82:4,5
**respond** 5:6
**response** 39:15
  88:9,18,25
  90:6 93:17
  125:21
**responses** 4:17
**rest** 31:20
  47:16 54:11
  78:9 100:11
**restrained**
  60:21 108:19
**result** 70:21
**results** 102:23
**return** 51:2
  83:13
**returned** 87:7
  122:4,5 131:18
**returns** 41:1,3
  53:17,18,18,20
  54:7 66:20

**[revenue - saying]**

| | | | |
|---|---|---|---|
| **revenue** 50:25 | 57:3,8,17 58:1 | 108:14,18 | **ruling** 7:13 |
| **review** 131:12 | 58:4,9 59:14 | 109:4,14,16,18 | **run** 10:11 97:9 |
| 132:1 133:1 | 61:4,9 64:6,16 | 110:8,10,11,19 | **running** 12:24 |
| **rib** 71:9 | 64:21 65:8,20 | 111:5,9,13,22 | 22:23 58:5 |
| **rid** 22:24 23:5 | 65:25 66:2,10 | 112:1 113:14 | **runs** 22:5 |
| **right** 4:15,21 | 66:15,17,19 | 113:22 114:6,8 | **rustic** 28:17 |
| 5:3,11,17 7:4 | 67:3,17,18,20 | 114:16,21 | 31:13 33:20 |
| 8:19 10:17,19 | 68:7,18 70:21 | 115:2,19,21 | 35:24 |
| 11:20 12:10,15 | 71:10,25 72:3 | 117:6 119:14 | **s** |
| 12:16 13:20 | 72:7,10,20,22 | 120:15,16,25 | **s** 131:15 133:8 |
| 14:16 16:7 | 72:24 73:14,21 | 121:8,12,23 | 133:8 134:3 |
| 17:4 18:5,21 | 73:25 75:2,4 | 122:5,7,11,16 | **safety** 105:15 |
| 19:9 20:4 | 75:19,25 76:3 | 122:18 123:20 | 105:15 106:19 |
| 23:10,13 24:25 | 76:13,18,24 | 124:11 125:8 | 106:19 |
| 25:19,24,25 | 77:5,9 78:11 | 125:18 126:1 | **sale** 43:4 |
| 28:5 29:23 | 79:14,22 80:15 | 126:12 127:9 | **salem** 67:23 |
| 30:1,9,15 31:3 | 81:20 82:16,20 | 127:19 | **samples** 112:14 |
| 32:18 33:7,13 | 82:23 83:6,20 | **rights** 126:19 | **sat** 105:12 |
| 33:18 34:21 | 83:24 84:11,15 | **road** 14:16 | **save** 17:20,23 |
| 35:7,12 36:16 | 84:18 85:17,19 | 28:17 33:20 | 18:4 79:2 |
| 37:10 38:5,10 | 85:25 86:3,6,8 | 35:24 | **saved** 18:1 44:2 |
| 39:5,7 41:2,8 | 86:16,18,24 | **rob** 67:25 | 44:3,15,19 |
| 41:12,19 43:6 | 87:4,6,8,11,15 | **robbing** 68:8 | **savings** 44:1,20 |
| 43:10,22 44:11 | 87:16,25 88:6 | **rode** 12:21 | 45:10,18 46:15 |
| 45:1,17 46:7 | 88:16,18,21 | **roll** 86:1,1 | **savvy** 6:20 |
| 46:21,24 47:3 | 89:14,21 90:12 | **roofing** 18:17 | **saw** 83:25 |
| 47:13,18,23 | 91:2 92:4,21 | **room** 74:3 | 84:13,14 86:5 |
| 49:5,16,16 | 93:12,17 94:10 | 102:11 | **saying** 45:11 |
| 50:3,6,25 | 94:15,20,22,22 | **roughly** 7:15 | 51:20 53:4 |
| 51:10,14,16,19 | 95:3,4,18,18,21 | **routes** 12:23 | 60:9 64:12 |
| 52:13,15,22 | 95:24 96:2,4 | **rudd** 1:15 | 70:8,18 86:18 |
| 53:6,7,11,15 | 96:13 99:8 | 129:3 130:5 | 89:1,6 90:19 |
| 54:6,10,16,17 | 100:9 101:20 | **rule** 5:3 129:19 | 90:20 91:7,11 |
| 55:14,21,23 | 102:7,16 | **rules** 1:14 4:15 | 91:14 99:19 |
| 56:2,4,9,11,21 | 104:19 107:20 | 132:5 133:5 | 107:10,13,16 |

**[saying - signed]**

112:19 122:10
**says** 47:4 50:8
51:21 53:21
54:11 63:11
64:3 113:24
**sbcglobal.net**
3:6
**scan** 75:1
**scene** 85:21
101:7 104:9,10
106:20
**school** 9:4
10:19,25 11:21
11:24 12:3,10
12:12,15 15:24
77:12,21
**schultz** 62:20
**seal** 130:2
132:15 133:21
**sean** 21:8
**search** 98:2
**seat** 66:12 79:9
79:14,15,20,24
86:10,16 95:7
**second** 35:13
40:7 63:24
64:3 93:21
116:4
**secondly** 4:22
**secure** 64:14
106:19
**security** 64:13
**see** 16:17 22:2
24:7,17 27:8
30:4 32:24

33:3 40:6,24
41:9 49:13
54:12 68:9
69:2 102:23
115:14 117:2,5
119:1,3,20
125:12
**seeing** 117:7
**seen** 68:23
69:16 70:13
84:6,9 118:9
118:14 124:10
**seize** 63:23
**self** 18:16 20:1
126:20
**sell** 25:7 29:8
30:1
**selling** 49:21
**send** 120:1
**sense** 5:9,15
18:25 122:10
**sent** 119:18
125:15
**separate** 56:16
110:12 117:11
122:25
**september** 76:8
77:8 110:22
**serial** 80:18
**series** 4:11
**serious** 70:22
**serve** 58:15,19
**serves** 80:1
**service** 20:14
20:18 50:25

117:23
**services** 21:22
22:4 25:25
26:9
**set** 2:15 48:7
124:22 130:1
**settlement** 20:4
59:3,10,14,19
59:25 62:14
**settlements**
61:17,25 62:7
**seven** 125:5
**several** 18:6
44:1 70:11
71:15,19 72:7
73:7,7 108:9
109:20 110:14
111:8
**share** 27:24
28:2
**sheet** 51:3
131:13 133:7
133:10,18
134:1
**sheets** 43:25
**shenae** 7:21 8:3
**shevaughn**
6:18
**shift** 65:8
**shirt** 93:11,18
93:19 94:4,8
94:13,17 95:7
97:11 101:6
**shit** 92:9

**shoe** 41:24
**shook** 88:20
89:1
**shopping** 67:22
68:3
**short** 36:14
37:1 38:11
116:1,3
**shortly** 113:21
**shot** 68:1 69:1
70:3
**shoulder** 66:17
67:17
**show** 22:23
33:11 50:15
**showed** 50:24
69:8,9 97:25
98:1
**showing** 34:10
52:10 63:6
**shown** 125:2
131:16
**shyona** 6:25
**sic** 83:7 115:18
**side** 19:7,8
60:22 66:2,4
84:21 85:22,22
87:7 102:14
**sign** 48:4,4
**signature** 63:8
63:12 125:6
130:4 131:14
**signed** 34:17
132:13 133:18

significant 14:4
52:25 58:23
61:11
significantly
55:1
signing 63:11
131:19
signs 58:5
simple 96:17,17
simply 98:12
sincerely
131:21
sinclair 11:2,4
11:10,14 15:21
16:5
sir 4:7 5:12
6:11 28:6
38:14 45:16
47:17 74:24
85:9 86:20
87:18 88:20,21
89:3,4,23 90:7
93:2 96:20
131:10
siren 83:25
84:1,3
sirens 84:12
sister 10:6,7
sitting 66:2
72:15 75:22,25
80:24 81:1,5
91:20
situation 9:16
91:12,15,19
97:8 100:12

121:19
six 7:15 13:16
37:6
sixth 3:10
skills 17:2,16
17:18
skin 115:8
sleep 117:15
slid 73:17 74:1
smith 3:8,9
21:7,8 34:14
34:24 37:18
46:13 50:19
55:15 70:10
116:23 117:21
119:16,20
120:1 124:4
127:23 131:5
sniff 98:7
sold 28:21,23
29:2,18 33:18
35:21,22 43:2
solutions 131:1
134:1
somebody 9:18
15:1 19:25
66:12 90:16
91:24 92:14,14
92:20 103:11
113:5 120:12
son 78:1,8
soon 83:20 84:9
sores 72:17
sorry 51:12
58:2 85:22

102:4
sort 123:19
sound 50:6
52:7 56:2 67:1
67:2 103:4
sounds 16:14
17:13 25:2
38:20 53:19
65:12
source 45:6
126:18
sources 19:21
19:24 126:16
southern 1:2
speak 112:3
specific 39:11
118:7
specifically
82:4
spectrum 80:23
81:3,9 83:12
83:15
spent 81:3
spinal 71:1
spine 70:25
spleen 71:7
sports 11:23
spot 36:17
spray 101:4
spun 66:13
ss 129:2
stage 73:9,9
74:15
standards
97:24 99:18

standing 81:6
start 5:6 15:17
17:4 28:11
32:25 33:2
75:12,13
112:22 117:7
started 9:25
16:4,9,13,22,25
20:19,20,22
26:1 42:19
76:4,5 77:21
79:10,22 90:22
103:6 113:3
starting 42:18
state 1:16
67:22 125:10
129:1,4 130:6
132:10 133:15
stated 112:21
statement
132:13,14
133:19,19
states 1:1
108:20 126:24
station 103:22
stay 39:25
67:14 75:11
94:10
steering 95:4
95:13,19,24
100:18
stenographic...
129:11
step 88:3,5
89:25 90:1,2

91:6,7
**stop** 58:5
**stopped** 83:21
85:2 91:20
**stopping** 36:17
84:7,16
**store** 67:23
68:4,8
**storm** 21:7
**straight** 55:11
**street** 1:18 3:10
3:17 24:22
28:16 33:2,3
35:17 36:6,7
40:1 86:20,22
92:5,12,13
116:20
**strengthening**
76:22
**strike** 100:24
**struck** 60:21
73:17 108:21
**stuff** 9:24 12:8
12:20,23 13:1
13:2,24,25
15:22 16:11,13
16:17 18:1,2,4
19:18,19 20:5
20:23 23:12
24:2,6,7 27:10
41:25 44:16
45:21 53:6
55:10 58:6
62:1,2 67:5,11
68:15 75:24

81:7 95:7
101:15 102:15
103:16 123:11
123:15,16
**subcontract**
25:6,6
**subcontracting**
43:12
**subcontractors**
21:12,13,19
23:7 25:20
**subcontracts**
22:5 23:24
**submitted**
48:10 59:17
125:10
**subscribed**
132:10 133:14
134:21
**substantially**
53:2
**suburban**
60:24 65:13,14
65:15
**successful**
75:20
**suffered** 70:22
**suite** 3:4,11
131:2
**summary** 43:25
51:3
**summer** 13:4
**summers** 13:7
**superior** 131:1

**supervisor**
88:24 93:14
94:19,20 98:1
101:6,9 106:17
**support** 9:7,8,9
9:12
**supposed** 26:5
113:20
**sure** 6:23 7:13
7:15,25 8:14
11:5 15:10
22:22 24:4
27:11 30:3,4,6
33:16 36:16
38:8 49:23,25
50:2,7 52:9
53:9,14 54:2,4
55:6 56:3,14
58:20 60:1,5,7
61:19 62:2,6
62:20 64:9,10
64:11,24 68:19
69:4,6,13,22
70:6 73:19
77:2 80:20
82:14 83:4,5
88:11 90:11
97:6 102:22
108:17 110:23
111:23 113:19
114:19 115:3,3
115:7,9 116:25
117:5,8,12
121:1

**surge** 25:25
**surgery** 110:24
111:6 113:18
113:19
**survived** 15:14
**swearing** 64:4
**sworn** 4:3
129:8 132:10
132:13 133:14
133:18 134:21
**system** 49:3

**t**

**tailbone** 74:2
111:1,3
**take** 4:18 5:11
5:14 7:6 8:2
11:3,9,15
12:11 34:14
36:14 37:1
38:10 49:17
50:8,10 77:14
78:17 79:5
87:18 96:23
102:9 106:16
112:10 115:13
115:25 116:1,2
117:21 127:9
**taken** 1:15 4:13
38:12 98:21
113:20 116:5
120:19,22
122:5
**talk** 10:17 12:1
20:10 28:5
33:10 43:23

**[talk - time]**

55:11 65:9,10
77:6,7 108:4
120:8
**talked** 15:12
25:13 34:4
65:2,11 66:23
67:12 92:23
101:9 116:9
120:4 122:22
123:5 125:11
126:12
**talking** 5:6
16:24 33:8
38:16 66:20
81:3,5,22 82:3
111:6 125:13
**tase** 101:2
**tax** 27:4,17
40:25 41:2
43:24,24 50:3
51:2 53:17,17
53:18,20 54:7
54:19 66:20,21
**taxes** 26:18,21
27:8,9 43:25
53:5
**tell** 5:18 6:16
18:13 19:23
20:13 21:14,21
22:1 23:8
24:15 28:6,10
28:12 32:20
33:1 40:11
41:10 48:22
53:12 55:14,23

59:7,13,19
63:1 67:20
68:11 75:9,16
82:4 93:25
96:10 98:21,23
99:3,6,8,13,16
107:14 121:3
**telling** 45:22
46:8 86:21
89:9 92:8
107:10
**temp** 14:17
**temperature**
28:8
**ten** 15:8 56:13
61:12,17 62:15
62:23 97:25
**tenant** 39:23
40:1,2
**tenants** 39:2,19
39:21 82:5,7,9
82:11,12
**terms** 9:2 14:4
37:25 39:11
43:22 44:1
46:9 52:8 67:4
120:6 121:14
123:22
**test** 12:25 86:3
118:25
**testify** 129:8
**testimony**
129:10 132:6,7
133:6,9,12

**testing** 24:6
119:1
**tests** 102:17
**thank** 50:19
127:24
**thanks** 116:4
127:22
**therapeutics**
116:16,18
118:10,12
**therapist** 117:2
**therapy** 118:3
**thing** 13:17
25:16 71:17
84:25 85:19
94:6 95:6,23
97:9 114:11
121:2
**things** 9:5 26:3
27:18 51:9
**think** 7:18
10:18 18:7
22:8 26:9
29:22 34:4
38:8 43:24
46:14 47:18
50:14 51:24
53:2,13 62:4
63:22 64:16
69:13 70:11
71:9 83:6
87:23 88:19,21
89:2 93:25
100:13,14
101:19 104:12

104:24 105:3
108:23 109:21
110:19 119:9
**thinking** 13:15
84:2
**third** 1:17 3:17
6:22
**thirty** 131:18
**thought** 36:2
104:21 112:9
122:8
**thousand** 40:15
61:7
**three** 7:6 8:1
13:6 31:6 62:9
73:9 74:15
**throw** 44:6
**thursday** 1:18
**tied** 122:9
**time** 5:12 9:21
9:23,23 10:14
10:15 11:17
13:3 14:6,7,24
15:14,20 16:19
18:22 19:11,11
19:23 25:22
29:25 40:25
41:15 42:19
44:22 45:6
49:18 58:11,19
58:24 64:6,14
64:15 65:17
71:24 72:14
73:10 75:10
79:25 81:3

84:19 86:9
87:4,8,19
93:21,22 97:11
97:13,15,20
98:19 100:23
101:1 106:16
109:6 111:12
115:1,6,25
118:5 122:7
**times** 37:15
60:4,9 70:11
92:24 115:4,12
**tingling** 103:1
**tint** 58:7 82:20
82:23 83:2,4,5
85:2 86:3 98:9
**tire** 73:16
**titled** 117:23
**today** 4:12 46:7
97:20 126:12
**together** 122:9
**told** 15:25 45:9
45:13 68:15
75:17 85:9
88:6,8 89:14
89:15,19,25
90:2 93:1,22
94:10 97:24
98:16 99:18
101:14,16
103:8 104:1
109:5 112:16
112:25,25
114:19

**took** 11:7 38:15
72:1 77:11,20
100:18 121:20
121:24 125:20
126:7,13,19,23
126:25 127:3,5
127:8
**top** 21:18 35:4
**topical** 115:2,5
115:11
**total** 47:3 49:19
49:21 53:24
**touch** 90:14,15
**towards** 114:14
**tracking** 120:2
**traction** 76:5
**trade** 17:2
**traffic** 58:4
**training** 11:21
12:23 26:25
27:3
**transactions**
43:1
**transcribed**
132:7
**transcript**
93:25 131:11
131:12 132:5
132:12 133:5
133:11,17
**transfer** 104:2
110:16
**transferred**
104:4

**treated** 66:7
72:19,24 74:12
74:15 76:17
108:12
**treating** 115:1
**treatment** 14:9
14:15 108:5,7
111:6 113:17
114:9 115:11
116:9,10,14
118:1,2
**trial** 124:9
**tried** 48:4 49:8
72:17 75:19
95:8 104:15
111:16
**truck** 65:15
**true** 55:12 64:8
64:10,15 89:19
97:1,1,2
**truth** 129:8,8,9
**try** 4:25 14:22
20:20 25:1,7
26:2 48:7,13
61:5 75:18
99:12 103:25
104:15 111:21
113:11 117:15
119:12
**trying** 19:2,20
23:3 45:23
51:21 52:1,24
63:23 76:1,20
79:2 86:2 92:7
92:10 95:16,25

96:9,10 111:18
112:5
**tuesday** 117:22
**tunnel** 119:2
**turn** 87:16,24
87:24 124:13
**turning** 121:17
**tv** 77:22 78:12
78:15
**tvs** 83:18
**two** 6:1,4 7:17
8:4,20,21 9:22
36:15,17 60:9
62:9 73:9
82:11 90:4
97:7 114:23
115:4,12 117:4
118:20 122:24
126:2
**type** 11:13
14:25 18:6
24:7 31:7 65:4
113:7 116:10
118:25 121:9
121:14 123:9
**types** 18:6
**typewriting**
129:13

| u |
|---|

**uh** 10:2 16:2
18:8 19:10
23:17,20 25:11
31:11 39:3
41:4 43:14
52:3 59:18

61:15
**ulcer** 71:20
72:12 73:8
74:15 75:2,6
76:8,9 77:4
103:3,8 108:7
110:2 113:25
114:25 115:2
**ulcers** 72:17
**ultimately** 72:5
**under** 56:22
57:9,12 61:11
61:17 64:4
69:23 125:9
129:18
**understand**
4:22 45:11,24
52:1 70:15
72:3 77:11
96:18,25 109:8
118:5 127:13
**understanding**
19:3 44:13
52:18 57:10
94:18
**uniform** 84:15
**union** 42:8 47:5
**unit** 33:23 82:2
**united** 1:1
**units** 33:24,25
34:1
**unpaid** 121:6
**unreasonable**
100:13

**updated** 119:15
**upper** 109:4
110:15
**uppers** 32:4
**upright** 75:23
**ups** 73:8 74:18
**upset** 87:20
**use** 110:15
122:12 123:11
124:9
**used** 13:20
17:19
**using** 112:10
115:18
**usually** 10:5
43:19 48:8
110:17
**utilities** 31:4

**v**

**v** 131:6 132:3
133:3
**vacant** 32:8
**valley** 65:18
66:7 76:17
108:25
**vehicle** 46:2,9
59:12 60:14,17
62:11 63:22
64:17 65:12
66:6 73:15
82:17 84:15
85:23 87:4
89:23,24 90:1
90:7,9,10
93:21 95:17

96:1,3,8,9,12
96:14,24 97:10
97:12 98:2,3,6
98:7,21 99:9
99:14,17,23
100:3,18
103:20,25
104:1 105:6,7
105:17,22
108:15,20
109:2
**vehicles** 82:21
83:2
**verbal** 4:17
24:1
**verification**
125:5
**verified** 104:13
**veritext** 131:1,7
134:1
**veritext.com.**
131:17
**video** 68:23
69:2,9,16
104:12 111:15
111:22
**videotape**
101:18
**violation** 82:22
82:25
**violations** 58:7
**visit** 73:3
**visits** 108:9
109:20

**volunteer** 17:2
17:14
**volunteered**
46:4
**vs** 1:7

**w**

**w** 1:17 3:10,17
21:23
**wages** 121:10
**waived** 131:19
**walk** 76:25
**want** 10:11
15:19 21:1
22:1 27:11,12
28:13 32:25
36:13 41:10
44:5 49:17
50:10 57:23
60:5 87:20
93:3 96:3
103:24 108:6
112:11,18,18
115:14 124:7
124:13
**wanted** 26:2
83:18 97:9,9
104:2 113:5
**wanting** 96:8
**waste** 14:9,15
**watching** 77:21
78:12,15
**water** 14:9,15
15:4
**way** 17:5 20:11
73:10,11,14

Page 31

| | | | |
|---|---|---|---|
| 82:14 91:25 | 81:2 83:21 | 107:2,8,12,16 | 18:20 19:6 |
| 94:17 96:11 | **western** 1:3 | 107:18,22 | 21:16,20 22:25 |
| 98:19 110:17 | **westwood** | 126:23 127:2,7 | 23:4,16,25 |
| 113:4 | 28:19 31:15 | 127:15 | 24:7 25:4,21 |
| **we've** 6:18 | 33:5,14 35:12 | **window** 58:7 | 37:16 43:11,12 |
| 47:18 50:3 | 36:1 | 82:20,23 86:1 | 49:20 67:9,10 |
| 53:17 123:5 | **whatnot** 83:19 | 86:3 98:9 | 93:15,22 |
| **weakened** | 115:8 | **windows** 28:8 | **worked** 14:8,13 |
| 110:15 | **wheel** 95:4,13 | **wireman** 21:22 | 20:1 21:4 |
| **weakness** | 95:19,24 | 21:23 22:3,4 | 126:7 |
| 110:13 118:23 | 100:18 | **withdrew** | **workers** 65:5 |
| 119:4 | **wheelchair** | 47:11 | **working** 13:9 |
| **weapon** 57:2,7 | 74:1 100:1 | **witness** 35:2 | 14:22 15:1 |
| 57:11,20 68:18 | 105:5 | 50:21 91:1 | 16:10 19:17,25 |
| 69:3,6,7 | **wheelchairs** | 92:15,20 100:8 | 76:20 114:13 |
| 100:15 | 100:1 | 107:4,17 120:8 | **wound** 70:22 |
| **weapons** 56:22 | **whereof** 130:1 | 122:17 129:12 | 72:7,8,18,23,25 |
| 57:9,12 | **white** 10:19 | 130:1 131:8,11 | 73:8 77:2 |
| **website** 47:25 | 77:14 81:1 | 132:1,4,11 | 108:8,11 |
| **went** 10:18 | 82:16 84:20 | 133:1,4,15 | 109:18,20,24 |
| 15:15 19:4 | 91:4 93:11,18 | **witnesses** 120:7 | 111:1,4,5 |
| 29:11 33:16 | 93:19 94:3,8 | 120:11 | 113:16,19 |
| 37:13 52:15 | 94:13,17 97:11 | **witnessing** | **wright** 42:8,14 |
| 65:17 66:15 | 101:6 104:10 | 100:12 | 43:8,17 47:5 |
| 67:16 72:22 | **white's** 22:1,16 | **witness'** 131:14 | **wrists** 110:14 |
| 73:2 77:21 | 22:17,18 | **woman** 8:4 | 118:17,23 |
| 82:25 85:13 | **wi** 81:24 82:1 | **wondering** | 119:4 |
| 86:23 101:22 | **williams** 22:7 | 17:10 | **writing** 41:19 |
| 102:6 108:8,10 | 22:12 | **word** 24:13,14 | 129:11 |
| 113:15 118:15 | **willing** 113:13 | **words** 85:7 | **written** 120:24 |
| **west** 5:22 24:17 | **willis** 3:3 36:15 | 94:2 111:24 | 123:15,21 |
| 28:17,18 30:8 | 36:19,22 98:10 | 112:13 | 124:6 |
| 30:11,13,15 | 98:16 105:18 | **work** 12:2,9 | **wrong** 22:1 |
| 31:14 35:9 | 105:21,25 | 13:13,20,22 | 41:10 45:4 |
| 78:21 79:10,23 | 106:5,9,12,21 | 17:3 18:2,18 | 101:14 103:19 |

**[y - zip]** Page 32

| y | |
|---|---|

**y** 8:9
**yank** 95:16
   96:9
**yeah** 17:9,15
   28:15 31:10
   32:1 35:14
   36:2,7 44:18
   52:2,17,23
   57:25 61:10
   64:19 66:1
   73:5,7 74:4,11
   76:3 84:13
   85:4,11,15
   91:17 102:4
   104:15 115:22
   121:2 125:14
**year** 6:21,24
   10:23 11:5
   14:11 15:10
   29:9 30:3
   33:11 51:4
   54:19 66:21
   73:12 74:13
**years** 6:21 7:1
   7:2,15 13:6
   14:1,12,18
   15:8 18:7
   19:22 23:8,18
   24:11 25:17
   26:22 38:20
   40:20,21 44:1
   52:6,25 53:20
   55:2 58:21
   71:19

**yep** 70:15
   123:18
**youngest** 78:1
**youth** 12:19

| z |
|---|

**zinc** 115:11
**zip** 119:22

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.